No. 22-1280

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

COALITION FOR TJ,

*Plaintiff-Appellee,*

vs.

FAIRFAX COUNTY SCHOOL BOARD,

*Defendant-Appellant.*

On Appeal From The United States District Court for the Eastern
District of Virginia, Case No. 1:21-cv-00296-CMH
The Hon. Claude M. Hilton

**APPELLANT'S MOTION TO STAY PENDING APPEAL**

Sona Rewari (VSB No. 47327)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500

Trevor S. Cox (VSB No. 78396)
HUNTON ANDREWS KURTH LLP
951 E. Byrd Street
Richmond, VA 23219
Telephone: (804) 788-7221

Donald B. Verrilli, Jr.
Ginger D. Anders
Xiaonan April Hu
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW,
Suite 500 E
Washington, DC 20001
Telephone: (202) 220-1100

Mica L. Moore
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

*Counsel for Fairfax County School Board*

# LOCAL RULE 26.1 DISCLOSURE STATEMENT

Pursuant to FRAP 26.1(c) and Local Rule 26.1(c), the Fairfax County

School Board certifies that it is a local government "body corporate" established

under Virginia law.  It is not a stock corporation, has no parent corporation, and

has no shareholders.


DATED:  March 18, 2022 MUNGER, TOLLES & OLSON LLP


By: /s/ Donald B. Verrilli, Jr.
Donald B. Verrilli, Jr.
*Counsel for Fairfax County School Board*

# TABLE OF CONTENTS

**Page**

LOCAL RULE 26.1 DISCLOSURE STATEMENT ..................................................i

INTRODUCTION ...................................................................................1

STATEMENT .......................................................................................3

    A.    Legal Background .............................................................3

    B.    The Admissions Plan............................................................5

    C.    Procedural History.............................................................7

ARGUMENT .......................................................................................9

I.    The Board is likely to succeed on the merits of its appeal. ...........10

    A.    The Plan does not disproportionately affect Asian Americans...........11

    B.    The Plan does not reflect an invidious discriminatory purpose. .........14

II.    The School Board Will Suffer Irreparable Harm Absent a Stay...................18

III.    A Stay Will Not Substantially Harm the Coalition. ......................................21

IV.    The Public Interest Favors a Stay. ...................................................22

CONCLUSION ....................................................................................23

CERTIFICATE OF COMPLIANCE....................................................................25

CERTIFICATE OF SERVICE ......................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alabama Ass'n of Realtors v. Dep't of Health and Human Servs.*,
    141 S. Ct. 2485 (2021)............................................................................10

*Boston Parent Coalition for Academic Excellence Corp. v. School
    Committee of City of Boston*,
    996 F.3d 37 (1st Cir. 2021)..............................................4, 10, 11, 16

*Boston Parent Coalition for Academic Excellence Corp. v. School
    Committee of City of Boston*,
    No. 21-cv-10330, 2021 WL 4489840 (D. Mass. Oct. 1, 2021)........................11

*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989)...............................................................1, 4, 15

*Doe ex rel. Doe v. Lower Merion School Dist.*,
    665 F.3d 524 (3d Cir. 2011) .................................................................4

*Fisher v. Univ. of Texas at Austin*,
    136 S. Ct. 2198 (2016)......................................................................4

*Fisher v. Univ. of Texas at Austin*,
    570 U.S. 297 (2013).....................................................................3, 16

*Grutter v. Bollinger*,
    247 F.3d 631 (6th Cir. 2001) .............................................................20

*Grutter v. Bollinger*,
    539 U.S. 306 (2003)......................................................................3, 17

*Hayden v. Cnty. of Nassau*,
    180 F.3d 42 (2d Cir. 1999) ...............................................................5

*Iowa v. Utils Bd. v. FCC*,
    109 F.3d 418 (8th Cir. 1996) .............................................................21

*Long v. Robinson*,
    432 F.2d 977 (4th Cir. 1970) .........................................................9, 18

*N. Carolina State Conf. of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ..............................................................12

*Nken v. Holder*,
    556 U.S. 418 (2009)..................................................................9, 22

*O'Brien v. Appomattox Cnty.*,
    71 F. App'x 176 (4th Cir. 2003) ........................................................21

*Parents Involved in Community Schools v. Seattle School Dist. No. 1*,
    551 U.S. 701 (2007) ...................................................................3, 15

