No. 22-1280

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

COALITION FOR TJ,

*Plaintiff-Appellee,*

vs.

FAIRFAX COUNTY SCHOOL BOARD,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Virginia, No. 1:21-cv-00296-CMH

**BRIEF OF *AMICI CURIAE* TJ ALUMNI FOR RACIAL JUSTICE,
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.,
CASA VIRGINIA, HISPANIC FEDERATION, ASIAN AMERICAN
YOUTH LEADERSHIP EMPOWERMENT AND DEVELOPMENT, AND
HAMKAE CENTER IN SUPPORT OF DEFENDANT-APPELLANT'S
MOTION FOR STAY PENDING APPEAL**

Jin Hee Lee
Michaele N. Turnage Young
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300

Niyati Shah
Eri Andriola
ASIAN AMERICANS ADVANCING
JUSTICE-AAJC
1620 L St. NW, Ste. 1050
Washington, DC 20036
Tel: (202) 296-2300

Francisca D. Fajana
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
Tel: (212) 219-3360

Arthur Luk
Christine J. Choi
Elizabeth Denning
Megan Pieper
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave. NW
Washington, D.C. 20001
Tel: (202) 942-5000

## **RULE 29(A)(4)(A) CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), the undersigned counsel for *amici* NAACP Legal Defense and Educational Fund, Inc. ("LDF") makes the following disclosure:   LDF does not have a parent company, and there is no publicly owned corporation that owns 10% or more of LDF's stock.

# TABLE OF CONTENTS

**Page**

RULE 29(A)(4)(A) CORPORATE DISCLOSURE STATEMENT........................ i

INTEREST OF *AMICI CURIAE* ......................................................................1

INTRODUCTION ...........................................................................................2

BACKGROUND ............................................................................................3

    A.    FCSB acted to remedy TJHSST's long-standing under-identification of Black, Latino, ELL, and Low-income Students.........3

    B.    The Plan expanded educational opportunities.....................................6

ARGUMENT ...............................................................................................10

    A.    FCSB is likely to succeed on the merits............................................11

        1.    The district court erred in its analysis of disparate impact. ......11

        2.    The district court erred in its analysis of discriminatory intent...................................................................................14

    B.    A stay would serve the public interest by preventing the harm of the district court's error from reverberating nationwide.................15

    C.    The public interest will be served by preventing irreparable harm that students and *Amici* will suffer because of the district court's injunction................................................................................16

        1.    An unexpected, mid-year overhaul of TJHSST's admissions process will disadvantage marginalized students.................................................................................17

        2.    The denial of a stay will subject Black, Latino, ELL, and low-income students to dignitary harm. ..................................19

        3.    Black and Latino students will suffer more acute racial isolation if a stay is denied........................................................21

        4.    All students will be deprived of the educational benefits of diversity if a stay is denied. ...............................................22

CONCLUSION ............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995)................................................................15

*Blakeney v. Fairfax County School Board,*
334 F.2d 239 (4th Cir. 1964) ...............................................3

*Bob Jones Univ. v. United States,*
461 U.S. 574 (1983)................................................................16

*Boston Parent Coalition for Academic Excellence Corp. v. School
Committee of the City of Boston,*
996 F.3d 37 (1st Cir. 2021)..................................................12

*Boston Parent Coalition for Academic Excellence Corp. v. School
Committee of the City of Boston,*
2021 WL 1422827 (D. Mass. Apr. 15, 2021)....................12

*Boston Parent Coalition for Academic Excellence Corp. v. School
Committee of the City of Boston,*
2021 WL 4489840 (D. Mass. Oct. 1, 2021) .................12, 14

*Brown v. Board of Education,*
347 U.S. 483 (1954)...........................................................20, 23

*Christa McAuliffe Intermdiate School PTO v. De Blasio,*
364 F. Supp. 3d 253 (S.D.N.Y. 2019) ...............................24

*Coalition for TJ v. Fairfax County School Board,*
2022 WL 579809 (E.D. Va. 2022) .....................................4

*Doe #1 v. Trump,*
957 F.3d 1050 (9th Cir. 2020) ...........................................11

*Fisher v. University of Texas at Austin,*
136 S. Ct. 2198 (2016)......................................................15, 23

*Fisher v. University of Texas at Austin,*
570 U.S. 297 (2013)...............................................................23

*Grace v. Whitaker*,
    2019 WL 329572 (D.D.C. Jan. 25, 2019) ........................................................10

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ..............................................................................22, 23

*Jana-Rock Constr., Inc. v. N.Y. Dep't of Economic Development*,
    438 F.3d 195 (2d Cir. 2006) ...........................................................14

*Long v Robinson*,
    432 F.2d 977 (4th Cir. 1970) ...........................................................10

*Loving v. I.R.S.*,
    920 F. Supp. 2d 108 (D.D.C. 2013) ..................................................10

*North Carolina State Conference of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) .............................................11, 12, 13

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ...........................................................2, 18, 24

*Personal Administrator of Mass. v. Feeney*,
    442 U.S. 256 (1979) ..........................................................................14

*Raso v. Lago*,
    135 F.3d 11 (1st Cir. 1998), *cert. denied*, 525 U.S. 811 (1998) ........................14

*Regents of the University of California v. Bakke*,
    438 U.S. 265 (1978) ..........................................................................23

*Stout v. Jefferson County Board of Education*,
    882 F.3d 988 (11th Cir. 2018) .........................................................20

*Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc.*,
    576 U.S. 519 (2015) ..........................................................................17

*United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus., AFL-CIO v. Barr*,
    1991 WL 241890 (D.D.C. Oct. 29, 1991) ......................................10

*Vaughns v. Board of Education of Prince George's Cnty.*,
    574 F. Supp. 1280 (D. Md. 1983), *aff'd in part, rev'd in part on other grounds*, 758 F.2d 983 (4th Cir. 1985) .................................13

iv

*Wright v. Council of Emporia*,
    407 U.S. 451 (1972).................................................................................20

