No. 22-1280

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

───────────────

COALITION FOR TJ,

*Plaintiff-Appellee,*

vs.

FAIRFAX COUNTY SCHOOL BOARD,

*Defendant-Appellant.*

───────────────

On Appeal From The United States District Court for the Eastern
District of Virginia, Case No. 1:21-cv-00296-CMH
The Hon. Claude M. Hilton

───────────────

**OPENING BRIEF OF APPELLANT**

───────────────

Sona Rewari (VSB No. 47327)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500

Trevor S. Cox (VSB No. 78396)
HUNTON ANDREWS KURTH LLP
951 E. Byrd Street
Richmond, VA 23219
Telephone: (804) 788-7221

Donald B. Verrilli, Jr.
Ginger D. Anders
Xiaonan April Hu
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW,
Suite 500 E
Washington, DC 20001
Telephone:  (202) 220-1100

Mica L. Moore
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 683-9100

*Counsel for Fairfax County School Board*

## LOCAL RULE 26.1 DISCLOSURE STATEMENT

Pursuant to FRAP 26.1(c) and Local Rule 26.1(c), the Fairfax County School Board certifies that it is a local government "body corporate" established under Virginia law.  It is not a stock corporation, has no parent corporation, and has no shareholders.


DATED:  May 6, 2022                MUNGER, TOLLES & OLSON LLP


By:    /s/ Donald B. Verrilli, Jr.
        Donald B. Verrilli, Jr.
        *Counsel for Fairfax County School Board*

# **TABLE OF CONTENTS**

**Page**

JURISDICTIONAL STATEMENT ..........................................................1

INTRODUCTION ................................................................................1

STATEMENT OF THE ISSUES............................................................4

STATEMENT OF THE CASE...............................................................4

      A.    Legal Background ................................................................4

      B.    Factual Background.............................................................6

      C.    Procedural History.............................................................13

STANDARD OF REVIEW ..................................................................22

ARGUMENT ......................................................................................23

I.     The District Court Erred in Concluding that the Plan Disparately
Impacts Asian Americans. ...............................................................23

      A.    The district court erred in relying on a simple year-over-year
comparison to find disparate impact. ...............................25

      B.    Even if the district court's year-over-year comparison were
appropriate, the court's conclusion that the Plan *caused* the
decrease in Asian-American admittees is legally and factually
unsupported. ......................................................................30

II.    The District Court Erred in Concluding that the Plan Was Adopted
with Invidious Discriminatory Purpose..........................................38

      A.    The undisputed record evidence demonstrates that the Board
did not adopt the Plan with any constitutionally impermissible
purpose. .............................................................................39

      B.    An objective of improving racial diversity, along with other
types of diversity, is not invidious discriminatory intent....51

CONCLUSION ...................................................................................57

i

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**FEDERAL CASES**

*Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Boston,*
    996 F.3d 37 (1st Cir. 2021)............................................................*passim*

*Brnovich v. Democratic Nat'l Comm.,*
    141 S. Ct. 2321 (2021)....................................................................37, 55

*Chavez v. Illinois State Police,*
    251 F.3d 612 (7th Cir. 2001) ...............................................................26

*Chicopee Mfg. Corp. v. Kendall Co.,*
    288 F.2d 719 (4th Cir. 1961) ...............................................................14

*City of Richmond v. J.A. Croson Co.,*
    488 U.S. 469 (1989)....................................................................*passim*

*Colacurcio v. City of Kent,*
    163 F.3d 545 (9th Cir. 1998) ...............................................................48

*Crawford v. Bd. of Educ. of City of Los Angeles,*
    458 U.S. 527 (1982)..............................................................................55

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
    140 S. Ct. 1891 (2020)..................................................................25, 56

*Doe ex rel. Doe v. Lower Merion Sch. Dist.,*
    665 F.3d 524 (3d Cir. 2011) ..........................................................6, 57

*Easley v. Cromartie,*
    532 U.S. 234 (2001).............................................................................47

*EEOC v. Joe's Stone Crab, Inc.,*
    220 F.3d 1263 (11th Cir. 2000) .....................................................29, 30

*Fisher v. Univ. of Texas at Austin,*
    570 U.S. 297 (2013)...................................................................5, 41, 54

# TABLE OF AUTHORITIES

**Page(s)**

*Fisher v. Univ. of Texas at Austin*,
   579 U.S. 365 (2016)....................................................................5, 41, 53

*Foster v. Univ. of Maryland-Eastern Shore*,
   787 F.3d 243 (4th Cir. 2015) ...........................................................22

*Grutter v. Bollinger*,
   539 U.S. 306 (2003)................................................................*passim*

*Hameed v. Int'l Ass'n of Bridge, Structural & Ornamental Iron*
   *Workers, Local Union No. 396*,
   637 F.2d 506 (8th Cir. 1980) ...........................................................31

*Hayden v. Cnty. of Nassau*,
   180 F.3d 42 (2d Cir. 1999) .......................................................6, 27, 30

*Hazelwood Sch. Dist. v. United States*,
   433 U.S. 299 (1977)........................................................................25

*Hunter v. Underwood*,
   471 U.S. 222 (1985)........................................................................45

*Lewis v. Ascension Par. Sch. Bd.*,
   806 F.3d 344 (5th Cir. 2015) ......................................................27, 32

*Lewis v. Bloomsburg Mills, Inc.*,
   773 F.2d 561 (4th Cir. 1985) ...........................................................26

*Miller v. Johnson*,
   515 U.S. 900 (1995)........................................................................48

*N. Carolina State Conf. of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) .......................................20, 28, 39, 45

*N. Carolina State Conf. of the NAACP v. Raymond*,
   981 F.3d 295 (4th Cir. 2020) ...........................................................50

*N.Y. City Transit Auth. v. Beazer*,
   440 U.S. 568 (1979)........................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

*Newark Branch, NAACP v. Town of Harrison, N.J.,*
940 F.2d 792 (3d Cir. 1991) ............................................................26

*Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1,*
551 U.S. 701 (2007)...........................................................................4

*Personnel Adm'r of Mass. v. Feeney,*
442 U.S. 256 (1979)....................................................5, 22, 39, 54

*Reyes v. Waples Mobile Home Park Ltd. P'ship,*
903 F.3d 415 (4th Cir. 2018) ...........................................................32

*Rothe Dev., Inc. v. United States Dep't of Def.,*
836 F.3d 57 (D.C. Cir. 2016).......................................................6, 57

*Schuette v. Coal. to Defend Affirmative Action, Integration &*
*Immigrant Rts. & Fight for Equal. By Any Means Necessary*
*(BAMN),*
572 U.S. 291 (2014)........................................................................55

*Spurlock v. Fox,*
716 F.3d 383 (6th Cir. 2013) .................................................6, 49, 57

*Stout v. Potter,*
276 F.3d 1118 (9th Cir. 2002) .........................................................29

*Sylvia Dev. Corp. v. Calvert Cnty.,*
48 F.3d 810 (4th Cir. 1995) .............................................................46

*Texas Department of Housing & Community Affairs v. Inclusive*
*Communities Project, Inc.,*
576 U.S. 519 (2015)...............................................................4, 31, 53

*Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.,*
429 U.S. 252 (1977).................................................................*passim*

*Wards Cove Packing Co. v. Atonio,*
490 U.S. 642 (1989)..............................................................24, 25, 29

# TABLE OF AUTHORITIES

**Page(s)**

*Washington v. Davis*,
    426 U.S. 229 (1976)................................................................23, 26, 54

*Watson v. Fort Worth Bank & Tr.*,
    487 U.S. 977 (1988)................................................................23, 30, 31

**FEDERAL STATUTES**

28 U.S.C. § 1291.........................................................................................1

28 U.S.C. § 1331.........................................................................................1

42 U.S.C. § 2000e-2(k)............................................................................24

**STATE STATUTES**

Va. Code Ann. § 22.1-79(8)....................................................................51

**OTHER AUTHORITIES**

Hunter, Brittany, Pacific Legal Foundation, *Restoring equality before
    the law — What the TJ victory means for education* (Mar. 2, 2022),
    https://pacificlegal.org/equality-before-the-law-w-tj-victory-
    means-education/ ...................................................................................40

TJ Alumni Action Group, *Debunking the Lie* (2022),
    https://www.tjaag.org/debunking-the-lie.............................................8

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the Coalition's equal protection claim under 28 U.S.C. § 1331. On February 25, 2022, the district court granted summary judgment to the Coalition and denied summary judgment to the Board, and enjoined "further use or enforcement" of the challenged admissions policy. On March 14, 2022, the Board filed its timely notice of appeal. This Court has jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION

In 2020, the Fairfax County School Board (the Board) adopted a new admissions policy for Thomas Jefferson High School for Science & Technology (TJ)—a selective school that focuses on math, science, and technology. The new policy addressed impediments that had unfairly worked against qualified students of all races, while maintaining the rigorous academic standards that historically characterized TJ's admissions process.

The district court struck down the new policy on the remarkable theory that the Board enacted it with the invidious intent to discriminate against Asian-American students in violation of the Fourteenth Amendment. But the Board did no such thing. The new policy is race-neutral and race-blind. It sets no racial quotas, goals, or targets. To the contrary, the Board forbade consideration of race in TJ admissions decisions, and all applications are anonymized so evaluators do not know

1

the race of any applicant.  The district court nonetheless slapped the pejorative label of "racial balancing" on the new policy, pointing to statements by individual Board members expressing the hope that increasing the socioeconomic and geographic diversity of the student population would also enhance its racial diversity.  Even if those views are attributed to the Board itself, however, the Supreme Court has repeatedly made clear that governments may adopt race-neutral measures to improve racial diversity (*see* pp. 4-5, *infra*).  And it is preposterous to describe the new policy as "racial balancing."  The demographic composition of the admitted class bears no resemblance to the demographic composition of Fairfax County (*see* note 9, *infra*).  And the policy's design ensured that it could not be used to achieve any such impermissible end.

