No. 22-1280

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

COALITION FOR TJ,

*Plaintiff-Appellee,*

vs.

FAIRFAX COUNTY SCHOOL BOARD,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Virginia, No. 1:21-cv-00296-CMH

**BRIEF OF *AMICI CURIAE* TJ ALUMNI FOR RACIAL JUSTICE, VIRGINIA STATE CONFERENCE OF THE NAACP, CASA INC., HISPANIC FEDERATION, ASIAN AMERICAN YOUTH LEADERSHIP EMPOWERMENT AND DEVELOPMENT, AND HAMKAE CENTER IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL**

Jin Hee Lee
Michaele N. Turnage Young
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300

Niyati Shah
Eri Andriola
ASIAN AMERICANS ADVANCING
JUSTICE-AAJC
1620 L St. NW, Ste. 1050
Washington, DC 20036
Tel: (202) 296-2300

Francisca D. Fajana
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
Tel: (212) 219-3360

Arthur Luk
Christine J. Choi
Elizabeth Denning
Megan Pieper
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, D.C. 20001
Tel: (202) 942-5000

## **RULE 29(A)(4)(A) CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), the undersigned counsel for *Amici* TJ Alumni for Racial Justice; Virginia State Conference of the NAACP ("VA NAACP"); CASA Inc.; Hispanic Federation; Asian American Youth Leadership Empowerment and Development ("AALEAD"); and Hamkae Center (f/k/a NAKASEC VA) make the following disclosures:

TJ Alumni for Racial Justice does not have a parent company and there is no publicly owned corporation that owns 10% or more of TJ Alumni for Racial Justice's stock.

VA NAACP does not have a parent company, and there is no publicly owned corporation that owns 10% or more of VA NAACP's stock.

CASA Inc. does not have a parent company and there is no publicly owned corporation that owns 10% or more of CASA Inc.'s stock.

Hispanic Federation does not have a parent company and there is no publicly owned corporation that owns 10% or more of Hispanic Federation's stock.

AALEAD does not have a parent company and there is no publicly owned corporation that owns 10% or more of AALEAD's stock.

Hamkae Center does not have a parent company and there is no publicly owned corporation that owns 10% or more of Hamkae Center's stock.

i

## TABLE OF CONTENTS

**Page**

RULE 29(A)(4)(A) CORPORATE DISCLOSURE STATEMENT .........................i

INTEREST OF AMICI CURIAE ..................................................................1

INTRODUCTION ......................................................................................2

BACKGROUND ........................................................................................5

I.    The Prior Admissions Process Under-Identified Talented Black, Latino, ELL, and Low-Income Students. ...........................................5

II.    The New Admissions Process More Objectively Identifies Talented Black and Latino Students, and ELL and Low-Income Students, Including Asian Americans. ...........................................................8

ARGUMENT ...........................................................................................9

I.    Appellant's Race Neutral Measures to Equalize Opportunity are Lawful and Do Not Trigger Strict Scrutiny.......................................9

    A.    The Plan Had No Disparate Impact. ..................................12

    B.    There Was No Discriminatory Intent................................16

    C.    The New Admissions Policy is Constitutional. ..................21

        1.    Rational Basis Review Applies, Under Which the Plan Would Easily Pass Constitutional Muster. ...............21

        2.    The Plan Is Rationally Related to Legitimate Government Interests. ...............................................22

CONCLUSION ......................................................................................28

CERTIFICATE OF COMPLIANCE.........................................................29

CERTIFICATE OF SERVICE .................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Blakeney v. Fairfax Cnty. Sch. Bd.*,
  334 F.2d 239 (4th Cir. 1964) (per curiam) .........................................5

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983).........................................................................26

*Bos. Parent Coal. for Acad. Excellence
  Corp.,* No. 21-cv-10330, 2021 WL 4489840
  (D. Mass. Oct. 1, 2021).....................................................11, 12, 13

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of
  Bos.*,
  996 F.3d 37 (1st Cir. 2021)...............................................................14

*Brown v. Board of Education*,
  347 U.S. 483 (1954)...........................................................................22

*Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*,
  364 F. Supp. 3d 253 (S.D.N.Y. 2019), *aff'd* 788 F. App'x 85
  (2d Cir. 2019).....................................................................................23

*City of New Orleans v. Dukes*,
  427 U.S. 297 (1976)...........................................................................22

*City of Richmond v. JA Croson Co.*,
  488 U.S. 469 (1989)...........................................................................18

*Fisher v. Univ. of Tex. at Austin*,
  136 S. Ct. 2198 (2016).......................................................................19

*Griggs v. Duke Power Co.*,
  401 U.S. 424 (1971)...........................................................................14

*Grutter v. Bollinger*,
  539 U.S. 306 (2003)...........................................................................22

*H.B. Rowe Co. v. Tippett*,
  615 F.3d 233 (4th Cir. 2010) .......................................................26, 27

*Jana-Rock Constr., Inc. v. N.Y. Dep't of Econ. Dev.*,
  438 F.3d 195 (2d Cir. 2006) .........................................................17

*Kimel v. Fla. Bd. of Regents*,
  528 U.S. 62 (2000).......................................................................22

*Lewis v. Ascension Par. Sch. Bd.*,
  806 F.3d 344 (5th Cir. 2015) ........................................................18

*N.C. State Conf. of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ...................................................13, 21

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007)......................................................17, 18, 23, 24

*Personnel Adm'r of Massachusetts v. Feeney*,
  442 U.S. 256 (1979)..........................................................9, 10, 11, 21

*Raso v. Lago*,
  135 F. 3d 11 (1st Cir. 1998), *cert denied*, 525 U.S. 811 (1998).......................17

*Regents of Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978)................................................................17, 22

*Spurlock v. Fox*,
  716 F. 3d 383 (6th Cir. 2013) .................................................17, 19

*Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*,
  576 U.S. 519 (2015)......................................................................18

*United States v. Hayes*,
  515 U.S. 737 (1995).......................................................................18

*Vaughns v. Bd. of Educ. of Prince George's Cty.*,
  574 F. Supp. 1280 (D. Md. 1983), *aff'd in part, rev'd in part on other grounds*, 758 F.2d 983 (4th Cir. 1985).......................................14

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)...............................................................9, 11, 21

