No. 22-1280

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

COALITION FOR TJ,
*Plaintiff-Appellee*,

v.

FAIRFAX COUNTY SCHOOL BOARD,
*Defendant-Appellant*.

---

On Appeal from a Judgment of the United States District Court
for the Eastern District of Virginia (Hon. Claude M. Hilton)
No. 1:21-cv-00296-CMH-JFA

---

## BRIEF OF AMICI CURIAE MASSACHUSETTS, CALIFORNIA, COLORADO, DELAWARE, THE DISTRICT OF COLUMBIA, HAWAIʻI, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEW MEXICO, NEW YORK, OREGON, VERMONT, AND WASHINGTON IN SUPPORT OF DEFENDANT-APPELLANT

---

MAURA HEALEY
  *Attorney General of Massachusetts*
Elizabeth N. Dewar
  *State Solicitor*
Robert E. Toone, Jr.*
  *Chief, Government Bureau*
Ann E. Lynch
David Ureña
  *Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
robert.toone@mass.gov
(617) 963-2178
  *Counsel of Record*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTERESTS OF AMICI ..................................................................1

ARGUMENT ..................................................................................4

    I.    Race-Neutral Policies Are Not Subject to Strict Scrutiny
          Simply for Aiming in Part to Increase Diversity. ...............................5

    II.   Adopting the District Court's Reasoning Would Lead to Drastic
          and Far-Reaching Consequences. ......................................................13

          A.    Inferring Animus from Efforts to Increase Racial and
                  Other Forms of Diversity Would Thwart Almost Any
                  Means of Attempting to Secure Important Educational
                  Benefits for All Students..............................................................14

          B.    The District Court's Reasoning Also Threatens to Impede
                  Effective Governmental Decision-Making in the Many
                  Realms in Which Policymakers Necessarily Are Aware
                  of and Consider Policies' Impact Across Racial Groups..........24

CONCLUSION ..............................................................................29

CERTIFICATE OF COMPLIANCE..................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson ex rel. Dowd v. City of Boston*,
  375 F.3d 71 (1st Cir. 2004) ................................................................... 9

*Bethune-Hill v. Virginia State Bd. of Elections*,
  137 S. Ct. 788 (2017) ........................................................................... 13

*Boston Parent Coal. for Acad. Excellence v. City of Boston*,
  996 F.3d 37 (1st Cir. 2021) ............................................................ 7-8, 9

*Christa McAuliffe Intermediate School PTO, Inc. v. De Blasio*,
  64 F. Supp. 3d 253 (S.D.N.Y 2019) .................................................... 21

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989) ............................................................................. 10

*Columbus Bd. of Educ. v. Penick*,
  443 U.S. 449 (1979) ............................................................................... 9

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
  665 F.3d 524 (3d Cir. 2011) ......................................................... 8, 9-10

*Fisher v. Univ. of Texas at Austin*,
  570 U.S. 297 (2013) .......................................................................... 7, 22

*Fisher v. Univ. of Texas at Austin*,
  579 U.S. 365 (2016) ............................................................................. 22

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ...................................................................... *passim*

*Lewis v. Ascension Parish Sch. Bd.*,
  806 F.3d 344 (5th Cir. 2015) ................................................................. 9

*Parents Involved in Community Schools v. Seattle School District No. 1*,
   551 U.S. 701 (2007) ........................................................................ 2, 8

*Personnel Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1975) ...................................................................... 6, 12

*Regents of University of California v. Bakke*,
   438 U.S. 265 (1978) .................................................................... 6-7, 14

*Ricci v. DeStefano*,
   557 U.S. 557 (2009) .................................................................... 10-11

*Roberts v. United States Jaycees*,
   468 U.S. 609 (1984) ......................................................................... 1

*Shaw v. Reno*,
   509 U.S. 630 (1993) ....................................................................... 13

*Spurlock v. Fox,*
   716 F.3d 383 (6th Cir. 2013) .................................................. 9, 12, 28

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project*,
   576 U.S. 519 (2015) ............................................................... 8, 11, 12

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) .......................................................... 5, 11, 12, 14

*Washington v. Davis*,
   426 U.S. 229 (1976) ....................................................................... 24

## Constitutional Provisions, Statutes, and Rules

U.S. Const. amend. XIV, § 1 ........................................................ *passim*

Exec. Order No. 13995, 86 C.F.R § 7193 ............................................ 26

Fed. R. App. P. 29(a)(2) ............................................................. 1

**Miscellaneous**

Adelle Simmons *et al.*, *Health Disparities by Race and Ethnicity During the COVID-19 Pandemic: Current Evidence and Policy Approaches*, U.S. Dep't of Health & Hum. Serv., Off. of the Assistant Sec'y for Plan. & Evaluation (Mar. 16, 2021) .................................................................. 26

Adrienne Nishina *et al.*, *Ethnic Diversity and Inclusive School Environments*, 54 Educ. Psychologist 306 (2019) ....................................... 17

Brenda Iasevoli, *Making Colleges More Diverse Even Without Affirmative Action: Lessons from California's Early Academic Outreach Program*, The Atlantic (Feb. 28, 2014) .............................................. 22

Cambridge Public Schools, *About Controlled Choice* (2022) .......................... 20-21

Cambridge Public Schools, *Controlled Choice Plan* (Nov. 2013) .................... 20-21

CBS-New York, *COVID Vaccine: 2 New Sites for Underserved Communities Opening In New York City* (Feb. 10, 2021) ................... 27

CDC, *COVID-19 Weekly Cases and Deaths per 100,000 Population by Age, Race/Ethnicity, and Sex* ......................................................... 26

CDC, *Minority Health Social Vulnerability Index Overview* (Nov. 19, 2021) ...... 27

College Board, *AP Cohort Data Report: Graduating Class of 2020* (2020) ......... 20

Dongbin Kim & Anne-Marie Nuñez, *Diversity, Situated Social Contexts, and College Enrollment: Multilevel Modeling to Examine Student, High School, and State Influences*, 6 J. Diversity in Higher Educ. 84 (2013) ......................... 17

Elizabeth Stearns *et al. Interracial Friendships in the Transition to College: Do Birds of a Feather Flock Together Once They Leave the Nest?*, 82 Soc. Educ. 173 (2009) ................................................................... 18

Elizabeth Stearns, *Long-Term Correlates of High School Racial Composition: Perpetuation Theory Reexamined*, 112 Tchrs. C. Rec. 1654 (Jun. 2010) ................................................................... 18

Frances E. Aboud *et al.*, *Cross-race Peer Relations and Friendship Quality*, 27 Int'l J. Behav. Dev. 165 (2003) ........................................................ 17, 18

