No. 22-1280

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

COALITION FOR TJ,

Plaintiff-Appellee

v.

FAIRFAX COUNTY SCHOOL BOARD,

Defendant-Appellant

and

SCOTT BRABAND, in his official capacity as
Superintendent of the Fairfax County School Board,
Defendant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING DEFENDANT-APPELLANT

———————————

LISA BROWN
  General Counsel

DANIEL KIM
ADINA KOLE
JESSICA WOLLAND
  Attorneys
  Department of Education
  Office of the General Counsel
  400 Maryland Ave., S.W.
  Washington, D.C.  20202-0001

KRISTEN CLARKE
  Assistant Attorney General

NICOLAS Y. RILEY
SYDNEY A.R. FOSTER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 305-5941

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ................................................................ 1

STATEMENT OF THE ISSUES ........................................................................... 2

SUMMARY OF ARGUMENT ............................................................................. 3

ARGUMENT

    I      ENSURING THAT STUDENTS OF ALL RACES ENJOY
            EQUAL EDUCATIONAL OPPORTUNITIES IS NOT A
            SUSPECT PURPOSE ........................................................................ 4

              A.    *Precedent Makes Clear That An Intent To Equalize*
                      *Opportunities For Persons Of All Races Is Not A*
                      *Suspect Discriminatory Purpose* ................................................. 6

              B.    *The Purposes Of The Equal Protection Clause And The*
                      *Longstanding Views Of The United States Reinforce The*
                      *Conclusion That Pursuing Equal Opportunities Is Not A*
                      *Suspect Purpose* .................................................................... 21

              C.    *The District Court's Analysis And Plaintiff's Arguments*
                      *Are Unpersuasive* .................................................................. 24

    II     IF STRICT SCRUTINY WERE TO APPLY TO THE
            CHALLENGED RACE-NEUTRAL POLICY, THE STRICT-
            SCRUTINY INQUIRY MUST BE ADAPTED FOR THIS
            NOVEL CONTEXT ........................................................................ 27

CONCLUSION .................................................................................................. 29

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                                 **PAGE**

*Allen* v. *Alabama State Bd. of Educ.*, 164 F.3d 1347 (11th Cir. 1999),
    vacated at joint request of parties, 216 F.3d 1263 (11th Cir. 2000)..............19

*Anderson* v. *City of Boston*, 375 F.3d 71 (1st Cir. 2004) ........................................18

*Antonelli* v. *New Jersey*, 419 F.3d 267 (3d Cir. 2005) ............................................14

*Boston Parent Coal. for Acad. Excellence Corp.* v. *School Comm. of Bos.*,
    996 F.3d 37 (1st Cir. 2021)...............................................................................19

*Brown* v. *Board of Educ.*, 347 U.S. 483 (1954)................................................ 21-22

*Citizens for Better Educ.* v. *Goose Creek Consol. Indep. Sch. Dist.*,
    719 S.W.2d 350 (Tex. App. 1986), writ refused n.r.e.,
    appeal dismissed for want of a substantial federal question,
    484 U.S. 804 (1987)................................................................................... 14-15

*City of Richmond* v. *J.A. Croson Co.*, 488 U.S. 469 (1989)................................. 7-8

*Crawford* v. *Board of Educ.*, 458 U.S. 527 (1982)..................................................15

*Doe* v. *Lower Merion Sch. Dist.*, 665 F.3d 524 (3d Cir. 2011) ................... 5, 18, 21

*Eisenberg* v. *Montgomery Cnty. Pub. Schs.*,
    197 F.3d 123 (4th Cir. 1999) .........................................................................25

*Fisher* v. *University of Tex.*, 570 U.S. 297 (2013)............................................ 25-26

*Fisher* v. *University of Tex.*, 579 U.S. 365 (2016)................................................. 8-9

*Grutter* v. *Bollinger*, 539 U.S. 306 (2003)....................................................... *passim*

*H.B. Rowe Co.* v. *Tippett*, 615 F.3d 233 (4th Cir. 2010) ..........................................9

**CASES (continued):**                                                    **PAGE**

*Hunter* v. *Underwood*, 471 U.S. 222 (1985) ............................................5

*Mandel* v. *Bradley*, 432 U.S. 173 (1977)..................................................15

*Manning* v. *Caldwell*, 930 F.3d 264 (4th Cir. 2019) (en banc) ...............16

*Martin* v. *Charlotte-Mecklenburg Bd. of Educ.*,
    626 F.2d 1165 (4th Cir. 1980) ...............................................16

*North Carolina State Bd. of Educ*. v. *Swann*, 402 U.S. 43 (1971) ..........16

*Parents Involved in Cmty. Schs.* v. *Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007)...................................................*passim*

*Personnel Adm'r* v. *Feeney*, 442 U.S. 256 (1979)..........................*passim*

*Raso* v. *Lago*, 135 F.3d 11 (1st Cir. 1998).......................................... 17, 21

*Ricci* v. *DeStefano*, 557 U.S. 557 (2009)........................................... 12, 14

*Riddick* v. *School Bd. of Norfolk*, 784 F.2d 521 (4th Cir. 1986) .......17-18

*Rothe Dev., Inc.* v. *United States Dep't of Def.*,
    836 F.3d 57 (D.C. Cir. 2016)................................................. 18, 20

*School Comm. of Bos.* v. *Board of Educ.*,
    227 N.E.2d 729 (Mass. 1967), appeal dismissed for want of a
    substantial federal question, 389 U.S. 572 (1968) .........................11

*Spurlock* v. *Fox*, 716 F.3d 383 (6th Cir. 2013)........................................18

*Stevenson* v. *Blytheville Sch. Dist. #5*, 800 F.3d 955 (8th Cir. 2015).....................19

*Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971) .......................16

*Texas Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.*,
    576 U.S. 519 (2015).................................................*passim*

