No. 22-1280

—————————————

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————————

COALITION FOR TJ,

Plaintiff – Appellee,

v.

FAIRFAX COUNTY SCHOOL BOARD,

Defendant – Appellant.

—————————————

On Appeal from the United States District Court
for the Eastern District of Virginia, No. 1:21-cv-00296-CMH
Honorable Claude M. Hilton, District Judge

—————————————

**APPELLEE'S RESPONSE BRIEF**

—————————————

GLENN E. ROPER
Pacific Legal Foundation
1745 Shea Center Drive, Suite 400
Pacific Legal Foundation
Highlands Ranch, Colorado 80129
Telephone: (916) 419-7111
GERoper@pacificlegal.org

ALISON E. SOMIN
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, Virginia 22201
Telephone: (202) 888-6881
ASomin@pacificlegal.org

ERIN E. WILCOX
CHRISTOPHER M. KIESER
JOSHUA P. THOMPSON
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
EWilcox@pacificlegal.org
CKieser@pacificlegal.org
JThompson@pacificlegal.org

*Attorneys for Plaintiff – Appellee*

## LOCAL RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Appellee Coalition for TJ hereby states that it has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

# TABLE OF CONTENTS

LOCAL RULE 26.1 DISCLOSURE STATEMENT ...................................i

TABLE OF AUTHORITIES ....................................................v

JURISDICTIONAL STATEMENT ...........................................1

INTRODUCTION .............................................................1

STATEMENT OF THE ISSUES ...........................................3

STATEMENT OF THE CASE .............................................4

   I.  Factual Background ...................................................4

   II.  Procedural History ................................................12

SUMMARY OF ARGUMENT ..............................................13

STANDARD OF REVIEW...................................................16

ARGUMENT ..................................................................17

   I.    The District Court Correctly Identified a Significant
        and Continuing Disparate Impact on Asian-American
        Applicants to TJ...................................................19

      A. The Before-and-After Comparison Is Proper
         Here and Demonstrates a Clear Impact
         Against Asian-American Students .........................21

      B. The Undisputed Record Shows Additional
         Evidence of Disparate Impact Beyond a
         Simple Before-and-After Comparison ...................28

      C. The Board's Proposed Comparison of the Applicant
         Pool to Offers Is Invalid and Extreme....................33

   II.   The District Court Correctly Determined That
        Undisputed Evidence Shows the Board Acted
        With Impermissible Discriminatory Intent ...............36

A. The Challenged Policy's Use of Race-Neutral
   Language Does Not Disprove Discriminatory Intent ........... 37

B. The Historical Background Shows That the
   Admissions Changes Were Motivated by an
   Impermissible Racial Purpose ................................. 37

C. The Board's Process Shows That It Was Motivated
   by an Impermissible Racial Purpose ...................... 42

D. The Board's Actions and Comments Demonstrate
   That the Admissions Changes Were Motivated
   by an Impermissible Racial Purpose ...................... 47

    1. The Board's reaction to the initial September 15 proposal
       shows an intent to racially balance TJ ............................ 47

    2. At the Board's direction, FCPS staff developed
       plans that put race at the forefront ................................. 49

    3. The Board members used geography
       as a proxy for race ............................................. 52

    4. Text messages between Board members show
       a consistent focus on race ................................... 55

III.   The Board's Actions Do Not Satisfy Strict Scrutiny .................. 58

A. Racial Balancing Is Not a Compelling Interest .................... 59

B. "Improving Racial Diversity" at TJ Is Not a
   Compelling Government Interest ........................................... 61

C. The Board's Actions Are Not Narrowly Tailored .................. 63

D. Contrary to the Argument of the United States
   as Amicus, Remand Is Unnecessary .................................... 64

CONCLUSION ..................................................... 66

iii

REQUEST FOR ORAL ARGUMENT ................................................ 67

CERTIFICATE OF COMPLIANCE ........................................... 68

CERTIFICATE OF SERVICE ................................................. 69

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Mote*,
    423 F.3d 438 (4th Cir. 2005) ............................................................ 17

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995) ............................................................... 19, 58

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................... 17

*Ass'n for Educ. Fairness v. Montgomery Cty. Bd. of Educ.*,
    560 F. Supp. 3d 929 (D. Md. 2021) ............................................ 57, 65

*Boston Parent Coal. for Academic Excellence Corp. v.*
    *Sch. Cmte. of City of Boston*, No. 21-10330-WGY,
    2021 WL 4489840 (D. Mass. Oct. 1, 2021) ....................................... 65

*Boston Parent Coalition for Academic Excellence Corporation v.*
    *School Committee of City of Boston*,
    996 F.3d 37 (1st Cir. 2021) ........................................................ 23, 65

*Christa McAuliffe Intermediate Sch. PTO v. de Blasio*,
    364 F. Supp. 3d 253 (S.D.N.Y. 2019), *aff'd on other*
    *grounds*, 788 F. App'x 85 (2d Cir. 2019) ....................................... 65

*Coalition for TJ v. Fairfax Cty. Sch. Bd.*,
    No. 21A590, 2022 WL 1209926 (U.S. Apr. 25, 2022) ......................... 13

*Coalition for TJ v. Fairfax Cty. Sch. Bd.*, No. 22-1280, 2022
    WL 986994 (4th Cir. Mar. 31, 2022) ............................................ 13, 47

*Crawford v. Board of Education of City of Los Angeles*,
    458 U.S. 527 (1982) ............................................................... 54

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
    665 F.3d 524 (3d Cir. 2011) ...................................................... 60, 62

v

*First Va. Banks, Inc. v. BP Exploration & Oil, Inc.*,
206 F.3d 404 (4th Cir. 2000)............................................................59

*Fisher v. Univ. of Tex. at Austin*,
570 U.S. 297 (2013)........................................3, 13, 19, 34, 58, 60, 63

*Gregg v. Georgia*,
428 U.S. 153 (1976)..........................................................................61

*Grutter v. Bollinger*,
539 U.S. 306 (2003).................................................... 3, 13, 57-58, 60

*Hayden v. County of Nassau*,
180 F.3d 42 (2d Cir. 1999) ..........................................................23-24

*Lewis v. Ascension Parish School Board*,
806 F.3d 344 (5th Cir. 2015).......................................................23, 28

*LULAC v. Perry*,
548 U.S. 399 (2006)..........................................................................66

*Marks v. United States*,
430 U.S. 188 (1977)..........................................................................61

*Metric/Kvaerner Fayetteville v. Fed. Ins. Co.*,
403 F.3d 188 (4th Cir. 2005)............................................................17

*Miller v. Johnson*,
515 U.S. 900 (1995)....................................................................18, 34

*Missouri v. Jenkins*,
515 U.S. 70 (1995)......................................................................19, 58

*Muth v. United States*,
1 F.3d 246 (4th Cir. 1993)................................................................59

*N.C. State Conference of NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016)..................................................... *passim*

*North Carolina v. League of Women Voters of North Carolina*,
135 S. Ct. 6 (2014)...........................................................................26

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ............................................................ 3, 13, 58-63

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) .................................................... 16, 19, 53, 58, 63

*Pleasant Valley Hospital, Inc. v. Shalala*,
    32 F.3d 67 (4th Cir. 1994) .................................................................. 16

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978) .................................................................... 17, 63

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ............................................................................ 25

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977) ............................................................... *passim*

*Washington v. Davis*,
    426 U.S. 229 (1976) .................................................................... 27, 33

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ................................................................. 1, 17-18

## Statutes

28 U.S.C. § 1291 ...................................................................................... 1

28 U.S.C. § 1331 ...................................................................................... 1

28 U.S.C. § 1343(a) ................................................................................. 1

28 U.S.C. § 2201–02 ............................................................................... 1

2020 Va. Acts 183 ............................................................................. 38-39

Va. Code. Ann. § 22.1-79(8) ................................................................ 46

## Other Authorities

Brief of the Commonwealth of Va. and 15 Other States as
    Amici Curiae Supporting Applicant, *Coalition for TJ v.*
    *Fairfax Cty. Sch. Bd.*, No. 21A590 (U.S. 2022) ................................ 4-5

FCPS, "Advanced Academic Level IV Program Locations,"
    https://www.fcps.edu/academics/elementary-school-
    academics-k-6/advanced-academics/advanced-academic-
    level-iv-center ...................................................................... 30

FCPS, "Full-Time Advanced Academic Program, Grades 3-8
    (Level IV)," https://www.fcps.edu/academics/elementary-
    school-academics-k-6/advanced-academics/full-time-
    advanced-academic-program ........................................... 30-31

Natanson, Hannah, *Fairfax Releases demographic data on
    Thomas Jefferson Class of 2026*, Wash. Post, May 25, 2022,
    https://www.washingtonpost.com/education/2022/05/25/tj-
    class-of-2026-data/ ................................................. 11, 20, 22

Overview of Thomas Jefferson High School for
    Science and Technology, U.S. News,
    https://www.usnews.com/education/best-high-
    schools/virginia/districts/fairfax-county-public-
    schools/thomas-jefferson-high-school-for-science-and-
    technology-20461 (last visited June 13, 2022) ..................... 4

Virginia Department of Elections,
    "Registration/Turnout Reports,"
    https://www.elections.virginia.gov/resultsreports/registrat
    ionturnout-statistics/ ......................................................... 26

## JURISDICTIONAL STATEMENT

The district court had jurisdiction to hear the Plaintiff-Appellee Coalition for TJ's equal protection claim under 28 U.S.C. §§ 1331 (federal question), 1343(a) (redress for deprivation of civil rights), and 2201–02 (the Declaratory Judgment Act). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION

This case is a new twist on a very old story. In 1886, the Supreme Court first struck down a facially race neutral but nonetheless invidiously discriminatory policy aimed at Asian Americans. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). In the 1960s, racist southern legislatures attempted to skirt the Reconstruction Amendments by devising race-neutral proxies to disenfranchise Black Americans. The federal courts stood as a bulwark against this pernicious, but covert, racial discrimination. And forty-five years ago, the Supreme Court for the first time established a guide to ferreting out this sort of discrimination. *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977). This case is proof that racially discriminatory policies can be just as effective, and are just as unconstitutional, when they are enacted using proxies for race instead of overt racial classifications.

