No. 22-1280

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

COALITION FOR TJ,

*Plaintiff-Appellee,*

v.

FAIRFAX COUNTY SCHOOL BOARD,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Eastern District of Virginia, Case No. 1:21-cv-00296-CMH
The Hon. Claude M. Hilton, District Judge

———————————

**BRIEF OF AMICI CURIAE COMMONWEALTH OF VIRGINIA AND
15 OTHER STATES IN SUPPORT OF APPELLEE**

———————————

JASON S. MIYARES
  *Attorney General*

CHARLES H. SLEMP, III
  *Chief Deputy Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-5315 – Telephone
(804) 371-0200 – Facsimile

June 21, 2022

ANDREW N. FERGUSON
  *Solicitor General*

ERIKA L. MALEY
  *Principal Deputy Solicitor General*

KEVIN M. GALLAGHER
  *Deputy Solicitor General*

ANNIE CHIANG
  *Assistant Solicitor General*

*Counsel for the Commonwealth of
Virginia*

## CORPORATE DISCLOSURE STATEMENT

As governmental parties, amici curiae are not required to file a certificate of interested persons. Fed. R. App. P. 26.1(a).

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ..................................................................... 1

IDENTITY AND INTERESTS OF AMICI CURIAE .............................. 2

BACKGROUND ..................................................................... 3

ARGUMENT ........................................................................ 12

   I.  The challenged admissions policy subjects Asian-American students to unconstitutional racial discrimination ........................ 12

  II.  The Board and its amici's arguments to the contrary are erroneous ..................................................................... 22

CONCLUSION ..................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Coalition for TJ v. Fairfax Cnty. Sch. Bd.*,
--- S. Ct. ---, 2022 WL 1209926 (Apr. 25, 2022) .................................. 12

*Coalition for TJ v. Fairfax Cnty. Sch. Bd.*,
2022 WL 986994 (4th Cir. March 31, 2022) .............................. *passim*

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
665 F.3d 524 (3d Cir. 2011) ......................................................... 27, 28

*Fisher v. University of Tex. at Austin*,
570 U.S. 297 (2013) ................................................................. 22, 23, 30

*Freeman v. Pitts*,
503 U.S. 467 (1992) ............................................................................ 12

*Grutter v. Bollinger*,
539 U.S. 306 (2003) .......................................................... 24, 25, 30, 31

*Johnson v. California*,
543 U.S. 499 (2005) ............................................................................ 29

*Md. Troopers Ass'n v. Evans*,
993 F.2d 1072 (4th Cir. 1993) ............................................................ 29

*Miller v. Johnson*,
515 U.S. 900 (1995) ............................................................................ 13

*N.C. State Conf. of NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) ..................................................... *passim*

*Palmore v. Sidoti*,
466 U.S. 429 (1984) ............................................................................ 28

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007) ................................................................... *passim*

iv

*Personnel Adm'r of Mass. v. Feeney,*
442 U.S. 256 (1979)..............................................................14, 15, 28, 32

*Rothe Dev., Inc. v. Dep't of Defense,*
836 F.3d 57 (D.C. Cir. 2016)...........................................................28

*Schuette v. Coal. to Defend Affirmative Action,*
572 U.S. 291 (2014)............................................................................28

*Shaw v. Hunt,*
517 U.S. 899 (1996)............................................................................27

*Spurlock v. Fox,*
716 F.3d 383 (6th Cir. 2013)...........................................................27

*Tuttle v. Arlington Cnty. Sch. Bd.,*
195 F.3d 698 (4th Cir. 1999)....................................................26, 27

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977)....................................................................*passim*

*Yick Wo v. Hopkins,*
118 U.S. 356 (1886)............................................................................13

## Other Authorities

FCPS, *Advanced Academics Identification and Placement for
Current FCPS Students* (last visited June 21, 2022),
https://tinyurl.com/2p8te6fe ...............................................................4

Federal Rule of Appellate Procedure 29(a)(2) ...........................................2

Gifted, *TJHSST Offers Admission to 550 Students; Broadens
Access to Students Who Have an Aptitude for STEM*
(June 23, 2021), https://tinyurl.com/3pduh7ep ...................................18

FCPS, *Full-Time Advanced Academic Program, Grades 3-8
(Level IV)* (last visited June 21, 2022),
https://tinyurl.com/5d79b4ba..................................................4, 7, 8, 10

Superintendent's Office, *Regulation 3355.15* at 5 (effective
Nov. 9, 2021), https://tinyurl.com/w927zbyt ................................10, 11

# INTRODUCTION

The Supreme Court has "many times over" reaffirmed that "racial balance is not to be achieved for its own sake." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 729-30 (2007) (opinion of Roberts, C.J.) (cleaned up). Racial balancing is contrary to the Supreme Court's "repeated recognition that at the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial … class." *Id.* at 730 (cleaned up).