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)..............................................................14, 15, 16

*Rothe Dev., Inc. v. United States Dep't of Def.*,
    836 F.3d 57 (D.C. Cir. 2016)...................................................5, 15, 16

*Spurlock v. Fox*,
    716 F.3d 383 (6th Cir. 2013) .........................................................5, 16

*Sylvia Dev. Corp. v. Calvert Cnty., Md.*,
    48 F.3d 810 (4th Cir. 1995) ..............................................................15

*Texas Department of Housing & Community Affairs v. Inclusive
    Communities Project, Inc.*,
    576 U.S. 519 (2015).........................................................................3

*United Ass'n of Journeymen and Apprentices of the Plumbing and
    Pipefitting Industry, AFL-CIO v. Barr*,
    No. 90-cv-2342, 1991 WL 241890 (D.D.C. Oct. 29, 1991)..............................21

*Veasey v. Perry*,
    574 U.S. 951 (2014)........................................................................22

*Veasey v. Perry*,
    769 F.3d 890 (5th Cir. 2014) ............................................................22

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
    429 U.S. 252 (1977)...............................................................*passim*

*Williams v. Rhodes*,
    393 U.S. 23 (1968)........................................................................22

**STATUTES**

Va. Code Ann. § 22.1-79(8)......................................................................17

**OTHER AUTHORITIES**

Order Granting Stay, *Hopwood v. Texas*,
    No. 94-50569 (5th Cir. Apr. 19, 1996)..............................................19

The district court's final judgment and injunctive order in this case forbids the Fairfax County School Board (Board) from using its current admissions policy to decide which students will receive offers to attend Thomas Jefferson High School for Science and Technology (TJ) for the upcoming academic year—decisions that must be made in a matter of weeks. That ruling will sow chaos unless it is stayed. Thousands of qualified prospective students have already completed the multistep process required for admission. The district court's order forces the Board to come up with an entirely new admissions policy without anything close to the time needed to design and implement such a process. School officials will then be required to implement the new policy in an extremely compressed timeframe. Prospective students and their parents will need to be informed of the new policy and will be forced to take the required steps to seek admission under it—with confusion, dismay, and community outrage certain to result.

There is no basis in the law for inflicting these serious and irreparable harms on the Board, school officials, students and their parents, and the public interest. The TJ admissions policy that the Court enjoined used race-neutral criteria adopted

---

[1] Pursuant to Federal Rule of Appellate Procedure 8(a)(2)(C), counsel for the Coalition has been given reasonable notice of this motion. The Coalition opposes this motion.

to promote geographic, socioeconomic, and racial diversity—criteria of the kind

repeatedly endorsed by the Supreme Court and uniformly upheld by numerous

federal courts of appeals.  The district court nevertheless held that the policy

violated the Fourteenth Amendment on the theory that it was enacted to improve

access for historically underrepresented groups and that such a purpose necessarily

reflects an invidious purpose to discriminate against Asian Americans, who

represented the largest racial group of students admitted under previous admissions

policies.  But not a shred of record evidence supports that conclusion, and it is

manifestly false.  The district court adopted Plaintiff's "zero-sum" theory—that

any steps taken to improve educational access for underserved groups is by

definition invidious discrimination against the existing majority.  No precedent of

this Court or any other supports such a false equivalence, which would slam the

door on virtually all race-neutral efforts to promote diversity in education,

employment, and other areas.  Accordingly, the Board has far more than a

substantial likelihood of prevailing in its appeal of the district court's order.

The Board thus respectfully submits that the district court's judgment and

order be stayed during the pendency of this appeal.

**STATEMENT**

**A.    Legal Background**

The Supreme Court has repeatedly reaffirmed that public institutions, including school boards, may adopt race-neutral measures for the express purpose of increasing diversity, including racial diversity. *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc*., 576 U.S. 519, 545 (2015).  For instance, "[s]chool boards may pursue the goal of bringing together students of diverse backgrounds and races through other means [than considering race], including strategic site selection of new schools; [and] drawing attendance zones with general recognition of the demographics of neighborhoods." *Id*. (quoting *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 789 (2007) (Kennedy, J., concurring in part and concurring in judgment)).  In the context of higher education, the Court has encouraged universities to explore "race-neutral alternatives," including lessening reliance on standardized tests and allocating percentages of the incoming class to all state high schools, for the purpose of "assembl[ing] a student body that is not just racially diverse, but diverse along all the qualities valued by the university." *Grutter v. Bollinger*, 539 U.S. 306, 340 (2003); *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 312 (2013) (universities must consider whether "workable race-neutral alternatives would produce the educational benefits of diversity" before

3

considering race in admissions); *see also City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 510 (1989) (governments may "increase the opportunities available to minority business" through measures such as altered bidding rules that do not "classify[] individuals on the basis of race"); *id*. at 526 (Scalia, J., concurring in the judgment).