**Statutes**

34 C.F.R. §100.3(b)(2)..............................................................................15

42 U.S.C. § 2000d....................................................................................15

Civil Rights Act of 1964 Title VI ............................................................15

Equal Protection Clause....................................................................11, 12, 17

Va. Code Ann. § 2.2-3902 .......................................................................15

**Other Authorities**

David Card & Laura Giuliano, *Universal screening increases the
    representation of low-income and minority students in gifted
    education*, 113(48) PNAS 13678, 13683 (2016),
    https://www.pnas.org/content/pnas/113/48/13678.full.pdf ...............19

Didi Elsyad, *My not so Black-and-White look at diversity at Jefferson*,
    TJ Today (June 20, 2020) https://www.tjtoday.org/29057/new-on-
    tjtoday/my-not-so-black-and-white-look-at-diversity-at-jefferson/ ..................21

Fairfax County Public Schools, Historic Records: Desegregation,
    https://www.fcps.edu/about-fcps/history/records/desegregation
    (last visited March 22, 2022) ...............................................................3

Fairfax County Public Schools, *TJ Admissions Merit Lottery
    Proposal, School Board Work Session*, (Sept. 15, 2020),
    https://go.boarddocs.com/vsba/fairfax/Board.nsf/files/BTGKX652
    F413/$file/TJHSST%20Admissions%20Merit%20Lottery%20Prop
    osal.pdf....................................................................................................4

*Gallup-McKinley County School District Resolution*, OCR Case No.
    08-11-5002 (2017) ...............................................................................13

Kenneth Gibbs, Jr., *Diversity in STEM: What it is and Why it Matters*,
    SCI. AM. (Sept. 10, 2014).....................................................................24

Grissom, J.A. & Redding, C., *Discretion and disproportionality: Explaining the underrepresentation of high-achieving students of color in gifted programs* ......................................................................17

Shaun Harper & Sylvia Hurtado, *Nine Themes in Campus Racial Climates and Implications for Institutional Transformations*, New Directions for Student Services 7, 12 (Winter 2007), https://eric.ed.gov/?redir=http%3a%2f%2fdx.doi.org%2f10.1002%2fss.254 ......................................................................................................22

Sonia Kanchan, *Dwindling diversity*, TJ Today, https://www.tjtoday.org/24808/showcase/dwindling-diversity/ (last visited March 21, 2022) ....................................................................3

Gurleen Kaur, *Your finish line and mine*, TJ Today (June 20, 2020) https://www.tjtoday.org/29068/new-on-tjtoday/your-finish-line-and-mine/ ......................................................................................22

Letter from Department of Education, Office for Civil Rights to Coalition of the Silence and NAACP-Fairfax (Sept. 25, 2012), https://coalitionofthesilence.files.wordpress.com/2012/10/cp-tj-notif-letter-pdf.pdf ..............................................................3

C. S. Mott Children's Hospital, *Mott Poll Report: Pay-to-Participate: Impact on School Activities*, Vol. 33, Issue 5 National Poll on Children's Health (March 18, 2019), https://mottpoll.org/sites/default/files/documents/031819_PayToParticipate.pdf ......................................................................................17

OCR Complaint No. 11-12-1503 (July 23, 2012), http://mlkcommission.dls.virginia.gov/meetings/2012/OCR_FCPS_COTS_fairfax_complaint_NAACP_TJHSST_admissions_etc_7-23-12.pdf ......................................................................................3

Scott J. Peters, *The Challenges of Achieving Equity Within Public School Gifted and Talented Programs*, 66:2 Gifted Child Quarterly 82, 86, https://journals.sagepub.com/doi/10.1177/00169862211002535 ......................19

Scott J. Peters, et al., *Effect of Local Norms on Racial and Ethnic Representation in Gifted Education*, 5(2) AERA Open 1, 4 (Apr.-June 2019), https://journals.sagepub.com/doi/pdf/10.1177/2332858419848446 ..................17

Press Release, FCPS, TJHSST Offers Admission to 486 Students
(June 1, 2020), https://www.fcps.edu/news/tjhsst-offers-admission-
486-students)....................................................................................4, 5

Press Release, *FCPS TJHSST Offers Admission to 550 Students;
Broadens Access to Students Who Have an Aptitude for STEM*
(June 23, 2021), https://www.fcps.edu/news/tjhsst-offers-
admission-550-students-broadens-access-students-who-have-
aptitude-stem....................................................................................6

Andrea Silva, *What it means to be a TJ Latina*, TJ Today (July 3,
2020) https://www.tjtoday.org/29172/showcase/what-it-means-to-
be-a-tj-latina/....................................................................................22

Claude M. Steele, WHISTLING VIVALDI: AND OTHER CLUES TO HOW
STEREOTYPES AFFECT US (2010) .....................................................20

TJ Alumni Action Group, *Debunking the Lie*,
https://www.tjaag.org/debunking-the-lie...........................................6, 7, 8

VA Dep't of Educ., 2019-20 Fall Membership Reports,
https://p1pe.doe.virginia.gov/buildatable/fallmembership......................4, 6, 7, 9

Gregory M. Walton & Steven J. Spencer, *Latent Ability: Grades and
Test Scores Systematically Underestimate the Intellectual Ability of
Negatively Stereotyped Students*, 20 Psychol. Sci. 1132 (2009),
https://doi.org/10.1111/j.1467-9280.2009.02417.x ...........................20

Amy Stuart Wells, Lauren Fox, and Diana Cordova-Cobo, *How
Racially Diverse Schools and Classrooms Can Benefit All
Students*, CENTURY FOUND. (Feb. 9, 2016), https://production-
tcf.imgix.net/app/uploads/2016/02/09142501/
HowRaciallyDiverse_AmyStuartWells-11.pdf...................................24

*When Being Different Is Detrimental: Solo Status and the
Performance of Women and Racial Minorities*, 2 Analyses Soc.
Issues & Pub. Pol'y 183 (2002), https://doi.org/10.1111/j.1530-
2415.2002.00037.x .........................................................................22

Gloria Wong, et al., *The what, the why, and the how: A review of
racial microaggressions research in psychology*, 6:2 Race and
Social Problems, 181-200 (2014), https://doi.org/10.1007/s12552-
013-9107-9.....................................................................................20

## INTEREST OF *AMICI CURIAE*

*Amici* TJ Alumni for Racial Justice, NAACP Legal Defense and Educational Fund, Inc., CASA Virginia, Hispanic Federation, Asian American Youth Leadership Empowerment and Development ("AALEAD"), and Hamkae Center (f/k/a NAKASEC Virginia) are nonprofit organizations that promote equality of opportunity for all, including in education. *Amici* each have an interest in supporting equal access to Thomas Jefferson High School for Science and Technology ("TJHSST") and providing the perspective of allied communities of color about the benefits of appropriate efforts to equalize opportunities and foster diversity.