The district court's other rationale for finding intentional discrimination was even more extreme.  The court held that any desire to increase the numbers of Black or Hispanic students at TJ constitutes invidious discrimination *by definition* because it would—given the finite number of offers available—foreseeably result in Asian-American students comprising a smaller share of the student body.  But no court of appeals has ever accepted such reasoning (*see* pp. 56-57, *infra*), doubtless because it would render presumptively unconstitutional the University of Texas "Top Ten Percent Plan" and all other race-neutral public initiatives to improve diversity.  And the extreme consequences of such a holding would extend even further.  Any

2

government policy, whatever its objective, would be presumptively unconstitutional if it could foreseeably alter the racial composition of a student body, a workforce, or a class of beneficiaries.

The district court's discriminatory intent analysis was as unnecessary as it was misconceived because its predicate—the court's finding that the new policy had a disparate impact on Asian Americans—lacks any record support and ignores established law. Asian-American applicants received a considerably larger share of offers under the policy than their share of the applicant pool. Asian Americans were not disadvantaged relative to students of other races; they suffered no cognizable disparate impact (*see* pp. 23-38, *infra*). The district court nevertheless found disparate impact because Asian-American applicants comprised a smaller share of offers, relative to other races, than under prior admissions policies. But such year-over-year comparisons are not probative of whether the challenged policy had a disparate impact on Asian Americans. And the district court did not even try to show that this alleged disparate impact was caused by the challenged aspects of the new policy rather than other factors that could well have explained the difference.

In sum, the district court's ruling lacked any foundation in the record and disregarded established law. It should be reversed.

## STATEMENT OF THE ISSUES

Whether the district court erred in holding that the race-neutral admissions policy for TJ violates the Equal Protection Clause, given that

(1) the policy does not cause a disparate impact on Asian-American applicants; and

(2) the policy was not adopted with invidious discriminatory intent.

## STATEMENT OF THE CASE

### A.   Legal Background

The Supreme Court has repeatedly reaffirmed that public institutions, including school boards, may adopt race-neutral measures designed to increase all types of diversity—socioeconomic, geographic, and racial. *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc*., 576 U.S. 519, 545 (2015). For instance, "[s]chool boards may pursue the goal of bringing together students of diverse backgrounds and races through other means [than considering race], including strategic site selection of new schools; [and] drawing attendance zones with general recognition of the demographics of neighborhoods." *Id*. (quoting *Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 789 (2007) (Kennedy, J., concurring in part and concurring in judgment)). In the higher education context, the Court has encouraged universities to explore "race-neutral alternatives," including lessening reliance on standardized tests and allocating percentages of the incoming class to all state high schools, for the purpose

4

of "assembl[ing] a student body that is not just racially diverse, but diverse along all the qualities valued by the university." *Grutter v. Bollinger*, 539 U.S. 306, 340 (2003); *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 312 (2013) ("*Fisher I*") (universities must consider whether "workable race-neutral alternatives would produce the educational benefits of diversity"); *see also City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 510 (1989) (governments may "increase the opportunities available to minority business" through race-neutral measures such as altered bidding rules); *id.* at 526 (Scalia, J., concurring in the judgment).

Because these race-neutral measures are designed to increase diversity, including racial diversity, they "may well have racially disproportionate impact." *Croson*, 488 U.S. at 526 (Scalia, J., concurring in the judgment). But, critically, they are nonetheless presumptively "permissible" under the Equal Protection Clause because "they are not based on race"—that is, they do not classify individuals based on their race. *Id.*; *Fisher v. Univ. of Texas at Austin*, 579 U.S. 365, 377 (2016) ("*Fisher II*"). Rather, race-neutral measures are suspect only if the challenger demonstrates that the measure was motivated by invidious intent to disfavor a targeted racial group—that is, it was enacted "because of," and not "merely 'in spite of,'" its disproportionate adverse impact on members of a particular race. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

5

Consistent with that guidance, every court of appeals to consider a race-neutral measure that promotes diversity has upheld the measure under rational basis review. *See, e.g.*, *Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Boston*, 996 F.3d 37, 46 (1st Cir. 2021) ("[A] public school system's inclusion of diversity as one of the guides to be used in considering whether to adopt a facially neutral plan does not by itself trigger strict scrutiny."); *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 529 (3d Cir. 2011) (upholding race-neutral school districting despite consideration of racial effects); *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 50-51 (2d Cir. 1999); *Spurlock v. Fox*, 716 F.3d 383, 396 (6th Cir. 2013); *Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57, 72 (D.C. Cir. 2016).

### B.  Factual Background

1.     TJ is a public high school located in Fairfax County, Virginia.  JA40. It is one of 19 Governor's Schools in Virginia, which provide advanced studies and require students to apply for admission.  JA30.  TJ's mission is to "provide students with a challenging learning environment focused on math, science and technology, to inspire joy at the prospect of discovery, and to foster a culture of innovation based on ethical behavior and the shared interests of humanity."  JA40.  The Fairfax County Public Schools system (FCPS) is operated by the Board, a public body comprising 12 elected members.  JA40.

6

This case concerns the Board's decision to alter TJ's admissions process in 2020. Before the changes at issue, to be eligible for admission to TJ, applicants were required to reside in a participating school division, have a minimum 3.0 grade point average (GPA), and to have completed, or be enrolled in, Algebra I. JA41. Applicants who satisfied these criteria were required to pay a $100 admission fee and take three standardized tests. JA41. Students who achieved a certain percentile ranking on the tests and maintained a 3.0 GPA advanced to the semifinalist round consisting of an exam that included three writing prompts and a problem-solving essay, and two teacher recommendations. JA41. Evaluators chose students for admission based on a holistic assessment of the application. JA41–42.

This admissions process produced classes that were overwhelmingly drawn from a small subset of middle schools, and that included few low-income students, English Language Learners (ELL), students receiving special education services, and students who identify as Black, Latino, or multiracial. JA708. Just eight of Fairfax County's twenty-six middle schools, accounted for 87% percent of the County's share of TJ's admitted students from 2016–2020. JA673-674. During the same period, less than 2% of admitted students qualified for Free or Reduced-price Meals (FRM), and less than 1% were ELL. JA614-616, JA1143. By contrast, 29.3% of FCPS's student body are FRM students, and 27.4% are ELL. JA294, JA615. In 2019, 1.23% and 3.29% of all offers went to Black and Hispanic applicants,

respectively.  See JA556, TJ Alumni Action Group, *Debunking the Lie* (2022), *available at* https://www.tjaag.org/debunking-the-lie.  These figures were consistent with prior application cycles.  *See Debunking the Lie.*  Also in 2019, Black students were 9.8% of the County student population and 7% of TJ's applicant pool, while Hispanic students were 26.8% of the County student population and 7% of TJ's applicant pool.  JA294, JA299.

2.    In May 2020, the Board was briefed by staff regarding potential changes to the admissions process that were designed to increase offers given to students from County schools that historically had sent few students to TJ, as well as FRM, ELL, special education, and Black and Hispanic students.  JA779-782.  In summer 2020, state officials expressed concern that TJ had historically admitted very few disadvantaged students, including "children from Asian working-class families," and that such students might not enjoy an equal opportunity to apply to and attend Governor's Schools.  JA616-617, JA800.

In September, Division Superintendent Scott Brabrand proposed that the Board modify TJ's admissions process to encourage students from underserved groups to apply; remove historical barriers to access; and include students from all parts of the County and its neighboring jurisdictions.  JA617, JA1138.  Under Dr. Brabrand's proposed "merit lottery," the Board would eliminate standardized tests, the problem-solving essay, the application fee, and teacher recommendations, but

increase the minimum GPA from 3.0 to 3.5.  JA617, JA747.  Eligible students would be assigned to regional pools based on residence; each pool would receive an equal number of seats; and students would be selected randomly from each pool.  JA617, JA748.  Dr. Brabrand presented his proposal with slides showing the lottery's projected impact on TJ's racial demographics, as well as on numbers of low-income and ELL students.  JA308-310.

During a September work session, the Board discussed the lottery proposal; decided to address TJ admissions at its October meeting, after further community outreach; and directed county staff to take various "next steps," including evaluating a "school-based" approach to increasing geographic diversity rather than a regional one.  JA618, JA883.  Board members expressed various views, including concerns that students from some regions of the County were historically underrepresented at TJ.  *See, e.g.*, JA840.

Dr. Brabrand's merit-lottery proposal proved controversial among Board members and in the community.  JA618-619, JA886.  The Coalition, an organization of FCPS parents, JA3, opposed it.  JA619, 1516.  Observing that the existing admissions process resulted in "underserved communities in Fairfax County," JA892, the Coalition proposed an alternative that included provisions addressing geographic diversity and a holistic evaluation, in which "underrepresented background" would be "evaluated favorably and weighted in the admissions

9

process."    JA895.    The Coalition    touted    its    proposal    as    "benefiting"
"disproportionately more Black and more Hispanic students," and "materially
increas[ing] both the geographic and the socioeconomic diversity at [TJ]."  JA730,
JA893.

In October 2020, Dr. Brabrand presented a revised proposal.  It retained the
regional lotteries for all but 100 seats, which would be awarded based on a "holistic"
review.    JA619-620, JA530.    The holistic review included two qualitative
assessments (a Student Portrait Sheet and problem solving essay) and considered
four "Experience Factors": (i)  eligibility for FRM; (ii) status as an ELL; (iii)
eligibility for special education services; and (iv) attendance at a historically
underrepresented public middle school, that is, a school that had sent few students
to TJ.  JA619-620, JA528.

At an October 2020 work session, after lengthy debate and consideration of
community feedback, the Board did not adopt the revised merit-lottery proposal.
JA620-621, JA908-910.   But the Board voted unanimously to eliminate the
application fee and standardized tests.  JA620, JA908.  The Board also directed the
Superintendent to increase TJ's admitted class from 480 to 550 students, and to
develop a non-lottery proposal.  JA620, JA908-910.