## Statutes and Rules

34 C.F.R. § 100.3(b)(2) ...............................................................16

42 U.S.C. § 2000d .......................................................................16

Va. Code Ann. § 2.2-3902 (West 2021) ...................................26

## Other Authorities

Jennifer Ayscue et al., *The Complementary Benefits of Racial and Socioeconomic Diversity in Schools*, Nat'l Coal. on Sch. Diversity (Mar. 2017), https://school-diversity.org/pdf/DiversityResearchBriefNo10.pdf ...................................23, 24

*The Benefits of Socioeconomically and Racially Integrated Schools and Classrooms*, Century Found. (Apr. 29, 2019), https://tcf.org/content/facts/the-benefits-of-socioeconomically-and-racially-integrated-schools-and-classrooms/ ......................................................23

C. S. Mott Children's Hospital, *Mott Poll Report: Pay-to-Participate: Impact on School Activities*, 33 Nat'l Poll on Child.'s Health 1, 1-2 (2019), https://mottpoll.org/sites/default/files/documents/031819_PayToParticipate.pdf .............................................................................3

*Consultation on the Validity of Testing in Education and Employment Before the U.S. Comm'n on Civil Rights* (June 16, 1989) (statement of James W. Loewen) *in* The Validity of Testing in Education and Employment, 42 (Eileen Rudert ed., 1993)...................................2

*Debunking the Lie*, TJ Alumni Action Group, https://www.tjaag.org/debunking-the-lie (last visited May 11, 2022) ...........................................8, 15

Hala Elhoweris et al., *Effect of Children's Ethnicity on Teachers' Referral and Recommendation Decisions in Gifted and Talented Programs*, 26 Remedial and Special Educ. 25–31 (2005) ..............................3

Didi Elsyad, *My Not so Black-and-White look at Diversity at Jefferson*, TJ Today (June 20, 2020) https://www.tjtoday.org/29057/new-on-tjtoday/my-not-so-black-and-white-look-at-diversity-at-jefferson/ ..........................................25

MARCIA GENTRY ET AL., GIFTED EDUCATION IN THE UNITED STATES:
    LAWS, ACCESS, EQUITY, AND MISSINGNESS ACROSS THE COUNTRY
    BY LOCALE, TITLE I SCHOOL STATUS, AND RACE 4 (2019) (schools
    fail to identify 63-74% of gifted Black students for known,
    correctable reasons),
    https://www.dropbox.com/s/0lxzznnyh5u0jj1/Access%20Denied.p
    df ............................................................................................................4

Jason A. Grissom & Christopher Redding, *Discretion and
    Disproportionality: Explaining the Underrepresentation of High-
    Achieving Students of Color in Gifted Programs*, 2 AERA OPEN 1
    (2016) ......................................................................................................3

*Historic Records: Desegregation*, FAIRFAX CNTY. PUB. SCHS.,
    https://www.fcps.edu/about-fcps/history/records/desegregation ........................5

Sonia Kanchan, *Dwindling Diversity*, TJ TODAY (Nov. 25, 2018)
    https://www.tjtoday.org/24808/showcase/dwindling-diversity/
    (last visited May 11, 2022) ..................................................................5

Gurleen Kaur, *Your finish line and mine*, TJ TODAY (June 20, 2020),
    https://www.tjtoday.org/29068/new-on-tjtoday/your-finish-line-
    and-mine/ ............................................................................................26

LETTER OF FINDINGS, Re: OCR Complaint No. 11-04-1020, Letter
    from Alice Wender, Director, U.S. Dep't of Educ. Office for Civil
    Rights, to Jack Dale, Superintendent, Fairfax Cnty. Pub. Schs.
    (May 25, 2012),
    https://www2.ed.gov/about/offices/list/ocr/docs/investigations/110
    41020-a.pdf ..........................................................................................5

Jim Loewen, *Here We Go Again: Tests for the Common Core May Be
    Unfair to Some and Boring to All*, HISTORY NEWS NETWORK (Nov.
    18, 2014), https://historynewsnetwork.org/blog/153543 ......................................3

NOTIFICATION/PARTIAL DISMISSAL LETTER, Re: OCR Complaint No.
    11-12-1503, Letter from Dale Rhines, Program Manager, Dep't of
    Educ., Office for Civil Rights to Coalition of the Silence and
    NAACP-Fairfax (Sept. 25, 2012),
    https://coalitionofthesilence.files.wordpress.com/2012/10/cp-tj-
    notif-letter-pdf.pdf ..............................................................................6

OCR Complaint No. 11-12-1503 (July 23, 2012),
http://mlkcommission.dls.virginia.gov/meetings/2012/OCR_FCPS
_COTS_fairfax_complaint_NAACP_TJHSST_admissions_etc_7-
23-12.pdf ................................................................................................... 6

Press Release, Fairfax Cnty. Pub. Schs., TJHSST Offers Admission to
486 Students (June 1, 2020), https://www.fcps.edu/news/tjhsst-
offers-admission-486-students) ............................................................... 7

Press Release, Fairfax Cnty. Pub. Schs., TJHSST Offers Admission to
550 Students; Broadens Access to Students Who Have an Aptitude
for STEM (June 23, 2021), https://www.fcps.edu/news/tjhsst-
offers-admission-550-students-broadens-access-students-who-
have-aptitude-stem; ................................................................................... 8

Andrea Silva, *What it Means to be a TJ Latina*, TJ TODAY (July 3,
2020) https://www.tjtoday.org/29172/showcase/what-it-means-to-
be-a-tj-latina/ .......................................................................................... 26

Rae R. Stevenson, *"I Don't Want to Be Ashamed, I Want to Learn
About My History": Racial Isolation in Portland's White Schools,*
13 PSU MCNAIR SCHOLARS ONLINE J. 1, 3 (2019)
https://doi.org/10.15760/mcnair.2019.13.1.3 ...................................... 25

*TJ Admissions Merit Lottery Proposal, School Board Work Session*,
FAIRFAX CNTY. PUB. SCHS. (Sept. 15, 2020),
https://go.boarddocs.com/vsba/fairfax/Board.nsf/files/BTGKX652
F413/$file/TJHSST%20Admissions%20Merit%20Lottery%20Prop
osal.pdf ...................................................................................................... 6

U.S. COMM'N ON CIVIL RIGHTS, PUBLIC EDUCATION FUNDING
INEQUITY IN AN ERA OF INCREASING CONCENTRATION OF POVERTY
AND RESEGREGATION 5 (2018),
https://www.usccr.gov/pubs/2018/2018-01-10-Education-
Inequity.pdf ............................................................................................. 23