Gregory J. Palardy, *High School Socioeconomic Segregation and Student Attainment*, 50 Am. Educ. Rsch. J. 714 (Aug. 2013) ............................... 16

Helene Gayle *et al.*, *Framework for Equitable Allocation of COVID-19 Vaccines*, National Academies of Sciences, Engineering, and Medicine (2020) ................................................................... 25

Igor Ryabov, *Adolescent Academic Outcomes in School Context: Network Effects Reexamined*, 34 J. Adolescence 915 (2011) ............................... 16

Jennifer Clayton, *Changing Diversity in U.S. Schools: The Impact on Elementary Student Performance and Achievement*, 43 Educ. & Urb. Soc'y 671 (Nov. 2011) ................................................................... 16

Jennifer C. Kerr, *Report Finds Segregation in Education on the Rise*, AP News (May 17, 2016) ................................................................... 20

Keith Meatto, *Still Separate, Still Unequal: Teaching about School Segregation and Educational Inequality*, N.Y. Times (May 2, 2019) ............... 19

Kenneth Shores *et al.*, *Categorical Inequalities Between Black and White Students are Common in US Schools—But They Don't Have to Be*, Brookings Institute (Feb. 21, 2020) ................................................................... 20

Kristen Davies *et al.*, *Cross-Group Friendships and Intergroup Attitudes: A Meta-Analytic Review,* 15 Personality & Soc. Psychol. Rev. 332 (2011) ........... 17

v

Latoya Hill & Samantha Artiga, *COVID-19 Cases and Deaths by Race/Ethnicity: Current Data and Changes Over Time*, Kaiser Family Foundation ...................................................................... 26

Lynette Guastaferro, *Why Racial Inequities are Rooted in Housing Policies*, USA Today (Nov. 2, 2020) ................................................................ 20

M.L. Clark & Marla Ayers, *Friendship Similarity During Early Adolescence: Gender and Racial Patterns*, 126 J. Psychol. 393 (1992) .................................... 18

Massachusetts Department of Public Health, *Baker-Polito Administration Launches Targeted Outreach Initiative in 20 Hardest Hit Communities to Increase Equity in COVID-19 Vaccine Awareness and Access; $1M to Support Vaccination in Historically Underserved Communities* (Feb. 16, 2021) .................................................................................. 25-26

Massachusetts Executive Office of Health & Human Services, *COVID-19 Equity Plan* (Mar. 14, 2022) ..................................................... 26-27

Maureen T. Hamilton & Steven S. Smith, *The Effects of Classroom Racial Composition on Students' Interracial Friendliness*, 48 Soc. Psychol. Q. 3 (1985) ........................................................................ 18

Michal Kurlaender & John T. Yun, *Fifty years after Brown: New Evidence of the Impact of School Racial Composition on Student Outcomes*, 6 Int'l J. Educ. Pol'y & Rsch. Practice 51 (2005) ...................................... 18-19

Michal Kurlaender & John T. Yun, *Measuring School Racial Composition and Student Outcomes in a Multiracial Society*, 113 Am. J. Educ. 213 (2007) .............................................................................. 19

Nambi Ndugga *et al.*, *Early State Vaccination Data Raise Warning Flags for Racial Equity*, Kaiser Family Foundation (Jan. 21, 2021) ................................... 26

Nambi Ndugga *et al.*, *How are States Addressing Racial Equity in COVID-19 Vaccine Efforts?*, Kaiser Family Foundation (Mar. 10, 2021) ........................... 27

National Institutes of Health, *NIH to Assess and Expand COVID-19 Testing for Underserved Communities* (Sep. 30, 2020) .................................................... 25

NBC New York, *Vaccine Appointments Open for Underserved Zip Codes in Queens, Brooklyn at NY-FEMA Sites* (Feb. 20, 2021) ......................................... 28

New York City Department of Education, Diversity in Admissions (2022) ......... 21

Nicholas A. Bowman, *College Diversity and Cognitive Development: A Meta-Analysis*, 80 Rev. Educ. Rsch. 4 (Mar. 2010) ............................................ 15

Pat Rubio Goldsmith, *Learning Apart, Living Apart: How the Racial and Ethnic Segregation of Schools and Colleges Perpetuates Residential Segregation*, 112 Tchrs. C. Rec. 1602 (Jun. 2010) ............................................. 19

Press Release, New York Governor Andrew Cuomo, Governor Cuomo Announces Allocation of $15 Million to Promote Vaccinations in Communities Disproportionately Affected by COVID-19 Pandemic (July 26, 2021) ...................................................................................................... 28

Press Release, New York Governor Andrew Cuomo, Governor Cuomo Announces Partnership With SOMOS Community Care to Vaccinate Underserved New Yorkers for COVID-19 at Community Medical Practices (Mar. 26, 2021) ..................................................................................... 28

Roslyn Arlin Mickelson & Mokubung Nkomo, *Integrated Schooling, Life Course Outcomes, and Social Cohesion in Multiethnic Democratic Societies*, 36 Rev. Rsch. Educ. 197 (2012) ............................................. 15, 16, 18

Sarah A. Lister *et al.*, *Health Equity and Disparities During the COVID-19 Pandemic: Brief Overview of the Federal Role*, Cong. Rsch. Serv., R46861 (2021) ................................................................................. 26

Spectrum News 1, *Bringing the Vaccine—and Reassurance—to Underserved Populations* (July 1, 2021) ................................................................................. 28

Thomas F. Pettigrew & Linda R. Tropp, *A Meta-analytic Test of Intergroup Contact Theory*, 90 J. Personality & Soc. Psychol. 751 (May 2006) ............ 17, 18

Tracy Swartz, *Can Selective Enrollment in Chicago Public Schools be Fairer? Proposed Changes Aim to Make Admissions More Equitable: 'It's a Touchy Subject'*, Chicago Tribune (Mar. 11, 2022) ........................................................ 21

University of California Admissions, *Blue and Gold Opportunity Plan* ............... 23

University of California Office of the President, *Report to the Regents: Student Academic Preparation and Educational Partnerships (SAPEP) Annual Outcomes Report, Academic Year 2018-19* (Sept. 7, 2021) .................. 22

University of California Office of the President, *Eligibility in the Local Context (ELC) Program* ......................................................................................... 23

University of Michigan, *Diversity, Equity & Inclusion Strategic Plan* (Oct. 2016) ....................................................................................................... 23

## INTERESTS OF AMICI

Massachusetts, California, Colorado, Delaware, the District of Columbia, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, New Mexico, New York, Oregon, Vermont, and Washington submit this brief as *amici curiae* under Fed. R. App. P. 29(a)(2) in support of the Fairfax County School Board to urge this Court to reject the District Court's reasoning below. Contrary to decades of Supreme Court precedent, the District Court concluded that any race-neutral policy to increase diversity in public schools necessarily carries with it an invidious intent to discriminate, because, in the District Court's view, seeking to increase access for underrepresented groups necessarily implies an intent to decrease access for others. Such a notion threatens the States' interest in ensuring our public schools equitably serve all students, regardless of race, socioeconomic status, or background.