**CASES (continued):**                                                **PAGE**

*Tometz* v. *Board of Educ.*, 237 N.E.2d 498 (Ill. 1968) ............................................11

*Tuttle* v. *Arlington Cnty. Sch. Bd.*, 195 F.3d 698 (4th Cir. 1999).............................9

*Washington* v. *Davis*, 426 U.S. 229 (1976) .........................................................4-5

**STATUTES:**

Civil Rights Act of 1964,
     42 U.S.C. 2000c-6 ..............................................................................1
     42 U.S.C. 2000d *et seq.* (Title VI)............................................ 1-2, 6
     42 U.S.C. 2000e-2(a)(1) (Title VII) ...............................................14
     42 U.S.C. 2000h-2 .............................................................................1

Fair Housing Act,
     42 U.S.C. 3601 *et seq.* ...................................................................13

**REGULATIONS:**

34 C.F.R. Pt. 100.........................................................................................2

**RULE:**

Fed. R. App. P. 29(a)(2)...............................................................................2

**MISCELLANEOUS:**

U.S. Dep't of Educ., *Achieving Diversity:  Race-Neutral Alternatives in American Education* (Feb. 1, 2004), https://perma.cc/LK93-3AC9 ............ 24

U.S. Dep't of Educ., Dear Colleague Letter on Parents Involved (Aug. 28, 2008), https://perma.cc/49UL-X94U .......................................... 24

U.S. Dep't of Just. & U.S. Dep't of Educ., Dear Colleague Letter on Withdrawal of Guidance (July 3, 2018), https://perma.cc/KQ6B-JMNY.................................................................. 23-24

**MISCELLANEOUS (continued):**                                    **PAGE**

U.S. Dep't of Just. & U.S. Dep't of Educ.,
   *Guidance on the Voluntary Use of Race to Achieve Diversity*
   *and Avoid Racial Isolation in Elementary and Secondary Schools*
   (Dec. 2, 2011), https://perma.cc/UG83-CMMD ......................................... 23

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 22-1280

COALITION FOR TJ,

Plaintiff-Appellee

v.

FAIRFAX COUNTY SCHOOL BOARD,

Defendant-Appellant

and

SCOTT BRABAND, in his official capacity as
Superintendent of the Fairfax County School Board,
Defendant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING DEFENDANT-APPELLANT

———————————

## INTEREST OF THE UNITED STATES

The United States has a substantial interest in questions concerning when

school districts may take race into account in making decisions. The United States

has significant responsibilities for enforcing the Equal Protection Clause in the

context of public education, see 42 U.S.C. 2000c-6, 2000h-2, and is also charged

with enforcing Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. 2000d

- 2 -

*et seq.* Among other things, Title VI generally prohibits recipients of federal financial assistance (including school districts) from intentionally discriminating on the basis of race, 42 U.S.C. 2000d, and courts apply the same standards for evaluating intentional discrimination under Title VI and the Equal Protection Clause. See, *e.g.*, *Grutter* v. *Bollinger*, 539 U.S. 306, 343 (2003). In addition, the Department of Education ensures Title VI compliance in the education context, and it issues regulations, guidance, and letters regarding the permissible use of race in that setting. *E.g.*, 34 C.F.R. Pt. 100. The United States files this brief under Federal Rule of Appellate Procedure 29(a)(2).

### STATEMENT OF THE ISSUES[1]

1. If a school board adopts a facially race-neutral policy to ensure that students of all races may equally take advantage of a valuable resource, does that intent qualify as a suspect discriminatory purpose under the Equal Protection Clause?

2. If strict scrutiny were to apply in such a novel context, should this Court address what the strict-scrutiny inquiry would entail when that question has not been subject to adversarial briefing?

---

[1] The United States takes no position on any other issue presented in this appeal, including how the law applies to the facts here.

- 3 -

## SUMMARY OF ARGUMENT

When a school board adopts—or retains—a facially race-neutral policy in order to ensure that students of all races may equally take advantage of a valuable resource, such as an education at a selective high school, that intent does not qualify as a discriminatory purpose triggering strict scrutiny.

A wealth of precedent supports this conclusion:  The Supreme Court has long held that public entities seeking to promote equal opportunity or increase racial diversity must first consider race-neutral means for accomplishing those goals before relying on explicit racial classifications, and at no point has it suggested that those race-neutral means are constitutionally suspect and must therefore satisfy strict scrutiny.  Indeed, the Supreme Court's opinions in *Parents Involved in Community Schools* v. *Seattle School District No. 1*, 551 U.S. 701 (2007), emphasized the distinction between race-neutral and race-based means for increasing racial diversity in the K-12 context, with Justice Kennedy's pivotal concurrence declaring that the former are unlikely to "demand strict scrutiny to be found permissible."  *Id.* at 789.  In *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015), the Supreme Court likewise affirmed that public entities may "choose to foster diversity and combat racial isolation with race-neutral tools," rejecting a contention that such race-conscious decisionmaking raises equal-protection concerns.  *Id.* at 545.

- 4 -

Every court of appeals to have decided the issue has agreed that providing equal opportunities and increasing racial diversity are not constitutionally suspect ends. That consensus is well founded. A governmental entity acts with a suspect discriminatory purpose only if it adopts a policy "'because of,' not merely 'in spite of,' its adverse effects" on a specific racial group. *Personnel Adm'r* v. *Feeney*, 442 U.S. 256, 279 (1979). When an entity acts to promote equal opportunity, however, it does not seek to benefit or burden any particular racial group; instead, it endeavors to ensure that individuals of *all* races may equally take advantage of valuable opportunities.

In the event that this Court nevertheless determines that the challenged race-neutral policy triggers strict scrutiny, it should decline to evaluate whether the policy survives review under that standard. Although the district court addressed that complex and novel question, the parties have not developed a record on it, and it has not been subject to adversarial briefing.