1

In *Arlington Heights*, the Court recognized the inescapable reality that policymakers do not often publicly announce their intent to discriminate. Instead, courts must conduct a "sensitive inquiry" into the circumstances surrounding the challenged action to ascertain discriminatory intent. *Id.* at 266. Such a look into the admissions changes at Thomas Jefferson High School for Science and Technology (TJ) shows that the Fairfax County School Board overhauled its admission policy with an intent to discriminate against Asian-American applicants.

The Board's fall 2020 remake of TJ admissions was not primarily intended to help needy families. It was not intended to admit more children from working-class Asian-American families. And it especially was not intended to obtain whatever benefits might flow from geographic diversity within a compact region of northern Virginia. Instead, the TJ admissions changes were about a school board that wanted to increase the numbers of Black and Hispanic students at TJ, had limited space for the increase, and targeted TJ's "overrepresented" racial group—Asian Americans—to make room.

The district court recognized that the Board's process was "infected with talk of racial balancing from its inception." JA2979. Racial

balancing for its own sake is "patently unconstitutional," *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013) (quoting *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003)), and cannot be transformed into something constitutional "simply by relabeling it 'racial diversity.'" *Id.* (quoting *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 732 (2007) (plurality opinion)).

The Board's attempt to racially balance TJ was at least partially successful. In its first year, the policy dramatically reduced the proportion of Asian Americans in the admitted class, from 73% to 54%. No matter what label the Board attaches to its actions, its decision to overhaul the TJ admissions policy to intentionally disadvantage Asian-American students is unconstitutional. This Court should affirm the district court's grant of summary judgment to the Coalition for TJ.

## STATEMENT OF THE ISSUES

Whether the district court correctly held that the Fairfax County School Board discriminated against Asian-American applicants in violation of the Equal Protection Clause of the Fourteenth Amendment when it changed TJ's admissions policy in a manner that was facially

race neutral but was undertaken for an impermissible racial purpose and had a disparate impact on Asian-American applicants.

## STATEMENT OF THE CASE

### I.    Factual Background

TJ is an academic-year Governor's School in Alexandria, Virginia, with an academic focus on science, technology, engineering, and mathematics. JA2955. It is considered one of the best high schools in the United States and is currently ranked as the nation's best public high school by US News & World Report.[1] Prior to October 2020, students were admitted to TJ from the surrounding area in northern Virginia through a competitive, merit-based process that included a three-part standardized test covering math, science, and reading. JA2957. Certain Fairfax County middle schools which host centers for academically advanced students regularly sent the most students to TJ. Brief of the Commonwealth of Va. and 15 Other States as Amici Curiae Supporting Applicant, *Coalition for TJ v. Fairfax Cty. Sch. Bd.*, No. 21A590 (U.S.

---

[1] Overview of Thomas Jefferson High School for Science and Technology, U.S. News, https://www.usnews.com/education/best-high-schools/virginia/districts/fairfax-county-public-schools/thomas-jefferson-high-school-for-science-and-technology-20461 (last visited June 3, 2022).

4

2022). In recent history, more than two-thirds of the applicants from the six most prominent feeder schools have been Asian American. JA0187. The Fairfax County School Board is responsible for setting TJ admissions policy, and in 2020 the Board set out to overhaul the TJ admissions process.

Even before the overhaul began, Board members and Fairfax County Public Schools (FCPS) administrators spoke openly about their intent to racially balance TJ. In June 2020 emails, Board member Karen Corbett Sanders called the Class of 2024 admissions data for Black students "unacceptable" and promised "intentful action." JA0192, JA0414. In an email to Superintendent Scott Brabrand, Corbett Sanders wrote that the Board and FCPS "needed to be explicit in how we are going to address the under-representation" of Black and Hispanic students at TJ. JA0426. Then, once the Board began the formal process to revise TJ admissions, the very first proposal that FCPS staff presented to the Board on September 15 declared the intention that TJ "should reflect the diversity of FCPS, the community and Northern Virginia." JA0293. The presentation reviewed previous attempts to increase racial diversity at TJ, noting "[t]hese changes have not made a significant impact on the

application pool or admitted student demographics." JA0296. The proposal then compared historical TJ admissions data by race with the racial makeup of FCPS and projected the racial effect of the proposed admissions policy, forecasting the exact 19 percentage point drop in Asian-American admissions offers experienced by the Class of 2025:



**Percent of Offered Students Using Current Holistic Process**

Class of 2024

18%
3%
1%
5%
73%

Economically Disadvantaged: 0.6%
English Language Learners: 0.6%



**Percent of Offered Students Using Merit Lottery**

Class of 2024 - Merit Lottery

25%
6%
8%
7%
54%

- Asian
- Black
- Hispanic
- 2 or More Races
- White

Economically Disadvantaged: 10.3%
English Language Learners: 3.4%

JA0310. All things considered, there was little doubt that in seeking "diversity," the Board and FCPS primarily meant racial diversity. JA2979.

That same racial focus is reflected in contemporaneous Board member text messages. In private conversations during the fall of 2020,

6

Board members Abrar Omeish and Stella Pekarsky recognized that Asian Americans are "discriminated against in this process [of revising TJ admissions]," that "there has been an anti [A]sian feel underlying some of this," and that the superintendent had "made it obvious" with "racist" and "demeaning" references to "pay to play," a derogatory Asian stereotype about test prep for the TJ admissions exam. JA0119, JA0125. Pekarsky wrote that one of Superintendent Brabrand's proposals would "whiten our schools and kick [out] Asians. How is that achieving the goals of diversity?" JA0119. Despite clearly recognizing that Asian Americans were being "discriminated against in this process," Omeish and Pekarsky never publicly raised these concerns and voted in favor of the new admissions policy. JA2977.

The admissions policy changes were implemented by Board votes at two different meetings. The first took place at an October 6 work session, where the Board voted to eliminate the standardized TJ admission test. The Board admits it does not typically take votes at work sessions, and the public was given no advance notice of the vote nor opportunity to comment on the test elimination prior to the vote. JA0013-14, JA0032. At that same work session, the Board passed a resolution

requiring the Superintendent to state in FCPS' annual diversity report that the "goal is to have TJ's demographics represent the [northern Virginia] region." JA2980. That vote passed by a margin of 11-0 with one abstention.

The next key vote took place on December 17, when the Board approved a new admissions policy for TJ by a vote of 10-1-1. JA2977. Board member Ricardy Anderson, who supported Superintendent Brabrand's initial lottery proposal, voted against the new policy. *Id*. Board member Megan McLaughlin abstained, in part because of the shoddy process used to develop and approve the new admissions process. JA2977, JA0372, JA0377.

The new admissions policy allocated guarantees seats at TJ for 1.5% of the eighth-grade population of each of the public middle schools within TJ's catchment area, so long as the students met the minimum standards for admission. JA2977. Only about 100 "unallocated" seats remain for students who do not obtain one of their school's allocated seats. Although this set-aside is facially race neutral, it effectively limits the number of students who can access TJ from certain middle schools that have historically sent far more than 1.5% of their eighth-grade

8

students to TJ. Specifically, the set-aside targets six FCPS middle schools with advanced academic programming that draw students away from their neighborhood middle schools. Not coincidentally, a substantial majority of applicants from these schools are Asian American have historically high numbers of Asian-American applicants and acceptances.[2]

The challenged policy also gives preferential treatment to applicants who satisfy certain "Experience Factors," including attendance at a middle school that has been "underrepresented at TJ." JA2958.[3] Once again, although facially race neutral, these extra points

---

[2] These six middle schools are Carson, Cooper, Frost, Kilmer, Longfellow, and Rocky Run. JA0187. All six are also Advanced Academic Program Level IV Centers, which provide full-time advanced coursework for academically gifted students. *See infra* fn. 11 & fn. 12. While just about half of all TJ applicants are Asian American, about two-thirds of the applicants from these schools have been Asian American. Students from these schools made up half of all TJ admits the year before the overhaul (243 of 486), but just 23.8% of admits under the new policy (131 of 550). *See* JA0187; JA2989-3904; JA0557.

[3] A student's GPA, Student Portrait Sheet, and Problem-Solving Essay are worth 300 points each in the new admissions process. The Experience Factors allow an applicant to earn up to 225 additional points, including 90 points for qualifying for free or reduced-price meals, and 45 points each for English Language Learner status, special education status, or attending an underrepresented middle school. JA0146-49.

9

work against Asian-American applicants: although about half of the applicants to TJ for the Class of 2025 were Asian American, Asian Americans only accounted for about 27% of those who received the underrepresented-school bonus.[4] Together with the 1.5% set-aside, the bonus points make it disproportionately more difficult for Asian-American students to gain admission to TJ.

That difficulty is reflected in admissions data under the new policy. In the first class admitted under the new policy, the proportion of offers to Asian-American students plummeted from 73% to 54%. JA2958-59.[5] In raw numbers, Asian Americans received 56 fewer offers than they had under the previous policy, even though FCPS extended 64 more total offers. JA2958. White, Black, and Hispanic students all increased their share of offers. JA0557. This result mirrored what Pekarsky predicted back in September 2020—the new policy did "whiten" TJ and "kick out" Asian-American students.

---

[4] The other main "Experience Factor," free-or-reduced-price lunch, also works against Asian-American applicants, as only about 34% of those who qualified for this bonus were Asian American. JA2912.

[5] As noted above, that was the precise percentage point drop predicted by the original revised admissions proposal presented to the Board. JA0310.