Thomas Jefferson High School for Science and Technology (TJ) is one of the crown jewels of Virginia's public-education system. It is, in fact, one of the best public high schools in the country. It achieved its excellence in part through a highly competitive, meritocratic admissions process. But, in response to exogenous political events, Appellant Fairfax County School Board set out to "remake" admissions at TJ because the Board was "dissatisfied with the racial composition of the school." JA2966. To accomplish its "goal of achieving racial balance," the Board replaced its race-neutral and meritocratic admissions policy with a new one intentionally designed to decrease Asian-American enrollment. *Ibid.*

As some members of the Board put it, the goal was "to increas[e] diversity through redefining merit," JA0428, and in doing so to move "towards greater equity to be clearly distinguished from equality," JA2981. The district court correctly ruled that an admissions policy crafted in opposition to equality was unconstitutional. This Court should affirm.

## IDENTITY AND INTERESTS OF AMICI CURIAE[1]

Amici curiae the Commonwealth of Virginia and 15 other States, represented by their attorneys general, have interests in protecting their citizens' Fourteenth Amendment rights, ensuring that local entities comply with federal law, and providing a public education. The Board's policy intentionally discriminates against Asian-American students in violation of the basic constitutional guarantee of equal protection, and therefore undermines these interests.

---

[1] This brief is filed under Federal Rule of Appellate Procedure 29(a)(2). All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person—other than the States or their counsel—contributed money that was intended to fund preparing or submitting this brief.

# BACKGROUND

TJ is an Academic-Year Governor's School in Alexandria, Virginia, administered by the Board as part of Fairfax County Public Schools (FCPS). It is regularly recognized as one of the best public high schools in the nation. Prospective students must apply for admission. Prior to 2020, eligible applicants[2] were placed in a semifinalist pool based on standardized test scores. JA2957. Applicants were chosen for admission from the semifinalist pool "based on a holistic review that considered GPA, test scores, teacher recommendations, and responses to three writing prompts and a problem-solving essay." *Ibid.*

TJ's mission is critically important to the Commonwealth's, and the country's, competitiveness. TJ provides a highly challenging, world-class education for gifted high-school students, focusing on science, technology, and math. The students it educates are this country's future scientists, researchers, inventors, doctors, and engineers. Their skills will be crucial to Virginia, and the country, in fostering innovation, solving the complex

---

[2] To be eligible, applicants were required to reside in one of the five participating school divisions, be enrolled in eighth grade, have a minimum 3.0 grade point average, have completed or be enrolled in Algebra I, and pay an application fee (which could be waived based on financial need). JA2957.

problems facing society, and maintaining the preparedness of our workforce.

Certain Fairfax County middle schools serve as Advanced Academic Program (AAP) Level IV centers. JA2978. Gifted students, many of whom would attend other middle schools based on their residential address, are admitted to these centers based on work samples and aptitude test scores. FCPS, *Advanced Academics Identification and Placement for Current FCPS Students* (last visited June 21, 2022), https://tinyurl.com/2p8te6fe. AAP centers "offer[] identified students a highly challenging instructional program" that "is designed to meet the needs of advanced learners." FCPS, *Full-Time Advanced Academic Program, Grades 3-8 (Level IV)* (last visited June 21, 2022), https://tinyurl.com/5d79b4ba. Historically, many of the students accepted to TJ have attended particular AAP centers. *E.g.*, JA0072 (half of the 486 "[t]otal offers extended" for the class of 2024 came "from top six feeder schools"). Moreover, a disproportionate share of applicants from these six AAP centers have been Asian-American. *E.g.*, JA0058; JA0072 (for the class of 2024, approximately 73.5% of "applicants from top six feeder schools … were Asian American"). While not every AAP

center sent significant numbers of students to TJ, every "feeder" school for TJ was an AAP center. Compare JA0187 with JA2899-900.

In the fall of 2020, the Board, along with Superintendent Scott Brabrand, began overhauling the school's admissions process to change "the racial makeup of TJ." JA2964. Three events precipitated these changes. First, the Board was "pushed … to act quickly to change TJ admissions with an explicit eye toward its racial composition" due to state agency initiatives to improve "diversity" at Governor's Schools, which the Board interpreted as admissions "within 5% of diversity in their local districts." JA2972. Second, in May 2020, nationwide unrest, including in Fairfax County, arose in response to George Floyd's murder. JA2959. Finally, the next month, admissions statistics for TJ's Class of 2024 were made public and showed that fewer than ten Black students had been admitted in a class of 486 students. JA0562-63.

In response, Board members, Brabrand, and TJ's principal determined that the school's racial composition must change. Six days after the admissions statistics were released, TJ's principal wrote to the entire TJ community that the school "d[id] not reflect the racial composition in FCPS" because, if it did, it "would enroll 180 Black and

460 Hispanic students, filling nearly 22 classrooms." JA0517. Later that month, Board member Sanders emailed Brabrand declaring that "the Board and FCPS need to be explicit in how we are going to address the under-representation of Black and Hispanic students." JA2960. And Board member Keys-Gamarra told her colleagues, "in looking at what has happened to George Floyd, we now know that our shortcomings are far too great … so we must recognize the unacceptable numbers of such things as the unacceptable numbers of African Americans that have been accepted to TJ." JA2971-72.

Concluding "TJ should reflect the diversity of FCPS, the community and Northern Virginia," FCPS staff developed a "merit lottery" proposal for TJ admissions, which Brabrand presented to the Board in September. JA0291-93. Brabrand's presentation projected the racial effect of his proposal—"a drastic drop in Asian-American students at TJ." JA2974; JA0308-10. The racial modeling touted a projected rise in Black enrollment from 1% to 7% and Hispanic enrollment from 3% to 8%, with a concomitant decrease in Asian-American enrollment from 73% to 54%. JA0310.