Because these race-neutral measures are expressly *intended* to increase diversity, including racial diversity, they "may well have racially disproportionate impact." *Croson*, 488 U.S. at 526 (Scalia, J., concurring in the judgment). But, critically, they are nonetheless "permissible" under the Equal Protection Clause and do not trigger strict scrutiny because "they are not based on race"—that is, they do not classify individuals based on their race. *Id*.; *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198, 2208 (2016).

Consistent with that guidance, every court of appeals to consider a race-neutral measure designed to increase diversity has upheld the measure under rational basis review. *See, e.g., Boston Parent Coalition for Academic Excellence Corp. v. Sch. Committee of City of Boston*, 996 F.3d 37, 46 (1st Cir. 2021) ("[A] public school system's inclusion of diversity as one of the guides to be used in considering whether to adopt a facially neutral plan does not by itself trigger strict scrutiny."); *Doe ex rel. Doe v. Lower Merion Sch. Dist*., 665 F.3d 524, 529 (3d Cir. 2011) (upholding race-neutral school districting despite consideration of racial

effects); *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 50–51 (2d Cir. 1999); *Spurlock v. Fox*, 716 F.3d 383, 396 (6th Cir. 2013); *Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57, 72 (D.C. Cir. 2016).

## B.    The Admissions Plan

This case concerns the race-neutral admissions policy for TJ, one of 19 regional public schools in Virginia that provide advanced studies and conduct admission by application.  A-030.  In designing that policy, the Board followed the uniform guidance described above; the admissions process is race-*blind* at every step but seeks to promote geographic, socioeconomic, and racial diversity.

Before 2020, admission to TJ was based heavily on applicants' performance on three standardized tests.  Applicants who received certain minimum test scores were selected for admission based on a holistic review of GPA, test scores, teacher recommendations, and student essays.  Admitted classes included very few students who qualified for free or reduced-price meals, were English language learners, received special education services, or identified as Black, Latino, or multiracial.  TJ's student body also was overwhelmingly comprised of students who attended a small subset of public middle schools.  Indeed, in the four years preceding 2020, students at just eight of Fairfax County's twenty-six middle schools accounted for 87% of the County's share of TJ's admitted students.  A-157–158.

In June 2020, the Board received correspondence from the then-Virginia Secretary of Education, noting TJ's small proportions of disadvantaged students over the prior five years. The Secretary convened a working group to examine barriers to access at Virginia's specialized schools. In September and October, Division Superintendent Scott Brabrand proposed changes to TJ's admissions process in order to remove historical barriers to access and expand the school's representation to include students from every part of the County and neighboring jurisdictions.

In December 2020, the Board adopted a new admissions policy (the "Plan") for TJ, which modified one of Brabrand's proposals. A-100. The Plan raised the eligibility criteria and eliminated standardized testing: applicants with a 3.5 GPA and enrollment in specified honors courses advance to a holistic review, which considers a student's GPA and essays. Applicants receive additional points for four "Experience Factors": (a) eligibility for free and reduced price meals; (b) status as an English language learner; (c) status as a special education student; and (d) attendance at a middle school deemed historically underrepresented at TJ. A-211–212. School Board Regulation 3355.14 directs that the Plan "must use only race-neutral methods that do not seek to achieve any specific racial or ethnic mix, balance, or targets," and that the process must be race-blind, with each applicant identified only by an applicant number. A-101.

The Plan also guarantees each participating public middle school seats equivalent to 1.5% of the school's eighth-grade class. Those seats are offered to the highest-evaluated applicants from each school. The remaining students then compete for about 100 unallocated seats. A-212.