*Amici* submit this brief to explain why the Fairfax County School Board ("FCSB") is likely to succeed in its appeal and how the public interest would be served by granting the stay since: (1) the stay will encourage schools to comply with anti-discrimination laws and our Constitution's equal protection guarantee, and (2) students and *Amici* will be irreparably harmed if the stay is denied. Further, this brief provides essential context about the difficulties Black, Latino, English Language Learner ("ELL"), and low-income students have faced in the context of the TJHSST admissions process, as well as the harm to student-applicants from a disrupted admissions process should FCSB's requested stay be denied.[1]

---

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or person funded the preparation of this brief. All parties have consented to the filing of this brief.

1

# **INTRODUCTION**

Our nation has a "moral and ethical obligation to fulfill its historic commitment to creating an integrated society that ensures equal opportunity for *all* of its children." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 797-98 (2007). Towards that end, the Fairfax County School Board ("FCSB") revised the 2020 admissions process (the "Plan") to remove known barriers to equal opportunity by adopting race-neutral, research-backed reforms that sought to give each student an equal opportunity to compete for admission to the Thomas Jefferson High School for Science and Technology ("TJHSST").

Although the Plan advanced equality, the district court enjoined it, erroneously reasoning that the Plan disparately impacts Asian Americans and that FCSB's concern about the under-identification of Black and Latino students evinces discriminatory intent. If not stayed and reversed, the district court's error will harm the public interest by: (1) deterring schools across the country from complying with the Constitution and anti-discrimination laws, and (2) irreparably harming students and *Amici* by (a) denying students equal educational opportunities by, *inter alia*, disadvantaging marginalized students who have less resources to navigate an unexpected, mid-year change; (b) imposing dignitary harms on Black, Latino, English Language Learner ("ELL"), and low-income students; (c) exacerbating racial

isolation; and (d) depriving students of the educational benefits of diversity. Accordingly, this Court should grant FCSB's stay motion.

## BACKGROUND

### A. FCSB acted to remedy TJHSST's long-standing under-identification of Black, Latino, ELL, and Low-income Students.

Founded in 1985, less than a generation after FCSB ended *de jure* school segregation,[2] TJHSST has had a student body that was 90% white and Asian American since its early years.[3] In 2012, the Fairfax County Branch of the NAACP filed a complaint with the U.S. Department of Education's Office for Civil Rights on behalf of Black and Latino students, alleging discriminatory exclusion from TJHSST given an overreliance on test scores that benefit students from households with the financial resources to pay for test preparation courses.[4]

---

[2] *Historic Records: Desegregation*, FAIRFAX CNTY. PUB. SCHS., https://www.fcps.edu/about-fcps/history/records/desegregation (last visited March 22, 2022). *See also Blakeney v. Fairfax Cnty. Sch. Bd.*, 334 F.2d 239, 240 (4th Cir. 1964) (finding the injunction to "prohibit a system of segregated schools … should have been granted").

[3] Sonia Kanchan, *Dwindling diversity*, TJ Today, https://www.tjtoday.org/24808/showcase/dwindling-diversity/ (last visited March 21, 2022) (noting TJHSST's demographic data in the early 1990s).

[4] OCR Complaint No. 11-12-1503 (July 23, 2012), http://mlkcommission.dls.virginia.gov/meetings/2012/OCR_FCPS_COTS_fairfax_complaint_NAACP_TJHSST_admissions_etc_7-23-12.pdf. By letter dated September 25, 2012, OCR dismissed allegations asserted on behalf of students with disabilities, but retained jurisdiction over complainants' race-based allegations. Letter from Department of Education, Office for Civil Rights to Coalition of the

Nevertheless, TJHSST's admissions criteria continued to rely heavily on test scores, as well as other factors that benefited affluent students: a $100 application fee, enrollment in or completion of advanced courses that only recently became available at all middle schools, and teacher recommendations.[5] By 2019, in the last admissions cycle before the Plan was adopted, Black, Latino, ELL, and low-income students were still markedly under-identified for admission to TJHSST:

| Table 1. TJHSST Class of 2024[6] | | | |
|---|---|---|---|
| | SY19-20 8th graders[7] | Applicants | Admitted |
| Asian American | 5,167 (17%) | 1,423 (56%) | 355 (73%) |
| Black | 3,702 (12%) | 160 (6%) | ≤10 (≤2%) |
| Latino | 7,991 (26%) | 208 (8%) | 16 (3%) |
| White | 11,594 (38%) | 595 (23%) | 86 (18%) |
| Total | 30,247 | 2,539 | 486 |

---

Silence and NAACP-Fairfax, (Sept. 25, 2012), https://coalitionofthesilence.files.wordpress.com/2012/10/cp-tj-notif-letter-pdf.pdf.

[5] A-009; A-211; Fairfax Cnty. Pub. Schs., *TJ Admissions Merit Lottery Proposal, School Board Work Session*, (Sept. 15, 2020), https://go.boarddocs.com/vsba/fairfax/Board.nsf/files/BTGKX652F413/$file/TJHSST%20Admissions%20Merit%20Lottery%20Proposal.pdf.