Over the next ten weeks, the Board considered two proposals by Dr.
Brabrand—an updated hybrid lottery proposal, and a "holistic" plan that would

10

allocate seats to each of the County's five administrative regions, and award seats within each region based on two qualitative assessments and the Experience Factors. JA622-623, JA1139.  Neither Dr. Brabrand nor his staff ever projected the impact of the holistic review proposal on TJ student-body demographics.  JA623, JA1246-1247.

In December 2020, following public comment, the Board rejected the hybrid merit-lottery proposal.  JA624, JA2223.  The Board instead adopted a modified version of the holistic review proposal (the "Plan").  JA2223-2224.  The Plan guaranteed that each public middle school would be allocated slots in the incoming class equal to 1.5% of the school's eighth-grade student population.  JA624, JA698. Students would be evaluated based on a race-blind review of their applications, including their GPA (now required to be 3.5 or higher), two written assessments (a Student Portrait Sheet and problem solving essay), and the Experience Factors. JA624, JA2224.  A student would receive 90 bonus points for the FRM Experience Factor, and 45 bonus points for each of the other factors, after being scored on a 900-point scale for all other metrics.  JA93–94.  Each middle school's allocated seats would be offered to the highest evaluated students from each school.  JA624, JA42-43.  Remaining applicants would compete for about 100 unallocated seats.  JA624, JA43.  Because students compete within each middle school for the allocated seats, the underrepresented schools factor affects admissions decisions only for the

11

unallocated seats—i.e., when students from different middle schools compete against one another for admission.

The Board mandated that the admissions process use "only race-neutral methods that do not seek to achieve any specific racial or ethnic mix, balance, or targets." JA624, JA2224. This mandate was codified in regulations that also provide that applications will be anonymized, and "[c]andidate name, race or ethnicity, or sex . . . will not be provided." JA697. The Plan and the race-blind mandate were adopted by a near-unanimous vote—with 10 Board members in favor, 1 abstaining, and 1 against. JA624, JA2224.

No Board member and no FCPS staff ever analyzed how the 1.5% allocation would affect the racial composition of the admitted class of students. JA624, JA1140. At no point during any work sessions or meetings—recordings of which are publicly available, and transcriptions of which are in the record—did any Board member express any intent to decrease the number of Asian-American students, or even mention Asian-American representation at TJ. JA625.

3.    Applications to TJ increased significantly under the Plan: 3,470 students applied in 2021, compared to 2,543 students in 2020 and 2,771 in 2019. JA673-674. The first class admitted under the Plan (the Class of 2025) included far higher proportions of low-income students, ELL students, and women than preceding classes. JA625-626, JA1143. Further, for the first time in at least fifteen

12

years, students from all 26 public middle schools in Fairfax County were offered admission. JA43, JA1142. The average GPA for admitted students (3.953) remained virtually unchanged from the prior year. JA626, JA1143.

Under the Plan, Asian-American applicants comprised 48.59% of the applicant pool and received 54.36% of the offers. JA675. The number of Asian-American students admitted from underrepresented County schools rose nearly 600%—from five offers in 2020 to twenty-nine in 2021. JA677; *see also* Sealed Joint Appendix Volume IX. The number of low-income Asian-American admittees similarly increased from one student in 2020 to 51 in 2021. *Id.* For twenty-three of the twenty-six Fairfax County public middle schools, Asian Americans received a far higher proportion of offers relative to their percentage of the student body. JA676-677. For example, Asian Americans received approximately 78% of offers at Frost Middle School (one of the six "feeder" schools on which the Coalition focuses) despite being approximately 25% of the student body. *Id.* The same was true for non-feeder schools: Asian Americans received 75% of offers at Lanier Middle School—where approximately 24% of the student body identifies as Asian American. *Id.*

### C.    Procedural History

1.    In March 2021, the Coalition sued the Board. JA22. The complaint alleged that the Board had intentionally discriminated against Asian Americans in

13

violation of the Fourteenth Amendment, and that the Plan, although facially race-neutral, was "specifically intended to reduce the percentage of Asian-American students who enroll in TJ." JA1. The Coalition contended that under the framework governing equal protection challenges to race-neutral policies set forth in *Feeney* and *Arlington Heights*, the Plan should be subject to strict scrutiny because it had a disparate impact on Asian-American students and was enacted with invidious intent.

2. Following cross-motions for summary judgment, the district court entered summary judgment for the Coalition on February 25, 2022. JA2986. In an opinion that tracked the Coalition's opening summary judgment brief nearly word-for-word, the court held that the Plan was subject to, and could not survive, strict scrutiny.[1]

The court first concluded that the Plan had a disparate impact on Asian Americans because the Asian-American proportion of offerees was lower under the Plan (54.36%) than it had been in the years immediately preceding the Plan's adoption (65-75%). In the court's view, the year-over-year comparison, alone, "tells much of the story." JA2968. The court did not mention that under the Plan, Asian Americans received a greater share of offers than their share of the applicant pool. The court went on to assert (without record citation) that the Plan reduced the

---

[1] Compare JA2955–2985 (Memorandum Opinion) to JA49–91 (Coalition's Motion for Summary Judgment). *See Chicopee Mfg. Corp. v. Kendall Co*., 288 F.2d 719, 724–25 (4th Cir. 1961) (disapproving nearly verbatim copying of counsel's brief).

proportion of offers to Asian Americans by forcing them to "compete against more eligible and interested applicants (often each other) for the allocated seats" and depriving them of the 45 points awarded to students from underrepresented schools. JA2969-2970.

The district court then held that the Board acted with discriminatory intent against Asian Americans because, in the court's view, the Board sought to achieve "racial balance" by increasing representation of Black and Hispanic students. JA2978. The court concluded that an examination of the circumstances set forth in *Arlington Heights*, 429 U.S. at 266, supported a finding of discriminatory intent.

First, the court stated that "[t]he discussion of TJ admissions changes was infected with talk of racial balancing from its inception." JA2979. As support, the court cited statements by some Board members expressing concern over the "under-representation of Black and Hispanic students" at TJ; a Board member statement recognizing that a "geographic distribution of students across the county will result in a change in demographics to include more students that are FRM (qualify for free or reduced-price meals), ELL (English language learners), black, Hispanic, or twice exceptional"[2]; and a resolution adopted by the Board expressing its goal to have "TJ's demographics represent the NOVA region." JA2979-2980.

_____

[2] "Twice exceptional" students are high-achieving students who qualified for special education services.

15

Second, the court asserted that "the Board's requests for consideration of racial data demonstrate discriminatory intent." JA2981. The court relied solely on a slide presentation by Superintendent Brabrand concerning the initial lottery proposal, which the Board rejected; that presentation projected the lottery's impact on TJ's racial demographics as well as its proportion of low-income and ELL students. JA2979. The court did not mention that no demographic modeling or analysis was done with respect to the Plan.

Third, the district court characterized the Board's process as "rushed," JA2978, even though the Board spent several months considering, and receiving public input on, alternative proposals. The court viewed as procedurally irregular the fact that the 1.5% allocation had not been presented publicly in a meeting before it was voted on. JA2977.

Ultimately, the district court concluded that the Board invidiously discriminated against Asian Americans by intending "to increase Black and Hispanic enrollment, which would, by necessity, decrease the representation of Asian-Americans at TJ." JA2981-2983. Based on that "zero sum" equal protection analysis, the court enjoined the Board from "further use or enforcement" of the Plan. JA2986.

16

3.    Because the injunction required the Board to halt the 2022 admissions process, then well underway, and design a new policy from scratch, the Board sought a stay pending appeal, which the district court denied.  Doc. 152.

The Board then sought, and this Court granted, a stay pending appeal.  *See* Order, Doc. 27, at 1 (4th Cir. Mar. 31, 2022).  In a concurring opinion, Judge Heytens explained the basis for the stay.  After noting that "it is undisputed that the challenged admissions policy is *race neutral*—indeed, evaluators are not told the race or even the name of any given applicant"—Judge Heytens expressed "grave doubts about the district court's conclusions regarding both disparate impact and discriminatory purpose, as well as its decision to grant summary judgment in favor of a plaintiff that would bear the burden of proof on those issues at trial."  *Id*. at 3.

With respect to disparate impact, he concluded that the district court's analysis "is likely flawed because it relies on the wrong comparator" (i.e., it relied on a before-and-after comparison of Asian-American admissions rather than examining performance relative to the applicant pool) and because the district court drew an unsupported inference that the Plan's 1.5% allocation caused the disparate impact. *Id*. at 7.

With respect to discriminatory intent, Judge Heytens concluded that the "centerpiece of the district court's analysis"—its conclusion that the Plan was adopted with invidious intent because it was "designed to increase Black and

17

Hispanic enrollment, which would, *by necessity*, decrease the representation of Asian-Americans at TJ," *id*. at 8-9 (emphasis added)—was irreconcilable with Supreme Court precedents approving the use of race-neutral policies to increase socioeconomic and racial diversity in public education, housing, and government contracting. He likewise concluded that the district court likely erred in concluding that the Plan was adopted to achieve "racial balanc[e]," as "the Coalition appears to have *identified no evidence* that TJ's current race neutral policy is intended to achieve a certain percentage of Black, Hispanic, or Asian American students." *Id*. at 11 (emphasis added). Judge Heytens also found that the Board would suffer irreparable harm absent a stay. *Id*. at 12-13.

Judge Rushing dissented. In her view, the Board had not demonstrated irreparable harm. With respect to disparate impact, Judge Rushing acknowledged that the Coalition's "year-over-year comparison may be influenced by other variables." *Id*. at 19. But, she asserted, "disproportionate impact is but one factor to consider." *Id*. With respect to discriminatory intent, she observed that the district court had found that the Board was engaged in "[r]acial balancing." *Id*. at 18.

4.    The Coalition filed an application to vacate this Court's stay in the Supreme Court. On April 25, 2022, the Supreme Court denied the application without opinion. 21A590 (S. Ct.). Justices Thomas, Alito, and Gorsuch dissented.