VA DEP'T OF EDUC., 2019-20 FALL MEMBERSHIP REPORTS (2020),
https://p1pe.doe.virginia.gov/buildatable/fallmembership .............. 7, 8

VA DEP'T OF EDUC., 2020-21 FALL MEMBERSHIP REPORTS (2021),
https://p1pe.doe.virginia.gov/buildatable/fallmembership ................ 20

Amy Stuart Wells, et al., *How Racially Diverse Schools and Classrooms Can Benefit All Students*, CENTURY FOUND. (Feb. 9, 2016), https://production-tcf.imgix.net/app/uploads/2016/02/09142501/HowRaciallyDiverse_AmyStuartWells-11.pdf..............................................................23, 24

## INTEREST OF AMICI CURIAE

*Amici* TJ Alumni for Racial Justice, Virginia State Conference of the NAACP, CASA, Inc. in Virginia, Hispanic Federation, Asian American Youth Leadership Empowerment and Development ("AALEAD"), and Hamkae Center (f/k/a NAKASEC Virginia) are nonprofit organizations that promote equality of opportunity for all, including in education. *Amici*, and the communities of color they serve and represent, stand together in support of equal access to Thomas Jefferson High School for Science and Technology ("TJHSST"). *Amici* offer the perspective that appropriate efforts to equalize opportunities and foster diversity are beneficial and do not contravene the Equal Protection Clause.[1]

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than amicus curiae and its counsel contributed money that was intended to fund preparing or submitting this brief.

1

# **INTRODUCTION**

If this Court were to accept the district court's reasoning, a school district could not remove obstacles that deny some students an equal chance to compete for admission to selective programs. It would be a distortion of the Equal Protection Clause, which stands for equal opportunity for all, to find a violation of that provision simply because a school district rightly attempts to create a fairer admissions process—one that yields a greater representation of previously under-identified students, thereby fostering racial, socioeconomic, geographic, and other forms of diversity. It remains so even if decisionmakers anticipated and welcomed this effect.

As often happens, extreme racial disparities—in particular, the paucity of Black and Latino students admitted to TJHSST—functioned as the canary in the coal mine, making obvious that something was amiss with TJHSST's prior admissions policy. In the five years prior to the admissions changes, no more than 10 Black students and no more than 23 Latino students were admitted in classes of more than 480 students each year. JA0561-0576. The stark, racially-disparate impact of TJHSST's prior admissions policy exposed that policy as invalid,[2] in that it failed to

---

[2] Admissions criteria (including TJHSST's admissions test) are "valid" when they assess "what they claim to measure (i.e., content validity) and correlate strongly with performance in [the academic institution they are used to assess suitability for, here, TJHSST] (predictive validity)" *Consultation on the Validity of Testing in Education*

identify many students who would thrive in TJHSST's academic program. Indeed, research shows that standardized tests like the TJHSST admissions test underpredict the potential of Black and Latino students;[3] that fees dissuade low-income students from applying;[4] and that teacher recommendation letters are often infected with racial bias.[5] It simply cannot be that only a handful of Black and Latino students in

---

*and Employment Before the U.S. Comm'n on Civil Rights* (June 16, 1989) (statement of James W. Loewen) *in* THE VALIDITY OF TESTING IN EDUCATION AND EMPLOYMENT, 42 (Eileen Rudert ed., 1993).

[3] Rather than measuring aptitude, standardized tests assess cultural literacy—i.e., how familiar the examinee is with the colloquial language commonly used in white middle-class homes like those of the test creators, and artificially depress the test scores of Black and Latino examinees. Jim Loewen, *Here We Go Again: Tests for the Common Core May Be Unfair to Some and Boring to All*, HISTORY NEWS NETWORK (Nov. 18, 2014), https://historynewsnetwork.org/blog/153543.

[4] *See, e.g.*, C. S. Mott Children's Hospital, *Mott Poll Report: Pay-to-Participate: Impact on School Activities*, 33 NAT'L POLL ON CHILD.'S HEALTH 1, 1-2 (2019), https://mottpoll.org/sites/default/files/documents/031819_PayToParticipate.pdf (pay-to-participate fees disproportionately disadvantaged low-income children).

[5] *See, e.g.*, Jason A. Grissom & Christopher Redding, *Discretion and Disproportionality: Explaining the Underrepresentation of High-Achieving Students of Color in Gifted Programs*, 2 AERA OPEN 1 (2016) (Black students are less likely to be identified for gifted and talented programs when teachers exercise discretion over which students are screened); Hala Elhoweris et al., *Effect of Children's Ethnicity on Teachers' Referral and Recommendation Decisions in Gifted and Talented Programs*, 26 REMEDIAL AND SPECIAL EDUC. 25–31 (2005) (white students receive higher referral rates than their minority counterparts, despite similar student descriptions).

the four vast counties and one city served by TJHSST had the aptitude to excel there.[6]

Accordingly, the school board abandoned biased admissions criteria and implemented a race-neutral, top 1.5% plan that controlled for inequities in educational opportunities across middle schools and helped correct the under-identification of Black, Latino, English Language Learner ("ELL"), and low-income students, including Asian Americans. The district court erroneously enjoined these changes as unconstitutional, reasoning that efforts to remedy the under-identification of Black and Latino students, "would, by necessity, decrease the representation of Asian-Americans," thereby constituting intentional racial discrimination. JA2981. This Court must reverse this unprecedented misinterpretation of the Equal Protection Clause.

---

[6] Indeed, the research supports this inference. *See, e.g.*, MARCIA GENTRY ET AL., GIFTED EDUCATION IN THE UNITED STATES: LAWS, ACCESS, EQUITY, AND MISSINGNESS ACROSS THE COUNTRY BY LOCALE, TITLE I SCHOOL STATUS, AND RACE 4 (2019) (schools fail to identify 63-74% of gifted Black students for known, correctable reasons), https://www.dropbox.com/s/0lxzznnyh5u0jj1/Access%20Denied.pdf.