The States have a compelling interest in eradicating race discrimination in all its forms. *Roberts v. United States Jaycees*, 468 U.S. 609, 628 (1984). The States also share a compelling interest in ensuring that our students receive the educational benefits that flow from diversity in our schools, including racial diversity. *Grutter v. Bollinger*, 539 U.S. 306, 328-33 (2003). As discussed further below, "numerous studies show that student body diversity promotes learning

1

outcomes, and better prepares students for an increasingly diverse workforce and society[.]" *Id.* at 330 (quotation omitted).

The District Court's reasoning in this case would effectively preclude state and local governments from working to increase our students' access to these educational benefits flowing from racial and other forms of diversity. This case does not concern a policy that takes an applicant's race into account in the admissions process in any way; no student will be admitted, or rejected, under the School Board's policy "on the basis of individual racial classifications" of the kinds the Supreme Court has held require strict scrutiny, *see Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 720 (2007). And yet the District Court held that such a race-neutral policy must be subject to strict scrutiny simply if some policymakers' aims in designing it included increasing the racial diversity of the school's student body, because any such increase in diversity "would, by necessity, decrease the representation" of students from more-represented groups as compared with past years' admitted classes. JA 2981-82. Under this deeply flawed reasoning, governmental educational institutions may *never* design a race-neutral admissions policy that in part aims to increase racial and other forms of diversity without facing strict scrutiny, because

any increase in racial diversity necessarily entails a reduction in representation from at least one other racial group.

Indeed, the implications of the District Court's reasoning sweep yet more broadly, threatening the States' ability to engage in effective policymaking and governance in critical areas at the core of our police powers. As discussed further below, many aspects of government policymaking involve allocating finite resources analogous to a sought-after placement at a particular school. In allocating such resources, policymakers frequently must ensure that resources are deployed effectively across a host of dimensions: people from every corner of our jurisdictions; people of varying socioeconomic status; people living in urban, suburban, and rural locations; people with and without disabilities; people of all ages; and people from diverse racial, ethnic, and language communities. And policymakers often must consider where the need for these resources is greatest—need which sometimes is centered in particular communities. Yet under the District Court's reasoning, a policy will be subject to strict scrutiny any time policymakers consider the impact potential race-neutral policies may have across various communities, and choose a particular race-neutral policy in part because it breaks down inequitable socioeconomic and geographic barriers and thereby may avoid arbitrarily excluding certain communities. The result would be perverse:

governments would be severely constrained in their ability to serve *all* of their communities—and therefore would fall short for many.

The Amici States engage in numerous such race-neutral efforts to ensure our limited resources are effectively and equitably deployed across our jurisdictions, in realms ranging from education to public health.  We thus urge this Court to reject the unfounded, illogical, and destructive notion that any race-neutral state policy must be subject to strict scrutiny simply because policymakers aimed to foster greater diversity, break down barriers to access, or avoid arbitrary exclusion.

## ARGUMENT

Precedent stretching back decades refutes the District Court's conclusion that a race-neutral government policy is subject to strict scrutiny solely because, in devising the policy, policymakers aimed to increase racial and other forms of diversity.  Rather, the Supreme Court has upheld such measures and has encouraged the States to consider race-neutral policies as means for ensuring that our limited governmental resources are allocated equitably and effectively.

Accepting the District Court's reasoning in this case would carry sweeping consequences.  Most obviously, it would prevent the use of even race-neutral means for ensuring students receive the educational benefits that flow from a diverse student body—benefits that in turn benefit our society, economy, and

democracy.  Even beyond the realm of education, such a notion threatens to constrain governmental policymakers as they determine how best to allocate many other kinds of benefits and burdens; it would subject race-neutral policies to strict scrutiny whenever policymakers chose a policy in part to ensure that resources reach, or burdens do not disproportionately fall upon, communities heretofore underserved or overburdened.  The Equal Protection Clause should not and cannot be understood to preclude government from working to serve all people.

## I.    Race-Neutral Policies Are Not Subject to Strict Scrutiny Simply for Aiming in Part to Increase Diversity.

There is no basis in this Court's or the Supreme Court's precedent for the District Court's holding that strict scrutiny must be applied if policymakers considered the interests of racial diversity, among other forms of diversity, in devising a race-neutral policy.  To the contrary, with the Supreme Court's express encouragement and approval, courts around the country have upheld precisely these kinds of race-neutral policies that aim to distribute benefits and burdens equitably across and within our States' diverse communities.

Under long-established doctrine, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause" where a race-neutral government action "results in a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

The Court requires proof of discriminatory intent before applying strict scrutiny to such laws and policies in part because it understands that legislators and administrators are "properly concerned with balancing numerous competing considerations" when governing. *Id.*

Any contention that strict scrutiny should apply to a facially race-neutral law or policy because of invidious discriminatory intent or purpose "demands a sensitive inquiry into such circumstantial and direct evidence." *Id.* at 266. Importantly here, a discriminatory purpose "implies more than intent as volition or intent as awareness of consequences." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1975). Instead, a discriminatory purpose requires "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* Thus, even if a decisionmaker is *aware* of potential "adverse effects" of a facially-neutral policy on a given racial group, that is not alone sufficient evidence that the decisionmaker acted with a discriminatory purpose. *See id.* Rather, the plaintiff must demonstrate an "invidious discriminatory purpose" to impose those adverse effects. *Id.*

Accordingly, in the context of higher education, where "a diverse student body . . . clearly is a constitutionally permissible goal," *Regents of University of*

*California v. Bakke*, 438 U.S. 265, 311-12 (1978) (Powell, J., concurring), race-neutral policies designed to increase racial and other forms of diversity in our colleges and universities are not constitutionally suspect. *See Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 312 (2013); *id.* at 333 (Thomas, J., concurring) (noting "blacks and Hispanics attending the University were admitted *without discrimination* under the Top Ten Percent plan" (emphasis added)). In applying strict scrutiny to policies that *do* use racial classifications to increase diversity, the Court has held that schools *must* consider and use race-neutral policies where possible and must demonstrate that "no workable race-neutral alternatives would produce the educational benefits of diversity," *id.*—even though any such race-neutral alternatives that actually do increase racial diversity will inevitably decrease representation of some racial groups. Thus, the Court has affirmatively encouraged jurisdictions to "draw on the most promising aspects of . . . race-neutral alternatives" being tested in some states "to achieve student body diversity." *Grutter*, 539 U.S. at 342.