## ARGUMENT

## I

## ENSURING THAT STUDENTS OF ALL RACES ENJOY EQUAL EDUCATIONAL OPPORTUNITIES IS NOT A SUSPECT PURPOSE

The legal framework that applies here is well established: The "central purpose" of the Equal Protection Clause is "the prevention of official conduct discriminating on the basis of race." *Washington* v. *Davis*, 426 U.S. 229, 239

- 5 -

(1976).  In enforcing that constitutional guarantee, the Supreme Court has held that "all racial classifications imposed by government" are subject to "strict scrutiny." *Grutter* v. *Bollinger*, 539 U.S. 306, 326 (2003) (citation omitted).  To satisfy strict scrutiny, a policy must be "narrowly tailored" to further "compelling governmental interests." *Ibid.*

In addition, facially race-neutral governmental policies can be subject to strict scrutiny if they were adopted with a "racially discriminatory purpose." *E.g.*, *Doe* v. *Lower Merion Sch. Dist.*, 665 F.3d 524, 543-544 (3d Cir. 2011).[2]  As explained below, when a school board adopts a race-neutral admissions policy for a selective public school in part to advance its interest in providing equal opportunities to students of all races, that intent does not qualify as a suspect discriminatory purpose within the meaning of the governing equal-protection doctrine.  Such an intent thus does not trigger strict scrutiny.[3]

---

[2]  Strict scrutiny does not apply to all race-neutral policies adopted with a racially discriminatory purpose.  Even when racial discrimination was one motivating factor for adopting a race-neutral policy, a defendant may avoid liability if it shows that it would have adopted the policy without consideration of that factor.  See, *e.g.*, *Hunter* v. *Underwood*, 471 U.S. 222, 228, 230-231 (1985).  Moreover, this brief does not address the question whether a plaintiff challenging a race-neutral policy must also establish a racially disparate impact—in addition to a racially discriminatory purpose—to trigger strict scrutiny, nor does it address the scope of what impact must be shown.

[3]  When we refer to a school board's interest in promoting equal opportunities for students of all races, we mean its interest in ensuring that students

(continued...)

- 6 -

A.    *Precedent Makes Clear That An Intent To Equalize Opportunities For Persons Of All Races Is Not A Suspect Discriminatory Purpose*

1.  The Supreme Court has repeatedly explained that public entities that seek to provide equal opportunities for persons of all races—or further the related purposes of increasing racial diversity or promoting racial integration—may do so through race-neutral means without triggering strict scrutiny.

a.  To begin, the Supreme Court's case law evaluating explicit racial classifications has routinely directed governmental actors that seek to promote equal opportunity or increase racial diversity to evaluate whether they can accomplish their goals through race-neutral means.  Indeed, racial classifications aimed at these ends fail strict scrutiny *unless* the entity has first considered in good faith such race-neutral alternatives.  See, *e.g.*, *Grutter*, 539 U.S. at 339-340.  But in discussing this requirement, the Supreme Court has never indicated that race-neutral means for achieving these goals, too, must satisfy strict scrutiny.[4]

_____

(...continued)
of all races may equally take advantage of valuable resources, regardless of whether such action is required by the Equal Protection Clause, Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.*, or another law.  Such resources include an education at the school at issue here, which ranks as one of the best public high schools in the country (J.A. 29).  See also p. 26, *infra*.

[4]  This brief discusses a number of decisions addressing interests in (1) advancing equal opportunity; (2) promoting racial integration; (3) avoiding racially isolated schools; (4) increasing racial diversity; and (5) obtaining the educational benefits that flow from a student body that is diverse along multiple

(continued...)

- 7 -

*Grutter*, for example, held that a law school employing racial classifications in its admissions program adequately considered "race-neutral alternatives" for "achiev[ing] the diversity [it] s[ought]," including the alternative of placing less emphasis on test scores. 539 U.S. at 339-340; see also *id.* at 361-362 (Thomas, J., joined in relevant part by Scalia, J., concurring in part and dissenting in part) (disagreeing with that conclusion but agreeing race-neutral means are permissible: "[w]ith the adoption of different admissions methods, such as accepting all students who meet minimum qualifications, the Law School could achieve its vision of the racially aesthetic student body without the use of racial discrimination") (citation omitted). Applying the same requirement, *City of Richmond* v. *J.A. Croson Co.*, 488 U.S. 469 (1989), faulted a city for relying on racial classifications without first considering "race-neutral means to increase minority business participation in city contracting." *Id.* at 507; *id.* at 509-510 (plurality opinion). Concurring in the judgment, Justice Scalia agreed that if a governmental entity "adopt[s] a preference" for contracting with small or new

---

(...continued)

dimensions (including race), the interest the Supreme Court deemed compelling in the higher-education context in *Grutter*, 539 U.S. at 324-325, 328, 337-338. Although those interests are not identical, they are similar in a key respect: the interests themselves do not inherently favor or disfavor any specific racial group, even if their application to particular factual scenarios may sometimes foreseeably result in more, or fewer, opportunities for individuals of a particular race than would otherwise be the case. See pp. 20-21, *infra.*

- 8 -

businesses, that preference would be "permissible" and "not based on race," even if were adopted for the purpose of "undo[ing] the effects of past [racial] discrimination" and had "a racially disproportionate impact." *Id.* at 526.

Most recently, in *Fisher* v. *University of Texas*, 579 U.S. 365 (2016), the Supreme Court evaluated several race-neutral practices for increasing the racial diversity of an undergraduate student body without suggesting that they triggered strict scrutiny, let alone that they were unlawful. Specifically, the Court rejected the plaintiff's contention that the defendant university could have avoided using explicit racial classifications in its admissions program by instead (1) weighting socioeconomic factors more heavily or (2) expanding its "Top Ten Percent Plan," which guaranteed admission to a certain number of students in each public high school in the State. *Id.* at 385-388. Although the Court questioned whether expanding the percentage plan would be more race neutral than the challenged policy, it never indicated that either of the proposed alternatives would violate the Equal Protection Clause. Instead, the Court held that the university need not adopt the alternatives because they were unworkable. *Ibid.* The dissenters disagreed with the workability conclusion, but they, too, indicated that such race-neutral means are permissible, explaining that the university "could have adopted [nonracial] approaches to further its goals," including "uncapping the Top Ten Percent [Plan] or placing greater weight on socioeconomic factors." *Id.* at 426-427

- 9 -

(Alito, J., joined by Roberts, C.J., and Thomas, J., dissenting); *id.* at 394, 409-410, 437.