In part, that was because the six FCPS feeder schools that sent the most Asian-American students to TJ the year before the overhaul saw that number cut almost in half—from 204 to 108—after the implementation. *Compare* JA0059 (factual assertions in Paragraph 19 of Coalition's opening summary judgment brief) *with* JA2811-12 (Paragraph 19 of the Board's summary judgment response). With the racial modeling from the first proposal and school-level data on past admissions cycles and TJ-eligible students by race provided by FCPS staff, Board members would have been able to generally predict this result. JA0308-10, JA0188-89.

On May 20, 2022, TJ announced admissions decisions for the Class of 2026. At 60% of the admitted class, Asian-American students continued to earn a substantially smaller proportion of the available seats than was common before overhaul.[6] The percentage of Hispanic students decreased slightly in the Class of 2026 compared to the first year after the admissions policy change, while the percentage of Black and white students offered admission remained approximately the same. *Id.*

---

[6] Hannah Natanson, *Fairfax Releases demographic data on Thomas Jefferson Class of 2026*, Wash. Post, May 25, 2022, https://www.washingtonpost.com/education/2022/05/25/tj-class-of-2026-data/.

## II.    Procedural History

The Coalition for TJ is an organization of parents, students, and community members in and around Fairfax County, Virginia. JA0001. The Coalition formed in August 2020 in response to the Board's efforts to racially balance TJ, and its primarily Asian-American members work to advocate for diversity and excellence at TJ.[7] JA0003. On behalf of its members with children seeking admission to TJ, the Coalition sued the Board in March 2021, seeking injunctive and declaratory relief. JA0025.

Following extensive discovery, the case was resolved on cross-motions for summary judgment after both parties acknowledged that no material facts remained in dispute. The district court granted the Coalition's motion for summary judgment and denied the Board's motion. JA2984-85. After a thorough *Arlington Heights* analysis, the district court concluded that the Board's admissions overhaul discriminates

---

[7] As part of its advocacy, the Coalition at one point prepared what it called a "Second-Look Semifinalist" proposal, an alternative to the racial proxies being considered by the Board that would have retained race-blind and merit-based admissions, yet allowed for a "second look" at the semifinalist pool to ensure at least five semifinalists came from each middle school. JA1513-21. The Coalition has never ratified or agreed with racial balancing or the proxy discrimination used by the Board in the new admissions policy.

against Asian-American students and ordered the Board to cease using it. JA2966.

The Board sought a stay pending appeal, which the district court denied. The Board then filed a timely notice of appeal and a motion for stay pending appeal. A panel of this Court granted the Board's motion over Judge Rushing's dissent. The Supreme Court declined to vacate the stay, with three Justices dissenting. *Coalition for TJ v. Fairfax Cty. Sch. Bd.*, No. 22-1280, 2022 WL 986994 (4th Cir. Mar. 31, 2022); *Coalition for TJ v. Fairfax Cty. Sch. Bd.*, No. 21A590, 2022 WL 1209926 (U.S. Apr. 25, 2022).

## SUMMARY OF ARGUMENT

Racial balancing for its own sake is unconstitutional. *See Fisher*, 570 U.S. at 311; *Parents Involved*, 551 U.S. at 729-730; *Grutter*, 539 U.S. at 330. "Racial balancing is no less pernicious if, instead of using a facial quota, the government uses a facially neutral proxy motivated by discriminatory intent." *Coalition for TJ*, 2022 WL 986994, at *7 (Rushing, J., dissenting). Performing the "sensitive inquiry" required by *Arlington Heights* to uncover "such circumstantial and direct evidence of intent as may be available," 429 U.S. at 266, the district court correctly

13

concluded that the Board acted with an impermissible racial purpose when it sought to decrease enrollment of "overrepresented" Asian-American students at TJ to more closely reflect the racial composition of the surrounding community.

A simple before-and-after comparison—the method endorsed by *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), this Court's most significant recent *Arlington Heights* decision—demonstrates the substantial disparate impact caused by the Board's TJ admissions overhaul. In the first year of the challenged policy, the proportion of admitted students who were Asian American dropped 19 percentage points. The second year saw slight fluctuation, but the Asian-American proportion of the class remains markedly lower than the years prior to the admission policy overhaul.

Beyond the before-and-after comparison, additional undisputed record evidence shows a disparate impact caused by the 1.5% middle school allocation and the Experience Factor bonus points. The 1.5% middle school allocation deals a particularly effective blow to the six feeder schools which had typically sent high numbers of Asian-American students to TJ—despite 64 additional seats at TJ, Asian-American

14

students from these six schools collectively received 96 fewer offers to TJ than before the overhaul. Those feeder school students not selected under the 1.5% set aside are then further disadvantaged in the unallocated pool, where they do not benefit from the bonus points awarded to students from underrepresented schools.

The Board's proposed comparator—the percentage of Asian-American students in the overall applicant pool compared to the percentage of Asian-American students receiving offers—is both invalid and extreme. It directly contradicts both *Arlington Heights* and *McCrory*, and permits an end-run around the whole idea of an *Arlington Heights* inquiry that would allow racial-balancing-by-proxy schemes to proliferate unchecked. The district court rightly rejected this comparison, as should this Court.

In addition to the significant evidence of disparate impact, the district court correctly concluded that the ample undisputed evidence of the Board's words and actions during the admissions overhaul demonstrated that it acted with an impermissible discriminatory intent. Contrary to the Board's assertion, race-neutral language in the admission policy itself does not disprove discriminatory intent—

15

decisionmakers rarely advertise their discriminatory motives. Rather, the events surrounding the Board's decision to overhaul the admissions policy, the "rushed and shoddy" process the Board used to arrive at the challenged policy, and the Board's actions and comments throughout the overhaul demonstrate that the policy changes were motivated by an impermissible racial purpose: namely, decreasing the number of Asian-American students in favor of students of other races.

Faced with this evidence that the Board acted at least "in part because of, not merely in spite of, the policy's adverse effects upon an identifiable group," the district court properly applied strict scrutiny. JA2981 (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Because neither racial balancing nor improving TJ's racial diversity is a compelling government interest, and because the Board's actions are not narrowly tailored, the challenged policy fails strict scrutiny. This Court should affirm the district court's grant of summary judgment.

## STANDARD OF REVIEW

The district court decided this case on cross-motions for summary judgment, and this court reviews that decision de novo. *Pleasant Valley Hospital, Inc. v. Shalala*, 32 F.3d 67, 69 (4th Cir. 1994). Summary

judgment "is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *ACLU v. Mote*, 423 F.3d 438, 442 (4th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). "A genuine issue of material fact is one that 'might affect the outcome of the suit under the governing law.'" *Metric/Kvaerner Fayetteville v. Fed. Ins. Co.*, 403 F.3d 188, 197 (4th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

## ARGUMENT

"Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 291 (1978) (controlling opinion of Powell, J.). Even where the government employs no explicit racial classification, the Supreme Court has long recognized that a policy "fair on its face and impartial in appearance" may violate the Equal Protection Clause if "it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances." *Yick Wo*, 118

17

U.S. at 373–74. More recently, the Court has confirmed that the government must satisfy that "most exacting judicial examination"—strict scrutiny—"not just when [its policies] contain express racial classifications, but also when, though race neutral on their face, they are motivated by a racial purpose or object." *Miller v. Johnson*, 515 U.S. 900, 904, 913 (1995). Because the challenged policy is facially race-neutral, the Court's task is to determine whether the Board overhauled TJ admissions for an impermissible racial purpose.

Determining racial purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. The Supreme Court has explained that relevant factors might include: (1) the "impact of the official action;" (2) the "historical background of the decision;" (3) the "specific sequence of events leading up to the challenged decision;" and (4) the "legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id*. at 266–68. Importantly, to trigger strict scrutiny, impermissible racial intent need only be a "motivating factor"—it need not be "the 'dominant' or 'primary' one." *Id*. at 265–66. And as this

18

Court has emphasized, the Board members need not harbor racial animus to act with discriminatory intent. *See McCrory*, 831 F.3d at 233. Rather, to trigger strict scrutiny, the Board need only pursue a policy "at least in part 'because of,' not merely 'in spite of,' [the policy's] adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279.

Once strict scrutiny applies, the burden shifts to the Board to prove that the changes are narrowly tailored to further a compelling government interest. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). "This most exacting standard 'has proven automatically fatal' in almost every case." *Fisher*, 570 U.S. at 316 (Thomas, J., concurring) (quoting *Missouri v. Jenkins*, 515 U.S. 70, 121 (1995) (Thomas, J., concurring)). Indeed, this burden is so heavy that the Board did not even attempt to satisfy it below. Therefore, if the Court agrees with the district court that the Board acted with discriminatory intent, it must affirm the judgment below and reinstate the district court's injunction.

## I. The District Court Correctly Identified a Significant and Continuing Disparate Impact on Asian-American Applicants to TJ

Disparate impact is an "important starting point" for determining whether a facially neutral policy was adopted with discriminatory intent.

19

*Arlington Heights*, 429 U.S. at 266. Here, the admissions data is unambiguous. In the five years before the Board altered the TJ admissions policy, Asian-American students never made up less than 65 percent of the admitted class. JA2958. Indeed, in the year before the change, Asian-American students earned approximately 73 percent of available seats. JA2958-59. But in the first year under the challenged policy, the Asian-American proportion of the admitted class plummeted 19 percentage points. JA2959. Of the four major racial groups FCPS tracks, Asian Americans were the only one to experience *any* decrease. JA2968. Reviewing this stark data and applying this Court's analysis from *McCrory*, the district court correctly concluded that "[t]he Board's overhaul of TJ admissions has had, and will have, a substantial disparate impact on Asian-American applicants to TJ." *Id*. And as it turned out, the impact did continue into the second year, as Asian-American students received only 60% of offers for the Class of 2026—still well below the percentage regularly earned in past years. Natanson, *supra* n.6.