Among other features, the merit lottery would have used "Regional Pathways" to cap offer numbers within FCPS regions. JA0306. Board members recognized that geographic caps could be used to obtain their desired racial outcome. See JA2980-81 (Board member Sanders advising that "geographic diversity" will "result in greater diversity in the demographics."). Some Board members, however, expressed skepticism of the lottery proposal, stating that a lottery "seems to leave too much to chance" and asking: "will chance give us the diversity we are after?" JA2980. Brabrand then proposed a revised merit lottery, including a holistic review of some applicants. JA2961. This revised proposal added "Experience Factors," which had the purported "advantage" of "statistically … provid[ing] some increase in admittance for underrepresented groups." *Ibid.*

During the October Board session, the Board took several votes— something it typically does not do during work sessions and which was not mentioned in the session's public description. JA2961-62. It unanimously voted to direct Brabrand to eliminate the TJ admissions examination. JA2962. And it dictated that a diversity plan submitted to the State "shall state that the goal is to have TJ's demographics represent

[that of] the NOVA region." JA0439, JA2962. No public comment was permitted before either vote and no notice was given to the public that these votes would occur. *Ibid.*

In the subsequent weeks, FCPS staff released a white paper comparing a holistic option with the hybrid merit lottery Brabrand had previously proposed. JA2976. This white paper "included voluminous racial modeling and discussion of efforts to obtain racial diversity at TJ." *Ibid.*; see JA1930-74. Then, in a December work session, Brabrand presented two plans to the Board: the hybrid merit lottery and the holistic plan featured in the white paper. JA2976. This holistic method would consider a student's GPA, written submissions, and the "Experience Factors" (including "attendance at an underrepresented middle school") and featured "regional pathways" setting geographic caps for offers. JA2977.

At its December meeting, the Board accepted Brabrand's holistic proposal with one modification: the Board replaced the regional pathways with a provision setting aside seats for the top 1.5% of the 8th grade class at each public middle school. JA2977; JA2223-24. The Board voted in favor of that proposal, despite not having given prior public

8

notice or opportunity to comment on the 1.5% set-aside. JA2977. Board member McLaughlin abstained from voting in part due to the problematic process, explaining that she "could not recall a messier execution of Board-level work in her nine years on the Board." JA0372, JA2977-78.

After voting for this proposal, Board members remained unsure whether the 1.5% set-aside would be based on the school a student attended or the one she was zoned to attend. JA2964. This distinction is highly significant for the disproportionately Asian-American students attending gifted AAP centers rather than their zoned schools. *Supra* at 4-5. Numerous stakeholders pointed out that basing the set-aside on the attending school would create "a special penalty that comes from pursuing AAP placement." JA0332; see JA0323-24 (flagging "several letters" to Board member raising concern); JA0319-21 (similar). Students not attending AAP centers would have higher chances of admission to TJ, "not because [admissions officers] compared them [to AAP students] and thought them equally qualified, but because [they] never compared them at all." JA0333. Basing the set-aside on the attending school would thus "purposely [favor] academically weaker students … over the ones that

FCPS has identified as needing Level IV [gifted] services," a result that "makes no sense," *ibid.*—apart from serving the purpose of racial balancing. In response, Brabrand insisted that the Board had voted for "attending school," which would "produce[] the geographic distribution the Board wanted." JA0065.

Thus, as the Board knew, the structure of the 1.5% set-aside disadvantages the disproportionately Asian-American applicants from the top AAP centers. It burdens these applicants by forcing them to compete largely "against other applicants *from the same school*," rather than all other eligible students across all the participating school divisions. Superintendent's Office, *Regulation 3355.15* at 5 (effective Nov. 9, 2021), https://tinyurl.com/w927zbyt (emphasis added); see JA0584. The set-aside leaves only about 100 of 550 total seats in each class unallocated. JA2958. These requirements "disproportionately force[] Asian-American students to compete against more eligible and interested applicants (often each other) for the allocated seats at their middle school." JA2969. And the inclusion of "Experience Factors" further disadvantages the disproportionately Asian-American applicants attending AAP centers at the "feeder schools." Those factors gave a

preference to students attending middle schools "historically underrepresented" at TJ; approximately a quarter of such applicants were Asian-American, far lower than the overall percentage of Asian-American applicants. JA2915; JA2961; JA0094-95.

Just as the Board had predicted and intended, the new admissions policy drastically decreased the number of Asian-American students admitted to TJ. The proportion of offers extended to Asian-American applicants in the five years prior to the policy change never fell below 65%, and was typically between 70% and 75%. JA2968. Indeed, 73% of the offers extended to the last class admitted under the previous, meritocratic system were extended to Asian-American applicants. *Ibid.* Only 54% of offers for the first class after the Board imposed the challenged admission policy were extended to Asian-American applicants; the school extended 56 fewer offers to Asian-American applicants for the class of 2025 despite the admitted class size increasing by 64 students. JA2958.