In 2021, applicants for the Class of 2025 were selected using the Plan. For the first time in at least fifteen years, students from all twenty-six Fairfax County middle schools received admission. The class had far higher proportions of students eligible for free meals, English language learners, and women than preceding classes. Demographically, only Asian-American and Latino students were more represented in the admitted-students population than in the applicant pool; other racial groups had smaller proportions of admitted students than applicants. A-128. The average GPA of admitted students—3.953—was virtually the same as in the prior year. A-128.

In October 2021, the School Board began the process for admitting the Class of 2026. A-245. Over 2,500 applicants remain in the admissions cycle and expect decisions next month (April 2022) per school regulation. A-246, A-283.

## C. Procedural History

In March 2021, the Coalition for TJ (the "Coalition") sued the Board, alleging that the Plan violated the Equal Protection Clause. The Coalition argued that the Plan, while facially race-neutral, "was intended to reduce the percentage of

Asian-American students who enroll in TJ, with the ultimate goal of racially balancing the school according to the racial demographics of Fairfax County." A-001.

The Coalition twice moved for a preliminary injunction. The district court denied both motions, finding each time that the School Board and the public had a valid "interest in seeing that their schools operate in an orderly fashion," and that "the entry of an injunction would harm the [Board] … more than … the plaintiffs." A-073–074, A-095.

Following cross-motions for summary judgment, the district court entered summary judgment for the Coalition. A-209. In an opinion that tracked the Coalition's opening summary judgment brief nearly word-for-word, the court held that strict scrutiny applied to the Plan. The court reasoned that the Plan had a disparate impact on Asian Americans because the Asian-American proportion of the admitted class was lower under the Plan relative to prior years. The court further concluded that the Board acted with invidious discriminatory intent against Asian Americans because the Board set out "to increase Black and Hispanic enrollment, which would, by necessity, decrease the representation of Asian-Americans at TJ." A-235–236. The court therefore enjoined the Board from "further use or enforcement of the Fall 2020 Admissions Plan." A-238, A-240.

The injunction requires the Board to halt the 2022 admissions process—which is well underway, with 2,540 applicants having completed the process—and design a new policy from scratch. Complying with the injunction will throw the ongoing admissions process into chaos, inflicting severe harm on the thousands of children and families who are currently expecting admissions decisions next month and causing irreparable damage to the Board and TJ.

The Board sought a stay pending appeal, which the district court denied. A-292. The Board now moves in this Court for a stay pending appeal. The Board also intends to move to expedite the appeal.

## ARGUMENT

This Court considers four factors in deciding whether to grant a stay pending appeal: (1) whether the applicant "will likely prevail on the merits of the appeal"; (2) whether the applicant "will suffer irreparable injury if the stay is denied"; (3) whether "other parties will not be substantially harmed by the stay"; and (4) whether "the public interest will be served by granting the stay." *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970). The first two factors—likelihood of success on the merits and irreparable harm—"are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). Where, as here, the irreparable harm and other factors favor a stay, the applicant need only present a serious legal question on the

merits.  *See Alabama Ass'n of Realtors v. Dep't of Health and Human Servs.*, 141 S. Ct. 2485, 2487 (2021).  All four factors favor a stay here.

## I.	The Board is likely to succeed on the merits of its appeal.

The district court's decision flies in the face of decades of Supreme Court and circuit-court precedent establishing that race-neutral measures adopted to promote diversity are presumptively permissible under the Equal Protection Clause.  The constitutionality of such measures follows inexorably from the fact that they do not classify individuals by race.  When, as here, a policy is facially race-neutral, it is subject to strict scrutiny only if it (1) has a "racially disproportionate impact"; and (2) was enacted for an "invidious discriminatory purpose"—that is, for the *purpose* of harming a particular disfavored group.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). As every circuit court to consider the question has concluded, a race-neutral policy adopted to increase diversity does not reflect an invidious discriminatory purpose—even if the decisionmakers considered race or recognized that a racial impact was a foreseeable consequence of the policy.  In concluding that TJ's race-blind admissions policy, adopted to promote all types of diversity, inflicts a disproportionate impact on Asian Americans and reflects invidious discrimination against them, the district court "contort[ed]" well-established equal protection doctrine.  *Boston Parent Coal.*, 996 F.3d at 48.

## A. The Plan does not disproportionately affect Asian Americans.

The district court's conclusion that the Plan has a disparate impact on Asian Americans lacks legal or factual support. Under the Plan, Asian-American students were by far the largest racial group among the students offered admission (54.36%), and their share of offers exceeded their share of the applicant pool (48.59%). A-128.