[6] *See* A-009 n.10 (citing Press Release, FCPS, TJHSST Offers Admission to 486 Students (June 1, 2020), https://www.fcps.edu/news/tjhsst-offers-admission-486-students); VA DEP'T OF EDUC., 2019-20 FALL MEMBERSHIP REPORTS, (2020), https://p1pe.doe.virginia.gov/buildatable/fallmembership. Due to suppression of data in categories containing less than 10 students, some figures are approximate.

[7] For both Tables 1 and 2, this column shows the number of eighth graders in various groups in Arlington County, Fairfax County, Falls Church City, Loudoun County, Prince William County, and across these school divisions.

- Low-income students were 30% of eighth graders in the school divisions TJHSST serves, but just 7% of applicants and only 1.4% of the semifinalists;

- ELL students were 10% of eighth graders in the school divisions TJHSST serves, but just 3% of applicants, and only 0.6% of semifinalists;

- White eighth graders were nearly twice as likely to apply to TJHSST than Latino eighth graders, while Asian American eighth graders were seven times as likely to apply to TJHSST than Black eighth graders and more than nine times as likely to apply as Latino eighth graders;

- White applicants were more than twice as likely to be admitted as Black applicants and nearly twice as likely to be admitted as Latino applicants, while Asian American applicants were four times as likely to be admitted than Black applicants and more than three times as likely to be admitted than Latino applicants.[8]

It was against this backdrop that FCSB instituted the Plan, eliminating the admissions test, teacher recommendations, and the application fee—barriers that impeded equal opportunity—and admitting the top performing 1.5% of eighth

---

[8] *Supra* note 6.

graders in each middle school who meet rigorous eligibility criteria. The Plan also raised the minimum GPA from 3.0 to 3.5, required enrollment in honors and science courses, and required submission of a problem-solving essay and a student portrait sheet, which were considered under a holistic review process.[9] Under the new admissions process, the average GPA for applicants (3.91) was higher than the previous five years, and the average GPA for students admitted (3.9539) was in line with previous years.[10]

### B. The Plan expanded educational opportunities.

The Plan yielded a nearly 20% increase in applications and the most demographically representative class in recent memory, increased the average GPA of applicants, ensured admission of students from all FCSB middle schools, and led to a sixfold increase in admittees from historically underrepresented schools (from 5.56% to 30.73%).[11]

---

[9] A-156; A-211-12.

[10] A-128.

[11] See id.; Press Release, *FCPS TJHSST Offers Admission to 550 Students; Broadens Access to Students Who Have an Aptitude for STEM* (June 23, 2021), https://www.fcps.edu/news/tjhsst-offers-admission-550-students-broadens-access-students-who-have-aptitude-stem; TJ Alumni Action Group, *Debunking the Lie*, https://www.tjaag.org/debunking-the-lie (last visited Mar. 22, 2022); VA DEP'T OF EDUC., 2019-20 FALL MEMBERSHIP REPORTS, https://p1pe.doe.virginia.gov/buildatable/fallmembership. Due to suppression of data in categories containing less than 10 students, some figures are approximate.

| Table 2: Class of 2025[12] | | | |
|---|---|---|---|
| | SY20-21 8th graders[13] | Applicants | Admitted |
| Asian American | 3633 (11.98%) | 1535 (50.59%) | 299 (54.36%) |
| Black | 5953 (19.62%) | 272 (8.97%) | 39 (7.09%) |
| Latino | 8312 (27.40%) | 295 (9.72%) | 62 (11.27%) |
| white | 11101 (36.59%) | 726 (23.93%) | 123 (22.36%) |
| Low-income | 8728 (28.77%) | 387 (12.76%) | 138 (25.09%) |
| ELL | 3174 (10.46%) | 124 (4.09%) | 39 (7.09%) |
| Special education | 4153 (13.69%) | 47 (1.55%) | 13 (2.36%) |
| Female | unavailable | 1471 (48.48%) | 253 (46.00%) |
| Total | 30335 | | |

In enjoining the Plan, the district court focused heavily on this reduction in the percentage of Asian Americans in the admitted class from 73% to 54%. But the admissions rate for Asian American students under the Plan is in line with historical trends going back at least 17 years.[14] Between 2004 and 2020, the acceptance rate for Asian American applicants ranged from 16.8% to 25.0%:[15]

---

[12] *Id.*

[13] *Supra* note 7.

[14] TJ Alumni Action Group, *Debunking the Lie*, https://www.tjaag.org/debunking-the-lie (last visited Mar. 24, 2022).

[15] *Id.*



Acceptance Rate by Race/Ethnicity

In 2021, under the new Plan, the acceptance rate for Asian American applicants was 19.48%, well within this historical range.[16] Indeed, the acceptance rate of Asian American applicants was actually lower in 2020, one year before the Plan was adopted.[17] By removing obstacles known to deprive applicants of an equal opportunity to compete for admission, FCSB significantly improved their identification of qualified Black and Latino applicants for admission.[18]

---

[16] *Id.*

[17] *Id.* (The acceptance rate of Asian American applicants was 19.35% for the Class of 2022).

[18] *Id.* ("Prior to the Class of 2025, the acceptance rate for Black and Hispanic applicants was consistently under 10%. With the recent admissions changes, the acceptance rate grew to 14% and 21% respectively.").