18

## SUMMARY OF ARGUMENT

The district court's decision flies in the face of decades of Supreme Court and circuit precedent establishing that race-neutral measures, including those adopted to promote diversity, are presumptively lawful under the Equal Protection Clause. When, as here, a policy is facially race neutral, it is subject to strict scrutiny only if it (1) has a "racially disproportionate impact"; and (2) was enacted for an "invidious discriminatory purpose"—that is, for the *purpose* of harming a particular racial group. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-266 (1977). The undisputed evidence demonstrates that the Plan does not disproportionately disadvantage Asian Americans in the admissions process, and that in adopting the Plan, the Board permissibly sought to increase all types of diversity, not to target Asian Americans or achieve racial balance.

I.    The district court's finding that TJ's admissions policy had a disparate impact on Asian-American applicants is factually and legally unsupported. Under the Plan, the percentage of Asian-American applicants receiving offers is considerably *higher* than the percentage of Asian Americans who applied for admission. And the Plan's focus on geographic and socioeconomic diversity benefited Asian Americans: for the first time, substantial numbers of Asian Americans from non-feeder schools and low-income backgrounds gained admission.

19

The district court found disparate impact based solely on the fact that Asian Americans comprised a smaller share of offerees in the first year under the Plan than in previous years.  But this Court has rejected such year-over-year comparisons to prove disparate impact, because they are not probative of whether a racial group was disadvantaged *relative to other races*.  *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016).  The Coalition made no attempt to demonstrate that Asian Americans had less ability than other racial groups to turn applications into offers—no doubt because the admissions statistics established that Asian American students had *more* success than other groups.

Even if a year-over-year comparison were probative of disparate impact, the district court erred in concluding that the alleged disparate impact was caused by the Plan, as opposed to other factors that could well have explained the difference. Because each year's applicant pool is composed of different individuals, there is no reason to assume that the proportion of Asian-American students in each class should remain constant every year.  And in 2020, Asian Americans were a smaller portion of the applicant pool than in previous years, the pool was far larger, and there were many additional applications from non-feeder schools.  The district court's speculation as to why the Plan nonetheless caused the decrease is contradicted by the record.

20

II.    The district court's finding that the Board acted with invidious discriminatory intent against Asian Americans likewise lacks factual and legal support.  The district court labeled the concededly race-neutral Plan an exercise in "racial balancing"—as the court put it, an attempt "to align" TJ's population "with districtwide enrollment data."  JA2972-2973, JA2979.  But the Plan sets no racial quotas or targets; it is implemented in a race-blind and anonymized manner; the Board did not perform or receive *any* demographic modeling of the Plan's likely effects; and the admitted class's racial demographics bear little resemblance to that of the districtwide population.  The court's contrary conclusion rested on a few statements by Board members and other officials that merely expressed hope that taking into account race-neutral factors such as geography and socioeconomic status would result in greater racial diversity.  But seeking to improve *diversity*—including geographic, socioeconomic, and racial diversity—is not the same as pursuing *racial balancing*, and the Supreme Court has repeatedly reaffirmed that the former goal may be pursued through race-neutral methods.  *See Grutter*, 539 U.S. at 319.

The district court also held that the Board acted with invidious intent because, in its view, the Plan "was designed to increase Black and Hispanic enrollment." JA2979.  The court reasoned that, given the "zero-sum" nature of admissions—there is a finite number of seats to award—it was foreseeable that a policy that improved representation of previously underserved racial groups would result in fewer Asian

21

Americans receiving offers.   But *Feeney* and *Arlington Heights* hold that a foreseeable impact does not give rise to an inference of invidious intent.  *Arlington Heights*, 429 U.S. at 266; *Feeney*, 442 U.S. at 279.  And the Supreme Court has repeatedly upheld public institutions' flexibility to undertake race-neutral measures to improve diversity, even when such measures have the zero-sum impact of which the district court complained.  *Grutter*, 539 U.S. at 340; *Croson,* 488 U.S. at 510.  For those reasons, every court of appeals to consider reasoning like the district court's has resoundingly rejected it on the ground that it "would pretty much mean that any attempt to use neutral criteria to enhance diversity—not just measures aimed at achieving a particular racial balance—would be subject to strict scrutiny." *Boston Parent Coal*., 996 F.3d at 48.

The district court's decision should therefore be reversed.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo. *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015). "Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (citation and internal quotation marks omitted).  This Court "view[s] the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party" when evaluating a grant of summary judgment.  *Id.* (citation omitted).

22

**ARGUMENT**

The district court deviated from decades of equal protection precedent in concluding that TJ's race-blind admissions policy, adopted to promote all types of diversity, inflicts a disproportionate impact on Asian Americans and reflects invidious discrimination against them. The Coalition did not come close to making the detailed factual showing that the Supreme Court and this Court have held is necessary to establish a racially disparate impact and invidious discriminatory purpose. The Board was therefore entitled to summary judgment, and the district court's grant of summary judgment to the Coalition should be reversed.

## I. The District Court Erred in Concluding that the Plan Disparately Impacts Asian Americans.

To obtain summary judgment, the Coalition bore the burden of proving on the basis of undisputed evidence that (1) under the Plan, Asian-American applicants have disproportionate difficulty, relative to other racial groups, in gaining admission to TJ; and (2) that specific aspects of the Plan caused that disproportionate impact. *See, e.g.*, *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994-995 (1988) (discussing evidentiary standard under Title VII, and observing that the Court has "framed the test in similar terms" in the equal protection context); *Washington v. Davis*, 426 U.S. 229, 246-247 (1976) (disparate impact may be shown by establishing that the challenged "hiring and promotion practice[]" causes

23

"substantially dispro[po]rtionate numbers of blacks" to be disqualified).   The
Coalition completely failed to muster the necessary proof.

What the undisputed evidence demonstrates is that the Plan gave Asian
Americans an equal opportunity to succeed—which they did.   Asian-American
students were by far the largest racial group among the students offered admission
(54.36%); their share of offers exceeded their share of the applicant pool (48.59%);
and (consistent with the Plan's objectives of promoting geographic and
socioeconomic diversity) far more Asian Americans from underrepresented schools
and economically disadvantaged backgrounds were admitted than in previous years.
Those facts—and the Coalition's total failure to offer evidence demonstrating why
and how the Plan's features made it disproportionately difficult for Asian Americans
to gain admission to TJ—should have resulted in summary judgment for the Board.
*See, e.g.*, *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650-652 (1989),
*superseded by statute on other grounds by* 42 U.S.C. § 2000e-2(k).

Instead, the district court held that the Plan had a disparate impact on Asian-
American applicants *as a matter of law* solely because the number and proportion of
Asian-American offerees in the Plan's first year was lower than in prior years under
other admissions policies.   That holding ignores the precedent of the Supreme Court
and this Court, and its reasoning would enable plaintiffs to claim that *any* policy
change that affects a public institution's racial demographics has a suspect racially

24

disproportionate impact.  That is not the law, and for good reason: it would turn the previous status quo into an immutable quota.  *Cf. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1916 (2020) (rejecting disparate-impact theory that would permit "virtually any generally applicable immigration policy [to] be challenged on equal protection grounds").

### A. The district court erred in relying on a simple year-over-year comparison to find disparate impact.

1.     In holding that the Plan has a disparate impact on Asian Americans, the district court relied exclusively on the fact that the "number and proportion of Asian-American students offered admission to TJ" was 54% under the Plan, compared to 65% to 75% in the five years prior.   JA2968.   But a simple before-and-after comparison cannot establish a disparate impact, because Asian Americans' performance under the previous policy is not the "proper baseline for comparison." Stay Order at 7 (Heytens, J., concurring).  Rather, proving disparate impact requires proof of a substantial disparity between the racial composition of the class of applicants offered admission *and the racial composition of the pool of eligible applicants.  See, e.g.*, *Wards Cove*, 490 U.S. at 650-652 (disparate impact in hiring for noncannery jobs must be shown through a comparison to the "pool of qualified job applicants" for noncannery jobs); *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-308 (1977) (The "proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified . . .

25

population in the relevant labor market."); *N.Y. City Transit Auth. v. Beazer*, 440 U.S. 568, 584 (1979); *Lewis v. Bloomsburg Mills, Inc.*, 773 F.2d 561, 568 (4th Cir. 1985) (finding disparate impact in Title VII case where "plaintiffs relied essentially upon the familiar procedure of comparing for the relevant period the 'observed' annual rate of hires of black females with the 'expected' rates . . . , then having the results of the comparison assessed for statistical significance through expert opinion testimony"); *Newark Branch, NAACP v. Town of Harrison, N.J.*, 940 F.2d 792, 798 (3d Cir. 1991).

A comparison to the applicant pool is necessary because establishing an equal-protection violation under *Arlington Heights* requires proof that a challenged race-neutral policy "*bears more heavily on one race* than another." 429 U.S. at 266 (quoting *Davis*, 426 U.S. at 242, emphasis added). Only a comparison to the applicant pool addresses that legally determinative question: comparing a racial group's proportion of offers to its proportion of the applicant pool reveals that group's success in converting applications into offers, and comparing that success rate to those of other racial groups provides insight into whether the admissions policy disproportionately disadvantages one race compared to others. *Id.*; *Chavez v. Illinois State Police*, 251 F.3d 612, 638 (7th Cir. 2001) ("[S]tatistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated."). A before-and-after comparison,

26

by contrast, sheds no light on whether Asian Americans have more difficulty obtaining admission than members of other groups. The most that can be said is that a before-and-after comparison indicates whether there were any changes between classes from one year to the next—not the *reason* for (or the significance of) those changes, *see* p. 30, *infra*. Moreover, a year-over-year comparison assumes that the previous status quo reflected a neutral baseline—yet here, the Coalition concedes that previous admissions policies "underserved" various communities. JA728, JA892-893.