# BACKGROUND

## I.    The Prior Admissions Process Under-Identified Talented Black, Latino, ELL, and Low-Income Students.

Founded in 1985, less than a generation after the Fairfax County School Board ("FCSB") ended *de jure* school segregation,[7] TJHSST's student body has been composed since its early years of around 90% white and Asian American students.[8] As early as 2002, FCSB acknowledged that its admission criteria denied some students an equal chance to compete. Its guidelines for TJHSST admissions staff stated: "Standardized testing for minority students does not necessarily reflect their abilities. The scores may be depressed."[9] In 2012, the Fairfax County Branch of the NAACP filed a complaint with the U.S. Department of Education's Office for Civil Rights on behalf of Black and Latino students, raising the admissions process's

---

[7]    *Historic Records: Desegregation*, FAIRFAX CNTY. PUB. SCHS., https://www.fcps.edu/about-fcps/history/records/desegregation (last visited May 11, 2022). *See also Blakeney v. Fairfax Cnty. Sch. Bd.*, 334 F.2d 239, 240 (4th Cir. 1964) (per curiam) (finding the injunction to "prohibit a system of segregated schools . . . should have been granted").

[8]    Sonia Kanchan, *Dwindling Diversity*, TJ TODAY (Nov. 25, 2018) https://www.tjtoday.org/24808/showcase/dwindling-diversity/ (last visited May 11, 2022) (noting TJHSST's demographic data in the early 1990s).

[9]    LETTER OF FINDINGS, Re: OCR Complaint No. 11-04-1020, Letter from Alice Wender, Director, U.S. Dep't of Educ. Office for Civil Rights, to Jack Dale, Superintendent, Fairfax Cnty. Pub. Schs. (May 25, 2012), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/11041020-a.pdf.

overreliance on test scores that benefitted students from households with the financial resources to pay for test preparation courses.[10]

Nevertheless, TJHSST's admissions process continued to rely heavily on test scores; a $100 application fee; enrollment in, or completion of, advanced courses that only recently became available at all middle schools; and teacher recommendations.[11] The prior admissions regime thereby artificially depressed the admissions rates of Black and Latino students, as well as ELL and low-income students, including Asian American students.[12] *See* Table 1 and Figure 1 below. Indeed, for 2019-2020, while low-income students were 30% of 8th graders and 7%

---

[10] OCR Complaint No. 11-12-1503 (July 23, 2012), http://mlkcommission.dls.virginia.gov/meetings/2012/OCR_FCPS_COTS_fairfax_complaint_NAACP_TJHSST_admissions_etc_7-23-12.pdf. By letter dated September 25, 2012, OCR retained jurisdiction over complainants' race-based allegations. NOTIFICATION/PARTIAL DISMISSAL LETTER, Re: OCR Complaint No. 11-12-1503, Letter from Dale Rhines, Program Manager, Dep't of Educ., Office for Civil Rights to Coalition of the Silence and NAACP-Fairfax (Sept. 25, 2012), https://coalitionofthesilence.files.wordpress.com/2012/10/cp-tj-notif-letter-pdf.pdf.

[11] JA0041; JA0297; *TJ Admissions Merit Lottery Proposal, School Board Work Session*, FAIRFAX CNTY. PUB. SCHS. (Sept. 15, 2020), https://go.boarddocs.com/vsba/fairfax/Board.nsf/files/BTGKX652F413/$file/TJHSST%20Admissions%20Merit%20Lottery%20Proposal.pdf.

[12] *See also* Oh Decl. (Ex. 1) ¶¶ 5, 10, 12 (Chinese, Indian, and Korean students may struggle with poverty, lack of citizenship, medical debt, and housing insecurity); Vohra Decl. (Ex. 2) ¶¶ 5-6, 8, 11 (Northern Virginia's Asian American community consists of numerous diverse ethnic subgroups, including individuals with refugee backgrounds, and those who face language barriers).

of applicants, they comprised only 1.4% of semi-finalists.[13] ELL students also constituted a smaller percentage of applicants and semi-finalists: 3% and 0.6%, respectively, although they comprised 10% of 8 graders.[14] Likewise, only 2% of Asian American students attending TJHSST were low-income, as compared to 19.8% of Asian American 8th grade students attending the school divisions served by TJHSST who were low-income. *See* Oh Decl. (Ex. 1 hereto) ¶ 11.

| Table 1. TJHSST Class of 2024[15] | | | |
|---|---|---|---|
| | SY19-20 8th graders[16] | Applicants | Admitted |
| Asian American | 5,167 (17%) | 1,423 (56%) | 355 (73%) |
| Black | 3,702 (12%) | 160 (6%) | ≤10 (≤2%) |
| Latino | 7,991 (26%) | 208 (8%) | 16 (3%) |
| White | 11,594 (38%) | 595 (23%) | 86 (18%) |
| Total | 30,247 | 2,539 | 486 |

---

[13] VA DEP'T OF EDUC., 2019-20 FALL MEMBERSHIP REPORTS (2020), https://p1pe.doe.virginia.gov/buildatable/fallmembership; JA 300.

[14] *Id.*

[15] *See* JA0009 n.10 (citing Press Release, Fairfax Cnty. Pub. Schs., TJHSST Offers Admission to 486 Students (June 1, 2020), https://www.fcps.edu/news/tjhsst-offers-admission-486-students); VA DEP'T OF EDUC., 2019-20 FALL MEMBERSHIP REPORTS, (2020), https://p1pe.doe.virginia.gov/buildatable/fallmembership. Due to suppression of data in categories containing less than 10 students, some figures are approximate.

[16] This column shows the number of eighth graders in various groups in Arlington County, Fairfax County, Falls Church City, Loudoun County, Prince William County, and across these school divisions.

II.  **The New Admissions Process More Objectively Identifies Talented Black and Latino Students, and ELL and Low-Income Students, Including Asian Americans.**

The new admissions process (the "Plan") expanded the applicant pool, yielding a nearly 20% increase in applications overall. JA0555. It also increased the average GPA of applicants and admitted students; ensured admission of students from all public middle schools in Fairfax County, Arlington County, Falls Church City, Loudoun County and Prince William County; and, by removing criteria that unfairly disadvantaged some applicants, led to a sixfold increase in admittees from historically underrepresented schools (from 5.56% to 30.73%), and helped correct the under-identification of Black, Latino, ELL, and low-income students. JA0556.[17]

---

[17] Press Release, Fairfax Cnty. Pub. Schs., TJHSST Offers Admission to 550 Students; Broadens Access to Students Who Have an Aptitude for STEM (June 23, 2021), https://www.fcps.edu/news/tjhsst-offers-admission-550-students-broadens-access-students-who-have-aptitude-stem; *Debunking the Lie*, TJ ALUMNI ACTION GROUP, https://www.tjaag.org/debunking-the-lie (last visited May 11, 2022); VA DEP'T OF EDUC., 2019-20 FALL MEMBERSHIP REPORTS (2020), https://p1pe.doe.virginia.gov/buildatable/fallmembership. Due to suppression of data in categories containing less than 10 students, some figures are approximate.