And with respect to elementary and secondary public schools, the Supreme Court "has never held that strict scrutiny should be applied to a school plan in which race is not a factor merely because the decisionmakers were aware of or considered race when adopting the policy." *Boston Parent Coal. for Acad.*

*Excellence v. City of Boston*, 996 F.3d 37, 49 (1st Cir. 2021) (quoting *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011)).  Rather, "it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body," in order to "bring[] together students of diverse backgrounds and races through other means," like "drawing attendance zones with general recognition of the demographics of neighborhoods."  *Parents Involved*, 551 U.S. at 788-89 (Kennedy J., concurring); *accord Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project*, 576 U.S. 519, 545 (2015) ("School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means [than explicitly considering race], including strategic site selection of new schools; [and] drawing attendance zones with general recognition of the demographics of neighborhoods." (quoting *Parents Involved*, 551 U.S. at 789 (Kennedy J., concurring))).  Strict scrutiny does not automatically apply in such cases, because legislators should not be precluded from considering "the impact a given approach might have on students of different races."  *Id.* at 789.

Recognizing this precedent, courts around the country have declined to apply strict scrutiny to facially race-neutral school-assignment plans that sought to increase diversity or were at least drafted with an awareness of racial demographic

data.  For example, in *Spurlock v. Fox*, the Sixth Circuit rejected claims that a

school-assignment plan employed racial classifications requiring strict scrutiny or

evinced a discriminatory purpose simply "because its drafters 'made use of

detailed racial and ethnic data throughout the process of development,'" "so as to

adopt measures that would have the least possible effect on increasing racial

isolation and exacerbating the racial achievement gap."  716 F.3d 383, 394, 399

(6th Cir. 2013).  As the court there noted, "[t]he claim that considering

demographic data amounts to segregative intent flies in the face of the Supreme

Court's holding that 'disparate impact and foreseeable consequences, without

more, do not establish a constitutional violation.'"  *Id.* at 398 (quoting *Columbus

Bd. of Educ. v. Penick*, 443 U.S. 449, 464 (1979)); *see also, e.g.*, *Boston Parent

Coal.*, 996 F.3d at 48 (recognizing that "a public school system's inclusion of

diversity as one of the guides to be used in considering whether to adopt a facially

neutral plan does not by itself trigger strict scrutiny" (citing *Anderson ex rel. Dowd

v. City of Boston*, 375 F.3d 71, 85-87 (1st Cir. 2004))); *Lewis v. Ascension Parish

Sch. Bd.*, 806 F.3d 344, 356-58 (5th Cir. 2015) (holding that school plans that

decisionmakers draft with consideration of racial demographics, but that do not

contain express racial classifications, are facially neutral and not subject to strict

scrutiny absent evidence of discriminatory purpose); *Doe*, 665 F.3d at 545-48

(declining to apply strict scrutiny to a race-neutral school redistricting plan on the basis of racial classification or discriminatory purpose simply because decisionmakers had drafted it with an awareness of race).

The Supreme Court has also declined to apply strict scrutiny to facially race-neutral laws in other contexts simply because the government adopts diversity as a goal or considers the impact the policy will have on different racial groups. Instead, the Court has expressly supported the use of race-neutral tools to remove barriers to access that may disproportionately affect underrepresented racial groups. In the contracting context, for example, the Court has noted that, if minority business enterprises "disproportionately lack capital or cannot meet bonding requirements, a race-neutral program of city financing for small firms would, *a fortiori*, lead to greater minority participation." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 509-10 (1989); *see also id.* at 526 (Scalia, J., concurring) ("A state can act to undo the effects of past discrimination [in state contracting] [by] adopt[ing] a preference for small businesses, or even new businesses—which would make it easier for those previously excluded by discrimination to enter the field."). In the employment context, the Supreme Court has not "question[ed] an employer's affirmative efforts to ensure that all groups have a fair opportunity to apply for promotions and to participate in the

10

[promotion] process." *Ricci v. DeStefano*, 557 U.S. 557, 585 (2009). And in the

housing context, the Supreme Court held that "local housing authorities may

choose to foster diversity and combat racial isolation with race-neutral tools, and

mere awareness of race in attempting to solve the problems facing inner cities does

not doom that endeavor at the outset." *Texas Dep't of Hous. & Cmty. Affs.*, 576

U.S. at 545.

The District Court's analysis below is thus incompatible with decades of

precedent. In one breath, the District Court held that "strict scrutiny applies"

because the School Board's race-neutral admissions "policy was designed to

increase Black and Hispanic enrollment, which would, by necessity, decrease the

representation of Asian-Americans" at the school. JA 2981-82. The court's phrase

"by necessity" starkly exemplifies a fundamental error in its reasoning, among

other errors.[1] The referenced "necessity"—that, at a school with a fixed number of

---

[1] For example, the School Board did not actually undertake a demographic analysis of the plan's likely effects, racial or otherwise, while considering adopting the plan, Brief for Appellant, 21, 44; this race-neutral plan actually *increased* the number of low-income Asian-American students admitted, *id.* at 13, and certainly did not produce the kind of "stark" racial disparity that the Supreme Court has held may sometimes alone support an inference of discriminatory intent, *Arlington Heights*, 429 U.S. at 266; and the District Court used as the baseline for its disparate impact analysis simply the overall change in the racial breakdown of admitted students for each class year while ignoring other factors relevant in the context of this case, *id.* at 25-27, 30-37.

students, a race-neutral policy change that operates to expand access to and increase representation of underrepresented groups will concomitantly diminish representation from other groups—is only a mathematical fact, not discriminatory animus. *See Feeney*, 442 U.S. at 279. Such a mathematical fact—the relative reduction in representation of one group that comes with an increase in representation of another—exists *whenever* policymakers make a choice to reallocate limited resources to address an inequity or arbitrary barrier they have identified. It is precisely to avoid paralyzing lawmakers in making such choices and "balancing numerous competing considerations" that the longstanding *Arlington Heights* framework requires additional evidence to show discriminatory animus, 429 U.S. at 265—not mere awareness of racial demographic data. *See Spurlock*, 716 F.3d at 394-95 ("Racial classification requires more than the *consideration* of racial data"; "the requirement that legislative classifications be color-blind does not demand demographic ignorance during the policymaking process.").

This Court should therefore reject as fundamentally incompatible with the Supreme Court's precedents this attempt to "doom . . . at the outset" race-neutral policies aiming to foster racial and other forms of diversity. *Texas Dep't of Hous. & Cmty. Affs.*, 576 U.S. at 545.