This Court has followed the same course.  For example, in *Tuttle* v. *Arlington County School Board*, 195 F.3d 698 (4th Cir. 1999), this Court rejected a school district's use of racial classifications for admitting students to a specialized school.  *Id.* at 701-702.  Significantly, the Court reasoned in part that the district "ha[d] race-neutral means to promote [racial] diversity," including setting aside "a certain number of slots" in the specialized school for students from "[e]ach neighborhood school."  *Id.* at 706 & n.11; see also *H.B. Rowe Co.* v. *Tippett*, 615 F.3d 233, 252 (4th Cir. 2010).  As Judge Heytens explained in his concurrence in this Court's stay pending appeal here, "it would be quite the judicial bait-and-switch" to hold that the race-neutral means that the Supreme Court has required entities to consider adopting "are also subject to strict scrutiny."  C.A. Doc. 27, at 10.

b.  The opinions issued in *Parents Involved in Community Schools* v. *Seattle School District No. 1*, 551 U.S. 701, 735 (2007), underscore the critical distinction between a school district's use of race-neutral means to equalize educational opportunity and a district's use of racial classifications.  At issue in *Parents Involved* were approaches two school districts (in Jefferson County, Kentucky, and Seattle, Washington) adopted for assigning students to schools to facilitate racial

- 10 -

integration and avoid racial isolation. See *id.* at 711-712, 715-717; *id.* at 725-726 (plurality opinion). The system adopted by Jefferson County designated a so-called "resides" school for each elementary-school student based on geography, and it then grouped those schools into clusters "to facilitate integration." *Id.* at 716 (majority opinion) (citation omitted). Jefferson County generally assigned students to schools within their cluster, but it based assignments in part on whether each school would have too few (less than 15%) or too many (more than 50%) Black students. *Id.* at 716-717. Seattle relied in part on a similar racial classification in assigning students to high schools. *Id.* at 711-712.

*Parents Involved* held that these express racial classifications failed strict scrutiny. 551 U.S. at 733-735. Importantly, however, the Court did not question the race-neutral component of Jefferson County's system that grouped schools into clusters to facilitate integration. Moreover, in evaluating whether the racial classifications survived strict scrutiny, the Court applied the precedent just described, faulting the school districts for not "consider[ing] methods other than explicit racial classifications to achieve their stated goals." *Id.* at 735 (citing materials showing that Seattle did not consider options such as using a lottery for school assignments, J.A. at 253a-254a, *Parents Involved*, *supra* (No. 05-908)). In doing so, the Court treated using race-neutral means to facilitate racial integration as permissible.

- 11 -

The plurality opinion, too, recognized that "different considerations" are in play when a court evaluates actions seeking to "achiev[e] greater racial diversity" that are race neutral rather than based on "explicit racial classifications." *Parents Involved*, 551 U.S. at 745 (Roberts, C.J., joined by Scalia, Thomas, and Alito, JJ.) (not addressing the validity of such race-neutral actions). Indeed, in harmonizing the Court's invalidation of the challenged racial classifications with prominent state-court decisions recognizing the permissibility of actions to promote racial integration, the plurality emphasized that those decisions did not concern racial classifications and had not applied strict scrutiny. See *id.* at 738 (distinguishing *Tometz* v. *Board of Education*, 237 N.E.2d 498, 501 (Ill. 1968), which upheld a statute requiring "race-consciousness in drawing school attendance boundaries"); *id.* at 739 n.16 (distinguishing *School Committee of Boston* v. *Board of Education*, 227 N.E.2d 729, 733-734 (Mass. 1967), appeal dismissed for want of a substantial federal question, 389 U.S. 572 (1968), which upheld a statute requiring school districts to avoid racial imbalance; explaining the statute "did not specify how to achieve this goal"). The plurality distinguished related precedent on similar grounds. See pp. 15-16, *infra*.[5]

---

[5] In an oral argument conducted in a later case, the Chief Justice stated that "[he] thought both the plurality and the concurrence in *Parents Involved* accepted the fact that race conscious action such as school siting or drawing district

(continued...)

- 12 -

Justice Kennedy, who provided the fifth vote to invalidate the racial classifications at issue in *Parents Involved*, explained how the constitutional analysis differs in the two circumstances.  His pivotal opinion concluded that "[i]f school authorities are concerned that the student-body compositions of certain schools interfere with the objective of offering an equal educational opportunity to all of their students, they are free to devise race-conscious measures to address the problem in a general way," without treating students differently "on the basis of a systematic, individual typing by race."  551 U.S. at 788-789 (Kennedy, J., concurring in part and concurring in the judgment).  Justice Kennedy explained that school boards "may pursue the goal of bringing together students of diverse backgrounds and races" through "other means," such as "strategic site selection of new schools" and "drawing attendance zones with general recognition of the demographics of neighborhoods." *Id.* at 789.  Significantly, Justice Kennedy said that "[t]hese mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible." *Ibid.*

---

(...continued)
lines * * * is okay, but discriminating in particular assignments is not."  Tr. of Oral Arg. at 54, *Ricci* v. *DeStefano*, 557 U.S. 557 (2009) (Nos. 07-1428, 08-328).