The Board does not dispute these percentages. Instead, it attempts to minimize the significant disparate impact on Asian-American students by arguing that the only permissible method of determining disparate

impact is by comparing the racial makeup of the applicant pool for the Class of 2025 with the racial makeup of the pool of admitted students for that same year. Board Br. 25. This argument not only ignores recent history at TJ, but is contrary to this Court's holding in *McCrory* and would effectively immunize racial balancing from *Arlington Heights* scrutiny.

### A. The Before-and-After Comparison Is Proper Here and Demonstrates a Clear Impact Against Asian-American Students

*Arlington Heights* directs courts to consider the "impact of the official action" in intentional discrimination claims. 429 U.S. at 266. Here, the "official action" was the Board's decision to overhaul TJ admissions, replacing the old criteria with the new. The proper method for determining the "impact" of that action is a simple before-and-after comparison. *See McCrory*, 831 F.3d at 231 (finding impact sufficient to support an inference of discriminatory intent where "African Americans disproportionately used each of the removed [voting] mechanisms"). In the five years before the Board changed TJ's admissions policy, Asian-American students had never received less than 65 percent of offers to TJ, and in three of the five years the Asian-American proportion of the

21

admitted class was at least 73 percent. In the year immediately following

the official action, offers to Asian-American students plummeted,[8] and

have not recovered:

| Class | Offers to Asian-American students | Asian-American proportion of offers (rounded) |
|---|---|---|
| 2026 | unknown[9] | 60% |
| 2025 | 299 | 54% |
| 2024 | 355 | 73% |
| 2023 | 360 | 73% |
| 2022 | 316 | 65% |
| 2021 | 367 | 75% |
| 2020 | 355 | 69% |

Despite a substantial increase in overall class size for the Class of

2025, the raw number of Asian-American students admitted was 56

fewer than the Class of 2024 and 61 fewer than the Class of 2023,

meaning that Asian-American students lost about a fifth of their

---

[8] Source: JA0557-78.

[9] FCPS apparently released admissions data for the Class of 2026 to the Washington Post, but has not released that data publicly. *See* Natanson, *supra* n.6.

22

representation in the admitted class immediately after the change was implemented. JA0557-67. In contrast, the other three listed racial groups experienced substantial increases: offers to white students increased by 43%, offers to Hispanic students increased by 288%, and offers to Black students increased by over 500%. JA0557-62.

Faced with this obvious disparate impact, the Board relies on distinguishable out-of-circuit cases to argue that a before-and-after comparison is legally impermissible. Board Br. 25-27. In *Boston Parent Coalition for Academic Excellence Corporation v. School Committee of City of Boston*, 996 F.3d 37 (1st Cir. 2021), a First Circuit panel—in the context of a motion for injunction pending appeal—adopted a distorted reading of *Arlington Heights* and *Feeney* that is contrary to *McCrory*, this Court's most significant *Arlington Heights* decision in years. The panel also considered a single year of admissions data from the period prior to the policy change, unlike the five years of prior data available in this case, and avoided a finding on the disparate impact question by concluding that the School Committee lacked discriminatory intent. *Id*. at 42, 46. Likewise, *Lewis v. Ascension Parish School Board*, 806 F.3d 344 (5th Cir. 2015), addressed a large-scale school assignment plan, and *Hayden v.*

23

*County of Nassau*, 180 F.3d 42 (2d Cir. 1999), involved a police department hiring scheme in a county of over one million people—neither of which bear resemblance to zero-sum admissions to a single, competitive high school.

The controlling precedent instead is *McCrory*, where this Court assessed disparate impact based on evidence that, *in previous election cycles*, "African Americans disproportionately used each of the removed mechanisms." 831 F.3d at 231. "*[R]emoving* voting tools that have been disproportionately used by African Americans," the panel continued, "meaningfully differs from not initially implementing such tools" in the first place *Id*. at 232. To assess disparate impact for purposes of *Arlington Heights*, this Court did not attempt to assess how difficult it would be for Black voters to vote under the challenged law. Instead, the panel found disparate impact based solely on the fact that the challenged law took away voting mechanisms that Black voters had disproportionately used in prior years. *Id*. Likewise, the Board removed the admissions policy that had allowed Asian-American students—particularly from the six prominent feeder schools—to succeed and replaced it with a new one that would make it harder for them. Whether evaluating election laws or

24

admissions policies, judging the "impact of the official action" under *Arlington Heights* requires a comparison between the old system and the new system to determine whether certain racial groups were disproportionately affected by the enactment. *See id.* at 230. The TJ admissions overhaul had just such an effect on Asian Americans.

The Board attempts to twist *McCrory* into something unrecognizable. Board Br. 28. Contrary to the Board's claim, nowhere in *McCrory* did this Court "reject[] an election-to-election comparison of African-American voter turnout to assess disparate impact," *id.* (citing *McCrory*, 831 F.3d at 232). Instead, the cited portion of *McCrory* notes that "courts should not place much evidentiary weight on any one election" and cites to *Thornburg v. Gingles*, 478 U.S. 30, 74-77 (1986), for the straightforward proposition that the results of multiple elections are more probative than the result of a single election. *McCrory*, 831 F.3d at 232. If anything, this supports the district court's consideration of multiple years of admissions data for Asian-American TJ applicants as more probative than the Board's preferred single-year method.

Similarly, while *McCrory* notes that midterm primary elections are "highly sensitive to factors likely to vary from election to election" when

25

compared to presidential elections, *id.* (quoting *North Carolina v. League of Women Voters of North Carolina*, 135 S. Ct. 6, 6-7 (2014) (Ginsburg, J., dissenting)), this hardly supports the Board's strained assertion that the substantial decrease in Asian-American offers to TJ could have been caused by "any number of factors other than the challenged policy." Board Br. 28 (emphasis omitted). The difference in the composition of the TJ applicant pool from year to year is nowhere near as stark as between turnout in a midterm primary election versus a presidential election.[10] The Board does not offer any evidence of factors besides the changed admissions policy that may have impacted Asian-American applicants' share of TJ offers. And it has publicly cited the changed policy as the *cause* of the "increased diversity" of the Class of 2025. *See* JA0554-55 (press release citing the increase in Black and Hispanic offers and the decrease in Asian-American offers). While some year-to-year fluctuation is inevitable, the drop in offers to Asian Americans following the new

---

[10] For example, voter turnout in Virginia for the 2014 midterm primary elections was 41.6% and for the 2016 presidential election was 72.05%, a difference of 30.45%. Virginia Department of Elections, "Registration/Turnout Reports," https://www.elections.virginia.gov/resultsreports/registrationturnout-statistics/. In contrast, the year-to-year variations of TJ's applicant pool are quite mild. JA0554-0578.

policy was outside any reasonably expected fluctuation. Under *McCrory*, the drastic drop in Asian-American acceptance to TJ is enough on its own to support a finding of disparate impact.

Nor was the Coalition required to provide expert testimony that the decrease in Asian-American offers was statistically significant. Board Br. 31-32. *McCrory* specifically cautioned against "requir[ing] too much" proof of disparate impact "in the context of an intentional discrimination claim." 831 F.3d at 231. The Court recognized that "[w]hen plaintiffs contend that a law was motivated by discriminatory intent, proof of disproportionate impact is not 'the sole touchstone' of the claim," but part of a consideration of the totality of the circumstances. *Id.* (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)). A showing of disparate impact, "even if not overwhelming impact, suffices to establish *one* of the circumstances evidencing discriminatory intent." *Id.* (emphasis in original).

Thus, the Board demands far too much in insisting that the Coalition was required to present "expert testimony or other evidence that controlled for changes in the applicant pool, to show *how and why* the Plan allegedly caused the decrease, or to show that the decrease is

27

likely to be replicated year after year." Board Br. 32. Indeed, the Board's only support for that outlandish requirement is the Fifth Circuit decision in *Lewis*, Board Br. 32 (citing *Lewis*, 806 F.3d at 361), but that case bears little resemblance to this one. The plaintiff in *Lewis* challenged a large-scale school assignment plan on the ground that it adversely impacted Black students who were sent to a materially worse school, but he could not show that the school was in fact materially worse. 806 F.3d at 361. Here, the question is whether the year-over-year admissions data shows that the Board's overhaul disadvantaged Asian-American students. Even a cursory look at the data answers that question in the affirmative.

In short, even if the year-to-year numbers were all that the Coalition had, that would be sufficient to show enough disparate impact to conduct a full *Arlington Heights* inquiry.

### B.  The Undisputed Record Shows Additional Evidence of Disparate Impact Beyond a Simple Before-and-After Comparison

The Board's concern about causation and statistical significance is misplaced in another significant way. The undisputed record also establishes that the 1.5% set-aside and the Experience Factor bonus points combine to disproportionately disadvantage Asian-American

students. This answers the Board's questions about *how* and *why* the Board's overhaul caused such a substantial drop in Asian-American admissions to TJ. As it continues to implement these proxies, the Board will continue to cause a substantial adverse impact on Asian-American applicants to TJ.

*First*, as noted above, the 1.5% allocation is designed to limit access to TJ for students from a set of middle schools that had typically done well in TJ admissions. These students are disproportionately Asian American: for the Class of 2025, more than 65% of the students who applied to TJ from the six main FCPS feeder schools were Asian American. And they experienced a sharp drop in admissions owing to the set-aside: despite 64 new seats, Asian-American students from these six schools collectively received 96 fewer offers after the overhaul. JA0557, JA0562. This was by design. After all, the Board had to make it harder for students from these schools to get in if it wanted to achieve its desired racial outcome. Thus, because these schools have many more qualified applicants to TJ, each student is subject to much heavier competition for the allocated seats from his or her school. *See* JA0150-56 (applicants from Carson middle school, which had 400 eligible students and 286 TJ

applicants—231 of whom were Asian American—for the Class of 2024, would have faced much stiffer competition for the school's allocated seats under the challenged plan than, for example, Whitman middle school's 19 applicants for its allocated seats); *see also* JA0188-89 (noting that five of these six schools were the ones with the highest proportion of students eligible to apply to TJ for the Class of 2025).