Coalition for TJ sued, alleging that the new policy unconstitutionally discriminated against Asian-American applicants. The district court agreed, granting Coalition for TJ summary judgment

and enjoining the Board from using the policy. JA2984-86. A divided panel of this Court voted to grant the Board's motion to stay the injunction, with Judge Heytens concurring and Judge Rushing dissenting. *Coalition for TJ v. Fairfax Cnty. Sch. Bd.*, 2022 WL 986994 (4th Cir. March 31, 2022). The Coalition filed an emergency application with the Supreme Court, requesting that it vacate the stay. *Coalition for TJ v. Fairfax Cnty. Sch. Bd.*, --- S. Ct. ---, 2022 WL 1209926 (Apr. 25, 2022). The Supreme Court denied the application, with Justices Thomas, Alito, and Gorsuch noting that they would have granted the application. *Id.* at *1.

## ARGUMENT

### I. The challenged admissions policy subjects Asian-American students to unconstitutional racial discrimination.

This Court should affirm because the challenged policy violates the constitutional rights of Asian-American students applying for admission to TJ. The challenged policy is "directed only to racial balance, pure and simple," an objective the Supreme Court "has repeatedly condemned as illegitimate." *Parents Involved*, 551 U.S. at 726 (opinion of Roberts, C.J.); *Freeman v. Pitts*, 503 U.S. 467, 494 (1992) ("Racial balance is not to be achieved for its own sake.").

The Supreme Court has long held that a facially race-neutral law is unconstitutional where its purpose is invidious racial discrimination. See *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) (prohibiting discriminatory enforcement of facially neutral laws). Where used as tools of racial discrimination, facially neutral policies are "just as abhorrent, and just as unconstitutional, as policies that expressly discriminate on the basis of race." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016). Policymakers cannot evade the Equal Protection Clause's "central mandate" of "racial neutrality in governmental decisionmaking" simply by concealing their discriminatory intent behind facially neutral proxies. *Miller v. Johnson*, 515 U.S. 900, 904 (1995).

Courts will not invalidate a facially race-neutral law solely because it results in a racially disproportionate impact. *Arlington Heights*, 429 U.S. at 265. Instead, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id.* at 265-66 (explaining that plaintiffs need not show "that the challenged action rested *solely* on racially discriminatory purposes," and instead must provide "proof that a discriminatory purpose has been a motivating factor

in the decision" (emphasis added)). For the intent to be discriminatory, the government must have enacted the challenged policy "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

To determine whether a plaintiff has provided such proof, this Court conducts a fact-intensive and sensitive inquiry into intent, using a nonexhaustive list of factors set forth in *Arlington Heights*. *McCrory*, 831 F.3d at 220. Namely, this Court examines the historical background of the challenged decision, the specific sequence of events leading up to the challenged decision, departures from normal procedural sequence, the legislative history of the decision, and the disproportionate impact of the official action—whether it bears more heavily on one race than another. *Id.* at 220-21 (citing *Arlington Heights*, 429 U.S. at 266-67).

Here, the challenged policy was enacted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon" Asian-American students. *Feeney*, 442 U.S. at 279. Each of the *Arlington Heights* factors weighs in favor of finding discriminatory intent.

First, the policy's historical background and the specific events leading up to its adoption reveal the Board's invidiously discriminatory purpose of achieving a preferred racial balance. The events that catalyzed the Board's actions—the protests following George Floyd's murder, and pressure from state and local officials, including the Superintendent and TJ's principal, to change the school's racial composition to match the demographics of the school system—confirm that the Board designed the challenged policy to racially balance the school. *Supra* at 5-6. The Board has put forward no reason for changing the policy apart from increasing "diversity," and the record demonstrates that the "diversity" the Board wanted to achieve was racial. *Supra* at 5-8; see JA2981 (policy change intended to "increas[e] diversity through redefining merit").

Second, the Board's conduct deviated from its normal procedures. Board members found the process "shoddy and rushed," remarking that they could not "recall a messier execution." JA2964; JA0372. Despite not usually taking votes during work sessions, for example, the Board took *several* during one session, without prior notice to the public or an opportunity for public comment. *Supra* at 7-9. The Board also adopted the 1.5% set-aside without prior public notice or opportunity for

comment. *Supra* at 8-9. Most glaringly, Board members did not even understand until *after* voting for the policy whether the 1.5% set-aside would be based on students' zoned or attending schools—and then deferred to Brabrand's insistence on using the attending schools, despite the serious fairness concerns raised by stakeholders. *Supra* at 9-10.

Third, the legislative history reveals that, just as in *Parents Involved*, "the goal established by the school board [was] attaining a level of diversity within the schools that approximates the district's overall demographics." 551 U.S. at 727 (opinion of Roberts, C.J.). Shortly before the Board began considering proposals to revamp the admissions policy, TJ's principal lamented that the school did not match the district's racial demographics. *Supra* at 5-6. The Board itself declared a "goal" of having "TJ's demographics represent [that of] the NOVA region." *Supra* at 7-8; see, *e.g.*, JA0421 (under the FCPS "racial equity policy," "[t]he Superintendent and the School Board believe that TJHSST should reflect the diversity of FCPS and our community … [and so] the admissions process needs to be addressed in a comprehensive way.").