The primary ground on which the district court relied was that the "number and proportion of Asian-American students offered admission to TJ" was lower for students admitted under the Plan in 2021 than for prior classes selected under the previous admissions policy. A-222. But a year-to-year comparison of the number of Asian-American students admitted, without more, cannot demonstrate a disparate impact: because each year's applicant pool is composed of *different* students of all races, there is no reason to assume that the proportion of Asian-American students admitted in one year should carry over to the next—or that any differences would be statistically significant.[2] *See Boston Parent Coal.*, 996 F.3d at 46 (comparison to performance under predecessor admissions plan was not "apt for purposes of determining adverse disparate impact"); *see also Boston Parent Coalition for Academic Excellence Corp. v. School Committee of the City of*

---

[2] The Coalition introduced no evidence that the differences in offer rates was statistically significant.

*Boston*, No. 21-cv-10330, 2021 WL 4489840, at *15 (D. Mass. Oct. 1, 2021) (where a racial group is highly represented, "nearly any changes to the admissions process will likely result in some reduction, if only from the law of averages"). Indeed, the decision on which the district court relied for its year-to-year comparison rejects just such a comparison. *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 232 (4th Cir. 2016) (election-to-election comparison of African-American voter turnout was not probative because of differences in voting populations across elections). Even worse, the district court ignored the fact that Asian-American applicants comprised a smaller proportion of total applicants in 2021 (48.59%) than in 2020 (56.08%)—something that could have contributed to the decrease in Asian-American admitted students in 2021 for reasons unrelated to the Plan.

The district court's second basis for finding disparate impact is even weaker than the first. The court fastened upon the Plan's allocation of seats in the entering class "for students at each middle school amounting to 1.5% of the school's eighth-grade class." A-223. Under that system, "[t]he highest-evaluated students at each school . . . gain admission to TJ," which means that *all students*, regardless of race, compete against other eligible applicants for the allocated seats at their middle school. A-223. Citing no supporting evidence, the district court concluded that this race-neutral allocation system "disproportionately force[s]" Asian-American

students to compete against one another for the allocated seats at each school. A-223. That makes no sense. While Asian-American students had an above average representation at two middle schools, and thus may have primarily competed against each other at those schools, each racial group has a similarly above-average representation in at least two other participating schools in Fairfax County. A198–203. Thus, members of each racial group—not just Asian Americans—had to compete against more members of their racial group at certain schools.

Finally, the district court concluded that the holistic review for the remaining 100 unallocated seats also disadvantages Asian Americans. The court reasoned that the historical underrepresentation factor disadvantaged students at schools that traditionally were overrepresented at TJ, two of which had high Asian-American enrollment. But only seven of the eighty-eight unallocated offers made went to students at schools designated as historically underrepresented—meaning that the underrepresented-school consideration had little, if any, impact. More broadly, Asian Americans accounted for the highest or second highest percentage of applicants *and* offers of admission for each of the four experience factors assessed during the holistic review as part of the 2021 admissions cycle, including the underrepresented-schools factor. *See* A-196. The district court's assertion that the underrepresented-school consideration disadvantaged Asian-American applicants thus lacks any record support.

**B.** **The Plan does not reflect an invidious discriminatory purpose.**

The district court's conclusion that the Plan was adopted for an impermissible "racial purpose" is also baseless. The court held that the Board acted with invidious intent because "the Board's policy was designed to increase Black and Hispanic enrollment, which would, by necessity, decrease the representation of Asian-Americans at TJ." A-235–236. In other words, the court found that the Board acted with invidious intent simply because it was foreseeable that the Plan could decrease Asian-American admissions. That is legal error—and is sufficient in itself to demonstrate that the Board is likely to succeed on appeal.

When a challenged measure is facially race-neutral—as the Plan is—the plaintiff must demonstrate that the decisionmaker "selected or reaffirmed a particular course of action at least in part *because of*, not merely in spite of, its *adverse* effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (emphasis added; internal quotation marks omitted). "Discriminatory purpose" "implies more than intent as volition or intent as awareness of consequences." *Id*. Thus, even where the challenged policy has a foreseeable disparate impact on a particular group, the decisionmaker's awareness of that impact does not establish discriminatory purpose. *Id*. Rather, the decisionmaker must act with "invidious discriminatory purpose"—that is, with a *desire* to inflict the adverse consequences on the disadvantaged group. *Arlington*

*Heights*, 429 U.S. at 266; *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995); *accord Feeney*, 442 U.S. at 279.