In erroneously finding that the Plan "burden[ed] Asian-American students," A-220, the district court overlooked the fact that many Asian American students face various socioeconomic, linguistic, and educational barriers and benefit from the Plan. *See, e.g.,* Oh Decl. (Ex. 1) ¶¶ 5, 10, 12 (some Chinese, Indian, and Korean students struggle with poverty, lack of citizenship, medical debt, and housing insecurity); Vohra Decl. (Ex. 2) ¶¶ 5-6, 11 (Northern Virginia's Asian American community consists of numerous diverse ethnic subgroups and includes individuals with refugee backgrounds, including those in the Bhutanese, Cambodian, and Vietnamese communities). They include recent immigrants who are unfamiliar with complex school processes and face language barriers in navigating systems and accessing resources. *See* Vohra Decl. (Ex. 2) ¶¶ 8, 10; *see also* Oh Decl. (Ex. 1) ¶¶ 6, 8. Like Black and Latino students, low-income Asian American students are under-identified for admission to TJHSST—while 19.8% of Asian American 8th grade students who attended the school divisions served by TJHSST during the 2020-21 school year were economically disadvantaged, only 2% of Asian American students attending TJHSST were economically disadvantaged.[19]

Indeed, Asian Americans were the highest or second highest percentage of applications and admittees who benefitted from extra points given for certain

---

[19] Oh Decl. ¶ 11 (citing VA DEP'T OF EDUC., 2020-21 FALL MEMBERSHIP REPORTS, https://p1pe.doe.virginia.gov/buildatable/fallmembership).

"experience factors" considered under the Plan—of the applicants eligible for free and reduced-price meals, 33.9% were Asian American; Asian Americans were also 49.2% of ELL applicants, 31.3% of special education applicants, and 27.2% of applicants attending underrepresented middle schools. A-194-195. The district court's narrow focus on a small slice of the Asian American population—and characterizing measures to expand access for all students as "set-asides" that harm Asian Americans—does not reflect the geographic, socioeconomic, ethnic, and linguistic diversity and wealth of lived experiences of Asian American students in Northern Virginia.

## **ARGUMENT**

FCSB meets the requirements for a stay: it is likely to succeed on the merits, will incur irreparable harm if the stay is denied, Appellee will not be substantially harmed by a stay, and the public interest will be served by a stay. *See Long v Robinson*, 432 F.2d 977, 979 (4th Cir. 1970) (setting forth the considerations for determining whether to grant a stay). *Amici* weigh in to explain why FCSB is likely to succeed in its appeal and how the public interest will be served by granting the stay since: (1) a stay will encourage schools to honor anti-discrimination laws and

our Constitution's equal protection guarantee, and (2) FCSB students and *Amici* will be irreparably harmed if the stay is denied.[20]

## A.     FCSB is likely to succeed on the merits.

FCSB easily satisfies the first factor in favor of a stay. Not only is the district court's injunction inconsistent with controlling precedent, it would turn the Equal Protection Clause on its head by prohibiting a race-neutral admissions plan designed to eliminate discriminatory barriers and expand educational opportunities.

### 1.     The district court erred in its analysis of disparate impact.

The district court erroneously reasoned that Asian American applicants suffered a racially disparate, adverse impact because Asian American students were a smaller share of the class admitted after the challenged Plan was enacted when compared with Asian American applicants admitted the year before. According to the court, all that was needed under this Court's precedent in *North Carolina State Conference of NAACP v. McCrory* to show such an impact was "a simple before-and-after comparison." A-223 (citing 831 F.3d 204, 231 (4th Cir. 2016)). But in reaching this conclusion, the court misconstrued this Court's reasoning in *McCrory*,

---

[20] Courts may consider irreparable harm to nonparties in deciding whether to grant a stay. *See, e.g.*, *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020) (considering harm to nonparties); *accord Grace v. Whitaker*, No. CV 18-1853, 2019 WL 329572, at *4 (D.D.C. Jan. 25, 2019); *Loving v. I.R.S.*, 920 F. Supp. 2d 108, 111 (D.D.C. 2013), *United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus., AFL-CIO v. Barr*, No. 90-2342, 1991 WL 241890, at *4 (D.D.C. Oct. 29, 1991) (same).

which held that a North Carolina voting law had a racially disparate, adverse impact where "the General Assembly enacted legislation restricting all—and only—practices disproportionately used by African Americans." 831 F.3d at 230. *McCrory* did *not* prescribe a before-and-after comparison, holding that "[t]he district court also erred in suggesting that Plaintiffs had to prove that the challenged provisions prevented African Americans from voting at the same levels they had in the past." *Id*. at 232.

For TJHSST, the applicant pool is comprised of a different set of students each year. Asian American applicants—like other applicants—may be more or less competitive in any given year than the Asian American students who applied in previous or future years. Given this, "[t]he racial demographics of [TJHSST] under the old plan were a disjunctive consequence year to year—there was no guarantee that any White or Asian student would even be admitted." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos*., No. 21-cv-10330, 2021 WL 4489840, at *15 n.20 (D. Mass. Oct. 1, 2021) (citing *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos*., 996 F.3d 37, 46 (1st Cir. 2021)).

By using a flawed before/after comparison, the district court converted "a variable consequence" into a "baseline against which all future [outcomes] must comport," thereby improperly entrenching the status quo. *Id*.; *see also Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos*., No. 21-cv-10330,

2021 WL 1422827, at *14 n.18 (D. Mass. Apr. 15, 2021) (The "Equal Protection Clause is not a bulwark for the status quo."). Here, Appellee failed to show disparate impact. *See Bos. Parent Coal. for Acad. Excellence Corp.*, 996 F.3d at 46 (holding that plaintiffs were not likely to succeed in challenging a magnet school admissions policy because the policy had no disparate impact "as compared to a random distribution of invitations" to all students); *see also Vaughns v. Bd. of Educ. of Prince George's Cnty.*, 574 F. Supp. 1280, 1304 (D. Md. 1983), *aff'd in part, rev'd in part on other grounds*, 758 F.2d 983 (4th Cir. 1985) (comparing "[B]lack children . . . in the [gifted and talented] program relative to their population in the school system as a whole"); *Gallup-McKinley Cnty. Sch. Resol.*, OCR Case No. 08-11-5002 (2017) (comparing "the number of American Indian students enrolled in the District and the number of American Indian students who participate in the District's [gifted and talented] program and honors and AP courses").