For those reasons, courts across the country have uniformly rejected attempts to establish a disparate impact for equal protection purposes merely by relying on before-and-after comparisons, and they have also emphasized the need for comparison to the applicant pool. *See, e.g.*, *Boston Parent Coal.*, 996 F.3d at 46 (comparison to performance under predecessor admissions plan was not "apt for purposes of determining adverse disparate impact"; compared to a "random" selection reflecting the eligible applicant pool, there was no disparate impact); *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 361 (5th Cir. 2015) (approving district court's rejection of before-and-after comparison); *Hayden v. Cty. of Nassau*, 180 F.3d 42, 52 (2d Cir. 1999) (discounting before-and-after test performance comparison).

27

Similarly, this Court in *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), rejected an election-to-election comparison of African-American voter turnout to assess disparate impact, explaining that an election-to-election change could be caused by any number of factors *other than* the challenged policy. *Id*. at 232. Thus, far from supporting the district court's reliance on a before-and-after comparator, JA2968-2969, *McCrory* explains why it cannot be probative. 831 F.3d at 232. And *McCrory* confirms that the chosen baseline must facilitate a comparison of the challenged policy's relative effects on different racial groups: the Court analyzed the effect of the elimination of specific voting mechanisms on African-American voters *relative to the effect on voters of other races*, and concluded that removing those mechanisms disproportionately affected African Americans. *Id*. at 233. That comparative analysis to students of other races is exactly what the district court failed to undertake.[3]

_____

[3] The Coalition has argued (21A590 S. Ct. Vacatur App. 19) that using the eligible applicant pool as the baseline would permit "racial balancing," so long as the allegedly disfavored racial group's portion of offers does not fall below its percentage of the eligible applicant pool. Not so. For one thing, the Supreme Court has defined prohibited "racial balancing" as matching the racial demographics of the admitted class to the demographics of the *school-system population*, not the applicant population. *See* pp. 41-42, *infra*. Using the applicant pool as a baseline therefore would reveal attempts to match admittee demographics to the outside population—and here, the substantial overrepresentation of Asian-American admittees (54%) relative to their representation in the school system (19.5%) forecloses any suggestion of racial balancing. In all events, the applicant pool is the appropriate measure of disparate impact because one would expect a *random*

2.      Considered against the correct baseline, the Plan did not disadvantage Asian-American applicants.  Under the Plan, Asian Americans were the *only* racial group whose share of offers (54.36%) substantially exceeded their share of the applicant pool (48.59%).  JA675.  Black, white, and multi-race students' share of offers were below their shares of the applicant pool, *id.*, and Hispanic students' share were roughly equivalent, *see* Sealed Exhibit A.  And the Asian-American admissions rate under the Plan (19.48%) was well within the historical 2004-2020 range of 16.8% to 25%.  *See* TJ Alumni for Racial Justice Amicus Br. 7-8 (4th Cir. Mar. 24, 2022).

It blinks reality to conclude, as the district court did, that the Plan disproportionately disadvantaged the only racial group that substantially *outperformed* its share of the applicant pool.  Courts have regularly made exactly that point, declining to find disparate impact where a group's percentage of offers equals or exceeds its percentage of the applicant pool.  *See, e.g.*, *Wards Cove*, 490 U.S. at 652 (no disparate impact where "less than . . . 17% of the applicants for these [medical] jobs were nonwhite" and nonwhite applicants obtained 17% of the offers); *Stout v. Potter*, 276 F.3d 1118, 1123 (9th Cir. 2002) (no disparate impact where offers were "nearly proportional" to applicants); *see also EEOC v. Joe's Stone Crab,*

selection among applicants—i.e., a system free of disparate impact on any race—to result in an admitted class that resembles the demographics of the applicant pool. *Boston Parent Coal.*, 996 F.3d at 46.

29

*Inc.*, 220 F.3d 1263, 1275 (11th Cir. 2000) (same); *cf. Hayden*, 180 F.3d at 52 (similar).  These undisputed facts therefore should have precluded a finding of disparate impact.

> **B.     Even if the district court's year-over-year comparison were appropriate, the court's conclusion that the Plan *caused* the decrease in Asian-American admittees is legally and factually unsupported.**

Even if a simple year-over-year comparison could be probative of disparate impact, the district court's decision must be reversed, and summary judgment must be entered for the Board, because the Coalition introduced no proof that the Plan *caused* the decrease in the percentage of Asian Americans admitted.  *Watson*, 487 U.S. at 994.

1.     It should be self-evident that the racial composition of a class of admitted students will naturally vary from year to year: because each year's applicant pool is composed of *different individuals* of all races, there is no reason to assume that the percentage of Asian-American students admitted in one year will replicate itself the next.  If anything, such an assumption smacks of stereotyping. Nor is there reason to assume that any differences would be statistically significant, that is, "sufficiently substantial [to] raise . . . an inference" that the fluctuations are caused by the Plan rather than chance or any number of other circumstances.  *Id*. at 995; *Boston Parent Coal.*, 996 F.3d at 46 (plaintiff who fails to offer evidence of statistical significance "generally does not even get to first base").

Unsurprisingly, the record reveals multiple circumstances that explain the lower percentage of Asian-American admittees in 2021. Asian-American students made up a substantially smaller proportion of applicants under the Plan than previously: 48.59% in 2021 compared to 56.08% in 2020. JA675. When a group's share of the applicant pool decreases, its share of the offers under a nondiscriminatory policy can reasonably be expected to decrease as well. *See Hameed v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local Union No. 396*, 637 F.2d 506, 520 (8th Cir. 1980). In addition, approximately 900 more students applied in 2021 (a 36% increase over 2020). JA673-674. Many of those additional applications came from County schools that had traditionally sent few students to TJ; there was a 42.19% increase in applications from County schools other than the eight that historically have accounted for the overwhelming majority of the admitted class. JA674. The 2021 applicant pool was therefore quite different than in previous years.

2.    The Coalition bore the burden of demonstrating that the challenged "practice in question," and not those differences in the applicant pool (or simple random variation), "caused the exclusion of applicants . . . because of their membership in a protected group." *Watson*, 487 U.S. at 994; *accord Tex. Dep't of Hous. & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 542 (2015) ("[A] disparate-impact claim that relies on a statistical disparity must fail

31

if the plaintiff cannot point to a defendant's policy or policies causing that disparity."); *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 425-426 (4th Cir. 2018) (same).  Yet the Coalition did not even attempt to establish that the decrease in Asian-American admissions was statistically significant: it presented no expert testimony or other evidence that controlled for the changes in the applicant pool, to show *how and why* the Plan allegedly caused the decrease, or to show that the decrease is likely to be replicated year after year.  *Lewis*, 806 F.3d at 361 (to establish discriminatory effect in equal protection claim, plaintiff must demonstrate that the claimed disparities are statistically significant and likely to be reproduced over time).  This complete failure to prove an essential element of its equal protection claim should have doomed the Coalition's case.

Instead, the district court uncritically embraced the Coalition's conclusory assertion that the Plan must have caused this year-over-year decrease, declaring that the year-over-year numbers "tell[] much of the story."  JA2968.  Piling unsubstantiated inference on top of unsubstantiated inference, the court then asserted that the Plan's allocation of seats to each middle school equivalent to 1.5% of the school's eighth grade class, and the Plan's underrepresented schools Experience Factor, "caused, and will continue to cause, a substantial racial impact."  JA2969. Those assertions cannot survive an encounter with the record evidence.

32

*First*, the undisputed facts refute the district court's assertion that the 1.5% allocation "disproportionately forces Asian-American students to compete against more eligible and interested applicants (often each other) for the allocated seats at their middle schools." JA2969. While Asian-American students had an above-average representation at two County middle schools (Carson and Rocky Run), and thus may have primarily competed against each other at those schools, each racial group has a similarly above-average representation in at least two other County schools. JA2901. Asian-Americans thus suffered no disproportionate disadvantage under the 1.5% allocation system because students from all racial groups would have had to compete primarily against other members of their racial group in at least two middle schools.

To salvage its attack on the 1.5% allocation, the Coalition contends that the Plan disadvantaged Asian-American students by decreasing the number of offers given to the top six "feeder" schools in the County.[4] Although the Plan did result in fewer offers given to feeder-school students (of all races)—unsurprisingly, given that a primary purpose of the Plan was to expand representation to all public middle schools—that does not prove, or even suggest, any disparate impact on Asian

---

[4] Those are Carson, Longfellow, Rocky Run, Kilmer, Frost, and Jackson. JA2900. Though the Coalition claimed Cooper was one of the "top six feeder" schools, Jackson had more students admitted in the previous five years, and is properly considered the sixth feeder school. *Id.*

33

Americans. Feeder schools are not a proxy for Asian-American students. Although two feeder schools were composed of an average of 46% Asian Americans from 2017 to 2021, the other four had average Asian-American populations of approximately 22-28%—a similar range as *eight* of the 20 non-feeder schools,[5] three of which (Holmes, Key and South County) were designated underrepresented schools. JA2905-2909; Sealed Exhibit A; JA676.

When the proportion of Asian-American *applicants* is considered, the same is true: nine County non-feeder schools had similar or higher proportions of Asian-American applicants relative to some of the top six feeder schools for various years before the Plan.[6] Sealed Exhibit A. For instance, for the last class selected under the prior policy, Asian-American applicants from four of the top six feeder schools accounted for 50% to 63.6% of all applications submitted by students attending those schools, while Asian-American applicants from four *non*-feeder schools (Cooper, Franklin, Liberty, and Key) accounted for 51.4% to 67.4% of all applications from their respective schools. *See id*. The undisputed facts thus refute the Coalition's

---

[5] Those schools are Cooper, Franklin, Lake Braddock, Lanier, Liberty, Holmes, Key, and South County. JA2905-2909.

[6] Those schools are Cooper, Franklin, Lanier, Liberty, Thoreau, Hayfield, Holmes, Key, and South County—the last three of which were designated as underrepresented schools. Sealed Exhibit A.

allegation that allocating seats to non-feeder schools caused any decrease in Asian-American admissions.