**Figure 1**



## <u>ARGUMENT</u>

**I.    Appellant's Race Neutral Measures to Equalize Opportunity are Lawful and Do Not Trigger Strict Scrutiny.**

Under controlling precedent, rational basis review applies to a facially neutral policy *unless* the plaintiff shows discriminatory intent. *See, e.g.*, *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 260 (1979) (a facially race-neutral policy "does not violate the Equal Protection Clause solely because it results in a racially disproportionate impact; instead, the disproportionate impact must be traced to a purpose to discriminate on the basis of race."); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977). To show discriminatory intent, the plaintiff must show "more than intent as volition or intent as awareness of

consequences . . . ." Indeed, the plaintiff must prove that the decisionmaker acted "at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279.

First, the district court erred when it reached the factually and legally unsupported conclusion that the Plan had an adverse effect on Asian Americans. The district court incorrectly reasoned that there was a disparate impact because Asian Americans made up a smaller share of the admitted class than the previous year. *See* JA2968. Instead, the district court should have assessed whether the Plan caused Asian American applicants to be far less likely than their peers to secure admission. That analysis reveals that there is no disparate impact as Asian Americans were *more likely* to be admitted than their peers.

Second, the district court misapplied *Feeney* when it inferred discriminatory intent from the mere "awareness of consequences." The district court erroneously concluded that FCSB acted with discriminatory purpose because its "policy was designed to increase Black and Hispanic enrollment, which would, *by necessity*, decrease the representation of Asian-Americans at TJ." JA2981-2982 (emphasis added). In other words, the district court inferred discriminatory intent where the policy was adopted "merely 'in spite of'" any potential adverse impact on an identifiable group, discarding *Feeney*'s causal requirement. As Judge Heytens explained in his concurring opinion granting FCSB's stay pending appeal, "[t]his

aspect of *Feeney*'s holding operates as a *critical limitation* on the potential to lodge constitutional challenges to facially neutral laws of all stripes." Order Denying Stay at 4 (4th Cir. Mar. 31, 2022) (Heytens, J., concurring) (emphasis added). By finding intentional discrimination without evidence that FCSB was motivated, at least in part, to harm Asian American students, the district court's approach is "flatly inconsistent" with *Feeney* and legally impermissible. *Id*.; *see also Bos. Parent Coal. for Acad. Excellence Corp.,* No. 21-cv-10330, 2021 WL 4489840 at *15 (D. Mass. Oct. 1, 2021) ("While the increase of a zero-sum resource to one group necessitates the reduction of that resource to others, the case law is clear—the concern is action taken because of animus toward a group, not in spite of an action's necessary effect on a group or groups." (citing *Feeney*, 442 U.S. at 256, 258 (1979)).

Appellee appears to recognize that controlling precedent foreclosed a finding of discriminatory intent, but nevertheless invited the district court to misapply the law in furtherance of its attempt to change the law to prevent schools across the country from removing known barriers to opportunity and adopting race-neutral, research-based reforms to promote equality. *See* Appellee's Emergency Application to Vacate the Stay Pending Appeal, 21A590 (S. Ct.), at 14, 22 (inviting the Supreme Court to change the interpretation of *Arlington Heights* and *Feeney* where a "zero-sum process" is involved or "where the government relies on an interest in promoting diversity"). Appellee argues that the interpretation of controlling

precedent should change because "*the only way* to increase the proportion of Black and Hispanic students admitted is to change the criteria in a way that makes it disproportionately harder for Asian-American students to get in," implying that any change preceding an increase in the representation of Black and Latino students is, per se, racial discrimination against Asian Americans. *Id*. at 22 (emphasis added). Instead of actually proving discriminatory intent, Appellee contends that such intent can be inferred from a mere increase in the number of Black and Latino admittees— an argument that would require the Court to endorse the racially discriminatory premise that Black and Latino students are disproportionately unlikely to be hardworking or talented enough to objectively merit admission. *See id.* at 21-23 (arguing that courts should equate awareness that a policy change could lead to an increase in the representation of some groups with an intent to discriminate against remaining groups). Appellee is wrong, and this Court should forcefully repudiate these racist beliefs.

Third, applying rational basis review—the proper legal standard—the Plan, as detailed below, readily passes constitutional muster.

This Court should reverse.

## A.    The Plan Had No Disparate Impact.

The district court improperly concluded that Asian American applicants suffered a racially disparate impact under the Plan by making the wrong comparison.

12

As Judge Heytens explained, the district court's "simple before-and-after comparison" is the "wrong comparator" to assess disparate impact, and the district court "*never* explained" why this was the proper baseline.[18] Order Denying Stay at 7 (emphasis added).

Using past results as a baseline is not only improper, it is woefully misleading. As the district court in *Boston Parent* correctly noted, when a racial group has been significantly overrepresented in the prior system, "nearly any changes to the admissions process will likely result in some reduction, if only from the law of averages." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, No. CV 21-10330-WGY, 2021 WL 4489840, at *15 (D. Mass. Oct. 1, 2021). This is a mathematical certainty and alone "is not a consequence that the caselaw considers a disparate impact." *Id.*; *see also* Order Denying Stay at 7 ("Nor am I aware of any other authority for the proposition that current government policy creates a floor against which all future policies will be judged, a principle that would, if adopted, make it exceedingly difficult for government actors to change existing policies that have a real (albeit unintentional) racially disparate impact.").

---

[18] The sole case the district court cited in support was *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 231 (4th Cir. 2016). But as Judge Heytens explained, *McCrory* "simply does not say" that a simple before-and-after comparison is the proper method; "[t]o the contrary . . . *McCrory* specifically rejected an election-to-election comparison of voter turnout to assess disparate impact." Order Denying Stay at 7 (citing *McCrory*, 831 F.3d at 232–33).

13

In endorsing Appellee's unworkable theory that *any* change in the racial composition of an admitted class sufficiently evidences disparate impact, the district court has turned the Equal Protection Clause on its head. After all, the Equal Protection Clause was not intended to be a bulwark for the status quo, and this Court must not allow it to be used to entrench inequalities. *See generally Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 46 (1st Cir. 2021); *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971) (explaining, in the employment context, that disparate impact liability targets policies that "operate to 'freeze' the status quo of prior discriminatory employment practices").