**II.     Adopting the District Court's Reasoning Would Lead to Drastic and Far-Reaching Consequences.**

The District Court's reasoning not only is unfounded in our constitutional jurisprudence and inherently illogical, but also would carry sweeping potential practical consequences if adopted.  First, such a theory would prevent policymakers from using even race-neutral policies to attempt to provide students with greater access to the educational benefits that flow from racial and other forms of diversity amongst their peers.  These educational benefits have long been recognized by the Supreme Court and are evident in copious and continuing research.  Accordingly, many school systems have adopted race-neutral means for fostering such diversity, and an adverse decision in this case would threaten those efforts.  Second, accepting the District Court's reasoning here would tie policymakers' hands in matters extending well beyond the context of diversity in education.  There are numerous areas in which policymakers are and must be "'*aware* of race . . . just as [they are] aware of . . . a variety of other demographic factors'" when they make decisions.  *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 797 (2017) (quoting *Shaw v. Reno*, 509 U.S. 630, 646 (1993)).  Yet the District Court's theory would apparently require strict scrutiny any time policymakers enact a policy aiming in part to ensure that benefits and burdens are distributed effectively and equitably across our communities and racial

groups, thereby "by necessity" arguably adversely affecting a group as compared with the status quo.

>    **A.    Inferring Animus from Efforts to Increase Racial and Other Forms of Diversity Would Thwart Almost Any Means of Attempting to Secure Important Educational Benefits for All Students.**

If widely adopted, the District Court's erroneous "by necessity" basis for imputing discriminatory animus under *Arlington Heights* would imperil race-neutral efforts to secure for students the educational benefits that flow from engaging with peers from diverse backgrounds, from elementary school through graduate school. The Supreme Court has long recognized these educational benefits in the context of higher education. *See, e.g.*, *Bakke*, 438 U.S. 312-14 & n.48; *Grutter*, 539 U.S. at 330-33. And, as discussed further below, there is also substantial evidence of important academic, social, and societal benefits conferred by diversity in elementary and secondary educational settings. Yet the decision below would subject to strict scrutiny any policy that even attempts to increase racial and other forms of diversity in schools on a race-neutral basis, simply on the ground that, by benefiting some students, that policy "by necessity" harms others.

The long-recognized benefits that inure to our students and our States from diversity in education remain of utmost concern to Amici States. Since *Grutter*, the evidence has only grown that diversity in colleges and universities confers

14

educational benefits for students' development[2]; it is clear that "the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints." *Grutter*, 539 U.S. at 330. Empirical evidence also shows that "integrated education is positively related to K-12 school performance, cross-racial friendships, acceptance of cultural differences, and declines in racial fears and prejudice."[3] Further, "[t]hese outcomes among K-12 students undergird improved long-term outcomes: higher educational and occupational attainment across all ethnic groups, better intergroup relations, greater likelihood of living and working in an integrated environment, lower likelihood of involvement with the criminal justice system, espousal of democratic values, and greater proclivity for aspects of civil engagement."[4] These

---

[2] *See, e.g.*, Nicholas A. Bowman, *College Diversity and Cognitive Development: A Meta-Analysis*, 80 Rev. Educ. Rsch. 4, 12, 14, 17-18 (Mar. 2010) (meta-analysis including studies of 77,029 undergraduate students finding a "generally positive relationship between college diversity experiences and cognitive development," including bigger gains in complex thinking and attributional complexity and smaller gains in critical-thinking and problem-solving skills, and further finding that interacting with racially diverse people was most successful at improving cognitive development, while diversity coursework, diversity workshops, and interpersonal interactions with nonracial diversity, such as socioeconomic diversity, had smaller, but still meaningful, effects).

[3] Roslyn Arlin Mickelson & Mokubung Nkomo, *Integrated Schooling, Life Course Outcomes, and Social Cohesion in Multiethnic Democratic Societies*, 36 Rev. Rsch. Educ. 197, 208 (2012).

[4] *Id.*

15

benefits, both short- and long-term, fall into three broad categories: academic, social, and societal.

First, students who attend a diverse K-12 school enjoy numerous academic benefits. Increased diversity at schools generally improves students' grades.[5] Diversity also has an impact on students' performance on standardized assessments. In one study analyzing fifth-grade students' performance on standardized reading and math exams, researchers found that "higher-poverty and higher-minority schools displayed lower pass rates at both the standard and advanced pass levels."[6] The racial composition of the school a student attends is also a "significant predictor of high school graduation," and "[a]ttending a high poverty school increased likelihood of dropping out for all students, especially for low-[socioeconomic status] students."[7] Additionally, students' high schools—and, specifically, their peers at their high schools—influence where they enroll in college: students who attend high schools where higher percentages of students go

---

[5] Igor Ryabov, *Adolescent Academic Outcomes in School Context: Network Effects Reexamined*, 34 J. Adolescence 915, 923 (2011).

[6] Jennifer Clayton, *Changing Diversity in U.S. Schools: The Impact on Elementary Student Performance and Achievement*, 43 Educ. & Urb. Soc'y 671, 688 (Nov. 2011).

[7] Mickelson & Nkomo, *supra* note 3, at 212-213; *see also* Gregory J. Palardy, *High School Socioeconomic Segregation and Student Attainment*, 50 Am. Educ. Rsch. Journal 714, 734 (Aug. 2013); Ryabov, *supra* note 5, at 924.

on to four-year institutions are themselves more likely to go to four-year institutions, and this pattern is the same for two-year institutions.[8]

Second, diversity in K-12 schools also confers social benefits. Students in more diverse classrooms report feeling safer, less picked-on, and less lonely, and report less social anxiety.[9] Studies also suggest that contact between different groups produces improved intergroup relations,[10] and, more specifically, that cross-group friendships are associated with more positive intergroup attitudes.[11] "[B]eing engaged socially with many cross-race companions and having a high-quality [cross-race] friendship was linked to unbiased attitudes."[12] And, perhaps unsurprisingly, several studies suggest that being in a more diverse school results

---

[8] Dongbin Kim & Anne-Marie Nuñez, *Diversity, Situated Social Contexts, and College Enrollment: Multilevel Modeling to Examine Student, High School, and State Influences*, 6 J. Diversity in Higher Educ. 84, 92 (2013).

[9] Adrienne Nishina *et al*., *Ethnic Diversity and Inclusive School Environments*, 54 Educ. Psychologist 306, 308 (2019) (citing studies including one of almost 2,000 sixth-grade students, another of more than 70 classrooms, and another of more than 4,000 students across 26 schools).

[10] Kristen Davies *et al*., *Cross-Group Friendships and Intergroup Attitudes: A Meta-Analytic Review,* 15 Personality & Soc. Psychol. Rev. 332 (2011) (citing Thomas F. Pettigrew & Linda R. Tropp, *A Meta-Analytic Test of Intergroup Contact Theory*, 90 J. Personality & Soc. Psychol. 751-783 (2006)).