- 13 -

c.  The Supreme Court's subsequent decision in *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015), reinforced the conclusion that race-neutral measures for equalizing opportunities do not trigger strict scrutiny.  *Inclusive Communities*' primary holding was that the Fair Housing Act, 42 U.S.C. 3601 *et seq.*, allows plaintiffs to pursue disparate-impact claims—claims challenging race-neutral practices that have a disproportionately adverse effect on a racial group and lack a legitimate justification.  *Inclusive Cmtys.*, 576 U.S. at 524, 530-546.  Significantly, the defendants in *Inclusive Communities* argued that the Supreme Court should adopt a contrary interpretation of the statute in order to avoid a constitutional question: whether recognizing disparate-impact claims would violate equal-protection principles by sometimes compelling race-conscious decisionmaking.  Pet. Br. at 42-45, *Inclusive Cmtys.*, *supra* (No. 13-1371).

Although the Court did not disagree with the premise that avoiding disparate impact sometimes requires taking race into account, the Court rejected the defendants' argument.  *Inclusive Cmtys.*, 576 U.S. at 540, 544-545.  As relevant here, the Court explained that "race may be considered in certain circumstances and in a proper fashion," citing Justice Kennedy's endorsement in *Parents Involved* of school boards' efforts to pursue racial diversity through race-neutral means.  *Id.* at 545.  "Just as this Court has not 'question[ed] an employer's

- 14 -

affirmative efforts to ensure that all groups have a fair opportunity to apply for promotions and to participate in the [promotion] process,'" the Court explained, it "does not impugn housing authorities' race-neutral efforts to encourage revitalization of communities that have long suffered the harsh consequences of segregated housing patterns." *Ibid.* (brackets in original) (quoting *Ricci* v. *DeStefano*, 557 U.S. 557, 585 (2009)).  Housing authorities may "choose to foster diversity and combat racial isolation with race-neutral tools." *Ibid.*[6]

    d.  A final set of Supreme Court decisions further reinforces the conclusion that strict scrutiny is not triggered by race-neutral means of pursuing permissible ends like promoting racial integration or racial diversity.  In *Citizens for Better Education* v. *Goose Creek Consolidated Independent School District*, 484 U.S. 804 (1987) (*Citizens II*), the Supreme Court dismissed an appeal challenging, on equal-protection grounds, a school district's facially race-neutral decision to change the

---

    [6]  Addressing an analogous provision of Title VII of the Civil Rights Act of 1964 (Title VII) that generally bars employers from intentionally discriminating based on race, 42 U.S.C. 2000e-2(a)(1), *Ricci* explained that Title VII "does not prohibit an employer from considering, before administering a[n] [employment] test or practice, how to design that test or practice in order to provide a fair opportunity for all individuals, regardless of their race."  557 U.S. at 585 (distinguishing that scenario from one in which an employer throws out the results of an employment examination it has already administered on the basis of disparate racial results, which Title VII prohibits in certain circumstances, *id.* at 579-584); cf. *Antonelli* v. *New Jersey*, 419 F.3d 267, 270, 274-276 (3d Cir. 2005) (similarly rejecting an equal-protection challenge to the design of an employment test).

- 15 -

geographical attendance zones for its high schools to avoid "*de facto* [racial] segregation," *Citizens for Better Educ.* v. *Goose Creek Consol. Indep. Sch. Dist.*, 719 S.W.2d 350, 351-353 (Tex. App. 1986) (*Citizens I*), writ refused n.r.e.  That dismissal for want of a substantial federal question is binding precedent and represents the Supreme Court's view that the plaintiffs' equal-protection challenge was meritless.  See, *e.g.*, *Mandel* v. *Bradley*, 432 U.S. 173, 176 (1977) (per curiam); cf. *Parents Involved*, 551 U.S. at 738-739 (plurality opinion) (noting that *Citizens I* applied rational-basis review and distinguishing it, apparently because it did not involve racial classifications).

In a similar vein, *Crawford* v. *Board of Education*, 458 U.S. 527 (1982), concluded that an intent to facilitate racial integration is not a suspect discriminatory purpose, albeit in the context of evaluating a claim that a law was motivated by a segregative intent.  *Id.* at 529-532 & n.1, 543-545 (concluding there was "no reason to challenge" a lower-court determination of no discriminatory intent even though the lower court found that the voters who ratified the law may have believed prior law was "aggravating" the "desegregation problem" by leading to racially isolated city schools).  As *Crawford* explained elsewhere in the opinion, "a distinction may exist between state action that discriminates on the basis of race and state action that addresses, in neutral fashion, race-related matters."  *Id.* at 538.

- 16 -

Finally, the Supreme Court's unanimous decision in *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971) (*Swann I*), said that school authorities may voluntarily act to promote racial integration "to prepare students to live in a pluralistic society." *Id.* at 16 (so stating in the course of discussing a court's authority to mandate remedies for constitutional violations); accord *North Carolina State Bd. of Educ*. v. *Swann*, 402 U.S. 43, 45 (1971).  Although that statement is dictum, the subsequent authority discussed above reinforced *Swann I*'s fundamental point—that promoting racial integration is not constitutionally suspect and may be pursued using appropriate means.[7] Cf. *Parents Involved*, 551 U.S. at 738 (plurality opinion) (stressing that *Swann I* "addresse[d] only a possible state objective; it sa[id] nothing of the permissible *means*—race conscious or otherwise—that a school district might employ to achieve that objective"); *Martin* v. *Charlotte-Mecklenburg Bd. of Educ.*, 626 F.2d 1165, 1166-1167 (4th Cir. 1980) (applying *Swann I* to hold that a school district did not violate the Equal Protection Clause when it voluntarily adopted a student-assignment plan in part to integrate its schools, but not identifying the means used in the plan).

---

[7] In addition, to the extent the cited discussion in *Swann I* and any of the other foregoing Supreme Court precedent reflects only dictum, it bears emphasizing that this Court "routinely afford[s] substantial, if not controlling deference to dicta from the Supreme Court." *Manning* v. *Caldwell*, 930 F.3d 264, 281-282 (4th Cir. 2019) (en banc).