Tellingly, the Board also ignores the impact of FCPS' Advanced Academic Program (AAP) Level IV Centers, several of which have historically served as TJ feeder schools. Va. Amicus Br. Indeed, the Board's Opening Brief fails to even mention these fourteen middle school centers, which operate within select middle schools to serve academically advanced students.[11] The AAP Level IV program is a "highly challenging instructional program in the four core subject areas" with "[d]ifferentiation in the depth, breadth, and pace of instruction . . . designed to meet the needs of advanced learners with a strong emphasis

---

[11] FCPS, "Advanced Academic Level IV Program Locations," https://www.fcps.edu/academics/elementary-school-academics-k-6/advanced-academics/advanced-academic-level-iv-center.

on higher level thinking skills."[12] Qualifying students may attend a Level IV Center instead of their zoned middle school, and high-achieving STEM-oriented students—the very students who tend to want to take advantage of TJ's challenging curriculum—frequently attend these Centers. As noted above, the six feeder middle schools are all Level IV Centers which serve concentrations of advanced learners. JA0150-51; JA0159-60; *supra* fn.2. The 1.5% set-aside thus disproportionately targets Asian-American students who chose to attend a Level IV center, making it harder for them to access TJ. Under such a targeted system, the resulting disparate impact on Asian-American students was a foregone conclusion.

*Second*, as the district court correctly concluded, "[t]he set-aside is only part of the equation." JA2969. Not only do Asian-American students at feeder middle schools face much stiffer competition under the 1.5% allocation, but once relegated to the "unallocated pool," they face a second wave of targeted discrimination. JA2969-70. Under the scoring rubric used to evaluate students under the challenged policy, three factors—

---

[12] FCPS, "Full-Time Advanced Academic Program, Grades 3-8 (Level IV)," https://www.fcps.edu/academics/elementary-school-academics-k-6/advanced-academics/full-time-advanced-academic-program.

GPA, the student portrait sheet, and the problem-solving essay—account for 900 cumulative points. JA0147-48. Then, 225 bonus points are available—including 45 points for attending an underrepresented middle school, which is enough to cover the entire difference between a 3.5 and a 4.0 GPA. JA0147-49. But students from the six feeder middle schools described above are categorically ineligible for these "underrepresented" points. Indeed, this factor strongly disadvantaged Asian Americans as a whole—even though about half of TJ applicants were Asian American, Asian Americans accounted for just 27.2% of students receiving the underrepresented school bonus. JA2915; JA0146-47. In a competitive admissions process like TJ's, every point counts, JA0144-45, and the Board all but admits that some Asian-American students were likely penalized under this factor. Board Br. 36-37 (in the Class of 2025, seven unallocated offers went to students at underrepresented schools). Together with the 1.5% set-aside, the Board's use of its chosen Experience Factors disproportionately harms Asian-American applicants to TJ.

### C.  The Board's Proposed Comparison of the Applicant Pool to Offers Is Invalid and Extreme

The Board claims that in evaluating disparate impact, the only permissible baseline is the proportion of Asian-American students in the applicant pool. *See* Board Br. 25. That claim is not only contrary to established precedent, but would invite further invidious discrimination.

As discussed above, *Arlington Heights* directs courts to consider the "impact of the official action whether it 'bears more heavily on one race than another.'" 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. at 242). The "official action" in this case was the Board's abandonment of the previous admissions policy and implementation of the new TJ admissions policy. The "impact" of that official action was that dramatically fewer Asian-American students received offers to TJ, even though the size of the incoming class increased. Under *McCrory*, that supports the district court's conclusion of disparate impact against Asian-American applicants. *See* 831 F.3d at 231.

In contrast, the Board's approach would permit it to racially balance TJ's incoming class up to the point that Asian-American offers became proportionate to Asian-American applicants in the pool, all while avoiding struct scrutiny. More broadly, that approach would allow

33

intentional discrimination against members of a particular race in a variety of contexts—from voting to public employment—as long as the targeted race had previously been statistically overrepresented among the pool of eligible participants. The Equal Protection Clause permits no such carve out. *See Fisher*, 570 U.S. at 311 (racial balancing for its own sake is "patently unconstitutional"). In fact, this is the very racial-balancing-by-proxy scheme that *Arlington Heights* exists to prevent. *See Miller v. Johnson*, 515 U.S. at 913 (strict scrutiny applies "not just when [enactments] contain express racial classifications, but also when, though race neutral on their face, they are motivated by a racial purpose or object"). Simply put, the existence of impermissible intent does not depend on a group's over- or underrepresentation relative to the population or the applicant pool. Allowing the Board to evade strict scrutiny simply because the racial composition of admitted students is somewhat proportional to that of the applicant pool would eviscerate *Arlington Heights* and allow unchecked proxy discrimination far beyond one Virginia high school.

That the composition of the applicant pool changes each year does not provide cover for the Board's racial balancing. *See* Board Br. 30.

Obviously, each year the eighth-grade applicant pool is made of up different individuals than the prior year, and yet every year since at least the Class of 2020, the proportion of offers made to Asian-American students was above 65%. JA2958. That was true even though different individuals applied for TJ each year and despite whatever other circumstances may have been at play. *Id*. Nor does the Board's plan get a pass because it failed to achieve complete racial balance. Board Br. 21 (claiming that the Class of 2025's "racial demographics bear little resemblance to that of the districtwide population"). The Board successfully and significantly shifted the racial demographics of TJ, even if it did not fully achieve its aim of "hav[ing] TJ's demographics represent the [northern Virginia] region." JA2980. It is no mystery why the percentage of offers to Asian-American students plummeted in the Class of 2025 and remained depressed in the Class of 2026: "[t]he Board instituted a system that does not treat all applicants to TJ equally." JA2969.

35

## II.    The District Court Correctly Determined That Undisputed Evidence Shows the Board Acted With Impermissible Discriminatory Intent

Having correctly held that there is a disparate impact, the district court also correctly applied *Arlington Heights* to hold that the Board overhauled TJ admissions precisely *because* the new process would further the racial outcome the Board wanted. As the district court recognized, the "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Arlington Heights*, 429 U.S. at 266, includes a look at the historical background, the sequence of events leading up to the Board's decision, and the legislative history—including Board member comments at all stages of the process.[13] JA2966-67. Those elements confirm the district court's conclusion that "the Board and high-level FCPS actors set out to increase and decrease the representation of certain racial groups at TJ to align with districtwide enrollment data." JA2972-73.

---

[13] The Board seems to imply that contemporary statements made by Board members are not attributable to the Board itself but offers nothing to support this contention. Board Br. 38, 47.

36

### A. The Challenged Policy's Use of Race-Neutral Language Does Not Disprove Discriminatory Intent

As an initial matter, contrary to the Board's claim, the challenged admissions policy itself cannot "conclusively establish" that no racially discriminatory purpose motivated its creation. Board Br. 43-44. Equally meaningless is the Board's assertion that the admissions policy on its face forbids racial balancing. Board Br. 42. A policy cannot avoid scrutiny by simply declaring that it is not discriminatory—indeed, the entire point of the *Arlington Heights* inquiry is to test that claim. And after consideration of the *Arlington Heights* factors, there is no doubt that the district court was correct in concluding that the process to change TJ's admission policy was "infected with talk of racial balancing from its inception." JA2979.

### B. The Historical Background Shows That the Admissions Changes Were Motivated by an Impermissible Racial Purpose

The district court correctly noted that "[p]lacing the Board's actions in historical context leaves little doubt that its decision to overhaul the TJ admissions process was racially motivated." JA2970. Although the Board claims that the TJ admissions overhaul was done with merely a "hope that the Plan's race-neutral policies would also promote racial

37

diversity at TJ," Board Br. 38, the undisputed evidence shows far more than a mere "hope." That evidence shows that the Board intentionally designed an admissions policy that it expected would move towards racial balance—specifically, by reducing the number of admitted Asian-American students (the only racial group that was "overrepresented" before the overhaul) in favor of students of other races.

As the district court recognized, attempts to alter TJ's racial demographics had been ongoing for at least ten years. JA2970; JA0296. Set against a decade of failed demographic tinkering, "[t]wo specific triggering events accelerated the Board's process and timeline." JA2970.

*First* was the March 2020 passage of a new Virginia state law requiring Governor's Schools like TJ to "set diversity goals for its student body and faculty, and develop a plan to meet said goals." 2020 Va. Acts 183; *see also* JA2970-71. Under the new law, each school must report yearly on whether admission processes "promote access for historically underserved students" and whether the school has "outreach and communication efforts deployed to recruit historically underserved students." *Id.* The report must also list the "racial/ethnic make-up and socioeconomic diversity of its students, faculty, and applicants." 2020 Va.

Acts 183. TJ's first report was due October 2020, and the upcoming reporting requirement strongly influenced the Board's decision to quickly overhaul TJ admissions.

In connection with the reporting requirement, Superintendent Brabrand reported to the Board in August 2020 that the state was considering requiring Governor's Schools to be within 5% of the diversity in their local districts within four years. JA0364. Faced with the prospect of further state intervention, the Board moved quickly to change TJ admissions with an explicit focus on its racial composition. JA0488 (Brabrand believed state legislation required reviewing TJ admissions policy); JA0495 (Brabrand told Corbett Sanders that state intervention would depend on whether Board changed TJ admission policy); JA0381 (Omeish believed state would intervene unless Board changed TJ's admissions policy). As the district court concluded based on this undisputed evidence, "Board members promised action on TJ admissions that would specifically address the school's racial makeup," and "FCPS

officials scrambled to meet a perceived deadline from Richmond to overhaul admissions with race in mind." JA2973.[14]

*Second*, George Floyd's murder in May 2020 was followed on June 1 by the release of TJ's Class of 2024 admissions data showing that fewer than ten Black students had been admitted. JA0562-63. Within a week, calls to overhaul TJ admissions had begun.