Indeed, the Board rejected a lottery-based admissions system because of concerns that a lottery would "leave too much to chance" and

might not achieve the racial balance the Board sought. JA0406. The Board also closely considered the projected racial effect of changes to TJ's admissions policy, JA0293, including studying a white paper filled with racial modeling, JA2976; JA1930-74. While the Board asserts that this racial modeling is irrelevant because it did not model the exact proposal it ultimately adopted, Board Br. 44, the data before the Board made clear the likely racial impact of its policy, see TJ Br. 11.

At the same time, Board members candidly (and, they believed, privately) recognized that "this process" "discriminated against" Asian-Americans and that "there has been anti [A]sian feel underlying some of this," "made … obvious" by Superintendent Brabrand's "racist" and "demeaning" statements. JA0085; JA0119 (text message exchange between Board members Omeish and Pekarsky) (quoting Brabrand's derogatory comments on Asian-Americans "pay[ing] to play"). Board members even acknowledged "deliberate" racism in the process. JA0128 (Pekarsky) (explaining that Brabrand "[c]ame right out of the gate blaming" Asian-Americans). Accordingly, the contemporaneous statements of the Superintendent and Board members make clear that

the policy changes were intended, at least in part, to decrease admissions of Asian-American students.

Last, the challenged policy "bears more heavily on one race"—Asian Americans—"than []other[s]." *McCrory*, 831 F.3d at 230. Under the new policy, the proportion of Asian-American applicants extended offers for the class of 2025 dropped 19% from the previous year, *Coalition for TJ*, 2022 WL 986994, at *8 (Rushing, J., dissenting), while offers extended to students of *every other* racial group increased.[3] That result is unsurprising: the record makes clear that the discriminatory effect of the policy—that "[i]t will whiten [the] schools and kick our [sic] Asians"—was not an unfortunate byproduct; it was the policy's purpose. JA0085; JA0119 (Omeish and Pekarsky).

Indeed, the Board's racial-balancing policies were targeted at Asian-American applicants with such precision that it is difficult to account for them apart from their discriminatory purpose. Asian-American applicants are differently situated because they disproportionately attend a handful of gifted centers that have

---

[3] See Fairfax County Association for the Gifted, *TJHSST Offers Admission to 550 Students; Broadens Access to Students Who Have an Aptitude for STEM* (June 23, 2021), https://tinyurl.com/3pduh7ep.

disproportionately high percentages of eligible applicants. *Supra* at 4-5. These centers draw middle-school students from multiple schools who have scored highly on aptitude tests and offer them advanced classes. See *ibid.* The 1.5% set-aside thus "disproportionately forces Asian-American students to compete against more eligible and interested applicants" attending these top gifted centers, rather than competing against all students in the participating divisions. JA2969.

The Board asserts that the 1.5% set-aside does not disadvantage Asian-American applicants, because all applicants must likewise compete primarily against students in their middle school. Board Br. 33. But this argument depends on the false premise that each middle school has the same percentage of eligible and interested applicants. To the contrary, the record shows that some schools have far higher percentages of eligible students than others, ranging from 55.6% at Carson Middle School to 9.5% at Whitman Middle School. JA0189; see JA0150-56. The set-aside plainly disadvantages the disproportionately Asian-American applicants attending the top gifted centers. The preference for "underrepresented" middle schools—which excludes these top gifted centers—compounds this disadvantage. JA2969. There is no apparent

reason for the Board to make it disproportionately difficult for students who attend these middle-school gifted centers to obtain admission to its magnet high school, apart from the Board's desire to change that school's racial composition. *Supra* at 5-8.

The Board further asserts that "[f]eeder schools are not a proxy for Asian-American students," but its analysis is partial and flawed. Board Br. 34. The Board looks at "*four* of the top six feeder schools," contending that they "had average Asian-American populations of … a similar range as *eight* of the 20 non-feeder schools." *Ibid.* (first emphasis added)). But the feeder schools it omits from that comparison—Carson and Rocky Run—have very high percentages of Asian-American students—approximately 45% at Carson and 47% at Rocky Run. *Id.* at 33-34 & n.4; JA2905, 2908.[4] And both schools had high numbers of successful applicants under the prior policy; indeed, far more students were admitted to TJ from Carson than any other middle school. JA2899-900

---

[4] In fact, all six feeder schools had higher proportions of Asian-American students than the district-wide average of 19%, ranging from 47% of students at Rocky Run to 24% of students at Frost. JA2905, 2908. The disparities are even starker when the percentage of *applicants* are considered; approximately two-thirds of applicants from the six feeder schools were Asian-American. *Supra* at 4-5.

(411 students admitted to TJ from Carson in the 5 years preceding the change; 181 students admitted from Rocky Run).

At the same time, many of the "underrepresented" schools have disproportionately low numbers of Asian-American students. JA2905-09 (about 4% of students at Whitman are Asian-American; 5% of students at Sandburg; 9% of students at Hughes). The Board's curiously limited analysis does nothing to undermine the district court's finding that the admissions policy disproportionately burdens Asian-American applicants by making it disproportionately difficult to obtain admission from the schools that previously had the highest numbers of successful Asian-American applicants.