That requirement of discriminatory animus is no doubt why the Supreme Court and the lower courts have long emphasized that increasing minority participation is a legitimate (and, indeed, laudable) interest that justifies race-neutral measures and does not trigger strict scrutiny—even when such measures have a foreseeable disparate impact on particular groups. *See* pp. 3–5, *supra*; *Croson*, 488 U.S. at 507; *see also Parents Involved*, 551 U.S. at 788–89 (Kennedy, J., concurring in part and concurring in judgment); *Rothe Dev.*, 836 F.3d at 72 ("Mere foreseeability of racially disparate impact, without invidious purpose, does not trigger strict constitutional scrutiny.").

The district court did not identify anything in the record that comes close to establishing that the Board acted out of an invidious intent to disadvantage Asian Americans. Instead, the court pointed to statements by some Board members expressing dissatisfaction with the fact that under the previous admissions plan, the "number of Black students admitted was too small to be reported," and expressing the view that "TJ should reflect the diversity of FCPS, the community and Northern Virginia." A-233. A general desire to increase representation of underrepresented groups cannot constitute invidious discrimination against Asian Americans under *Feeney* and *Arlington Heights*. Indeed, every court of appeals to

consider reasoning like the district court's has resoundingly rejected it as a "contort[ion]" of Equal Protection doctrine. *See, e.g., Boston Parent Coal*., 996 F.3d at 48 (that reasoning "would pretty much mean that any attempt to use neutral criteria to enhance diversity—not just measures aimed at achieving a particular racial balance—would be subject to strict scrutiny"); *Rothe Dev.*, 836 F.3d at 72; *Spurlock*, 716 F.3d at 395.

There is likewise no merit to the district court's attempts to characterize the Board members' statements as reflecting an impermissible desire to "bring about racial balance." A-235. Racial balancing is the practice of defining sought-after diversity as "some specified percentage of a particular group merely because of its race or ethnic origin." *Fisher*, 570 U.S. at 311 (citation omitted). Here, however, *every* statement identified by the district court merely expressed the hope that taking into account race-neutral factors such as geography and socioeconomic status would "result in greater diversity in the demographics," "increas[e] diversity," or move "towards greater equity." A-234–235. Seeking to improve *diversity*—including geographic, socioeconomic, and racial diversity—is not the same as pursuing *racial balancing*, and the Supreme Court has repeatedly reaffirmed that the former goal may be pursued through race-neutral methods. *See Grutter*, 539 U.S. at 319. Furthermore, had the Board's objective been racial balancing, it would not have adopted a multistep Plan that is race-*blind* at every

16

step, whose demographic impact was never forecasted, A-126, and whose holistic analysis is so nuanced that even the Coalition admitted that its demographic consequences were "difficult" to predict.  A-094.

The district court also held that the purportedly "rushed and shoddy" process of adopting the Plan supported an inference that the Board acted with invidious intent.  That rationale does not withstand scrutiny.  The district court itself acknowledged that the "Board does not appear to have broken any procedural rules."  A-227.  The court thus relied heavily on some individual Board members' concerns that the process was moving too quickly in October 2020—but the Board did not adopt a new admissions plan until December, after an additional *ten weeks* of deliberation, robust community feedback, and several lengthy public meetings and debates.  A-123–125.  And while the court complained that the 1.5% plan was not publicly revealed until shortly before it was adopted, Virginia law did not obligate the Board to obtain advance public input.  Va. Code Ann. § 22.1-79(8).

More importantly, the court's analysis misses the point: under *Arlington Heights*, "[d]epartures from the normal procedural sequence" are relevant only to the extent that they "might afford evidence that improper purposes are playing a role."  429 U.S. at 267.  The district court cited nothing indicating that these purported procedural failings reflected invidious animus towards Asian Americans, or concealment of such intent.  To the contrary, it is undisputed that the Board

adopted a mandate during the December vote that "the admission process must use only race-neutral methods that do not seek to achieve any specific racial or ethnic mix, balance, or targets." A-126.