To assess impact, the district court could have also considered whether Asian Americans were disproportionately adversely impacted by any particular change to the admissions criteria. *See McCrory,* 831 F.3d 204. However, to the extent the district court considered whether Asian Americans were adversely affected by various aspects of the challenged admissions process, its conclusions were factually unsupported. As noted above, Asian Americans were more likely than other applicants to receive extra points because of eligibility for free and reduced priced

meals, being an ELL student, a special education student, or attending a middle school historically underrepresented at TJHSST. *See* A-195. Likewise, as FCSB points out, the district court failed to cite any evidence that Asian American students were affected by the top 1.5% plan or other changes. Appellant's Mot. at 18-19.

## 2. The district court erred in its analysis of discriminatory intent.

The district court's analysis of discriminatory intent was similarly unmoored from binding precedent. A school board's desire to provide equal educational opportunities by revising an admission process that has been under-identifying Black and Latino students for an academically selective program "is not analogous to an intent to discriminate" against other groups. *See Bos. Parent Coal. for Acad. Excellence Corp.*, 2021 WL 4489840 at *15 ("While the increase of a zero-sum resource to one group necessitates the reduction of that resource to others, the case law is clear—the concern is action taken *because of* animus toward a group, not *in spite of* an action's necessary effect on a group or groups." (citing *Personal Administrator of Mass. v. Feeney*, 442 U.S. 256, 258 (1979)); *Jana-Rock Constr., Inc. v. N.Y. Dep't of Econ. Dev.*, 438 F.3d 195, 211 (2d Cir. 2006) (a desire to alleviate discrimination against "some disadvantaged groups" is not the same as "an intent to discriminate against other groups"). The district court's faulty reasoning would call into question "[e]very antidiscrimination statute aimed at racial discrimination, and every enforcement measure taken under such a statute, [which

necessarily] reflect a concern with race." *Raso v. Lago*, 135 F.3d 11, 16 (1st Cir. 1998), *cert. denied*, 525 U.S. 811 (1998).

"Government is not disqualified from acting in response to the unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 202 (1995). Indeed, even those Supreme Court justices who have dissented from opinions upholding race-conscious measures to diversify post-secondary, educational institutions have endorsed race-neutral measures, such as the Plan at issue here. *See Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2236 (2016) (the Chief Justice and Justice Thomas joining a dissenting opinion by Justice Alito, where he notes that UT Austin could have relied more heavily on race-neutral measures like its top 10% plan).

### B. A stay would serve the public interest by preventing the harm of the district court's error from reverberating nationwide.

*Amici* also highlight the necessity of a stay in light of the public interest at stake. Absent a stay, the district court's opinion will deter school districts across the country from complying with Title VI of the Civil Rights Act of 1964 by removing known barriers to opportunity from the selection processes for their academically advanced programs and replacing them with research-based, race-neutral reforms.[21]

---

[21] Absent a stay, the district court's opinion will also discourage Virginia school districts from complying with the Virginia Human Rights Act, which likewise

*See, e.g.*, 42 U.S.C. § 2000d; 34 C.F.R. §100.3(b)(2) ("A recipient, in determining . . . the class of individuals to be afforded an opportunity to participate in any such program, may not . . . utilize criteria . . . which have the effect of . . . defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin"). Such an outcome undermines our constitutional guarantee of equality. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 593, 604 (1983) ("[T]he Government has a fundamental, overriding interest in eradicating racial discrimination in education—discrimination that prevailed, with official approval, for the first 165 years of this Nation's history.")

### C. The public interest will be served by preventing irreparable harm that students and *Amici* will suffer because of the district court's injunction.

Further, students will suffer significant harm absent a stay. An unexpected overhaul of the admissions process will harm students who have already relied upon and submitted applications to TJHSST, and that effect will disproportionately fall

---

prohibits intentional and disparate impact racial discrimination in educational institutions. Va. Code Ann. § 2.2-3902 (West) ("[C]onduct that violates any Virginia or federal statute or regulation governing discrimination on the basis of race, color . . . or national origin . . . is an unlawful discriminatory practice under this chapter."). Unless stayed, the district court's opinion will fundamentally undermine *Amici*'s ability to effectively advocate for equal opportunities, frustrating their organizational purposes and forcing them to divert resources to mitigate the myriad harms that will result.

on marginalized students. A denial of a stay would also cause dignitary harm to highly qualified Black and Latino students admitted under the Plan, exacerbate racial isolation, and deprive students of the educational benefits of diversity.

1. **An unexpected, mid-year overhaul of TJHSST's admissions process will disadvantage marginalized students.**

The Equal Protection Clause guarantees equal opportunity for all. Schools advance that fundamental promise of our Constitution when they remove known barriers to equal opportunity from their admissions processes and replace them with race-neutral, researched-backed reforms that distribute publicly-funded educational opportunities more fairly. Research has found that application fees,[22] standardized tests,[23] and teacher recommendation letters[24] deny students an equal opportunity to

---

[22] C. S. Mott Children's Hospital, *Mott Poll Report: Pay-to-Participate: Impact on School Activities*, 33, Nat'l Poll on Child.'s Health 1, 1-2 (2019). https://mottpoll.org/sites/default/files/documents/031819_PayToParticipate.pdf (pay-to-participate fees disproportionately disadvantaged low-income children, with 25% not participating in school activities due, in part, to cost).

[23] Standardized tests underpredict the potential of Black and Latino students. *See* Jay Rosner, The SAT: Quantifying the Unfairness Behind the Bubbles, in Sat Wars: The Case for Test-Optional College Admissions 134 (Joseph A. Soares 2015) ("The process 'used by psychometricians to construct admissions tests such as the SAT, ACT, GRE, LSAT, GMAT, MCAT, and many other bubble tests' is racially biased.").