To the contrary, Asian-American students at non-feeder schools *benefited* from the 1.5% allocation system. At several non-feeder schools with approximately 20% Asian-American students (Franklin, Holmes, Lanier, Liberty, and Key), the number and/or proportion of offers given to Asian-American students increased under the Plan—hardly what one would expect from a Plan that systematically disadvantaged Asian Americans. *See* Sealed Exhibit A. The number of Asian-American students admitted from underrepresented schools increased by almost 600%, from 5 in 2020 to 29 in 2021. *Id*. Of the eight County schools that sent no students to TJ in 2020, six sent at least one Asian-American student under the Plan. *Id*. And at virtually every non-feeder school, Asian-Americans received offers at a rate far higher than their share of the school's population. *Id*. Overall, the Plan's focus on geographic diversity substantially *increased* the number of offers given to Asian Americans at non-feeder schools in Fairfax County: those offers rose sharply, from 46 to 79.

In addition, Asian Americans benefited the most from the Plan's effort to increase socioeconomic diversity (through both the 1.5% allocation and the FRM Experience Factor). JA2912. In 2020, only one Asian American who was eligible for free and reduced meals received an offer, while in 2021, under the Plan, 51

received offers, more than any other racial group. The Coalition's myopic focus on the feeder schools thus ignores the ways in which Asian Americans—particularly those in the socioeconomic and geographic categories for which the Plan sought to increase access—benefited from the allocation system.

*Second*, undisputed record evidence likewise refutes the district court's assertion that the "underrepresented schools" Experience Factor, which benefits students who attend middle schools deemed "historically underrepresented at TJ," disadvantages Asian Americans in competing for the approximately 100 unallocated seats that remain after the 1.5% allocation is applied. JA2967-2968. Although the court did not explain its reasoning and provided no citations to the record, it appears to have concluded that this factor placed students at "feeder" schools "at a significant disadvantage . . . compared to their peers at underrepresented schools." JA2970. As discussed above, the court had no basis for equating students at feeder schools with Asian-American students. But even setting that aside, the district court ignored undisputed evidence that the underrepresented schools factor played an extremely small role in determining who received unallocated offers under the Plan.

When offers were made under the Plan, eight of the ten historically underrepresented schools in the County[7] did not exceed their total 1.5% allotment—

---

[7] These ten schools were Glasgow, Holmes, Hughes, Key, Poe, Sandburg, South County, Stone, Twain, and Whitman.

meaning that the points accorded to students from underrepresented schools did not affect admission from those schools or affect any other applicant's chances. JA2903. Of the 88 unallocated offers made to FCPS students, only seven went to students at the other two underrepresented schools (Glasgow and Twain)—and the majority of offerees at those schools were Asian American. *Id*. The other 81 unallocated offers (more than 90%) went to students at the same schools that the Coalition claims are being disproportionately harmed by the use of the underrepresented schools factor. *Id.* As a result, the underrepresented schools factor had almost no impact on offers for unallocated seats. In fact, Asian Americans may well have received some of the seven unallocated offers made to students at underrepresented schools (the Coalition offered no proof on that point). That undisputed evidence therefore refutes the assertion that the underrepresented schools factor caused the percentage of Asian-American offerees to decrease—or that the underrepresented schools factor placed Asian-American students at a "significant disadvantage." *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2346-2347 (2021) (it is insufficient to assert that a challenged practice disadvantages minorities to some unknown extent, without "concrete evidence" demonstrating how and to what extent minorities are "disproportionately disadvantaged").

The district court's disparate impact finding was thus unmoored from both the factual record and the governing law, and must be reversed. Asian Americans not

37

only availed themselves of the Plan's efforts to broaden socioeconomic and geographic access, but also substantially outperformed their share of the applicant pool as a whole. That track record of success forecloses any conclusion that the Plan had a disparate impact on Asian Americans.

## II. The District Court Erred in Concluding that the Plan Was Adopted with Invidious Discriminatory Purpose.

Even if the Coalition had established a disparate impact on Asian-American students, the district court should still be reversed because the Coalition failed to prove that the Board adopted the Plan for invidious discriminatory purposes. To the contrary, the undisputed facts show that Board sought to broaden access to TJ for high-achieving students across all County middle schools, by breaking down socioeconomic and geographic barriers that had impeded students of all races. To be sure, some Board members expressed the hope that the Plan's race-neutral policies would also promote racial diversity at TJ. But even if that hope is imputed to the Board as a body, the use of race-neutral measures to promote racial diversity is lawful—indeed, laudable—as appellate courts have held time and again. The district court was able to conclude otherwise only by mischaracterizing the Board's *lawful* objectives as an *unlawful* scheme to achieve racial balance or, alternatively, as an invidious desire to decrease Asian-American representation in a zero-sum admissions process. Those conclusions lack any basis in the record, and "contort" well-established equal protection doctrine. *Boston Parent Coal.*, 996 F.3d at 48.

38

### A. The undisputed record evidence demonstrates that the Board did not adopt the Plan with any constitutionally impermissible purpose.

When a challenged measure is facially race-neutral—as the Plan is—the plaintiff must demonstrate that the decisionmaker "selected or reaffirmed a particular course of action at least in part *because of*, not merely in spite of, its *adverse* effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (emphasis added; internal quotation marks omitted). It is not sufficient that a decisionmaker can foresee an adverse impact on a particular racial group. *Id*. Rather, the decisionmaker must act with "invidious discriminatory purpose"—that is, with a *desire* to inflict that adverse impact. *Arlington Heights*, 429 U.S. at 266. As this Court has explained, although *Arlington Heights* does not require decisionmakers to have acted out of racial hatred, it does require that they intentionally "target[]" the group for disadvantageous treatment. *McCrory*, 831 F.3d at 233-234 (legislators possessed discriminatory intent because, although they did not harbor racial animus, they *intended to disadvantage* African-American voters).

To determine whether decisionmakers harbored invidious intent, the court must assess the circumstances under which the decision was made, including by examining contemporaneous statements and any departures from ordinary procedures. *Arlington Heights*, 429 U.S. at 266. Here, *no* record evidence supports

39

the Coalition's allegation that the Board was motivated by any constitutionally impermissible purpose.

1. When it filed this suit, the Coalition's theory was that the Board acted with the specific intent to reduce Asian-American enrollment in TJ. JA2 (complaint alleging that "[o]verwhelming public evidence exists that the [Plan] was adopted with the purpose of disadvantaging Asian-American students and reducing Asian-American enrollment at TJ."). But the record makes clear that those allegations are baseless. There is not a single statement from any Board member, or any FCPS official at any level, expressing a desire to decrease Asian Americans' share of the admitted class. The Coalition no longer contends otherwise in its briefing, *see* 21A590 S. Ct. Vacatur App. 20-24 (although it continues to press this canard in its public advocacy).[8]

Far from expressing animus, Board members showed solicitude for Asian-American students. For example, one Board member worried that Superintendent Brabrand's description of standardized-test preparation as "pay to play" was "perceived as 'racist' by some Asian-American communities." JA2918. She and another member also suggested that Brabrand's lottery proposals would "whiten our

---

[8] Brittany Hunter, Pacific Legal Foundation, *Restoring equality before the law — What the TJ victory means for education* (Mar. 2, 2022) ("In the school board's view, the real problem was that TJ had too many Asian-American students."), https://pacificlegal.org/equality-before-the-law-w-tj-victory-means-education/.

schools and kick ou[t] Asians."  JA2918.  They also pointed out that the prior admissions process disadvantaged low-income Asian Americans.  JA2918-2919. These remarks demonstrate sympathetic concern, not invidious intent.  It was, after all, the Board that had the authority to set admissions criteria—and the Board members who voiced these concerns ultimately voted to adopt the Plan after concluding that it did not discriminate against any race.  JA2919.

2.    Lacking any evidence of the invidious intent required by *Arlington Heights*, the district court latched onto a different theory:  it asserted that the Board engaged in unconstitutional "racial balancing" by altering TJ's racial demographics "to align with districtwide enrollment data."  JA2972-2973.  The undisputed evidence forecloses that conclusion, too.

a.    As the district court's own phrasing reflects, the Supreme Court has defined racial balancing as the practice of matching—or "balancing"—a racial group's representation "to their representation in the local population."  *Croson*, 488 U.S. at 507; *Fisher II*, 579 U.S. at 406-407 (Alito, J., dissenting) ("pursuing parity" between admitted student body and "Texas demographics" is racial balancing). Such a practice is impermissible because it defines sought-after diversity as "some specified percentage of a particular group merely because of its race or ethnic origin."  *Fisher I*, 570 U.S. at 311 (citation omitted).  The undisputed record evidence

41

refutes any suggestion that the Board designed or adopted the Plan to achieve racial balance.

Most obviously, the Plan's structure itself precludes any conclusion that the Board sought to match TJ's racial demographics to the County's student population, because the Plan forbids officials from calibrating admissions to achieve racial balance. When it adopted the Plan, the Board mandated that the admissions process use only race-neutral methods that "do not seek to achieve any specific racial or ethnic mix, balance, or targets." JA697. Accordingly, the Plan is race-*blind* at every step: evaluators do not know applicants' names, race or ethnicity, meaning that they cannot predict or affect in advance the racial breakdown of the admitted class. *Id.* Unsurprisingly, the class admitted under the Plan bears little resemblance to the school system's demographics.[9]

Nor is there any evidence that, as the Coalition contends, the Board sought to achieve racial balancing by relying on proxies for race. From the inception of the revision process, Board members and other officials focused on multiple concerns, including that TJ's student population was drawn from too small a slice of the County's schools, that low-income students of all races—including "children from

---

[9] The County's student population in fall 2019 was 37.8% White, 19.5% Asian, 26.8% Hispanic, 9.8% Black, and 5.7% mixed race. JA294. Students offered admission under the Plan were 22.36% White, 54.36% Asian, 11.27% Hispanic, 7.09% Black, and 4.91% mixed race. JA44, 626.