Using the correct comparator, the data shows that Asian American applicants did not suffer disparate impact under the Plan. As Judge Heytens explained, "the more obviously relevant comparator for determining whether this race-neutral admissions policy has an outsized impact on a particular racial group is the percentage of applicants versus the percentage of offers." Order Denying Stay at 7. This metric shows "whether members of one group have, proportionally, more difficulty securing admission than others," which addresses the "core question for assessing disparate impact." *Id.*; *Bos. Parent Coal.*, 996 F.3d at 46 (holding that plaintiffs were not likely to succeed in challenging a magnet school admissions policy because the policy had no disparate impact "as compared to a random distribution of invitations"); *Vaughns v. Bd. of Educ. of Prince George's Cty.*, 574

14

F. Supp. 1280, 1304 (D. Md. 1983), *aff'd in part, rev'd in part on other grounds*, 758 F.2d 983 (4th Cir. 1985) (comparing "[B]lack children . . . in the [gifted and talented program] relative to their population in the school system as a whole"); *Gallup-McKinley County Schools Resolution*, OCR Case No. 08-11-5002 (2017) (comparing "the number of American Indian students enrolled in the District and the number of American Indian students who participate in the District's [gifted and talented] program and honors and AP courses").

Under the Plan, the percentage of Asian Americans accepted (54.36%) was higher than the percentage Asian American applicants (48.59%). JA675. Moreover, the admissions rate for Asian American students admitted was consistent with historical trends going back at least 17 years.[19] As Figure 1 *supra* shows, between 2004 and 2020, the acceptance rate for Asian American applicants ranged from 16.8% to 25.0%.[20] In 2021, under the Plan, the percentage of accepted Asian American applicants was 19.48%, well within the historical range.[21] Indeed, Asian

---

[19] *Debunking the Lie*, TJ ALUMNI ACTION GROUP, https://www.tjaag.org/debunking-the-lie (last visited May 11, 2022).

[20] *Id.*

[21] *Id.*

American applicants had a *lower* acceptance rate the year before the Plan's implementation.[22]

As Judge Heytens observed, "[a]t the very least, the record reveals a likely dispute of fact on this question that would preclude summary judgment in favor of the Coalition." Order Denying Stay at 8.

### B.    There Was No Discriminatory Intent.

FCSB's efforts to remove obstacles preventing students from enjoying an equal opportunity to be admitted to TJHSST do *not* evince racially discriminatory intent. Nor do they constitute "racial balancing." The Plan includes neither racial quotas nor targets, and there is no evidence that it is designed to admit any specific percentage of students based on race. Rather, FCSB attempted to fulfill its obligation to provide equal opportunities to all students, including by remedying policies that had the practical effect of unfairly excluding Black, Latino, ELL, and low-income students, including Asian Americans. *See, e.g.*, 42 U.S.C. § 2000d; 34 C.F.R. § 100.3(b)(2) ("A recipient, in determining . . . the class of individuals to be afforded an opportunity to participate in any such program, may not . . . utilize criteria . . . which have the effect of . . . defeating or substantially impairing accomplishment of

---

[22] *Id.* (The acceptance rate of Asian applicants was 19.35% for the Class of 2022). Furthermore, Asian American students have only recently made up more than 60% of TJHSST's student body; prior to the Class of 2016, Asian Americans regularly represented less than 60% of the incoming class. *See id.*

the objectives of the program as respect individuals of a particular race, color, or national origin"); *see also Jana-Rock Constr., Inc. v. N.Y. Dep't of Econ. Dev.*, 438 F.3d 195, 211 (2d Cir. 2006) (a desire to alleviate discrimination against "some disadvantaged groups" is not the same as "an intent to discriminate against other groups"). FCSB's new policy is facially race-neutral and uniformly applied, and as such "good faith [is] presumed in the absence of a showing to the contrary." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 318-19 (1978).

The district court's conclusion that the "Board's requests for and consideration of racial data demonstrate discriminatory intent" is also contrary to well-established precedent. JA2981. As Justice Kennedy explained in his concurrence to the controlling opinion in *Parents Involved*, school district decisionmakers may take race-neutral affirmative measures to equalize educational opportunities and foster diversity without triggering strict scrutiny. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 788-89 (2007) (Kennedy, J., concurring in part and concurring in judgment).[23] Justice Kennedy

---

[23] *See also Raso v. Lago*, 135 F. 3d 11, 16 (1st Cir. 1998), *cert denied*, 525 U.S. 811 (1998) ("[P]laintiffs are mistaken in treating 'racial motive' as a synonym for a constitutional violation. Every antidiscrimination statute aimed at racial discrimination, and every enforcement measure taken under such a statute, reflect a concern with race. That does not make such enactments or actions unlawful or automatically 'suspect' under the Equal Protection Clause."); *Spurlock v. Fox*, 716 F. 3d 383, 394 (6th Cir. 2013) ("If consideration of racial data were alone sufficient to trigger strict scrutiny, then legislators and other policymakers would be required

specifically recommended several of the race-neutral elements used by FCSB in TJHSST's new admission process. *Id.* at 788-89. The Court reaffirmed these principles in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 545 (2015), explaining that "race may be considered in certain circumstances and in a proper fashion,"[24] and quoting the portion of Justice Kennedy's *Parents Involved* opinion recognizing that "[s]chool boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; [and] drawing attendance zones with general recognition of the demographics of neighborhoods." *Id.* at 544. Under this precedent, FCSB's awareness that the Plan might yield greater representation of previously underrepresented students does not evince discriminatory intent.

---

to blind themselves to the demographic realities of their jurisdictions and the potential demographic consequences of their decisions."); *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 358 (5th Cir. 2015) ("[T]he district court's legal conclusion that the Board's consideration of demographic data . . . 'does not amount to [adopting] a rezoning plan that assigns students on the basis of race' conforms to Supreme Court case law."); *cf. United States v. Hayes*, 515 U.S. 737, 745 (1995) ("We recognized in *Shaw* [*v. Reno*], however, that 'the legislature always is aware of race when it draws district lines, just as it is aware of . . . a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination.'").

[24] *See, e.g.*, *City of Richmond v. JA Croson Co.*, 488 U.S. 469, 507 (1989) (endorsing the use of race-neutral means of increasing minority participation in city contracting).