[11] Davies *et al.*, *supra* note 10, at 340, 345.

[12] Frances E. Aboud *et al*., *Cross-race Peer Relations and Friendship Quality*, 27 Int'l J. Behav. Dev. 165, 172 (2003).

17

in more cross-racial friendships[13]—a benefit that then continues through college and into adulthood.[14]

Third, society benefits from diverse schools.  In addition to the societal benefits flowing from more positive intergroup attitudes and relations already described,  studies have found that "high school composition was a significant and powerful predictor of coworker racial mix."[15]  One study found that "those who attended more racially diverse high schools" ultimately chose jobs "in less racially isolated workplaces."[16]  Similarly, individuals who attend diverse schools are more likely to live in integrated neighborhoods as adults.[17]  One study found that the

---

[13] Mickelson & Nkomo, *supra* note 3, at 211 (citing Maureen T. Hamilton & Steven S. Smith, *The Effects of Classroom Racial Composition on Students' Interracial Friendliness*, 48 Soc. Psychol. Q. 3-16 (1985)); *see also* Aboud *et al*. *supra* note 12, at 166 (citing, *e.g.*, M.L. Clark & Marla Ayers, *Friendship Similarity During Early Adolescence: Gender and Racial Patterns*, 126 J. Psychol. 393-405 (1992)).

[14] Mickelson & Nkomo, *supra* note 3, at 218 (citing Thomas F. Pettigrew & Linda R. Tropp, *A Meta-analytic Test of Intergroup Contact Theory*, 90 J. Personality & Soc. Psychol. 751-783 (May 2006), and Elizabeth Stearns *et al*., *Interracial Friendships in the Transition to College: Do Birds of a Feather Flock Together Once They Leave the Nest?*, 82 Soc. Educ. 173-195 (2009)).

[15] Mickelson & Nkomo, *supra* note 3, at 217.

[16] Elizabeth Stearns, *Long-Term Correlates of High School Racial Composition: Perpetuation Theory Reexamined*, 112 Tchrs. C. Rec. 1654, 1661, 1669-1670 (Jun. 2010).

[17] Mickelson & Nkomo, *supra* note 3, at 218 (citing Michal Kurlaender & John T. Yun, *Fifty years after Brown: New Evidence of the Impact of School Racial*
(footnote continued)

lack of diversity in teenagers' high schools, which reflected the level of housing segregation in their neighborhood, was predictive of the degree of diversity in their college.[18] And, ultimately, the level of segregation in teenagers' neighborhoods, high schools, and colleges is robustly predictive of the level of segregation in the neighborhoods in which young adults choose to live.[19]

Despite the numerous benefits that flow from diversity in our schools, many of our students continue to learn in segregated environments with unequal resources. In fact, data suggest that "[m]ore than half of the nation's schoolchildren are in racially concentrated districts, where over 75 percent of students are either white or nonwhite."[20] Moreover, students of color often attend

---

(footnote continued)
*Composition on Student Outcomes*, 6 Int'l J. Educ. Pol'y Rsch. & Practice 51-78 (2005), and Michal Kurlaender & John T. Yun, *Measuring School Racial Composition and Student Outcomes in a Multiracial Society*, 113 Am. J. Educ. 213-242 (2007)).

[18] Pat Rubio Goldsmith, *Learning Apart, Living Apart: How the Racial and Ethnic Segregation of Schools and Colleges Perpetuates Residential Segregation*, 112 Tchrs. C. Rec. 1602, 1603, 1618, 1620-1621 (Jun. 2010).

[19] Goldsmith, *supra* note 18, at 1621-1623.

[20] Keith Meatto, *Still Separate, Still Unequal: Teaching about School Segregation and Educational Inequality*, N.Y. Times (May 2, 2019), https://tinyurl.com/54u4prrp.

schools with fewer resources, both financial and otherwise.[21]  For example, schools with high concentrations of poor and Black or Hispanic students tend to offer fewer math, science, and advanced placement coursework.[22]

To benefit all students, many school systems in the United States have, like the School Board here, implemented race-neutral policies to decrease inequities in access to educational resources and increase diversity of various kinds, including racial diversity.  For example, Cambridge, Massachusetts uses a "controlled choice" school-assignment policy based on a socioeconomic breakdown of the city that aims for each school's percentage of students who receive free or reduced school lunch to come close to the percentage of students who qualify in the district

---

[21] Lynette Guastaferro, *Why Racial Inequities are Rooted in Housing Policies*, USA Today (Nov. 2, 2020), https://tinyurl.com/2p96zwhk (discussing study showing that predominantly nonwhite school districts received $23 billion less in state and local funding than majority white school districts in 2016); Kenneth Shores *et al.*, *Categorical Inequalities Between Black and White Students are Common in US Schools—But They Don't Have to Be*, Brookings Institute (Feb. 21, 2020), https://tinyurl.com/5n94tp6f.

[22] Jennifer C. Kerr, *Report Finds Segregation in Education on the Rise*, AP News (May 17, 2016), https://tinyurl.com/yuypum3s (describing findings that schools with high concentrations of poor and Black or Hispanic students tended to have fewer math, biology, chemistry, and physics courses than more affluent counterparts with fewer minority students, and that less than half offered AP math courses); College Board, *AP Cohort Data Report: Graduating Class of 2020* (2020), https://tinyurl.com/y9asdm4s (Black students comprised 14.2% of all public high school seniors in 2020, but only 8.3% of students nationwide who took an AP exam).

as a whole.[23]  To increase geographic, racial, and ethnic diversity at New York

City's specialized high schools, in 2018, the New York City Schools Chancellor

exercised his statutory authority to expand the "Discovery Program," which is the

alternative to standardized testing for admission, by increasing the number of seats

at each school reserved for students admitted through the program and limiting

eligibility for participation in the program to those who are both individually

disadvantaged and also attend high-poverty middle schools.[24] Meanwhile,

Chicago's magnet and selective-enrollment schools admit students not only based

on academic achievement, but also in part based on a socioeconomic analysis of

the census tracts within the district.[25]

And, as *Grutter* itself acknowledged and expressly encouraged, institutions

of higher education across the country have also made use of race-neutral

---

[23] Cambridge Public Schools, *About Controlled Choice* (2022),
https://tinyurl.com/ms3j9svf; Cambridge Public Schools, *Controlled Choice Plan*
(Nov. 2013), https://tinyurl.com/3swp7h6p.