- 17 -

2.  All courts of appeals to have addressed the question have agreed that the goals of equalizing opportunities for persons of all races, increasing racial diversity, and promoting racial integration are not constitutionally suspect.  For example, in *Raso* v. *Lago*, 135 F.3d 11 (1st Cir. 1998), the First Circuit evaluated a suit brought by former residents of a predominantly white neighborhood who claimed they were entitled to first preference for certain new housing units.  *Id.* at 12-13.  The plaintiffs asserted an equal-protection claim against the Department of Housing and Urban Development (HUD), contending that HUD engaged in racial discrimination when it insisted that former residents receive first preference for only some units so that the remaining units would be available on an equal basis to individuals of all races.  *Id.* at 13-15.  The First Circuit explained that the plaintiffs were "mistaken in treating 'racial motive' as a synonym for a constitutional violation," noting that "[e]very antidiscrimination statute aimed at racial discrimination, and every enforcement measure taken under such a statute, reflect a concern with race."  *Id.* at 16.  Because HUD insisted on the race-neutral condition "to secure *equal* treatment of applicants regardless of race," the court held that HUD's motivations were not constitutionally suspect.  *Id.* at 15-17.

In *Riddick* v. *School Board of Norfolk*, 784 F.2d 521 (4th Cir. 1986), this Court similarly concluded that the purpose of promoting racial integration is not a suspect discriminatory purpose under the Equal Protection Clause.  In *Riddick*,

- 18 -

Black children challenged a school district's revised school-assignment plan that assigned elementary-school students in the first instance to schools "based upon the residence of the child," not race. *Id.* at 524-527, 532, 540. This Court observed that the school board adopted the plan in part to avoid "white flight" from the school system, but it held that purpose was not suspect because the board's ultimate goal was "stabiliz[ing] school integration" in the district. *Id.* at 539-540, 543 (emphasizing that the school district had eradicated the vestiges of *de jure* segregation). The Court also noted that the board considered race in crafting "the school assignment lines to result in the maximum amount of integration possible," which the Court deemed appropriate. *Id.* at 540; see also *Spurlock* v. *Fox*, 716 F.3d 383, 394-396, 399-400 (6th Cir. 2013) (similar).

Other court of appeals decisions have reached similar conclusions. See, *e.g.*, *Anderson* v. *City of Boston*, 375 F.3d 71, 76-77, 85-88, 91 (1st Cir. 2004) (holding that school district's "mere invocation of racial diversity as a goal" was "insufficient" to subject its facially race-neutral student-assignment plan to strict scrutiny); *Doe*, 665 F.3d at 547-548, 553-554, 556 (3d Cir.) (holding that school board's purpose of avoiding a "racially disproportionate impact" in adopting facially race-neutral school-assignment plan did not trigger strict scrutiny); *Rothe Dev., Inc.* v. *United States Dep't of Def.*, 836 F.3d 57, 71-72 (D.C. Cir. 2016) (holding that facially race-neutral statute was not subject to strict scrutiny even

- 19 -

though Congress enacted it in part to "advance equality of business opportunity" and to "counteract" "racial discrimination"); see also, *e.g.*, *Stevenson* v. *Blytheville Sch. Dist. #5*, 800 F.3d 955, 961, 969-972 (8th Cir. 2015); *Allen* v. *Alabama State Bd. of Educ.*, 164 F.3d 1347, 1352-1354 (11th Cir. 1999), vacated at joint request of parties, 216 F.3d 1263 (11th Cir. 2000). Indeed, in a context similar to the one at issue here, the First Circuit recently explained that the "inclusion of [racial] diversity as one of the guides" in selecting a race-neutral admissions policy for a selective school "does not by itself trigger strict scrutiny." *Boston Parent Coal. for Acad. Excellence Corp.* v. *School Comm. of Boston*, 996 F.3d 37, 41, 46, 48-49 (1st Cir. 2021) (denying injunction pending appeal).

3. The Supreme Court's precedent delineating the circumstances in which a motivation qualifies as a suspect discriminatory purpose amply supports the consensus reached by the federal appellate courts. In *Personnel Administrator* v. *Feeney*, 442 U.S. 256 (1979), the Supreme Court explained that to establish that a race-neutral policy was adopted with a discriminatory purpose, a plaintiff must show more than that the decisionmaker knew the policy would have consequences for members of a particular racial group. Rather, the plaintiff must prove that the decisionmaker "selected or reaffirmed [the policy] at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 279

(holding that a law establishing a hiring preference for veterans was not enacted with a sex-based discriminatory purpose).

It follows that when a governmental entity adopts a race-neutral policy to ensure that persons of all races may equally take advantage of a valuable resource, it is not acting with a suspect purpose. In those circumstances, the entity's goal is not to benefit or burden any particular racial group, but rather to promote equal opportunities for individuals of all races. Cf. *Rothe*, 836 F.3d at 64 (holding that a statute making certain benefits available to individuals who have experienced racial prejudice does not classify individuals based on race).

To be sure, when an entity pursues its equal-opportunity interest in a particular scenario, it will sometimes be foreseeable that specific racial groups will benefit and others will be burdened relative to the status quo. Moreover, the entity may at times describe its intent broadly—as promoting equal opportunities—or more narrowly—as increasing representation of the particular racial groups underserved in the relevant context, such as Hispanic Americans in one context, or Asian Americans in another. But neither of these circumstances would establish that the entity has acted "'because of,' not merely 'in spite of,' [any] adverse effects upon an identifiable [racial] group"; as just explained, an interest in assuring that all students, regardless of race, have an equal opportunity to take advantage of a valuable resource is not the same as an interest in benefiting or

- 21 -

burdening students of a particular race. *Feeney*, 442 U.S. at 279; see also *Doe*, 665 F.3d at 547-548.