On June 7, TJ Principal Ann Bonitatibus emailed the TJ community regarding the George Floyd murder, lamenting that TJ "do[es] not reflect the racial composition in FCPS," and specifying how many Black and Hispanic students TJ should have if it were to "reflect" FCPS' racial demographics. JA0516-17. Around that same time, Board member Corbett Sanders stated in a series of emails that she was "angry and disappointed" about the recent TJ admissions results and that she expected "intentful action forthcoming," JA0414, because "in seeing the numbers when they were released, we know that the current approach is

---

[14] That the new admissions policy was not ultimately adopted until December does not, as the Board now contends, "refute[] the district court's assertion that the October 2020 deadline for submitting a diversity report to the State compressed the deliberative process,"—it shows nothing more than the Board blew past that deadline. Board Br. 49.

40

unacceptable." JA0191-92. In an email to Superintendent Brabrand, she urged action, writing that the Board and FCPS "needed to be explicit in how we are going to address the under-representation" of Black and Hispanic students. JA0426.

Meanwhile, Board member Laura Jane Cohen wrote to a constituent that the number of Black students admitted in the Class of 2024 was "completely unacceptable" and that the Board was "committed to examining and bettering" the admissions process. JA0435. And at a Board meeting later that month, Board member Karen Keys-Gamarra said "in looking at what has happened to George Floyd, we now know that our shortcomings are far too great . . . [s]o we must recognize the unacceptable numbers of such things as the unacceptable numbers of African Americans that have been accepted to T.J." JA0259.

This backdrop of perceived state pressure and promises to take action to address TJ's racial makeup firmly supports the district court's finding of a discriminatory motive.

## C. The Board's Process Shows That It Was Motivated by an Impermissible Racial Purpose

The district court correctly concluded that the undisputed evidence showed that the Board's process was "rushed, not transparent, and more

41

concerned with simply doing something to alter the racial balance at TJ than with public engagement." JA2978. When considering the sequence of events leading up to a challenged decision, "a court must consider '[d]epartures from the normal procedural sequence,' which may demonstrate 'that improper purposes are playing a role.'" *McCrory*, 831 F.3d at 227 (quoting *Arlington Heights*, 429 U.S. at 267). The district court rightly concluded that the events leading up to the TJ admissions overhaul supported a finding of impermissible racial motivation.

*First*, the process to change the admissions policy was "unreasonably hurried." JA2973. The first proposal, presented at a work session on September 15, 2020, "focused on the projected racial effect" of changing TJ admissions to a lottery system, "[n]amely, a drastic drop in Asian-American students at TJ." JA2974. That proposal caused frustration among community members, who had no opportunity for input, and garnered opposition from some Board members, who had not been able to review the proposal in advance of the meeting. *Id.*; JA0104; JA0107, JA0110. Board members also felt pressured to act quickly, with one later accusing Brabrand of creating a "false [sense of] urgency that

42

FCPS must drastically overhaul the TJ Admissions process within a three week decision-making window." JA0375.

Despite this frustration and uncertainty, the Board forged quickly ahead, voting to eliminate TJ's standardized admissions exam just three weeks later, on October 6. The vote took place at a work session, rather than a regular Board meeting, "something [the Board] has acknowledged it does not typically do." JA2975. While work session votes are not prohibited by law, Board Br. 50, it is the "[d]eparture[] from the normal procedural sequence" that matters for purposes of the *Arlington Heights* inquiry. *Arlington Heights*, 429 U.S. at 267. For the Board, voting at a work session is an admitted departure from its standard procedure. JA0013-14; JA0032.

While the Board argues that its members' complaints about the rushed procedure were made in early October, before the final policy was adopted, Board Br. 49, the district court actually considered statements made right up to the final December vote. For example, in November, FCPS staff produced a lengthy white paper detailing two options for a new admissions policy, including "voluminous racial modeling and discussion of efforts to obtain racial diversity at TJ." JA2976; JA0441-84.

43

The proposed options were supposed to be discussed at a November 17 work session, but "multiple Board members protested that the white paper was posted far too late for proper consideration." JA2976. As the district court recognized, the "rushed, shoddy" process continued right up to the final vote on December 17; the morning before the vote, Keys-Gamarra emailed Brabrand to express concern that no motions had been posted for the Board to vote on. JA2977; JA0370. According to McLaughlin, motions were not posted for the public or Board to consider until 30 minutes before the closed session began—a stark departure from the typical process. JA2977; JA0377.

As the district court also noted, the 1.5% plan ultimately adopted "had not been presented publicly in any meeting before it was voted on." JA2977. Even Board members who voted for the new policy were unsure how it worked, with multiple Board members (after they voted for the change) questioning FCPS staff whether the 1.5% set-aside was to be selected from a student's "base school" or "attending school"—a significant question given that AAP Level IV centers draw students from multiple base middle schools. *Id.* McLaughlin even abstained from the vote, later writing that "this is not how the Board should conduct its

44

business," and that she "could not recall a messier execution of Board-level work" in her nine years as a Board member. JA2977-78*;* JA0372; JA0377.

*Second*, the district court correctly observed that there was "a noticeable lack of public engagement and transparency—even among Board members." JA2973. Examples include the fact that there was no stakeholder input prior to the presentation of the first proposal on September 15, JA0104-10; that the October 6 work session vote to eliminate the longstanding admissions exam took place without any public notice that a vote would occur, JA2975-76, JA0239, JA0549; and that two days later, the Board rejected a motion to direct Superintendent Brabrand to engage stakeholders and allow for more community input before presenting a final plan. JA2976; JA0246-47. Apologizing to constituents for the failed motion, Tholen acknowledged "the outreach to date has been one-sided and did not solicit input from all of our communities." JA2976; JA0394. Contrary to the Board's claims, *see* Board Br. 49, this lack of public engagement and transparency continued beyond the October 6 work session to the final vote on December 17.

The confusion over the plan ultimately adopted did not just impact the Board—the public was also in the dark as to what was being considered until 30 minutes before the Board meeting began and had no opportunity for question or comment. JA0377. Ultimately, as the district court noted, whereas "[t]he Board held full, public meetings on renaming Mosby Woods Elementary School and Lee High School, . . . the public did not even see the proposed plan that the Board actually adopted for TJ admissions until 30 minutes before the final meeting." JA2978.[15] The events leading up to the adoption of the new admissions policy—and the unusual departures from normal procedure—fully support the district court's conclusion that "for such a significant set of actions, the procedure was remarkably rushed and shoddy." JA2973.

---

[15] There is no merit to the Board's contention that its vote on the 1.5% plan without public notice or comment should not be considered atypical because Virginia law does not *require* advance public input for this action. Board Br. 50-51. Changing the name of Mosby Woods Elementary and Lee High School also did not *require* advance public input, *see* Va. Code. Ann. § 22.1-79(8), yet the Board held full public meetings with notice and comment prior to taking those votes. Once again, the relevant *Arlington Heights* inquiry is whether the challenged action deviated from normal procedure—not whether it violated some provision of state procedural law. 429 U.S. at 267.

46

### D. The Board's Actions and Comments Demonstrate That the Admissions Changes Were Motivated by an Impermissible Racial Purpose

The legislative history of a policy change "may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body." *Arlington Heights*, 429 U.S. at 268. As Judge Rushing noted, "Board member discussions were permeated with racial balancing, as were its stated aims and its use of racial data to model proposed outcomes." *Coalition for TJ*, 2022 WL 986994, at *7 (Rushing, J., dissenting). The words and actions of Board members and high-level FCPS employees leave no material dispute that—at least in part—the purpose of the Board's overhaul of the TJ admissions policy was to change the racial makeup of TJ to the detriment of Asian Americans.

### 1. The Board's reaction to the initial September 15 proposal shows an intent to racially balance TJ

As the district court concluded, racial balancing was at the forefront of the admissions policy discussion from the very first proposal in September 2020. JA2979; *see also* JA0293-95; JA0298-99; JA0309-10; JA0506-10 (acknowledging that "diversity includes racial diversity"). That proposal, which would have held a lottery for TJ admissions weighted by region, stated that TJ "should reflect the diversity of FCPS,

47

the community, and Northern Virginia," JA0293, and reviewed previous attempts to increase racial diversity at TJ, noting "[t]hese changes have not made a significant impact on the application pool or admitted student demographics." JA0296. The proposal included modeling showing the projected racial effect of applying the lottery to three previous TJ classes. JA0308-10. In each model, far fewer Asian-American students would have been admitted under the proposed lottery system. *Id.*

The Board responded unfavorably to the lottery, largely because some members feared it might not go far enough to achieve racial balance. Tholen questioned whether a lottery would "leave too much to chance" and asked, "will chance give us the diversity we are after?" JA0401-06. McLaughlin advocated for a higher-education style system embracing diversity as a compelling interest, texting a Board colleague that "[u]sing a lottery means random selection. How does that guarantee an increase in racial/[socioeconomic status] diversity?" JA0101. Board member Rachna Sizemore Heizer later wrote to Brabrand suggesting he frame his proposed admissions plan as "increasing diversity through redefining merit." JA0428. Omeish perhaps said it the most clearly,

writing that she planned to "support the proposal towards greater *equity*, to be clearly distinguished from *equality*." JA0430.[16]

### 2. At the Board's direction, FCPS staff developed plans that put race at the forefront

The undisputed evidence shows FCPS staff acted on a mandate from the Board to develop a procedure that would disadvantage Asian-American students in the service of racial balance. Facing Board dissatisfaction with the initial lottery proposal, staff developed a second proposal that included the use of "Experience Factors," including attendance at an underrepresented middle school. TJ Admissions Director Jeremy Shughart asked staffer Lidi Hruda to review the Experience Factors and "provide us a review of our current weighting and whether or not this would be enough to level the playing field for our historically underrepresented groups." JA0176-77. Hruda responded that "[i]t is hard to know exactly what will level the playing field but my gut says that you may need to double all the points (and the total) so the

---

[16] Omeish also agreed with an FCPS staff member that "we have enough Black and Hispanic 8th grade Level 4 [AAP] students (the most rigorous program we have in elementary and middle school) to fill an entire TJ class," so "the best way to create more diversity is to change the admissions process and test specifically." JA0338.

applicants can receive up to 200 points overall for these experience factors." JA0176-77.