Accordingly, each of the *Arlington Heights* factors demonstrates that the Board had the discriminatory intent to racially balance the school. The Supreme Court has made clear that this sort of racial balancing for its own sake is "patently unconstitutional." *Fisher v. University of Tex. at Austin*, 570 U.S. 297, 311 (2013) (cleaned up). The prohibition on racial balancing "is one of substance, not semantics"; racial balancing "is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'"

*Parents Involved*, 551 U.S. at 732 (opinion of Roberts, C.J.). While the Board chose facially neutral means to achieve its end, "racial balancing is no less pernicious if, instead of using a facial quota, the government uses a facially neutral proxy motivated by discriminatory intent." *Coalition for TJ*, 2022 WL 986994, at *7 (Rushing, J., dissenting). This Court should affirm.

## II. The Board and its amici's arguments to the contrary are erroneous.

The arguments made by the Board and its amici in favor of the challenged policy rest on misapprehensions of both the law and the facts.

First, the Board contends that affirming the district court's decision would subject "any attempt to use neutral criteria to enhance diversity … to strict scrutiny."[5] Board Br. 22, 56-57. Not so. The district court did

---

[5] For instance, the Board contends that the district court's reasoning would render presumptively unconstitutional the University of Texas's "Top Ten Percent Plan," which the Board contends has been blessed by the Supreme Court. Board Br. 2. The Supreme Court, however, has never ruled on the constitutionality of the Top Ten Percent Plan. See, *e.g.*, *Fisher*, 579 U.S. at 378 ("Despite the Top Ten Percent Plan's outsized effect on petitioner's chances of admission, she has not challenged it. For that reason, throughout this litigation, the Top Ten Percent Plan has been taken, somewhat artificially, as a given premise."); see *id*. at 386 (noting that the "Top Ten Percent Plan" may not be "more race neutral" than a facially race-conscious policy to the extent it uses geography as a racial proxy).

not create any sort of categorical rule; instead, it followed the Supreme Court's strictures and evaluated the Board's intent by conducting a sensitive and fact-intensive inquiry into the policy's history and impact. Indeed, as the district court acknowledged, *only* where the record shows a government actor was motivated by racial purpose does strict scrutiny apply. See JA2966-67, 2982. The district court did nothing to change the legal landscape. Policymakers can avoid strict scrutiny as long as they do not enact laws with a racially discriminatory purpose. That is not asking much; only that they comply with the guarantee of equal protection. The Board's argument is nothing more than a slippery slope fallacy.

Second, the Board and its amici contend that promoting racial diversity is a legitimate governmental interest, and does not display an "invidious desire to decrease Asian-American representation in a zero-sum admissions process." Board Br. 38. For instance, the Board invokes the Supreme Court's decision in *Grutter v. Bollinger*, 539 U.S. 306 (2003), characterizing its admissions policy as "seeking to improve *racial diversity* … through race-neutral methods" or "to remove barriers and to ensure equal access to educational opportunities." Board Br. 52-53; see

U.S. Br. 9, 12, 23 (describing the policy as "equaliz[ing] educational opportunity").

*Grutter*, however, is inapposite both because it is limited to higher education, and because it did not involve racial balancing at all. The admissions program in *Grutter* used racial criteria to achieve a "critical mass of minority students." *Grutter*, 539 U.S. at 329 (cleaned up). The law school in *Grutter* did not define the "critical mass," however, by reference to preferred percentages of particular racial groups. *Ibid*. That, the Court explained, would be "outright racial balancing, which is patently unconstitutional." *Ibid*. Instead, it defined the critical mass "by reference to the educational benefits that diversity is designed to produce." *Id*. at 330. The Supreme Court has previously held that such a program can survive strict scrutiny in "the unique context of higher education." *Parents Involved*, 551 U.S. at 725.

*Parents Involved*, by contrast, involved racial balancing. The school districts in that case used racial classifications to ensure that the racial composition of individual schools matched the racial composition of the districts. *Id*. at 710. The Court rejected this as precisely the sort of "working backward to achieve a particular type of racial balance" that

the Fourteenth Amendment has long been understood to proscribe. *Id.* at 729 (opinion of Roberts, C.J.).

This case is a close relative of *Parents Involved* and far removed from *Grutter*. Just like the "diversity" programs rejected in *Parents Involved*, the animating purpose of the Board's admissions policy was to align the enrollment at TJ with the "specific racial demographics" of the region. *Id.* at 726, 729 (opinion of Roberts, C.J.). The Board and FCPS staff did not design a policy that would "increase Black and Hispanic enrollment" to achieve some educational benefit of diversity, Board Br. 51; rather, its purpose was to decrease Asian-American enrollment at TJ to such an extent that the racial makeup of the school would align with the demographics of the school system.[6] *Supra* at 5-8. The only difference

---

[6] The Board claims that it did not engage in racial balancing because the "demographic composition of the admitted class bears no resemblance to the demographic composition of Fairfax County." Board Br. 2. Surely incompetence does not redeem discriminatory purpose. That the Board's policy—the result of a process so ham-fisted and irregular that one member refused to even participate—did not perfectly achieve the Board's desired racial balance in the first year does not make it less racially motivated. See *Tuttle v. Arlington Cnty. Sch. Bd.*, 195 F.3d 698, 707 (4th Cir. 1999) (finding policy to be unconstitutional racial balancing despite "some statistical variation"). Just as the Board predicted, its new policy significantly changed the racial composition of the class, with a

between this policy and the policies in *Parents Involved* is that the Board hid its discriminatory purpose behind neutral language. But the Fourteenth Amendment prohibits racial balancing irrespective of the language used. Indeed, a facially neutral statute motivated by invidious purpose is "just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race." *McCrory*, 831 F.3d at 220.