*    *    *

The district court was able to strike down the Plan only by distorting beyond recognition the legal framework governing race-neutral policies. The Board has shown a substantial likelihood of success on the merits of its appeal.

## II. The School Board Will Suffer Irreparable Harm Absent a Stay.

The district court's injunction requires the Board to abandon the current admissions process, pursuant to which 2,540 students have applied for admission and await imminent admissions decisions; design a new admissions policy from the ground up in a matter of weeks; and require current applicants immediately to comply with that policy. The Board unquestionably "will suffer irreparable injury if [a] stay is denied." *Long*, 432 F.2d at 979.

Reverting to the Board's pre-Plan admissions policy is not an option. Before the Plan, applicants were evaluated on three different tests: the ACT Aspire Reading, the ACT Aspire Science, and the Quant-Q. A-211. Applicants were required to achieve certain minimum scores in order to advance for further evaluation. A-247. Today, the two ACT tests used are no longer commercially available, and the vendor has not provided comparable substitutes. A-246.

Without a stay, the Board must create a new policy—and it must do so immediately. Pursuant to school regulation, the 2,540 students who have completed the application process expect to receive decisions next month—"no later than April" 2022. A-246; A-269.

The adverse consequences of creating a new admissions policy are exceptional. To begin with, the district court's reasoning—especially its conclusions concerning disparate impact vis-à-vis previous years' admitted-student demographics—is so unbounded that the Board faces continuing uncertainty about what policies *would* comply with the Equal Protection Clause in the district court's view. *See* Order Granting Stay at 5, *Hopwood v. Texas*, No. 94-50569, (5th Cir. Apr. 19, 1996) (granting a stay pending certiorari and noting the "continuing uncertainty and confusion [that the University of Texas Law School] faces while attempting to conduct an admissions program that is not in conflict with applicable case law").

Moreover, forcing the 2,540 students who have completed the existing admissions process to start over using a new process would cause them and their families hardship and uncertainty. In light of the compressed timetable, the Board will be unable to solicit feedback from community stakeholders before adopting the new policy. The current Plan was adopted after three months of public debate, meetings, and work sessions, which resulted in significant modifications from

initial proposals. A-248, A-227. But the Board will have only limited opportunities to consider community input if it must put a new policy in place in time to select the entering Class of 2026. Nor will there be any time to educate the community about the new policy before applying it to students. The current timetable does not permit the informational sessions and other forms of community outreach ordinarily provided to families with prospective applicants. A-248. If the Board is forced to hurriedly adopt a new policy with little or no community input, its credibility and reputation in the community will be irreparably damaged.

Delaying final admissions decisions will also irreparably harm TJ's ability to compete for applicants. Many TJ applicants also apply to other selective schools and programs, which typically set deadlines in late Spring for enrollment in the following school year. A-248. Such competitive harms are irreparable and justify stay relief. *See Grutter v. Bollinger*, 247 F.3d 631, 633 (6th Cir. 2001).[3]

Finally, because the Board is unlikely to recover what it spends to develop a new policy, even in the event of a favorable ruling, those costs constitute irreparable harm. *See Iowa v. Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir.

---

[3] For the Class of 2025, admissions decisions were not announced until late June 2021. *This* year, however, applicants have been told to expect decisions by late April, and delay will undermine those expectations, cause community confusion, and damage the Board's credibility. In all events, the injunction would force the Board to design, implement, and apply a new policy to students in an unreasonably compressed period—and with no guidance from the court about what policies it might view as permissible. *See supra* p.19.

1996); *accord O'Brien v. Appomattox Cnty.*, 71 F. App'x 176, 178–79 (4th Cir. 2003) (affirming injunction premised on economic losses that were potentially unrecoverable through litigation).

The Coalition's contention below that the Board could have avoided these harms by designing a backup admissions policy is meritless. The district court's ruling broke new legal ground. No appellate court has *ever* invalidated a race-neutral policy adopted to promote diversity, and the Supreme Court has repeatedly reaffirmed that such measures are constitutional. There is no reasonable argument that the Board must abandon its current admissions process midstream and expend resources on developing a contingency plan in response to a district court ruling that provides no guiding principles for a new policy and that will likely be overturned on appeal—with the result that the Board would have "expended its limited manpower and monetary resources for naught." *United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, AFL-CIO v. Barr*, No. 90-cv-2342, 1991 WL 241890, at *2 (D.D.C. Oct. 29, 1991).