[24] *See, e.g.*, Grissom, J.A. & Redding, C., *Discretion and disproportionality: Explaining the underrepresentation of high-achieving students of color in gifted programs*, AERA Open, 2. (2016) (Black students are less likely to be identified for gifted and talented programs when teachers exercise discretion over which students are screened).

compete for admission to academically advanced programs. In contrast, measures like a top 1.5% plan[25] give all students a fairer opportunity to compete. *See Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 545 (2015) (quoting Justice Kennedy's controlling concurrence in *Parents Involved,* 551 U.S. at 789, for the proposition that "[s]chool boards may pursue the goal of bringing together students of diverse backgrounds and races [by] drawing attendance zones with general recognition of the demographics of neighborhoods."). By enjoining the Plan that replaced several undisputed barriers to equal opportunity with race-neutral, researched-backed reforms, the district court took several tools for ensuring equal opportunity off the table, significantly narrowing FCSB's options to objectively and more effectively identify students for admission to TJHSST.

Furthermore, a rushed, mid-year pivot to a new admissions process will deny equal opportunity to many marginalized students who lack the resources to navigate the change. The impact of the district court's injunction will fall disproportionately on students who have been underrepresented historically at TJHSST and have also

---

[25] Scott J. Peters et al., *Effect of Local Norms on Racial and Ethnic Representation in Gifted Education*, 5 AERA OPEN 1, 4 (2019), https://journals.sagepub.com/doi/pdf/10.1177/2332858419848446 (recommending gifted placement policies that select the top percentage of students at each school since comparing a student to his/her schoolmates (rather than all of the students across a school district) better accounts for a student's opportunities to foster their natural talents and allows educators to better identify which students are not sufficiently challenged and not being educated to their full potential).

experienced outsized educational impacts of the COVID-19 pandemic. Many of the students *Amici* serve are low-income, ELL, or recent immigrants who may find it challenging to navigate a rushed, unexpected, mid-year change to TJHSST's admissions processes given limited resources, time, and language and cultural barriers.[26] Absent a stay, the district court's injunction will prevent FCSB from affording each student an equal opportunity to compete for admission.

### 2. The denial of a stay will subject Black, Latino, ELL, and low-income students to dignitary harm.

Denying a stay will also exacerbate the dignitary harm faced by (1) Northern Virginia Black, Latino, ELL, and low-income students attending an isolating school environment where the selection process for the regional high school for gifted students has long under-identified such students, and (2) members of TJHSST's class of 2025, for being admitted under a process the district court has erroneously invalidated as an unfair "set-aside" for Black and Latino students. The district court's opinion lends a patina of legitimacy to the prior inequitable, segregating

---

[26] *See* David Card & Laura Giuliano, *Universal screening increases the representation of low-income and minority students in gifted education*, 113 PNAS 13678, 13683 (2016), https://www.pnas.org/content/pnas/113/48/13678.full.pdf (noting that language barriers and cultural factors could present challenges that disadvantage poor, immigrant, and minority children in the gifted identification process); Scott J. Peters, *The Challenges of Achieving Equity Within Public School Gifted and Talented Programs*, 66 GIFTED CHILD QUARTERLY 82, 86 ("[P]arents with the cultural capital to advocate for their child's identification are more likely to have a student who is identified as gifted."), https://journals.sagepub.com/doi/10.1177/00169862211002535.

admissions process and the false and divisive narrative that Black, Latino, ELL, and low-income students admitted under the Plan do not belong on TJHSST's campus and are taking the places of other more deserving applicants.

These narratives lead to microaggressions and contribute to stereotype threat, harming these students' academic achievement and overall well-being.[27] Courts have long acknowledged the dignitary harms associated with the near-categorical (or categorical) exclusion of a group from educational programs. *See Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1012 (11th Cir. 2018) (noting that a predominantly-white city's racially-motivated secession from a more diverse county school system sent "messages of inferiority," which could not have "escaped the [Black] children in the [C]ounty") (quoting *Wright v. Council of Emporia*, 407 U.S. 451, 466 (1972)); *Brown v. Bd. of Educ.*, 347 U.S. 483, 493-94 (1954) (recognizing

---

[27] *See* Gloria Wong, et al., *The what, the why, and the how: A review of racial microaggressions research in psychology*, 6:2 Race and Soc. Problems, 181, 181--200 (2014) https://doi.org/10.1007/s12552-013-9107-9 (Microaggressions are "subtle insults . . . directed toward racial minorities" that "sap the energy of recipients which impairs performance in multitude of settings."); *id.* ("[P]erceived stigmatization pertaining to gender, race, and sexual orientation is associated with depression and anxiety symptoms, decreased psychological wellbeing, lower self-regard, and physical health issues (e.g., higher blood pressure)."),; Claude M. Steele, WHISTLING VIVALDI: AND OTHER CLUES TO HOW STEREOTYPES AFFECT US (2010) ("[S]tereotype threat" occurs when individuals fear that their performance on a task could confirm a negative stereotype about their racial (or other identity) group"); Gregory M. Walton & Steven J. Spencer, *Latent Ability: Grades and Test Scores Systematically Underestimate the Intellectual Ability of Negatively Stereotyped Students*, 20 PSYCHOLOGICAL Sci. 1132, 1132 (2009), https://doi.org/10.1111/j.1467-9280.2009.02417.x.

that the "intangible" harm of racial segregation "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone").

### 3. Black and Latino students will suffer more acute racial isolation if a stay is denied.

Absent a stay, the district court's opinion will exacerbate the racial isolation caused by the under-identification of Black and Latino students for admission to TJHSST. For example, one senior at TJHSST who identifies as Black experienced "shameful walks down the hall" at TJHSST, "wondering if anyone was staring at me, thinking 'Whoa, look, a Black kid,' and the racist jokes that seemed funny to everyone but me."[28] Racial isolation led her to try to bleach her skin to "look less Black" and fit in.[29] She "realized that one year at [TJHSST] made the real me—from my culture to my own skin—feel foreign and unwanted. My school didn't accept me; I didn't accept me. At that moment, I felt completely and utterly alone."[30]

Likewise, another student who identifies as Latina feels "uncomfortable at [TJHSST], not because of who I am, but because there aren't enough . . . Latino people that can say they attend the #1 public school in the country, when there are

---

[28] Didi Elsyad, *My not so Black-and-White look at diversity at Jefferson*, TJ TODAY (June 20, 2020) https://www.tjtoday.org/29057/new-on-tjtoday/my-not-so-black-and-white-look-at-diversity-at-jefferson/.