Asian working-class families"—were a vanishingly small portion of the student body, and that Blacks and Hispanics were also underrepresented. *See*, *e.g.*, p. 8, *supra*; JA2339-2340, 2368-2369 (Board member statements supporting geographic diversity); JA119, 2918-2919 (describing one Board member's belief that the prior admissions plan discriminated against underprivileged students, including Asian-American students). Some Board members also expressed concern about the underrepresentation of Blacks and Hispanics, and the hope that addressing geographic and socioeconomic diversity would also increase racial diversity. JA411. But the Plan was designed to break down socioeconomic and geographic barriers that had made it difficult for substantial numbers of students of *all* races, from a variety of backgrounds and from throughout Fairfax County, to gain admission to TJ. *See Boston Parent Coal.*, 996 F.3d at 50 (declining to find discriminatory intent where "officials expressed a variety of concerns regarding how best to award seats in the Exam Schools").

The Plan's admissions criteria not only follow directly from those animating concerns; they also are "apt" metrics employed by many other school systems. *See id*. As the First Circuit observed in upholding measures similarly designed to increase geographic diversity, "[o]ne can readily see why a school system would prefer" that a "high-profile, pace-setting school[]" like TJ draw its students—and therefore its community support—from the entire area that it serves, rather than just

43

a few feeder schools.  *Id*. at 49.  Both the 1.5% allocation and the underrepresented schools Experience Factor address that objective.  And "one can easily see why selective schools might favor students who achieve academic success without the resources available to" more students from affluent communities, *id*., as well as students who have succeeded academically despite being non-native English speakers or having a disability.  The other Experience Factors directly advance those nonracial objectives.  Thus, the Plan's elements themselves conclusively establish that no racially discriminatory purpose motivated the Plan's adoption.

Moreover, the Board undertook no analysis of the kind of data that would have been critically important had racial balancing been the goal.  The Board did not seek, receive, or consider any modeling predicting how the Plan would affect the racial makeup of students admitted to TJ.  JA624, JA1140.  The Board did not receive *any* demographic data suggesting how each racial group would fare under the Experience Factors, and TJ's admissions director testified during his deposition that he never investigated how the Experience Factors would affect diversity along any metric.  JA2919, JA145.  And although the Board possessed data on the racial composition of each FCPS middle school, it did not have such data on each school's *eligible* applicant pool, and the County and its staff never attempted "to predict how the 1.5% plan would affect the racial makeup of students admitted to TJ."  JA624.  Indeed, although the 1.5% allocation redistributed spots from feeder schools to non-feeder

schools, projecting the likely impact on racial demographics would have required modeling. For instance, four feeder schools had Asian-American populations comparable to that of at least eight non-feeder schools in the County, *see* p. 34, *supra*; one feeder school had a Hispanic population (47.86%) substantially *higher* than most other County schools; and other feeder schools had Hispanic populations comparable to or slightly larger than other non-feeder schools in the County. See JA2905-2906. In short, to achieve racial balancing, the Board would have had to crunch the numbers. *Cf. McCrory*, 831 F.3d at 230 (legislature's reliance on extensive data showing that African Americans disproportionately relied on certain voting accommodations suggested discriminatory intent in repealing those accommodations). That the Board did not do so underscores that racial balancing was never the objective.

b.    In concluding otherwise, the district court relied on cherry-picked statements from individual Board members and purported deviations from normal Board processes. None of that evidence even suggests that any Board member desired racial balance—much less establishes invidious intent as a matter of law. Nor does the evidence show that the *Board*, as the decisionmaker, sought racial balancing. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (observing that given the "high" "stakes" in equal protection claim, the Court "eschew[s]

45

guesswork" in discerning the intent of a multimember decision-making body(citation omitted)).

*First*, the district court relied heavily on a slide presentation produced by Superintendent Brabrand pertaining to the rejected merit-lottery proposal, which stated that TJ "should reflect the diversity of FCPS, the community and northern Virginia." JA293, JA2979. "[D]iversity," the district court declared, "primarily meant racial diversity." JA2979. The court had no basis for that statement, as the presentation's *very next page* defined "historically underrepresented students" to include English language learners and economically disadvantaged students, and it provided historical data and demographic projections as to those groups in addition to racial groups—thus establishing that the "diversity" to be "reflect[ed]" included *all* types of diversity. JA293-310; *see Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 821-822 (4th Cir. 1995) (court must not "ignore or distort the plain meaning of words or conveniently to read them out of context" to find discriminatory intent). In all events, the general aspiration that TJ should "reflect the diversity" of the community falls far short of expressing a desire to *match* TJ's racial demographics to those of the community.[10]

---

[10] The district court also faulted the Board for voting to include in the required annual diversity report to the governor a statement that "the goal is to have TJ's demographics represent the NOVA region," and to increase applications from underserved populations. JA2980. That statement referred to all types of diversity

*Second*, the district court highlighted statements by individual Board members or other officials expressing a hope that taking into account geography and socioeconomic status would "result in greater diversity in the demographics," as well as "increas[e] diversity" of all sorts. JA2981. These statements emphasized that race-neutral proposals to increase socioeconomic and geographic diversity could also promote racial diversity; for instance, early in the process (before the Plan was under consideration), one Board member stated that increasing the "geographic distribution" of students would "result in a change in demographics" to include "more students that are FRM [economically disadvantaged], ELL [English language learners]," or "black[ or] Hispanic." JA2980-2981. Even if those statements are attributed to the Board itself (as opposed to individual Board members), on their face they do not even suggest that TJ's racial demographics should *mirror* any outside baseline, or that Board members expected whatever process was ultimately adopted to accomplish that sort of mirroring. *See Easley v. Cromartie*, 532 U.S. 234, 253 (2001) (legislator's stated desire for "racial balance" in redistricting showed only

---

that officials were seeking and that Board members had been discussing at the session. JA964. The resolution's implementation in the final report confirms that point. The report stated that "[d]iversity is broadly defined to include a wide variety of factors; such as race, ethnicity, gender, English Language Learners (ELLs), geography, socioeconomic status, prior school and cultural experiences, and other unique skills and experiences," and that TJ's "long-term diversity goal is to increase the broad diversity that represents all participating jurisdictions." JA1073. Nothing in the report suggests any intent to racially balance TJ's student population. JA1073-1076.

"that the legislature considered race, along with other partisan and geographic considerations; and as so read it says little or nothing about whether race played a predominant role comparatively speaking"); *Colacurcio v. City of Kent*, 163 F.3d 545, 552 (9th Cir. 1998) (statements of individuals were probative only if they raised inference of decision-making body's intent, as opposed to the individuals' subjective intent).

*Third*, the district court stated that the "Board's requests for and consideration of racial data demonstrate discriminatory intent." JA2981. The court did not explain what data it was referring to, or cite any part of the record. That is no doubt because the record once again refutes the court's assertion. Although the Board was provided with modeling of the merit-lottery proposal's effect on racial as well as FRM and ELL demographics, the Board rejected that proposal, and it undertook no demographic analysis of the *Plan's* likely effects, racial or otherwise.[11] *See* p. 11-12, *supra*. That is evidence that the Board was not engaged in racial balancing.[12]

---

[11] The district court also relied on a "white paper detailing a holistic option alongside the hybrid merit lottery" that, the court asserted, "included voluminous racial modeling." JA2976. The "modeling" predicted outcomes under the hybrid merit lottery—a proposal that, again, was rejected by the Board—for racial groups as well as low-income students, ELL, and students with disabilities. JA461. No modeling of any "holistic" proposal was done. *Id*.

[12] Even if the Board had considered such data, that would not in itself suggest anything about the Board's intent. *See Miller v. Johnson,* 515 U.S. 900, 916 (1995)

*Fourth*, the district court critiqued the Board's process as "rushed, not transparent, and more concerned with simply doing something to alter the racial balance at TJ than with public engagement." JA2978. But the court based that conclusion on individual Board members' statements *in early October* that the process was moving too quickly, JA2975-2976—when the Board did not actually adopt the Plan until December, after *an additional ten weeks* of considering alternative admissions proposals and community feedback. JA42, JA620. That the Plan was not adopted until December also refutes the district court's assertion that the October 2020 deadline for submitting a diversity report to the State compressed the deliberative process. JA2975.

In December, when the Board actually voted on the Plan, many Board members emphasized the extensive community engagement, and they thanked community advocates for their substantial input. JA2818. Indeed, the amount of attention devoted to TJ was all the more notable in view of the other challenges facing the Board, including remote learning during the COVID-19 pandemic.[13] JA1734.

---

(legislature's awareness of racial demographics does not suggest that race predominated); *Spurlock*, 716 F.3d at 395.

[13] A single Board member (McLaughlin), who abstained from voting on the Plan, criticized the process of adopting the Plan, JA2977—but this Court has cautioned against inferring discriminatory intent from statements of individual members of a

The sole additional evidence of purported procedural irregularities identified by the district court is even weaker.  First, at the October 6, 2020 work session, the Board voted to discontinue TJ's admissions exams, a procedural action that the district court viewed as atypical.  JA2975.  But it is undisputed that the Board's procedures permit votes any time during a meeting, including without advance public notice; that the Board has voted at work sessions before, JA1248; and that the merits of discontinuing the exam had received a thorough public airing before the meeting.  JA1832, JA1857.  Second, the district court complained that the 1.5% allocation aspect of the Plan was not publicly revealed until the meeting at which the Board voted on it.  But the Board had considered community feedback on multiple proposals that included seat allocation based on geographic regions composed of multiple schools, and it also had been asking for a "school-based" approach since October.  *See* p. 9, *supra*.  The 1.5% allocation to each middle school was a logical outgrowth of those proposals, and it furthered geographic diversity in much the same way.  And as the Coalition and the district court acknowledged, JA76, JA2973, the Board's vote on the 1.5% proposal did not deviate from normal practice or Virginia law, which requires the Board to obtain advance public input only for a narrow

---

decision-making body, particularly those who disagreed with the outcome.  *See N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 307 (4th Cir. 2020).

category of board actions, none of which were at issue here.  *See* Va. Code Ann. §
22.1-79(8).