The district court additionally erred in characterizing elements of the TJHSST's admissions process as "proxies that disproportionately burden Asian American students." JA2966. As a matter of law, courts have "repeatedly disavowed" the "claim that geography-based school assignments are unconstitutional because they are really nothing more than race-based policies in disguise." *Spurlock v. Fox*, 716 F. 3d 383, 396 (6th Cir. 2013). After all, reframing *any* neutral classification that is somehow correlated with race as an impermissible proxy for race would only serve to undermine all forms of diversity. To this point, even Supreme Court justices who have dissented from opinions upholding race-conscious measures to diversify post-secondary educational institutions have endorsed race-neutral measures like the top-1.5% plan at issue here. *See, e.g.*, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2236 (2016) (Chief Justice Roberts and Justice Thomas joining a dissenting opinion by Justice Alito, where he notes that UT Austin could have relied more heavily on race-neutral measures like, for example, UT Austin's top 10% plan).

As a factual matter, no element of the Plan is sufficiently correlated with race as to operate as a proxy. The district court infers discriminatory intent from the top-1.5% plan and the consideration of underrepresented schools as an "experience factor" because these mechanisms allegedly impact students at TJHSST feeder schools more than their peers at underrepresented schools. JA2969-70. But students

attending the handful of cherry-picked, so-called feeder schools are not a protected class. As such, changes that may burden these students violate the Equal Protection Clause only if they are not rationally related to a legitimate government interest under rational basis review, which is clearly not the case as discussed below. The district court's logic in finding discriminatory intent only makes sense if attendance at a so-called feeder school is a proxy for race, but it is not. Indeed, the proportions of Asian American students at these schools—Carson (46%), Longfellow (26%), Kilmer (24%), Rocky Run (45%), Frost (24%), and Jackson (19%), FCSB Br. at 33-34—are similar to and, in fact, sometimes even *lower* than the proportions of Asian American students at other eligible middle schools–Loudoun County: Stone Hill (60%), Mercer (44%), Willard (41%), J. Michael Lunsford (39%), Brambleton (38%), Eagle Ridge (34%), Farmwell Station (29%), Trailside (25%); Fairfax County: Cooper (30%), Liberty (30%), Franklin (25%), Frost (24%); Prince William County: Pennington (24%).[25] Nor are the other "experience factors" racial proxies, especially given that Asian American applicants were the highest or second highest percentage of applicants and admittees who *benefitted* from extra points for "experience factors." JA2902; *see* FCSB Br. at 40-44. No element of TJHSST's admissions process comes close to "target[ing Asian Americans] with almost

---

[25] VA DEP'T OF EDUC., 2020-21 FALL MEMBERSHIP REPORTS (2021), https://p1pe.doe.virginia.gov/buildatable/fallmembership.

surgical precision" in a way that indicates discriminatory intent. *McCrory*, 831 F.3d at 214. Rather, in the context of FCSB's other efforts to equalize access to TJHSST, such as eliminating the application fee and removing the standardized testing requirement, this is a case where "the legitimate noninvidious purposes of a law cannot be missed." *Feeney*, 442 U.S. at 275.

Finally, the district court misconstrues the relevant historical context in its *Arlington Heights* analysis. The district court does not explain how FCSB's "decade-long tinkering" with TJHSST's admissions process "intended to impact issues of diversity and inclusion" leads to its conclusion that the Plan was motivated by discriminatory intent. JA2970. Instead, there was no "racial balancing." FCSB's facially race-neutral effort to address longstanding obstacles used no racial targets or quotas. Indeed, in expanding access, the district opened opportunities for many students, including Black and Latino students, as well as low-income and ELL Asian American students who were previously disadvantaged under the old system. This Court must reverse these erroneous conclusions to allow students of all races an equal opportunity to compete for a place at TJHSST.

## C. The New Admissions Policy is Constitutional.

### 1. Rational Basis Review Applies, Under Which the Plan Would Easily Pass Constitutional Muster.

Under a rational basis standard, a government entity need only establish that the challenged conduct or policy is rationally related to a legitimate government

interest. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). This standard thus affords the challenged policy "a strong presumption of validity," and the policy must be upheld "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [official's] actions were irrational." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000) (quotation omitted).

Here, as discussed at length in Section I, the Plan was designed to equalize opportunity for all students and thereby achieve FCSB's legitimate interests in fostering diversity and diminishing racial isolation. In short, there was a "combination of legitimate purposes" for the Plan's enactment; therefore, the Plan must be upheld as constitutional under rational basis review.

### 2.    The Plan Is Rationally Related to Legitimate Government Interests.

In *Brown v. Board of Education*, the U.S. Supreme Court recognized education as "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." 347 U.S. 483, 493 (1954). The Court has also recognized the "substantial, . . . important and laudable" benefits that flow from a diverse student body. *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003); *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 311-15 (1978).

22

More recently, in *Parents Involved*, five members of the Supreme Court found that the interest in the educational benefits of diversity long recognized in higher education extend to the elementary and secondary educational setting. Justice Kennedy, in his concurrence, explained that "[d]iversity, depending on its meaning and definition, is a compelling educational goal a school district may pursue." 551 U.S. at 783 (Kennedy, J., concurring in part and concurring in judgment). And *Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*—in discussing the interest in diversity in elementary and secondary school settings—explained:

> If [educational] benefits flow from increasing racial diversity in universities, the Court sees no logical reason why increasing racial diversity in high schools would not benefit students to the same extent. Indeed, an argument could be made that increased racial diversity is more beneficial at the high school level, when students are younger.

364 F. Supp. 3d at 253, 283 (S.D.N.Y. 2019), *aff'd* 788 F. App'x 85 (2d Cir. 2019).

Research shows that attending a racially diverse school has a positive impact on academic achievement and is beneficial to all students.[26] For example, diversity

---

[26] U.S. COMM'N ON CIVIL RIGHTS, PUBLIC EDUCATION FUNDING INEQUITY IN AN ERA OF INCREASING CONCENTRATION OF POVERTY AND RESEGREGATION 5 (2018), https://www.usccr.gov/pubs/2018/2018-01-10-Education-Inequity.pdf; Amy Stuart Wells, et al., *How Racially Diverse Schools and Classrooms Can Benefit All Students*, CENTURY FOUND. (Feb. 9, 2016), https://production-tcf.imgix.net/app/uploads/2016/02/09142501/HowRaciallyDiverse_AmyStuartWells-11.pdf; Jennifer Ayscue et al., *The Complementary Benefits of Racial and Socioeconomic Diversity in Schools*, NAT'L COAL. ON SCH. DIVERSITY (Mar. 2017), https://school-diversity.org/pdf/DiversityResearchBriefNo10.pdf.

in the learning environment fosters richer classroom discussions that promote creativity, critical thinking, and problem-solving skills.[27] Likewise, students who attended integrated schools have greater comfort in interracial settings—a comfort that extends into adulthood—and are more likely to live and work in diverse settings.[28] Diverse learning environments also prepare students to work and become leaders in an increasingly global economy. For instance, the ability to share ideas and viewpoints with a varying array of people, as well as the leadership expertise fostered in diverse environments, are valued skills.[29] Given this, there is at least a legitimate government interest in fostering the educational benefits of diversity.