[24] *See* New York City Department of Education, Diversity in Admissions (2022),
https://tinyurl.com/yckwrrad (describing program for specialized high schools);
*Christa McAuliffe Intermediate School PTO, Inc. v. De Blasio*, 364 F. Supp. 3d
253, 264-65 (S.D.N.Y 2019) (describing program in decision denying preliminary
injunction in equal protection challenge to the 2018 expansion), *aff'd*, 788 Fed.
Appx. 85 (2d Cir. 2019) (unpublished).

[25] *See* Tracy Swartz, *Can Selective Enrollment in Chicago Public Schools be
Fairer? Proposed Changes Aim to Make Admissions More Equitable: 'It's a
Touchy Subject'*, Chicago Tribune (Mar. 11, 2022), https://tinyurl.com/3bpyn423.

approaches "to achieve student body diversity." 539 U.S. at 342. In addition to

the University of Texas's "Top Ten Percent Plan" described in the Supreme

Court's *Fisher* decisions, 570 U.S. at 305; *Fisher v. University of Texas at Austin*,

579 U.S. 365, 371-72 (2016), California, for example, has a long history of

programs intended to build diverse student bodies at public institutions of higher

education through race-neutral means. The University of California tracks

outcomes for fourteen different programs that attempt to engage with younger

students and communities beyond the university to increase diversity within

California's institutions of higher education.[26] One such program, started in 1976,

reaches hundreds of California secondary schools,[27] providing low-income and

educationally-disadvantaged students with "individualized college counseling, help

filling out applications and financial aid forms, free PSAT and SAT prep, campus

visits, [and] . . . enrichment classes on Saturdays and during the summer."[28]

Another program promises automatic admission to at least one University of

---

[26] *See* University of California Office of the President, *Report to the Regents: Student Academic Preparation and Educational Partnerships (SAPEP) Annual Outcomes Report, Academic Year 2018-19*, 2-3 (Sept. 7, 2021), https://tinyurl.com/9cp2z9zm.

[27] *Id.* at 2.

[28] Brenda Iasevoli, *Making Colleges More Diverse Even Without Affirmative Action: Lessons from California's Early Academic Outreach Program*, The Atlantic (Feb. 28, 2014), https://tinyurl.com/2emky7z5.

California campus to students who have a grade-point average in the top nine percent at their participating high school, so long as they have completed the required core classes.[29]  And a financial aid program waives tuition and fees and provides additional financial supports for admitted students who have a total family income of less than $80,000 and qualify for financial aid.[30]  Similarly, in Michigan, among other race-neutral programs aiming to increase diversity, one program sited in majority-minority school districts grants a full, four-year scholarship to high school students who complete the program and are admitted to the University of Michigan, and another provides high-achieving, low-income Michigan high school students with targeted early notifications of already-existing financial eligibility for full scholarships if they are admitted.[31]

Accepting the District Court's reasoning would imperil educational institutions' attempts to follow *Grutter*'s encouragement to "draw on the most promising aspects of these race-neutral alternatives" to race-based affirmative

---

[29] University of California Office of the President, *Eligibility in the Local Context (ELC) Program*, https://tinyurl.com/2jdhfwee.

[30] University of California Admissions, *Blue and Gold Opportunity Plan*, https://tinyurl.com/3d9nppca.

[31] University of Michigan, *Diversity, Equity & Inclusion Strategic Plan* 23-24 (Oct. 2016), https://tinyurl.com/bde9j2e9 (describing Wolverine Pathways and HAIL Scholars programs, among others).

action programs.  539 U.S. at 342.  By the District Court's logic, any success of

such programs intended to foster racial and other forms diversity by increasing the

likelihood of representation among students from some racial groups "by

necessity" would decrease representation from others and thereby subject the

program to strict scrutiny.  The holding below thus reaches far beyond Fairfax

County and threatens efforts to increase diversity in elementary, secondary, and

higher education in general.

### B. The District Court's Reasoning Also Threatens to Impede Effective Governmental Decision-Making in the Many Realms in Which Policymakers Necessarily Are Aware of and Consider Policies' Impact Across Racial Groups.

Beyond the realm of student body diversity, the District Court's reasoning

below calls into question the constitutionality of race-neutral measures

governments have long taken when they distribute limited benefits and inevitable

burdens among their residents.  As the Supreme Court has long recognized, "a

whole range of tax, welfare, public service, regulatory, and licensing statutes" may

foreseeably "be more burdensome" for particular racial groups—but the Equal

Protection Clause permits the government to maintain those policies despite its

knowledge of their impact.  *Washington v. Davis*, 426 U.S. 229, 248 (1976) (noting

that subjecting all such programs to strict scrutiny "would be far reaching and

would raise serious questions about, and perhaps invalidate," many).  If adopted,

the District Court's illogical and erroneous conclusion to the contrary below—that

aiming to increase diversity or equity in such government programs, including for

under-represented racial groups, necessarily entails animus against other racial

groups and therefore requires strict scrutiny—would gravely impair governments'

ability to make effective policy that takes into account multidimensional

demographic realities in aiming to eliminate disproportionate burdens and

inequitable barriers.  And the rule would have dramatic and nonsensical policy

consequences, effectively locking in one demographic distribution where

policymakers know a change may affect racial demographics.

Basic, race-neutral public health measures, for example, could become

susceptible to strict scrutiny under the District Court's theory.  The COVID-19

pandemic response is a case in point.  Governments at all levels have grappled with

the pandemic's disproportionate impacts on communities that are medically

underserved.[32]  Federal, state, and local data show significant disparities in

---

[32] *See, e.g.*, Helene Gayle *et al.*, *Framework for Equitable Allocation of COVID-19 Vaccines*, National Academies of Sciences, Engineering, and Medicine (2020); National Institutes of Health, *NIH to Assess and Expand COVID-19 Testing for Underserved Communities* (Sep. 30, 2020),  https://tinyurl.com/fnm6zk59; Massachusetts Department of Public Health, *Baker-Polito Administration Launches Targeted Outreach Initiative in 20 Hardest Hit Communities to Increase Equity in COVID-19 Vaccine Awareness and Access; $1M to Support Vaccination*
(footnote continued)

COVID-19 cases and deaths between people of color and their white

counterparts.[33]  Several factors contribute to these disparities, including long-

existing inequities that have resulted in, among other things, lack of access to safe

and affordable housing, lack of access to quality healthcare and health insurance,

and lower incomes.[34]

Legislators and public health policymakers have taken steps to help allocate

scarce resources to these and other communities in need.[35]  Many States, for

---

(footnote continued)
*in Historically Underserved Communities* (Feb. 16, 2021),
https://tinyurl.com/4fbrm5kr.