Of course, in circumstances where an entity claims that it adopted a race-neutral policy to equalize opportunities for students of all races, the plaintiff remains free to argue that the asserted rationale is pretextual—and that the actual purpose was instead an invidious discriminatory purpose. Cf., *e.g.*, *Raso*, 135 F.3d at 16-17 (holding that strict scrutiny did not apply to race-neutral action taken to provide equal opportunities—which, on the facts there, meant the government acted "to increase minority opportunities"—but explaining that a different result would have obtained if the plaintiffs had shown that the government was instead pursuing a "secret discriminatory standard"). In the absence of such a showing, however, a race-neutral policy adopted with the purpose of equalizing educational opportunities is not suspect and thus is not subject to strict scrutiny.

B.    *The Purposes Of The Equal Protection Clause And The Longstanding Views Of The United States Reinforce The Conclusion That Pursuing Equal Opportunities Is Not A Suspect Purpose*

A ruling that an intent to equalize opportunities for individuals of all races is constitutionally permissible would align with key purposes of the Equal Protection Clause. As the Supreme Court explained in *Brown* v. *Board of Education*, 347 U.S. 483 (1954), "education is perhaps the most important function of state and local governments," and "[s]uch an opportunity" is a "right which must be made

- 22 -

available to all on equal terms." *Id.* at 493. More generally, "[e]nsuring that public institutions are open and available to all segments of American society, including people of all races and ethnicities, represents a paramount government objective." *Grutter*, 539 U.S. at 331-332 (brackets in original; citation omitted).

As *Inclusive Communities* recognized, however, "[m]uch progress remains to be made in our Nation's continuing struggle against racial isolation," and the government has a central role to play "in moving the Nation toward a more integrated society." 576 U.S. at 546-547. It cannot be the case that the Equal Protection Clause, which was enacted to break down racial barriers, requires school authorities to "accept the status quo" when they learn that one of their policies is impeding the ability of students of all races to take advantage of a valuable public good, such as an education at the prestigious high school at issue here. *Parents Involved*, 551 U.S. at 787-788 (Kennedy, J., concurring in part and concurring in the judgment).

Conversely, the Equal Protection Clause does not prohibit a school district that *has* implemented equitable policies from refusing to adopt *less* equitable policies. Imagine, for example, that the school at issue here had always followed the admissions policy plaintiff challenges, and plaintiff had requested that the school board instead adopt a testing-based policy. If the board refused based on a concern that the proposed policy would interfere with its goal of making the

- 23 -

education at issue here equally available to students of all races or would decrease the racial diversity of the student body, it cannot be the case that the board would be acting with a suspect purpose: it would be nonsensical—and unworkable—to require school boards to defend myriad decisions declining to adopt a wide array of inequitable policies under the demanding strict-scrutiny standard. This hypothetical thus illustrates the fundamental principle that a school board does not act with a constitutionally suspect intent when it pursues its interest in promoting equal opportunities. And, significantly, there is no reason the applicability of that principle should depend on the baseline state of affairs that happens to be present.

Consistent with that logic, the United States and the Department of Education—which have important enforcement responsibilities in this area, see pp. 1-2, *supra*—have consistently taken the position for more than 20 years that race-neutral means for achieving equal educational opportunity, racial integration, or racial diversity in the K-12 context are lawful, sometimes making explicit that such measures are not subject to strict scrutiny. See, *e.g.*, U.S. Dep't of Just. & U.S. Dep't of Educ., *Guidance on the Voluntary Use of Race to Achieve Diversity and Avoid Racial Isolation in Elementary and Secondary Schools* 5-6 (Dec. 2, 2011), https://perma.cc/UG83-CMMD (2011 Guidance), withdrawn, U.S. Dep't of Just. & U.S. Dep't of Educ., Dear Colleague Letter on Withdrawal of Guidance 1 (July 3,

- 24 -

2018), https://perma.cc/KQ6B-JMNY (2018 Letter);[8] U.S. Dep't of Educ., Dear

Colleague Letter on *Parents Involved* (Aug. 28, 2008), https://perma.cc/49UL-

X94U, replaced by 2011 Guidance; U.S. Br. at 17, 24-27, *Parents Involved*, *supra*

(No. 05-908) (2006); Tr. of Oral Arg. at 18, 21-23, *Parents Involved*, *supra* (No.

05-908) (2006); U.S. Dep't of Educ., *Achieving Diversity: Race-Neutral*

*Alternatives in American Education* (Feb. 1, 2004), https://perma.cc/LK93-3AC9.

For all of the reasons identified above, this longstanding position is correct.

C.    *The District Court's Analysis And Plaintiff's Arguments Are Unpersuasive*

The district court did not apply the correct legal standard when it evaluated

whether the school board intended to discriminate against Asian Americans in

adopting the challenged race-neutral admissions policy. The court concluded that

the school board impermissibly sought "to change the racial makeup [of the school

at issue] to the detriment of Asian-Americans," elaborating that the board intended

"to increase Black and Hispanic enrollment, which would, by necessity decrease

the representation of Asian-Americans." J.A. 2979, 2981. But the critical inquiry

is whether the board adopted the policy "'because of,' not merely 'in spite of,' its

_____

[8] The 2018 Letter summarily withdrew the 2011 Guidance and six other documents on the ground that they "suggest[ed] to public schools" that they "take action or refrain from taking action beyond plain legal requirements." 2018 Letter 2. The letter did not disagree with any conclusion in the 2011 Guidance as to the actions public schools are constitutionally permitted to take. *Ibid.*

- 25 -

adverse effects" on a particular racial group.  *Feeney*, 442 U.S. at 279.  And

extensive precedent—which the court ignored—establishes that a public entity

does *not* act with the requisite discriminatory intent when it seeks to promote equal

educational opportunities.  By failing to evaluate whether any race-related purpose

of the school board qualified as a permissible intent to promote equal

opportunities, the court committed legal error.