There is no doubt Shughart and Hruda made race the primary factor in designing the new TJ admissions policy. Hruda wrote that several portions of the TJ application had "historically favored White and Asian candidates," which leaves "only the Experience Factors to help shift the landscape and bring more diversity into play and acceptance of historically underrepresented students." *Id*. Per Hruda's advice, a scoring rubric including 200 points for Experience Factors was presented to the Board on October 6, just before the vote to eliminate the admissions exam. *See id*. After that session, Brabrand emailed Shughart and FCPS Chief Operating Office Marty Smith asking whether 200 points would "change who got in" to TJ. JA0181-82. He referred to "modeling [the Board members] are asking about" and asked: "[W]ould 200 points be a game changer[?]" *Id*.; JA2741. Shughart replied that "200 points or 50 points would make a difference. I don't know how that impacts our diversity." JA0181.

In contrast to the current case, with its wealth of contemporaneous statements focusing on race, the *McCrory* court (due to legislative

50

privilege) did not consider *any* statements by legislators in determining whether North Carolina's omnibus election bill was racially motivated. *See McCrory*, 831 F.3d at 229. Instead, it weighed the fourth *Arlington Heights* factor in favor of discriminatory intent based solely on "the General Assembly's requests for and use of race data in connection with" passing the law. *Id.* at 230. The Fourth Circuit reasoned that because the legislators sought racial data and enacted provisions that would disproportionately impact Black voters, but rejected proposals that would disproportionately impact white voters, they acted with discriminatory intent. *See id.* With *McCrory* as a guide, the district court in this case considered the fact that even aside from the many Board member statements confirming that the Board's goal was to racially balance TJ, its requests for and consideration of racial data would be enough to demonstrate discriminatory intent. JA2981; JA0181-82 (Board members asking about modeling for holistic process); JA0466-72. It does not matter that the Board did not "seek, receive, or consider any modeling predicting how the [ultimately adopted policy] would affethe racial makeup of students admitted to TJ." Board Br. 44. As the Board admits, it already possessed data on the racial composition of each middle school, including

51

the TJ feeder schools with their high population of eligible applicants, obviating the need for further modeling. *Id.*[17]

### 3.    The Board members used geography as a proxy for race

Contemporaneous statements also leave no question that the Board used geographic diversity as a proxy for racial diversity. At the October 6 work session, the Board voted 11-0-1 to adopt a resolution requiring that FCPS' annual diversity report to the state "shall state that the goal is to have TJ's demographics represent the NOVA [Northern Virginia] region." JA0240. This was more than a mere "hope"—Board members sought to use geography as a proxy to obtain their desired demographic outcome. The day before the work session, Corbett Sanders noted that she was "urging the superintendent to modify his plan to take into account geographic diversity as well as students on Free and Reduced Lunch which should result in greater *diversity in the demographics*." JA0411 (emphasis added); *see also* JA0346 (Corbett Sanders and Pekarsky on October 6 saying all agree on the goal of diversity, and

---

[17] The Board's claim that it received no demographic data predicting the impact of the Experience Factors is unavailing, as that information never existed. Board Br. 44; JA0181-82.

52

specifically that admissions should take into account "inclusion in under-represented populations").

Although *awareness* of a disproportionately adverse effect on a particular racial group does not necessarily mean there was discrimination, here the Board acted with *intent* to discriminate, not just awareness that its actions may disproportionately impact Asian Americans. Board Br. 54-55. *Feeney* highlights the distinction between awareness and intent. 442 U.S. at 279. In *Feeney*, a state employment preference for veterans was enacted despite knowledge that nearly all veterans at that time were men. *Id.* at 271. Nonetheless, the Supreme Court rejected the argument that the statute was intended to discriminate; the disparate impact on women was a mere byproduct of the goal of helping veterans, rather than the intent of the legislation. *See id.* at 279–80. In this case, the Board not only had knowledge that the new admissions policy would have a disproportionate adverse effect on Asian-American students, but intended as much—the disparate impact, administrative history, sequence of events leading to the change, and contemporaneous statements by Board members and FCPS officials leave no doubt that the Board intended the new admissions policy to have

an adverse effect on Asian-American students. JA2981-82. That effect was the primary feature of the Board's action, not an incidental byproduct.[18]

However, the increase in TJ offers to low-income Asian-American applicants in the Class of 2025, *see* Board Br. 13, *was* an incidental byproduct of the Board's new admissions policy—one the Board tolerated as long as the admitted class as a whole trended towards racial balance. Even if there were evidence that the Board had overhauled the admission policy in part to help low-income Asian Americans earn admission to TJ, which there is not, the undisputed evidence shows that the Board intended to disadvantage Asian-American applicants as a whole. JA2966. The number of low-income Asian-American students admitted under the

---

[18] *Crawford v. Board of Education of City of Los Angeles* is inapposite. 458 U.S. 527 (1982). The official action in that case—legislation forbidding state courts to order pupil school assignment or transportation in the absence of a Fourteenth Amendment violation—conferred a benefit (neighborhood schooling) "made available regardless of race." *Id.* at 537. As the Court noted, "even if [the legislation] had a racially discriminatory effect, in view of the demographic mix of the District it is not clear which race or races would be affected the most or in what way." *Id.* At TJ, in contrast, the benefit of increased likelihood of acceptance was made available only to select racial groups, and per the Board's own modeling it was very clear that on the whole, only Asian-American applicants would be adversely affected.

challenged policy is dwarfed by the number kept out due to the use of racial proxies. Because impermissible racial intent need only be *a* "motivating factor," not even "the 'dominant' or 'primary' one," the increase in admissions offers to low-income Asian-American applicants does not justify the Board's actions to racially balance TJ. *Arlington Heights*, 429 U.S. at 265-66.

### 4. Text messages between Board members show a consistent focus on race

Text messages between Board members reinforce the racial motive behind the admission policy changes. These are not "cherry-picked statements" that are taken out of context or somehow misrepresented, as the Board implies. *See* Board Br. 45. Instead, they are contemporaneous statements made by decisionmakers and as such are highly relevant to a determination of improper racial motive. *Arlington Heights*, 429 U.S. at 268. In a text conversation, Omeish and Pekarsky recognized that Asian Americans are "discriminated against in this process," that "there has been an anti [A]sian feel underlying some of this, hate to say it lol" and that Brabrand had "made it obvious" with "racist" and "demeaning" references to "pay to play," referring to test prep by Asian-American families for the TJ admission exam. JA0119; JA0125; *see also* JA0128

(Brabrand "[c]ame right out of the gate blaming" Asian Americans). Pekarsky wrote that one of Brabrand's proposals would "whiten our schools and kick [out] Asians. How is that achieving the goals of diversity?" JA0119. Sizemore Heizer texted that Brabrand was "trying to be responsive to the times—BLM [Black Lives Matter] and a super progressive board." JA0116. Another Board member said in a text "the Asians hate us." JA0128. And despite their awareness that the process to overhaul the admission policy singled out Asian-American students for different treatment, all but two Board members voted in favor of the new discriminatory policy.

The Board contends that "[t]here is not a single statement from any Board member, or any FCPS official at any level, expressing a desire to decrease Asian Americans' share of the admitted class." Board Br. 40. This is not surprising, as decisionmakers rarely broadcast their intent to violate constitutional rights, and indeed the *Arlington Heights* inquiry exists to ferret out such unexpressed motives. In any event, it is irrelevant, as in a zero-sum environment like TJ admissions, an intent to increase one particular racial group's share of admissions offers necessarily requires the decrease of at least one other racial group's

share. *See Ass'n for Educ. Fairness v. Montgomery Cty. Bd. of Educ.*, 560 F. Supp. 3d 929, 953 (D. Md. 2021) (a school board acts with discriminatory intent when it "set[s] out to increase and (by necessity) decrease the representation of certain racial groups . . . to align with districtwide enrollment data").[19] And though the Board tries to paint Board members' comments regarding the "anti [A]sian feel" of the process as "solicitude for Asian-American students," Board Br. 40, the district court correctly concluded that these statements showed a process permeated with an impermissible discriminatory intent. JA2979.

The Board's argument not only conflicts with legal precedent, but with basic math. A school like TJ, even with the additional seats added to the Class of 2025, necessarily has a finite number of seats. And in the context of zero-sum admissions, the Supreme Court has recognized that granting preferential treatment to members of certain groups necessarily disfavors those who do not receive the preference. *See Grutter*, 539 U.S. at 316-17, 326-27. It has consistently rejected the argument that racial

---

[19] The Board contends that "a desire to *decrease* representation of a racial group that comprises the majority of the admitted class, and a desire to *increase* representation of another racial group . . . are not two sides of the same coin." Board Br. 53. But this is the very definition of zero-sum.

discrimination deserves less scrutiny if it is supposedly meant to help members of some groups rather than hurt members of others. *See Parents Involved*, 551 U.S. at 720, *Grutter*, 539 U.S. at 326-27. In a zero-sum process like TJ admissions, the only way the Board could guarantee an increase in the proportion of Black and Hispanic students admitted was to change the admissions policy in a way that made it disproportionately harder for Asian-American applicants to get in. That was the Board's clear intent.