The Board also contends that the courts of appeals have consistently upheld "a race-neutral measure that promotes diversity" under "rational basis review," Board Br. 6, but the cases it cites come nowhere close to supporting this sweeping assertion. In *Hayden v. County of Nassau*, for instance, the government was acting to remedy a racially discriminatory policy. 180 F.3d 42, 51 (2d Cir. 1999) (holding it constitutional to change police officers' entrance exam to "rectify hiring practices" found to unconstitutionally discriminate against minority candidates). The Supreme Court established long ago that the government may rely on race-based classifications in order to remedy the effects of discrimination for which the government itself was responsible.

---

large decrease in the enrollment of "overrepresented" Asian-American students, and a corresponding increase in the enrollment of all other "underrepresented" racial groups. TJ Br. 38; JA2959.

*Shaw v. Hunt*, 517 U.S. 899, 909 (1996). Here, however, there was no finding that TJ's prior race-neutral and meritocratic admissions policy violated the Constitution, and "nonremedial racial balancing is unconstitutional." *Tuttle*, 195 F.3d at 704-05.

In other cases on which the Board relies, the courts adopted the same legal framework used by the district court, but concluded that the policymakers lacked discriminatory intent to racially balance or disadvantage any racial group after engaging in the fact-intensive *Arlington Heights* analysis. *Spurlock v. Fox*, 716 F.3d 383 (6th Cir. 2013); *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 552 (3d Cir. 2011); *Rothe Dev., Inc. v. Dep't of Defense*, 836 F.3d 57, 72 (D.C. Cir. 2016) ("Mere foreseeability of racially disparate impact, *without invidious purpose*, does not trigger strict constitutional scrutiny." (emphasis added)). Here, however, the evidence shows not merely that the Board acted with an "awareness" of demographics, *Doe*, 665 F.3d at 548, but that the Board selected the challenged policy "at least in part *because of*, not merely in spite of, its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279 (cleaned up) (emphasis added); see also *McCrory*, 831 F.3d at 233-34.

To the extent the Board contends that the policy is constitutional because it intended to burden Asian-American applicants in order to benefit "underrepresented" racial groups, this argument fails. "Meant to obliterate rather than endorse the practice of racial classifications, the Fourteenth Amendment's guarantees obtain with equal force regardless of the race of those burdened or benefitted." *Schuette v. Coal. to Defend Affirmative Action*, 572 U.S. 291, 325 (2014) (Scalia, J., concurring in the judgment) (cleaned up) (quoting *Miller*, 515 U.S. at 904); *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984) ("A core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race."). That the Board intended to discriminate against one racial group in order to benefit other racial groups does not make that discrimination permissible. See *Johnson v. California*, 543 U.S. 499, 505 (2005) (strict scrutiny applies to "benign" racial classifications); *Md. Troopers Ass'n v. Evans*, 993 F.2d 1072, 1076 (4th Cir. 1993) (even "benign remedial aims" remain "inherently suspect and thus call for the most exacting judicial examination" (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273 (1986))).

Third, the Board attempts to distance itself from Brabrand, contending that Board members did not share his anti-Asian sentiments. Board Br. 40-41. This argument—that the Board was not influenced by its chief executive officer on matters for which he was its principal counselor—beggars belief. While the Board correctly observes that it had the ultimate decision-making authority on the policy, Board Br. 40-41, the record shows that Brabrand heavily influenced its decisions, *supra* at 5-10; JA0372 (Board member remarking "Brabrand's flawed operational proposals have greatly contributed to [the] embarrassing process" of adopting the new policy). Although the policy the Board ultimately adopted was not identical to Brabrand's holistic proposal, its only significant deviation was the replacement of the proposed "regional pathways" with the 1.5% set-aside for regional middle schools. *Supra* at 8-9. And Board members then deferred unquestioningly to Brabrand on the critical issue whether the 1.5% set-aside would be based on the applicant's zoned or attending school. *Supra* at 9-10. Brabrand's involvement is thus significant in evaluating the intent motivating the challenged policy. That said, it is not as though Brabrand cajoled an unwilling Board into adopting its discriminatory policies; the record is

laced with racially-charged comments from Board members as well. See *supra* at 6, 17-18; TJ Br. 55-57.