## III.    A Stay Will Not Substantially Harm the Coalition.

A stay will not "substantially injure" the Coalition or any of its members. *Nken*, 556 U.S. at 426 (citation omitted). The Coalition has identified only two children of its members who have applied to TJ this year—and they may yet be admitted under the Plan. A-106. Such speculative harms cannot outweigh the

Board's likelihood of success and the irreparable harm arising from the severe

disruption that would result if the injunction is not stayed. *Nken*, 556 U.S. at 426.

Although the Coalition has asserted that being required to seek admission

under the Plan constitutes "irreparable harm" to its members, the courts have

decisively rejected that reasoning. In the analogous context of elections rules, for

example, the Supreme Court has held that the state's interest in avoiding the

burdens and disruptions of altering election rules midstream outweighs any harm to

the plaintiffs from being subject to unconstitutional or otherwise illegal elections

rules. *Williams v. Rhodes*, 393 U.S. 23, 35 (1968) (declining to grant affirmative

injunctive relief to candidates unconstitutionally excluded from ballot because it

would be "extremely difficult" to reprint ballots); *Veasey v. Perry*, 769 F.3d 890

(5th Cir. 2014) (granting stay pending appeal of final order enjoining racially

discriminatory voter ID law because election was imminent); *Veasey v. Perry*, 574

U.S. 951 (2014) (declining to vacate stay). So too here: the district court's

injunction will cause the Board and TJ irreparable harm and throw thousands of

families in the region into uncertainty. Those extraordinary harms far outweigh

any harm to plaintiffs.

## IV. The Public Interest Favors a Stay.

For much the same reasons, the public interest would also not be served by

scrapping the current admissions process so close to the end of the cycle,

scrambling to develop a new process, and conducting that new process—all in the space of a few short months. Allowing the district court's judgment to take effect, thereby delaying admissions decisions, would disrupt the expectations of many families whose children are midway through the admissions process. A-244–245, A-247.

Any replacement process is also likely to throw applicants' plans into disarray. Lowering the minimum GPA back to 3.0 or loosening the course requirements would introduce many more students into the admissions process. It would likewise be disruptive to add new testing or assessment elements without providing applicants time to prepare or comply. These unexpected changes to the admissions process will undoubtedly cause hardship and distress to students.

Compounding the confusion, TJ admissions staff would be far less able to provide students and parents with ongoing support, if a new admissions process suddenly had to be developed and undertaken. A-248. Staff instead would be occupied with crafting and implementing the new admissions process. The public interest clearly favors a stay.

## CONCLUSION

For these reasons, the School Board respectfully requests that the Court stay the judgment below pending the resolution of the Board's appeal.

DATED:  March 18, 2022  MUNGER, TOLLES & OLSON LLP

By:  /s/ Donald B. Verrilli, Jr.

Sona Rewari (VSB No. 47327)  Donald B. Verrilli, Jr.
HUNTON ANDREWS KURTH LLP  Ginger D. Anders
2200 Pennsylvania Avenue, NW  Xiaonan April Hu
Washington, DC 20037  MUNGER, TOLLES & OLSON LLP
Telephone:  (202) 955-1500  601 Massachusetts Avenue NW, Suite 500 E
Washington, DC 20001
Telephone:  (202) 220-1100

Trevor S. Cox (VSB No. 78396)
HUNTON ANDREWS KURTH LLP
951 E. Byrd Street  Mica L. Moore
Richmond, VA 23219  MUNGER, TOLLES & OLSON LLP
Telephone:  (804) 788-7221  350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-9100

*Counsel for Fairfax County School Board*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Circuit Rule 32-1, I certify that the attached motion is proportionally spaced, has a typeface of 14 points and contains 5172 words.

DATED: March 18, 2022          MUNGER, TOLLES & OLSON LLP


By:    /s/ Donald B. Verrilli, Jr.
       Donald B. Verrilli, Jr.
       *Counsel for Fairfax County School Board*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2022, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which sent notification of such filing to all registered CM/ECF users. I also e-mailed a copy of the foregoing to counsel for the Appellee.

DATED: March 18, 2022   MUNGER, TOLLES & OLSON LLP

By:   /s/ Donald B. Verrilli, Jr.
    Donald B. Verrilli, Jr.