[29] *Id*.

[30] *Id*.

so many that could."[31] She added that the underrepresentation of Latino students at TJHSST makes it difficult to combat stereotypes and signals to prospective TJHSST applicants "that the only way to get ahead is to distance themselves from their culture."[32] But such feelings also encompass other students, including Asian American students: for instance, a low-income South Asian student "remembered all the times I'd been laughed at for being poor and kept my mouth shut."[33]

Racial isolation hinders academic achievement and causes other harms that *Amici* will be forced to expend resources to address.[34]

### 4. All students will be deprived of the educational benefits of diversity if a stay is denied.

Without a stay, the district court's opinion will make it more likely that Black, Latino, ELL, and low-income students will once again be woefully under-identified

---

[31] Andrea Silva, *What it means to be a TJ Latina*, TJ TODAY (July 3, 2020) https://www.tjtoday.org/29172/showcase/what-it-means-to-be-a-tj-latina/.

[32] *Id*.

[33] Gurleen Kaur, *Your finish line and mine*, TJ TODAY (June 20, 2020) https://www.tjtoday.org/29068/new-on-tjtoday/your-finish-line-and-mine/.

[34] *See, e.g.*, Mischa Thompson & Denise Sekaquaptewa, *When Being Different Is Detrimental: Solo Status and the Performance of Women and Racial Minorities*, 2 ANALYSES SOC. ISSUES & PUB. POLICY 183, 183 (2002), https://doi.org/10.1111/j.1530-2415.2002.00037.x; Shaun R. Harper & Sylvia Hurtado, *Nine Themes in Campus Racial Climates and Implications for Institutional Transformations*, in RESPONDING TO THE REALITIES OF RACE ON CAMPUS 7, 12 (2007), https://www.gvsu.edu/cms4/asset/5D80BD51-996D-6AE0-B9D7668ADFEA7A31/why_do_a_climate_survey_nine_themes_in_campus_racial_climate_and_implications_for_institutional_transformation_article_3.pdf.

for admission to TJHSST, impairing the quality of the educational experience by depriving all students of the educational benefits of diversity. *See Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (the educational benefits of diversity cannot be accomplished "with only token numbers of minority students."). Since *Brown*, the Supreme Court has recognized the "substantial, . . . important and laudable" benefits that flow from a diverse student body. *Grutter*, 539 U.S. at 330 (2003). Such a student body "promotes cross-racial understanding, helps to break down racial stereotypes, . . . enables students to better understand persons of different races," and facilitates "enhanced classroom dialogue and the lessening of racial isolation" on campus. *Fisher*, 136 S. Ct. at 2210; *see also Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 308 (2013). Crucially, diversity in education "promotes learning outcomes" and helps "prepar[e] students for work and citizenship" in our extraordinarily diverse society. *Grutter*, 539 U.S. at 330-33; *see also Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 313 (1978) ("[T]he nation's future depends upon leaders trained through wide exposure to the ideas and mores of students as diverse as this Nation of many peoples." (internal quotation marks omitted)).

These benefits extend to PK-12 schools,[35] including STEM schools like TJHSST.[36] *See Parents Involved*, 551 U.S. at 783 (five members of the Supreme Court finding that the compelling interest of the educational benefits of diversity extends to PK-12 schools) (Kennedy, J., concurring in part and concurring in judgment); *see also McAuliffe Intermdiate School PTO v. De Blasio*, 364 F. Supp. 3d 253, 283 (S.D.N.Y. 2019) ("if [the educational] benefits flow from increasing racial diversity in universities, the Court sees no logical reason why increasing racial diversity in high schools would not benefit students to the same extent").

---

[35] Amy Stuart Wells, Lauren Fox, and Diana Cordova-Cobo, *How Racially Diverse Schools and Classrooms Can Benefit All Students*, THE CENTURY FOUND (Feb. 9, 2016), https://tcf.org/content/report/how-racially-diverse-schools-and-classrooms-can-benefit-all-students/?agreed=1.

[36] *See* Kenneth Gibbs, Jr., *Diversity in STEM: What It Is and Why It Matters*, SCI. AM. (Sept. 10, 2014), https://blogs.scientificamerican.com/voices/diversity-in-stem-what-it-is-and-why-it-matters/.

# CONCLUSION

For the foregoing reasons, *Amici* respectfully request that this Court grant

FCSB's motion for stay pending appeal in this case.

DATED: March 24, 2022

Jin Hee Lee
Michaele N. Turnage Young
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300

Niyati Shah
Eri Andriola*
ASIAN AMERICANS ADVANCING
JUSTICE-AAJC
1620 L St. NW, Ste. 1050
Washington, DC 20036
Tel: (202) 296-2300

Francisca D. Fajana°
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
Tel: (212) 219-3360

Arthur Luk
Christine J. Choi
Elizabeth Denning
Megan Pieper
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave. NW
Washington, D.C. 20001
Tel: (202) 942-5000

*Counsel for Amici Curiae TJ Alumni For Racial Justice, NAACP Legal Defense and Educational Fund, Inc., CASA Virginia, Hispanic Federation, Asian American Youth Leadership Empowerment And Development, and Hamkae Center*

---

* *Admitted in New York only. DC practice limited to federal courts.*
° *Admission application to the Fourth Circuit Court of Appeals forthcoming.*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Circuit Rule 32-1, I certify that this brief is proportionally spaced, has a typeface of 14 points and contains 5,140 words.


DATED:  March 24, 2022            ARNOLD & PORTER KAYE SCHOLER, LLP


By: _/s/ Arthur Luk_____
     Arthur Luk
     Counsel for *Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2022, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which sent notification of such filing to all registered CM/ECF users.


DATED:  March 24, 2022          ARNOLD & PORTER KAYE SCHOLER LLP


By:  /s/ *Arthur Luk*_____
     Arthur Luk
     Counsel for *Amici Curiae*