In all events, "departures from the normal procedural sequence" are relevant
under *Arlington Heights* only to the extent that they "afford evidence that improper
purposes are playing a role."  429 U.S. at 267 (emphasis added).  The district court
cited *nothing* suggesting that any of the purported procedural deviations reflected
invidious animus towards Asian Americans, or an intent to engage in racial
balancing—or concealment of such intent.  Any procedural faults are therefore
entirely irrelevant to the issue before this Court.

### B.    An objective of improving racial diversity, along with other types of diversity, is not invidious discriminatory intent.

The undisputed evidence therefore demonstrates that, far from acting with any
invidious discriminatory intent, the Board acted in a race-neutral manner to break
down socioeconomic and geographic barriers that had impeded access to TJ for
students of all races—and that some Board members hoped that these changes would
increase racial diversity at TJ.  Perhaps recognizing as much, the district court's
decision ultimately rested on the extraordinary contention that because the Plan was
"designed" "in part" to "increase Black and Hispanic enrollment," that objective
amounts to a constitutionally impermissible purpose.  JA2981.  But even if one
attributes the desire to increase racial diversity to the Board itself, decades of

precedent make clear that such an objective is neither impermissible racial balancing nor invidious discrimination against any particular group.

*First*, the district court erred in equating a Board member's stated desire to increase diversity with impermissible racial balancing. JA2981. Courts have long held that seeking to improve *racial diversity* is not the same as pursuing *racial balancing*, and that the former goal may be pursued lawfully through race-neutral methods. *See Grutter*, 539 U.S. at 319; *Croson*, 488 U.S. at 509-510 (disapproving racial balancing based on demographics, while stating that city could take race-neutral steps to improve racial diversity). The district court's false equivalence of the two was legal error. *See Boston Parent Coal*., 996 F.3d at 48.

*Second*, the district court erred in holding that any attempt to improve educational access for underserved groups is by definition invidious discrimination against Asian Americans. The court reasoned that "increas[ing] Black and Hispanic enrollment . . . would, by necessity, decrease the representation of Asian-Americans at TJ." JA2981-2982. Under such logic, because admissions is a "zero-sum" process—that is, there is a finite number of admissions slots—any policy intended to increase enrollment of an underserved group necessarily discriminates against the group that constitutes the majority. That logic turns decades of equal protection precedent upside down.

Even putting aside the fact that the Plan was designed to increase socioeconomic and geographic diversity (a fact that the district court ignored), it should be self-evident that a desire to *decrease* representation of a racial group that comprises the majority of the admitted class, and a desire to *increase* representation of another racial group whose portion of the admitted class is quite low, are not two sides of the same coin. It is difficult to imagine steps taken to decrease representation of the former that would not be based at least in part on racial stereotypes—for instance, that members of the group all share similar characteristics, or that "too many" members of the racial group detract from the educational experience. But steps taken to increase representation of the latter may—as here—reflect interests that the courts have long recognized as legitimate, including a desire to remove barriers and to ensure equal access to educational opportunities. *See Grutter*, 539 U.S. at 331; *Croson*, 488 U.S. at 507, 509-510 (city may remove barriers to entry by new contractors in order to disproportionately benefit underrepresented minorities). Indeed, the Supreme Court has repeatedly approved of race-neutral steps taken to improve access for underrepresented minorities—even though such measures necessarily would have the "zero-sum" effect of reducing representation of the existing majority. *Grutter*, 539 U.S. at 342; *Croson*, 488 U.S. at 507, 509-510; *Texas Dep't of Hous. and Cmty. Affs*., 576 U.S. at 545; *Fisher II*, 136 S. Ct. at 2242 (Alito, J., joined by Roberts, C.J., and Thomas,

53

J., dissenting); *Fisher I*, 570 U.S. at 333 (2013) (Thomas, J., concurring) ("blacks and Hispanics attending the University were admitted *without discrimination* under the Top Ten Percent plan," which was enacted expressly to increase representation of Blacks and Hispanics) (emphasis added).

The district court's "zero-sum" reasoning therefore boils down to the assertion that in the admissions context, any foreseeable impact on the existing majority group is equivalent to invidious discriminatory intent. But *Feeney* and *Arlington Heights* make clear that even if a race-neutral policy has a foreseeable adverse impact on a particular racial group—which the Plan does not, as explained above—the decisionmakers' knowledge of that foreseeable impact does not establish the necessary invidious intent to disadvantage that group. *Feeney*, 442 U.S. at 279; *Arlington Heights*, 429 U.S. at 266-267.

Numerous lines of well-established doctrine depend on that principle. As the Supreme Court acknowledged in *Washington v. Davis*, "a whole range of tax, welfare, public service, regulatory, and licensing statutes" may foreseeably "be more burdensome" for particular racial groups—but the Equal Protection Clause permits the government to maintain those policies despite its knowledge of their impact. 426 U.S. at 248. If knowledge of a likely adverse impact on the racial majority equates to invidious discriminatory intent, then the government would have to discontinue

54

any race-neutral policy shown to have a disparate impact—and it would not be able to enact new policies with similarly foreseeable effects.

The Supreme Court has long held exactly the opposite.  The Equal Protection Clause permits states to repeal "legislation designed to ameliorate race relations or to protect racial minorities," even though such a repeal foreseeably may have a "disproportionately adverse effect on a racial minority." *Crawford v. Bd. of Educ. of City of Los Angeles*, 458 U.S. 527, 539, 537-538 (1982).  And the Court recently upheld a state constitutional amendment nullifying existing racial preferences in education, holding that the amendment did not reflect invidious discrimination despite its predictable adverse effect on members of some racial groups. *Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rts. & Fight for Equal. By Any Means Necessary (BAMN)*, 572 U.S. 291, 309, 313 (2014) (plurality op.); *id*. at 330-331 (Scalia, J., joined by Thomas, J., concurring in the judgment) (amendment's foreseeable impact did not raise inference of discriminatory purpose). Similarly, in the voting context, the Court has held that because "members of a racial group" may share "voting preferences," election laws enacted with "partisan motives" may have a foreseeable adverse impact on such groups, but that does not make such laws impermissibly racially motivated. *Brnovich*, 141 S. Ct. at 2349. And in the immigration context, the Court held that the fact that rescinding the DACA program foreseeably had an "outsized" impact on "Latinos[, who] make up

55

a large share of the unauthorized alien population" did not raise a plausible inference of invidious purpose. *Regents of the Univ. of California*, 140 S. Ct. at 1915.

Those decisions rest on the premise that decisionmakers' awareness of a foreseeable adverse impact on a particular racial group does not, without more, demonstrate that they possessed any constitutionally impermissible intent. That principle is necessary to ensure that governmental institutions have the flexibility to enact neutral policies even when they have a foreseeable racial impact.

Indeed, the combined implications of the district court's disparate-impact and discriminatory-intent rationales are jaw-dropping: *any* action that correlates to a year-over-year shift in racial demographics would be held to have a suspect racially disparate impact, and the institution's mere ability to foresee that possible demographic shift would automatically give rise to a finding of invidious discriminatory intent. It would be virtually impossible for any institution constitutionally to take race-neutral steps that might change the demographic status quo. On that view, even the Coalition's proposed alternative admissions policy— which the Coalition described as "result[ing] in disproportionately more Black and more Hispanic students" being admitted, JA730—would be unconstitutional.

The Equal Protection Clause cannot be construed to ossify the status quo in this way. For just that reason, every court of appeals to consider reasoning like the district court's has rejected it as irreconcilable with fundamental equal protection

principles. *See, e.g., Boston Parent Coal.*, 996 F.3d at 48 (noting that reasoning "would pretty much mean that any attempt to use neutral criteria to enhance diversity—not just measures aimed at achieving a particular racial balance—would be subject to strict scrutiny"); *Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57, 72 (D.C. Cir. 2016); *Spurlock*, 716 F.3d at 395; *Doe*, 665 F.3d at 548.  This Court should do the same.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's grant of summary judgment in favor of the Coalition and remand with instructions to grant summary judgment to the Board.

DATED: May 6, 2022                    MUNGER, TOLLES & OLSON LLP


                                      By:  /s/ Donald B. Verrilli, Jr.

Sona Rewari (VSB No. 47327)           Donald B. Verrilli, Jr.
HUNTON ANDREWS KURTH LLP              Ginger D. Anders
2200 Pennsylvania Avenue, NW          Xiaonan April Hu
Washington, DC 20037                  MUNGER, TOLLES & OLSON LLP
Telephone: (202) 955-1500             601 Massachusetts Avenue NW, Suite 500 E
                                      Washington, D.C. 20001
Trevor S. Cox (VSB No. 78396)         Telephone:  (202) 220-1100
HUNTON ANDREWS KURTH LLP
951 E. Byrd Street                    Mica L. Moore
Richmond, VA 23219                    MUNGER, TOLLES & OLSON LLP
Telephone: (804) 788-7221             350 South Grand Avenue, 50th Floor
                                      Los Angeles, California 90071
                                      Telephone:  (213) 683-9100

        *Counsel for Fairfax County School Board*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Circuit Rule 32-1, I certify that

the attached motion is proportionally spaced, has a typeface of 14 points and contains

12,978  words.

DATED: May 6, 2022                    MUNGER, TOLLES & OLSON LLP


                                      By: /s/ Donald B. Verrilli, Jr
                                          Donald B. Verrilli, Jr
                                          *Counsel for Fairfax County School Board*

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2022, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which sent notification of such filing to all registered CM/ECF users.

DATED:  May 6, 2022                    MUNGER, TOLLES & OLSON LLP


                                       By: /s/ Donald B. Verrilli, Jr.
                                           Donald B. Verrilli, Jr.

60