Furthermore, the U.S. Supreme Court has long recognized the harmful impacts of racial isolation. In *Parents Involved*, five Justices agreed that, given the Nation's "moral and ethical obligation to fulfill its historic commitment to creating an integrated society that ensures equal opportunity for all of its children," "[a] compelling interest exists in avoiding racial isolation." 551 U.S. at 797-98

---

[27] *See* Wells, et al., *supra* note 26; *The Benefits of Socioeconomically and Racially Integrated Schools and Classrooms*, CENTURY FOUND. (Apr. 29, 2019), https://tcf.org/content/facts/the-benefits-of-socioeconomically-and-racially-integrated-schools-and-classrooms/.

[28] *See* Ayscue, et al., *supra* note 26.

[29] *See* Wells, et al., *supra* note 26.

(Kennedy, J., concurring in part and concurring in judgment; Breyer, J., joined by Stevens, J., Souter, J., & Ginsburg, J., dissenting).[30]

The effects of racial isolation at TJHSST have been devastating. One of TJHSST's few Black students experienced "shameful walks down the hall," while "wondering if anyone was staring at me, thinking 'Whoa, look, a Black kid,' and the racist jokes that seemed funny to everyone but me."[31] Racial isolation led her to try to bleach her skin to "look less Black" and fit in.[32] She "realized that one year at [TJHSST] made the real me—from my culture to my own skin—feel foreign and unwanted. My school didn't accept me; I didn't accept me. At that moment, I felt completely and utterly alone."[33]

Likewise, a Latina TJHSST student felt "uncomfortable . . . , not because of who I am, but because there aren't enough of me. There aren't enough Latinx people that can say they attend the #1 public school in the country, when there are so many

---

[30] *See also* Rae R. Stevenson, *"I Don't Want to Be Ashamed, I Want to Learn About My History": Racial Isolation in Portland's White Schools,* 13 PSU MCNAIR SCHOLARS ONLINE J. 1, 3 (2019) https://doi.org/10.15760/mcnair.2019.13.1.3 (describing harms that students who lack same-race peers face).

[31] Didi Elsyad, *My Not so Black-and-White look at Diversity at Jefferson*, TJ TODAY (June 20, 2020) https://www.tjtoday.org/29057/new-on-tjtoday/my-not-so-black-and-white-look-at-diversity-at-jefferson/.

[32] *Id.*

[33] *Id.*

that could."[34] She added that the underrepresentation of Latino students at TJHSST makes it difficult to combat stereotypes and signals to prospective TJHSST applicants "that the only way to get ahead is to distance themselves from their culture."[35]

Similarly, a student of South Asian descent described feelings of isolation at TJHSST as a low-income student. When a friend asked her why she needed to find a job, she "remembered all the times I'd been laughed at for being poor and kept my mouth shut."[36] Avoiding racial and socioeconomic isolation is a legitimate government interest that this Court must uphold.

Finally, FCSB's compliance with federal and state anti-discrimination laws is an independent legitimate government interest that justifies removing barriers to equal educational opportunity.[37] *See, e.g.*, *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) ("[T]he Government has a fundamental, overriding interest in eradicating racial discrimination in education—discrimination that prevailed, with official approval, for the first 165 years of this Nation's history."); *H.B. Rowe Co. v.*

---

[34] Andrea Silva, *What it Means to be a TJ Latina*, TJ TODAY (July 3, 2020) https://www.tjtoday.org/29172/showcase/what-it-means-to-be-a-tj-latina/.

[35] *Id*.

[36] Gurleen Kaur, *Your finish line and mine*, TJ TODAY (June 20, 2020), https://www.tjtoday.org/29068/new-on-tjtoday/your-finish-line-and-mine/.

[37] FCSB is also bound by the Virginia Human Rights Act, which likewise prohibits intentional and disparate impact racial discrimination in educational institutions. VA. CODE ANN. § 2.2-3902 (West 2021).

*Tippett*, 615 F.3d 233, 256 (4th Cir. 2010) ("The State has a compelling interest, indeed an 'absolute duty,' to remedy this injustice [of disparate impact racial discrimination in public-sector subcontracting].").

## **CONCLUSION**

For the foregoing reasons, *Amici* respectfully request that this Court reverse the decision of the district court and remand with instructions to grant summary judgment to FCSB.

DATED:  May 13, 2022

Jin Hee Lee
Michaele N. Turnage Young
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300

Niyati Shah
Eri Andriola*
ASIAN AMERICANS ADVANCING
JUSTICE-AAJC
1620 L St. NW, Ste. 1050
Washington, DC 20036
Tel: (202) 296-2300

Francisca D. Fajana
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
Tel: (212) 219-3360

Arthur Luk
Christine J. Choi
Elizabeth Denning
Megan Pieper
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, D.C. 20001
Tel: (202) 942-5000

*Counsel for Amici Curiae TJ Alumni for Racial Justice, Virginia State Conference of the NAACP, CASA, Inc. in Virginia, Hispanic Federation, Asian American Youth Leadership Empowerment And Development, and Hamkae Center*

*\*Admitted in New York only.
DC practice limited to federal courts.*

28

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Circuit Rule 32-1, I certify that this brief is proportionally spaced, has a typeface of 14 points and contains 5,729 words.

DATED:  May 13, 2022          ARNOLD & PORTER KAYE SCHOLER, LLP

                              By: /s/ *Arthur Luk*
                                  Arthur Luk
                                  Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2022, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which sent notification of such filing to all registered CM/ECF users.


DATED:  May 13, 2022       ARNOLD & PORTER KAYE SCHOLER LLP


By:  /s/ *Arthur Luk*               
     Arthur Luk
     Counsel for *Amici Curiae*