[33] *See, e.g.*, CDC, *COVID-19 Weekly Cases and Deaths per 100,000 Population by Age, Race/Ethnicity, and Sex* (last updated May 12, 2022),
https://tinyurl.com/3e6ct57f; Latoya Hill & Samantha Artiga, *COVID-19 Cases and Deaths by Race/Ethnicity: Current Data and Changes Over Time*, Kaiser Family Foundation (Feb. 22, 2022), https://tinyurl.com/4jht942c; Sarah A. Lister *et al.*, *Health Equity and Disparities During the COVID-19 Pandemic: Brief Overview of the Federal Role*, Cong. Rsch. Serv., R46861 (2021); Nambi Ndugga *et al.*, *Early State Vaccination Data Raise Warning Flags for Racial Equity*, Kaiser Family Foundation (Jan. 21, 2021), https://tinyurl.com/99kty57n.

[34] *See* Adelle Simmons *et al.*, *Health Disparities by Race and Ethnicity During the COVID-19 Pandemic: Current Evidence and Policy Approaches*, U.S. Dep't of Health and Hum. Serv., Off. of the Assistant Sec'y for Plan. & Evaluation, Issue Brief (Mar. 16, 2021),  https://tinyurl.com/46ta6ex2.

[35] *See, e.g.*, Exec. Order No. 13995, 86 C.F.R § 7193 (Jan. 21, 2021) (establishing a COVID-19 Health Equity Task Force within the U.S. Department of Health and Human Services to make recommendations to the President on "mitigating the health inequities caused or exacerbated by the COVID-19 pandemic and for preventing such inequities in the future."); Massachusetts Executive Office of
(footnote continued)

instance, implemented vaccine allocation strategies based on the Center for Disease Control and Prevention's Social Vulnerability Index (SVI), which uses U.S. Census Bureau data to measure the "relative social vulnerability of every census tract."[36] The SVI tracks variables such as socioeconomic status, household composition, whether a household member has a disability, language spoken, housing type, availability of transportation, and racial or ethnic minority status.[37] Based upon this information and COVID-19 case rates, Massachusetts, for example, allocated additional vaccines and resources to the 20 communities most disproportionately impacted by the pandemic.[38] Similarly, New York has adopted numerous race-neutral methods to address vaccine hesitancy and low vaccination rates among its hardest-to-reach communities, which were disproportionately communities of color.[39]

---

(footnote continued)
Health & Human Services, *COVID-19 Equity Plan* (Mar. 14, 2022), https://tinyurl.com/y39svew6.

[36] Nambi Ndugga *et al.*, *How are States Addressing Racial Equity in COVID-19 Vaccine Efforts?*, Kaiser Family Foundation (Mar. 10, 2021), https://tinyurl.com/mtpue9hy.

[37] CDC, *Minority Health Social Vulnerability Index Overview* (Nov. 19, 2021), https://tinyurl.com/4d79742f.

[38] Massachusetts Executive Office of Health & Human Services, *supra* note 35.

[39] *See, e.g.*, CBS-New York, *COVID Vaccine: 2 New Sites for Underserved Communities Opening In New York City* (Feb. 10, 2021),

(footnote continued)

Under the District Court's reasoning, however, health policy that has as one of its goals increasing resources for underserved racial groups in order to promote health equity—even if the policy also has other goals, and even if it does not explicitly factor race into any individual grant of a resource—may be subject to strict scrutiny, because where resources are finite, an increase in resources for some racial groups "by necessity" limits the availability of those resources for others. The implication of the District Court's ruling is that policymakers cannot intentionally use limited resources to attempt to address such health disparities, even through race-neutral measures. *See Spurlock*, 716 F.3d at 394 ("If consideration of racial data were alone sufficient to trigger strict scrutiny, then

---

(footnote continued)

https://tinyurl.com/y5zhywnz (describing federal partnership); Spectrum News 1, *Bringing the Vaccine—and Reassurance—to Underserved Populations* (July 1, 2021), https://tinyurl.com/59ayh56t (announcing vaccine distribution center at public housing site); Press Release, New York Governor Andrew Cuomo, Governor Cuomo Announces Allocation of $15 Million to Promote Vaccination in Communities Disproportionately Affected by COVID-19 Pandemic (July 26, 2021), https://tinyurl.com/2p83j74y; NBC New York, *Vaccine Appointments Open for Underserved Zip Codes in Queens, Brooklyn at NY-FEMA Sites* (Feb. 20, 2021), https://tinyurl.com/3sbmhzmj (describing initiative setting aside first week of appointments at new vaccination sites for specified zip codes to reach underserved, hardest-hit communities); Press Release, New York Governor Andrew Cuomo, Governor Cuomo Announces Partnership With SOMOS Community Care to Vaccinate Underserved New Yorkers for COVID-19 at Community Medical Practices (Mar. 26, 2021), https://tinyurl.com/2p9b3c5h.

legislators and other policymakers would be required to blind themselves to the demographic realities of their jurisdictions and the potential demographic consequences of their decisions.").

The District Court's reasoning thus would irrationally and perniciously ossify the distribution of benefits and burdens across our society in untold ways. Race-neutral policies simply attempting to ensure that the benefits of public policymaking reach all of our residents—and thereby redress circumstances where some demographically identifiable communities are denied or have only limited access to benefits available to others, or disproportionately shoulder inevitable burdens—would be subject to strict scrutiny where such efforts would "by necessity" affect resources or burdens for other racial groups.  While the Equal Protection Clause requires the States to meet strict scrutiny where we find it necessary to use individual racial classifications to achieve policy aims, it imposes no such constraint on race-neutral policies aiming to achieve equity or foster diversity.

## **CONCLUSION**

For the foregoing reasons, the District Court's grant of summary judgment below should be vacated.

29

Respectfully submitted,

MAURA HEALEY
  *Attorney General of Massachusetts*
Elizabeth N. Dewar
  *State Solicitor*
Robert E. Toone, Jr.*
  *Chief, Government Bureau*
Ann E. Lynch
David Ureña
  *Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
robert.toone@mass.gov
(617) 963-2178
    *Counsel of Record*

Date: May 13, 2022

ROBERT BONTA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General of Delaware*
820 North French Street
Wilmington, DE 19801

KARL A. RACINE
*Attorney General for the District of Columbia*
400 6th Street NW
Washington, D.C. 20001

HOLLY T. SHIKADA
*Attorney General of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
100 West Randolph Street, 12th Floor
Chicago, IL 60601

AARON M. FREY
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
*Attorney General of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

DANA NESSEL
*Attorney General of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Boulevard
St. Paul, MN 55155

HECTOR BALDERAS
*Attorney General of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

LETITIA JAMES
*Attorney General of New York*
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
1162 Court Street N.E.
Salem, OR 97301

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

ROBERT W. FERGUSON
*Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because this brief contains 6,497 words (as counted in Microsoft Word), excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Robert E. Toone, Jr.
*Counsel of Record*

Dated: May 13, 2022