The district court made a related analytical mistake in accepting plaintiff's

argument that the school board adopted its admissions policy for the impermissible

purpose of achieving "racial balance."  J.A. 2979-2981.  "Racial balancing," as the

Supreme Court has used that term, means a preference for "some specified

percentage of a particular group merely because of its race or ethnic origin."

*Fisher* v. *University of Texas*, 570 U.S. 297, 311 (2013) (*Fisher I*) (citation

omitted).  As the Supreme Court has explained, "outright racial balancing" is not a

compelling interest justifying the extreme measure of using racial classifications.

*Ibid.* (citation omitted); accord *Eisenberg* v. *Montgomery Cnty. Pub. Schs.*, 197

F.3d 123, 131-134 (4th Cir. 1999).  But the district court failed to recognize that

that holding is inapplicable when a school board employs facially race-neutral

means to provide equal educational opportunities:  in such circumstances, a board

neither seeks to attain any "specified percentage[s]" of racial groups "merely

because of  *  *  *  race," nor does it employ constitutionally problematic racial

- 26 -

classifications, *Fisher I*, 570 U.S. at 311 (citation omitted).  Cf., *e.g.*, *Grutter*, 539

U.S. at 330, 339-340 (explaining that racial classifications cannot be used to

achieve racial balancing *and* indicating that race-neutral means for promoting

diversity are permissible).

Thus, when a governmental entity is deciding how to distribute a valuable

resource to members of the public, it may take race-neutral steps to ensure that

individuals of all races may equally take advantage of that resource—here, an

education at one of the best public schools in the country.  In doing so, there is

nothing problematic about endeavoring to ensure that the cohort of admitted

students more closely reflects the racial makeup of students in the relevant

community, as that is one way to measure whether the resource is being distributed

on an equal basis.  Indeed, if a school board were committed to that equal-

opportunity goal above all others, it could distribute seats at the school on the basis

of a lottery.  Such an action could not possibly be constitutionally problematic,

underscoring the conclusion that pursuing an equal-opportunity interest is not

constitutionally suspect.

Plaintiff correctly concedes that "the mere mention" of "racial

diversity  * * *  as a goal is not sufficient to establish discriminatory intent" (J.A.

2721), and that school boards can take certain steps to "improve educational access

for underserved groups" (Pl. S. Ct. Reply 13, No. 21A590 (Apr. 15, 2022)).

- 27 -

According to plaintiff, however, a school board may not further those ends by "treating applicants differently based on factors designed to produce a racial result"; instead, a board is apparently limited to measures that treat everyone exactly the same, such as eliminating application fees and offering free test-preparation courses. Pl. S. Ct. Appl. to Vacate Stay 22 n.7, No. 21A590 (Apr. 8, 2022). But plaintiff points to no case law constraining the types of race-neutral means a public entity may use to pursue its valid interest in equal opportunity, and there is no good reason why the Equal Protection Clause should demand that school boards be limited to the approaches plaintiff favors. Cf. pp. 7-12, 14-15, 18-19, *supra* (describing precedent sanctioning a wide variety of race-neutral approaches that treat affected individuals differently, including in admissions contexts like this one).

## II

## IF STRICT SCRUTINY WERE TO APPLY TO THE CHALLENGED RACE-NEUTRAL POLICY, THE STRICT-SCRUTINY INQUIRY MUST BE ADAPTED FOR THIS NOVEL CONTEXT

In the event that this Court were to determine that the policy challenged here is subject to strict scrutiny, it should not address (as the district court did (J.A. 2982-2984)) whether the policy satisfies the strict-scrutiny inquiry. The school board has not yet presented a record on that question, nor has it briefed that complex issue at any stage of this litigation.

- 28 -

In an appropriate appeal in which the issue were briefed, this Court would first need to consider the compelling governmental interests the school board would assert to justify the challenged policy.  Cf. *Parents Involved*, 551 U.S. at 720-725 (rejecting two interests as inapplicable in the K-12 context at issue there but not "attempting  *  *  *  to set forth all the interests a school district might assert").  The Court would also need to determine the contours of the narrow-tailoring inquiry in this unusual context—a difficult task that no federal appellate court has had occasion to perform.

For example, in ruling that the school board's policy here was not narrowly tailored, the district court concluded that the policy must be a "last resort" for accomplishing the board's objectives.  J.A. 2984 (citation omitted).  But it makes little sense to apply the doctrine the court invoked—that entities using racial classifications must adequately consider "race-neutral alternatives," *Grutter*, 539 U.S. at 339—when a plaintiff challenges an action that itself is *already* race neutral.  "[S]trict scrutiny must take relevant differences into account," and courts must "calibrate[]" the narrow-tailoring inquiry to the relevant context.  *Id.* at 327, 333-334 (citation and internal quotation marks omitted).  If this Court determines that strict scrutiny applies in this novel setting, it should await another appeal to adapt the narrow-tailoring inquiry to these unique circumstances.

- 29 -

# CONCLUSION

For the foregoing reasons, this Court should hold that an intent to equalize educational opportunities for students of all races is not a suspect discriminatory purpose, and it should decline to address what the strict-scrutiny inquiry might entail in this novel context.

Respectfully submitted,

LISA BROWN
  General Counsel

KRISTEN CLARKE
  Assistant Attorney General

DANIEL KIM
ADINA KOLE
JESSICA WOLLAND
  Attorneys
  Department of Education
  Office of the General Counsel
  400 Maryland Ave., S.W.
  Washington, D.C.  20202-0001

s/ Sydney A.R. Foster
NICOLAS Y. RILEY
SYDNEY A.R. FOSTER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 305-5941

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 6499 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared in Times New Roman 14-point font using Microsoft Office Word 2019.

s/ Sydney A.R. Foster
SYDNEY A.R. FOSTER
Attorney

Date: May 13, 2022