## III. The Board's Actions Do Not Satisfy Strict Scrutiny

Because the Board acted at least "in part because of, not merely in spite of, the policy's adverse effects upon an identifiable group," the district court properly applied strict scrutiny. JA2981 (citing *Feeney*, 442 U.S. at 279). Under strict scrutiny, the burden falls on the Board to prove that the new admissions policy is narrowly tailored to further a compelling state interest. *Adarand*, 515 U.S. at 227. This is the "most exacting standard" under which courts evaluate government actions; it "'has proven automatically fatal' in almost every case." *Fisher*, 570 U.S. at 316 (Thomas, J., concurring) (quoting *Missouri v. Jenkins*, 515 U.S. at 121 (Thomas, J., concurring)). Yet in three rounds of briefing below, the

Board never once tried to justify its policy under strict scrutiny. JA0607-0647; JA2801-2843. It cannot do so for the first time on appeal, but even if it could, that attempt would fail. *See First Va. Banks, Inc. v. BP Exploration & Oil, Inc.*, 206 F.3d 404, 407 n.1 (4th Cir. 2000) (declining to consider issues for the first time on appeal); *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993) (holding that issues raised for the first time on appeal generally will not be considered absent exceptional circumstances of plain error or fundamental miscarriage of justice).

## A.   Racial Balancing Is Not a Compelling Interest

There is no interest compelling enough to justify race-based classifications in TJ admissions: FCPS has no remedial interest, JA2982, and the Supreme Court has never extended *Grutter*'s diversity rationale to secondary schools like TJ. *Parents Involved*, 551 U.S. at 724-25. To the contrary, it has expressly held that such a rationale is unique to higher education institutions and that lower courts that had applied *Grutter* "to uphold race-based assignments in elementary and secondary schools" had "largely disregarded" its limited holding. *Id.*; *see also id.* at 770-71 (Thomas, J., concurring) (*Grutter*'s holding "was critically dependent upon features unique to higher education."). Though the *Parents Involved*

Court fractured on the extent to which a more limited interest in diversity might be compelling in the K-12 context, *compare id.* at 731-32 (plurality opinion), *with id.* at 783 (Kennedy, J., concurring in part and concurring in the judgment), it issued no holding on this question other than that *Grutter* is inapplicable outside of the higher education context. *See Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 544 n.32 (3d Cir. 2011) ("Justice Kennedy's proposition that strict scrutiny is 'unlikely' to apply to race conscious measures that do not lead to treatment based on classification does not 'explain[] the result' of [*Parents Involved*]."). The Board must therefore identify a new compelling interest to justify its racial discrimination in the TJ admissions process.

It did not do so below and cannot do so now. Racial balancing for its own sake is "patently unconstitutional" and not a permissible—let alone compelling—governmental interest. *Fisher*, 570 U.S. at 311 (quoting *Grutter*, 539 U.S. at 330)). As the district court rightly concluded, the Board's pursuit of racial "diversity" is more accurately described as racial balancing. JA2983; *see Parents Involved*, 551 U.S. at 732 (plurality opinion) (racial balancing cannot be transformed into a compelling interest "simply by relabeling it 'racial diversity'"). Unlike the school

districts in *Parents Involved*, who at least tried "various verbal formulations" to deflect from their intent to racially balance schools, 551 U.S. at 725, 732 (plurality opinion), the Board did not even bother with such verbal formulations. Whether done overtly or via proxies, racial balancing is not a compelling interest.

### B. "Improving Racial Diversity" at TJ Is Not a Compelling Government Interest

For the first time on appeal, the Board advocates for a diversity interest for K-12 schools on par with that permitted in higher education institutions, Board Br. 4-6, 51-54, rooted in Justice Kennedy's concurring opinion in *Parents Involved*. *Id*. at 4. Even if it could properly invent such a rationale at this stage, the Board's reliance is misplaced. In the first place, Justice Kennedy's concurrence is not binding because "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds . . . .'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). *Parents Involved* was decided on narrow tailoring grounds, and Justice Kennedy's concurring opinion discussing diversity as a

compelling interest therefore represents only the views of a single Justice. 551 U.S. at 733-35.

But even if it were binding precedent, Justice Kennedy's concurrence only contemplates generic race-conscious policies that could promote diversity like "strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race." *Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring in part and concurring in judgment). The use of racial proxies to limit enrollment of a specific racial group in a competitive-admissions high school is fundamentally different—and well beyond anything approved of in the concurrence. Rather than mere race consciousness or race awareness, policies like the new TJ admission policy unconstitutionally assign "benefits or burdens on the basis of race." *Doe*, 665 F.3d at 553. The Board has no compelling interest in making race relevant to the TJ admission process.

Nor did the district court erroneously "equat[e] a Board member's stated desire to increase diversity with impermissible racial balancing."

Board Br. 52. Government actors can to some extent lawfully pursue racial diversity through race neutral methods, *id*., but as the district court concluded, this is not what the Board did. JA2984. For example, the Board could have constitutionally utilized race-neutral methods like expanding the AAP program, offering free TJ test prep, conducting additional parent outreach, and the like. But what the Board did instead was different in kind: it elected to remake the TJ admissions policy in a process that was "infected with talk of racial balancing from its inception," JA2979, and that was "at least in part because of, not merely in spite of, the policy's adverse effects upon an identifiable group." JA2981 (citing *Feeney*, 442 U.S. at 279).

## C. The Board's Actions Are Not Narrowly Tailored

Even if the Board had a compelling interest in increasing diversity at TJ, it cannot prove that the changed admissions policy is "necessary" to accomplish that interest. *Fisher*, 570 U.S. at 312 (quoting *Bakke*, 438 U.S. at 305). To be narrowly tailored, the plan must be a "last resort" to accomplish the purported compelling interest. *Parents Involved*, 551 U.S. at 790 (Kennedy, J., concurring in part and concurring in judgment). That is not the case here—even Board members thought that perhaps

more could be done to encourage racial diversity at TJ short of a discriminatory admission policy. For example, texts between Pekarsky and Omeish show they believed that changing the process was secondary to improving outreach and awareness of TJ and implementing universal screening. JA0122. Omeish said, "[w]e could have even kept the tests," while Pekarsky lamented that "[w]e have an application problem. We haven't bothered to ask why people don't apply." *Id*. Improving outreach, universal screening, investigating why more Black and Hispanic students don't apply—as well as other race-neutral means like increasing the size of TJ or providing free test prep—could have been implemented before the Board defaulted to a system that does not treat applicants equally in order to engineer a desired racial outcome. Since, as the district court concluded, overhauling the TJ admissions process was not the last resort for the Board to accomplish its goals, the Board's actions were not narrowly tailored. JA2984.

### D. Contrary to the Argument of the United States as Amicus, Remand Is Unnecessary

Facially race-neutral government action violates the Equal Protection Clause if undertaken for an impermissible racial purpose, *Arlington Heights*, 429 U.S. at 265-68, but a new divide has emerged as

public school districts across the nation overhaul the admissions criteria for selective K-12 schools in an attempt to alter the racial composition of admitted students. These school districts—including the Board in this case—openly admit their goal of admitting more Black and Hispanic students but deny any intent to discriminate against the Asian-American students who typically bear the brunt of the admissions policy manipulations.

Courts are split as to whether to apply strict scrutiny in such cases,[20] but in no instance has a case been remanded to the trial court for further factual development before a strict scrutiny determination could

---

[20] Like the district court below, multiple courts have held that facially race-neutral policies that treat applicants differently to achieve racial balance discriminate against Asian-American applicants—and thus must satisfy strict scrutiny. *See* JA2955-85; *Ass'n for Educ. Fairness*, 560 F. Supp. 3d at 950-56 (plaintiff organization plausibly alleged that a county Board of Education overhauled magnet middle school program admission criteria to limit Asian-American enrollment and achieve racial balance). Other courts have not required strict scrutiny. *See Boston Parent Coal. for Academic Excellence Corp. v. Sch. Cmte. of City of Boston*, No. 21-10330, 2021 WL 4489840, at *10–11 (D. Mass. Oct. 1, 2021), appeals docketed at Nos. 21-1303 & 22-1144 (1st Cir.); and *Christa McAuliffe Intermediate Sch. PTO v. de Blasio*, 364 F. Supp. 3d 253, 277-80 (S.D.N.Y. 2019), *aff'd on other grounds*, 788 F. App'x 85 (2d Cir. 2019) (strict scrutiny inappropriate); *see also Boston Parent Coal. for Academic Excellence Corp.*, 996 F.3d at 45-50 (denying request for injunction pending appeal and concluding that strict scrutiny would likely not apply).

be made. And in the instant case, contrary to the position of amicus United States, Dkt. 51-1 at 27-28, such a remand is unnecessary.

The Board has been on notice since the Complaint was filed that the Coalition's position is strict scrutiny applies. JA0024. Despite this, the Board has never argued that its actions would satisfy strict scrutiny, even in the alternative, until now. The Board's failure to raise this argument until appeal does not mean it should get a second bite at the apple via remand. A strict scrutiny analysis is a matter of law and well within the purview both of the district court, which applied this "most exacting standard" and found the Board's plan wanting, and of this Court. The Board has had every opportunity to attempt to justify its actions under strict scrutiny, as indeed logically follows from any claim of an interest in diversity. Its failure to do so does not merit further delay through remand.

## CONCLUSION

"It is a sordid business, this divvying us up by race." *LULAC v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part, concurring in judgment in part, and dissenting in part). This Board's

actions in this case were not only sordid, but unconstitutional. This Court

should affirm the district court's grant of summary judgment.

## REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellee Coalition for TJ requests oral argument.

DATED: June 13, 2022.

Respectfully submitted,

ERIN E. WILCOX
CHRISTOPHER M. KIESER
GLENN E. ROPER
ALISON E. SOMIN
JOSHUA P. THOMPSON

s/ Erin E. Wilcox
ERIN E. WILCOX
*Attorneys for Plaintiff – Appellee*

67

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32-1, I certify that the attached brief is proportionally spaced, has a typeface of 14 points and contains 12,964 words.

**Signature** <u>s/ Erin E. Wilcox</u>      **Date** <u>June 13, 2022</u>
ERIN E. WILCOX

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Erin E. Wilcox
ERIN E. WILCOX