Finally, the Board takes issue with the district court's disparate-impact analysis, asserting that the district court should have compared Asian-American applicants' offer rate to their proportion of the applicant pool. *E.g.*, Board Br. 24. But this reasoning is hopelessly irreconcilable with the command of equal protection. For one thing, it would bless unadorned racial balancing for its own sake, which the Supreme Court has condemned time and again as "patently unconstitutional." *Grutter*, 539 U.S. at 330; see also *Fisher*, 570 U.S. at 311; *Parents Involved*, 551 U.S. at 723. Moreover, this theory would sanction an admissions policy dangerously close to a quota system, in which a school board would be free to engineer a system to align the number of offers extended to members of a particular racial group to the proportion that racial group comprised of the applicant pool. Such a system strikes "at the heart of the Constitution's guarantee of equal protection," which "command[s] that the Government must treat citizens as individuals, not simply as components of a racial ... class." *Parents Involved*, 551 U.S. at 730 (cleaned up) (opinion of Roberts, C.J.) (quoting *Miller*, 515 U.S. at 911);

see *Grutter*, 539 U.S. at 334 ("[A] race-conscious admissions program cannot use a quota system—it cannot insulate each category of applicants with certain desired qualifications from competition with all other applicants." (cleaned up) (opinion of Powell, J.) (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 315 (1978)).

That reasoning is also contrary to Supreme Court's instruction to consider the "impact of the official action" in determining whether a facially neutral law is discriminatory. *Arlington Heights*, 429 U.S. at 266; *Feeney*, 442 U.S. at 274-75; see *McCrory*, 831 F.3d at 230-31.[7] Measuring a policy change's impact on a particular racial group would be exceedingly difficult—perhaps impossible—without comparing the racial group's treatment under the new policy to its treatment under the old policy. Cf. *Coalition for TJ*, 2022 WL 986994, at *8 (Rushing, J.,

---

[7] The Board argues that this Court "*rejected* such year-over-year comparisons to prove disparate impact" in *McCrory*. Board Br. 20 (emphasis added). But this Court held that a race-discrimination claim can succeed even *without* showing a year-over-year comparison, not that such a showing is insufficient or irrelevant for the disparate impact analysis. See *McCrory*, 831 F.3d at 232 ("The district court also erred in suggesting that Plaintiffs *had* to prove that the challenged provisions prevented African Americans from voting at the same levels they had in the past … [because] neither the Fourteenth Amendment nor § 2[ ] *requires* such an onerous showing." (emphasis added)).

dissenting). Indeed, the only way to "facilitate a comparison of the challenged policy's relative effects on different racial groups," Board Br. 28, is to examine how the implementation of the challenged policy affected different racial groups.

Here, the Board's policy clearly had a disparate impact on Asian-American applicants; the proportion of Asian-American applicants extended offers for the class of 2025 dropped 19% from the previous year, while offers extended to students of *every other* racial group increased. *Supra* at 18. Because the policy unconstitutionally discriminates against Asian-American applicants, the district court's judgment should be affirmed.

\*     \*     \*

The Board adopted an admissions policy that sacrificed equality in order to achieve other objectives—including "redefin[ing] merit" and "equity." It did so by denying educational benefits to Asian-American children on the basis of those children's race. That policy broke faith with "the Constitution's guarantee of equal protection," which "command[s] that the Government must treat citizens as individuals, not simply as a

components of a racial … class." *Parents Involved*, 551 U.S. at 730 (cleaned up) (opinion of Roberts, C.J.) (quoting *Miller*, 515 U.S. at 911).

"[E]very time the government uses racial criteria to bring the races together, someone gets excluded, and the person excluded suffers an injury solely because of his or her race. … This type of exclusion, solely on the basis of race, is precisely the sort of government action that pits the races against one another, exacerbates racial tension, and provokes resentment among those who believe that they have been wronged by the government's use of race." *Id.* at 759 (Thomas, J. concurring) (cleaned up). The Board's exclusionary program did just that and should not be permitted to continue.

## CONCLUSION

This Court should affirm the district court's judgment.


Respectfully submitted,

By:  */s/ Andrew N. Ferguson*
        Andrew N. Ferguson
        *Solicitor General*

JASON S. MIYARES
   *Attorney General*

CHARLES H. SLEMP, III
   *Chief Deputy Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-5315 – Telephone
(804) 371-0200 – Facsimile

June 21, 2022

ERIKA L. MALEY
   *Principal Deputy Solicitor General*

KEVIN M. GALLAGHER
   *Deputy Solicitor General*

ANNIE CHIANG
   *Assistant Solicitor General*

*Counsel for the Commonwealth of Virginia*

*Counsel for Additional Amici States*

STEVE MARSHALL
Attorney General
State of Alabama

MARK BRNOVICH
Attorney General
State of Arizona

LESLIE RUTLEDGE
Attorney General
State of Arkansas

CHRISTOPHER M. CARR
Attorney General
State of Georgia

DEREK SCHMIDT
Attorney General
State of Kansas

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

JEFF LANDRY
Attorney General
State of Louisiana

ERIC SCHMITT
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

DOUGLAS J. PETERSON
Attorney General
State of Nebraska

JOHN O'CONNOR
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

KEN PAXTON
Attorney General
State of Texas

SEAN D. REYES
Attorney General
State of Utah

PATRICK MORRISEY
Attorney General
State of West Virginia

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because it contains 6,403 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century typeface.

*/s/ Andrew N. Ferguson*
Andrew N. Ferguson

## CERTIFICATE OF SERVICE

I certify that on June 21, 2022, the foregoing document was served

on all parties or their counsel of record through the CM/ECF system.

*/s/ Andrew N. Ferguson*
Andrew N. Ferguson