No. 22-1280

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

COALITION FOR TJ,

*Plaintiff-Appellee,*

vs.

FAIRFAX COUNTY SCHOOL BOARD,

*Defendant-Appellant.*

On Appeal From The United States District Court for the Eastern
District of Virginia, Case No. 1:21-cv-00296-CMH
The Hon. Claude M. Hilton

### REPLY BRIEF OF APPELLANT

Sona Rewari (VSB No. 47327)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500

Trevor S. Cox (VSB No. 78396)
HUNTON ANDREWS KURTH LLP
951 E. Byrd Street
Richmond, VA 23219
Telephone: (804) 788-7221

Donald B. Verrilli, Jr.
Ginger D. Anders
Xiaonan April Hu
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW,
Suite 500 E
Washington, DC 20001
Telephone: (202) 220-1100

Mica L. Moore
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

*Counsel for Fairfax County School Board*

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

INTRODUCTION ....................................................................................1

ARGUMENT ..........................................................................................4

I.    The Coalition has not demonstrated that the Plan disparately impacts Asian Americans...........................................................................4

    A.    The district court improperly relied on a before-and-after comparison to assess disparate impact. ................................4

    B.    There is no evidence in the record that any aspect of the Plan disadvantaged Asian Americans relative to other races.....................10

II.   The Coalition failed to demonstrate that the Board acted with discriminatory intent. ...........................................................15

    A.    Undisputed record evidence demonstrates that the Board did not adopt the Plan to achieve racial balancing or for any other constitutionally impermissible purpose...............................17

    B.    An objective of improving racial diversity, along with other types of diversity, is not invidious discriminatory intent...................25

III.  The Coalition's strict scrutiny analysis underscores the error of its equal protection analysis. ..........................................................28

CONCLUSION .....................................................................................29

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**FEDERAL CASES**

*Boston Parent Coal. For Acad. Excellence Corp. v. Sch. Comm. of*
   *City of Boston*,
   996 F.3d 37 (1st Cir. 2021).........................................................4, 5, 8

*City of Richmond v. Croson*,
   488 U.S. 469 (1989)....................................................................17, 21, 27

*Fisher v. University of Texas*,
   570 U.S. 297 (2013)........................................................................*passim*

*Grutter v. Bollinger*,
   539 U.S. 306 (2003)..........................................................................26, 27

*Hazelwood Sch. Dist. v. United States*,
   433 U.S. 299 (1977)...............................................................................8

*Jefferson v. Hackney*,
   406 U.S. 535 (1972)............................................................................28

*North Carolina State Conf. of the NAACP v. Raymond*,
   981 F.3d 295 (4th Cir. 2020) ...............................................................11

*North Carolina State Conf. of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ........................................................7, 8, 11

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007)...............................................................................9

*Personnel Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979).........................................................................16, 27

*Rosenstiel v. Rodriguez*,
   101 F.3d 1544 (8th Cir. 1996) ...........................................................22

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Schuette v. Coal. to Defend Affirmative Action, Integration &*
*Immigrant Rts. & Fight for Equal. By Any Means Necessary*
*(BAMN)*,
572 U.S. 291 (2014).........................................................................28

*Spurlock v. Fox*,
716 F.3d 383 (6th Cir. 2013) ......................................................17, 28

*Thai Meditation Ass'n of Alabama, Inc. v. City of Mobile, Alabama*,
980 F.3d 821 (11th Cir. 2020) ....................................................19, 21

*Village of Arlington Heights v. Metropolitan Housing Development*
*Corp.*,
429 U.S. 252 (1977).........................................................4, 7, 23, 27

*Wards Cove Packing Co. v. Atonoio*,
490 U.S. 642 (1989).......................................................................8, 9

*Washington v. Davis*,
426 U.S. 229 (1976)....................................................................3, 9, 28

*Watson v. Fort Worth Bank & Tr.*,
487 U.S. 977 (1988).............................................................................5

**STATUTES**

2020 Va. Acts ch. 1289.........................................................................20

**INTRODUCTION**

The Coalition's brief brims with inflammatory rhetoric and sweeping accusations that the admissions policy for TJ (the Plan) was adopted for the nefarious purpose of discriminating against Asian Americans. What it lacks is any serious effort to grapple with the undisputed facts or controlling Equal Protection law. That is doubtless because the facts and the law doom its case.

The Coalition all but ignores the undisputed facts at the heart of this case. Those facts establish that the Plan is a race-neutral, race-blind effort to break down socioeconomic and geographic barriers that held back students of *all* races. The Plan provides students of all races an equal opportunity to gain admission to TJ, and Asian-American students in fact gained admission at rates that exceeded their percentage of the applicant pool. There is not a shred of evidence that the Board adopted the Plan for the purpose of discriminating against Asian Americans. Nor is there a shred of evidence that the Board adopted the Plan to align TJ admissions with districtwide racial demographics or to ensure any set admissions percentages for any racial group.

Given these undisputed facts, established law forecloses a finding that the Board intentionally discriminated against Asian Americans. Discriminatory intent also cannot be inferred from the Plan's alleged disparate impact on Asian Americans. That is so both because the Coalition did not even attempt to make a

statistically significant showing that the Plan—and not changes in the applicant pool in 2021 or normal year-over-year fluctuation—actually caused the 2021 change in Asian-American admission rates, and because such year-over-year comparisons are not probative of disparate impact in any event.  To prove disparate impact, the Coalition must show that the Plan made it *disproportionately* more difficult for Asian Americans than students of other races to gain admission to TJ.  But the undisputed facts foreclose such a showing.  Nor has the Coalition identified *anything else* from which discriminatory intent could be inferred.

What the Coalition does instead is repeat incessantly the phrase "racial balancing," in the evident hope that by dint of repetition it can create the false impression that the Board engaged in the kind of racial engineering that the Constitution forbids.  But "racial balancing" has an established meaning:  taking steps to ensure "specified percentages" of particular racial groups gain admission. *Fisher* v. *University of Texas*, 570 U.S. 297, 311 (2013) (*Fisher I*).  The Plan does nothing of the sort.  To the contrary, the Plan's design prevents the Board from predicting, much less controlling, what the racial composition of the incoming class will be.  With respect to race, the most that can be said is that several Board members expressed the hope that breaking down socioeconomic and geographic barriers would result in greater numbers of Black and Hispanic students being admitted to

2

TJ.  That is not racial balancing and does not otherwise raise any equal protection concerns.

In the end, the Coalition's argument comes down to the extraordinary proposition that the Constitution forbids the Board from adopting race-blind measures designed to break down socioeconomic and geographic barriers that disadvantaged students of all races, because doing so might increase the number of Black and Hispanic students admitted to TJ, and reduce the number of Asian-American students.  *No precedent* supports that untenable view of the Equal Protection Clause.  Adopting it would invalidate measures that the Supreme Court has repeatedly identified as appropriate race-neutral methods of advancing diversity, such as the University of Texas's "Top Ten Percent" plan.  *Fisher I*, 570 U.S. at 305. More broadly, it would render constitutionally suspect any action taken by any governmental body that could foreseeably alter the benefits available to or burdens imposed upon any racial group—a position the Supreme Court has emphatically rejected.  *Washington* v. *Davis*, 426 U.S. 229, 239 (1976).  Indeed, it would be the antithesis of respect for the principle of Equal Protection of the Laws.

The district court's decision must be reversed.

# ARGUMENT

## I.    The Coalition has not demonstrated that the Plan disparately impacts Asian Americans.

### A.    The district court improperly relied on a before-and-after comparison to assess disparate impact.

1.    To establish disparate impact under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, a plaintiff must prove that the challenged policy "bears more heavily on one race than another."  429 U.S. 252, 266 (1977) (citation omitted).  The Coalition attempts to meet this burden by pointing to the fact that fewer Asian Americans were admitted under the Plan than in prior years.  But the Coalition adduced no evidence establishing what actually *caused* that change.  Instead, the Coalition's case rests entirely on the unproven assumption that the differential necessarily resulted from the features of the Plan that the Coalition attacks—and not other factors such as the much larger and more diverse applicant pool in 2021 or even normal year-over-year fluctuations.  Such *ipse dixit* is no substitute for proof.  *Arlington Heights*, 429 U.S. at 266 (examining "impact *of* the official action" (emphasis added)).

As the Coalition acknowledges (Br.26-27), fluctuations in admissions demographics are "reasonably expected," for any number of reasons.  To "get to first base" on its disparate impact claim, therefore, the Coalition had to make a statistically significant showing that the change in the proportion of admitted students who were Asian American was caused by the Plan, as opposed to other

4

factors. *Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Boston*, 996 F.3d 37, 46 (1st Cir. 2021); *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 995 (1988). The Coalition offered no such evidence. Instead, the Coalition (Br.27) mocks the very idea that it should be required to make a statistically significant showing that the data actually proves what the Coalition alleges—a burden that all plaintiffs carry.[1]

The need for statistically significant proof of disparate impact is particularly important given the record in this case, which suggests that factors other than the Plan account for the single-year decrease at the heart of the Coalition's complaint. Historically, Asian-American admission percentages were lower in years when Asian Americans' percentage of the applicant pool was lower. JA560-JA570. That was true in 2021 as well, when the Asian-American proportion of the applicant pool fell to 48.59% from 56.08%. JA675. Furthermore, the number of applicants increased by 36% in 2021; and many more applicants from non-feeder schools applied than in previous years. Opening.Br.31. Indeed, the acceptance rate for Asian-American applicants under the Plan (19.48% in 2021) was well within the

---

[1] Contrary to the Coalition's argument (Br.26), statistical significance measures the causal relationship between the policy and the claimed effect, not merely the magnitude of the effect. *Watson*, 487 U.S. at 995 (statistical significance measures whether differences are "sufficiently substantial [to] raise . . . an inference" of causation). The Coalition's failure to demonstrate statistical significance means it failed to prove causation.

5

historical 2004-2020 range of 16.8% to 25%, suggesting that the changes in admissions percentages may be explained by the differences in the applicant pool. *See* TJ.Alumni.Amicus.Br.15. Surely, the Coalition cannot maintain that Asian Americans must constitute a specific percentage of every admitted class, regardless of how many Asian-American students applied or the strength of their applications relative to the applicant pool. Yet that appears to be the upshot of the Coalition's argument.

If anything, the Coalition's reliance on year-over-year data undermines its case. For five years preceding the Plan's adoption, Asian Americans' portion of offerees fluctuated between 65% and 75%, by as much as 10% per year. Significant shifts thus occurred even without any admissions policy overhaul. In 2021, the Plan's first admissions cycle, Asian Americans received 54% of offers—but in 2022, they received 60%.[2] That is only 5 points lower than the 65% of offers that Asian Americans received at times under the previous policy. The year-over-year numbers therefore are far from "sufficient to show" to show that the Plan caused a disparate impact (Br.28); they could easily be explained by year-over-year variations in the applicant pool and in particular by the substantial differences between the pool in 2021 and the preceding year. Moreover, the Coalition's dissatisfaction with 2022's 60% figure—a modest fluctuation from pre-Plan demographics—underscores that

---

[2] The Coalition cited the 60% figure, which is not in the record, in its response brief.

6

the Coalition's true objective is to treat pre-Plan class composition as a racial quota that the Board must meet every year.

2. Even more to the point, a before-and-after comparison does not demonstrate disparate impact. In *North Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), this Court held that a comparison of election-to-election turnout did not establish disparate impact because yearly fluctuations in turnout could be attributable to factors unrelated to the challenged policy. *Id.* at 232. Nonetheless, the Coalition insists (wrongly) that *McCrory* supports its case. For example, the Coalition claims (Br.25) that *McCrory* merely cautioned against reliance on a comparison to a single election. In fact, *McCrory* listed multiple reasons for doubting the probative value of the election-to-election comparison, including that the relevant elections were "highly sensitive to factors likely to vary from election to election." 831 F.3d at 232 (citation omitted). That reasoning applies with even greater force to an admissions process that necessarily sees a 100% year-over-year applicant turnover.

*McCrory* also establishes the proper comparison under *Arlington Heights*: the chosen baseline must allow the court to evaluate whether the challenged policy disproportionately disadvantages one racial group relative to others. *McCrory*, 831 F.3d at 230-31; *Arlington Heights*, 429 U.S. at 269. Contrary to the Coalition's assertion (Br.24), *McCrory* did not merely examine whether fewer African

7

Americans voted under the challenged voting law, which eliminated certain voting mechanisms and required voter ID. The critical point was that the new law made it *disproportionately* more difficult for African Americans than for members of other racial groups to vote. 831 F.3d at 231 (African Americans "disproportionately lacked the photo ID required by [the statute]," and had "disproportionately used" the eliminated voting mechanisms). The Court emphasized that because African Americans had disproportionately relied on the eliminated voting accommodations out of "necessity," their elimination imposed a structural "burden" on African Americans and not on other races. *Id*. at 231, 233. That analysis highlights the touchstone of the inquiry: whether the challenged policy affords all races an equal opportunity, or whether instead it disfavors a particular race.

*McCrory* makes clear that in the present context the proper measure of disparate impact is whether Asian Americans have more difficulty than members of other racial groups in gaining admission *under the same policy*. *See Boston Parent Coal.*, 996 F.3d at 46 (measuring admissions policy's relative racial impact based on "distribution of invitations"). The Supreme Court has long recognized in the indistinguishable context of hiring decisions that the "proper" way to assess disparate impact is to measure each racial group's portion of the eligible applicant pool against its proportion of offers. *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977); *see also Wards Cove Packing Co. v. Atonoio*, 490 U.S. 642,

8

650-52 (1989); *Washington*, 426 U.S. at 246-47.  Remarkably, the Coalition does not even mention this authority in its brief.  Had the district court applied this law, it would have necessarily rejected the Coalition's disparate-impact allegation because Asian Americans were the only racial group that substantially outperformed its share of the applicant pool under the Plan, receiving 54.36% of offers despite comprising 48.59% of the applicant pool.  JA675.

The Coalition protests (Br.33-34) that using the eligible applicant pool as the baseline would permit "racial balancing," so long as the allegedly disfavored racial group's portion of offers does not fall below its percentage of the applicant pool.  Not so.  "Racial balancing," as the Supreme Court has explained, is admitting "some specified percentage of a particular group merely because of its race or ethnic origin" in order to match a predetermined demographic baseline.  Such a system is "patently unconstitutional" no matter how racial balance is achieved.  *Fisher I*, 570 U.S. at 311 (citation omitted); *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 729-30 (2007).  In a true case of "racial balancing," therefore, the *Arlington Heights* disparate impact analysis would be both inapposite and unnecessary.  But where, as here, no such evidence exists (*see* Part II, *infra*), a plaintiff proceeding under *Arlington Heights* must show that a challenged policy disproportionately disadvantages the plaintiff group compared to members of other races.  Otherwise, there is no basis for inferring discriminatory intent.

9

**B.    There is no evidence in the record that any aspect of the Plan disadvantaged Asian Americans relative to other races.**

The Coalition's disparate-impact argument fails for a second reason: its theory (Br.29) of "how and why" the Plan purportedly disadvantaged Asian Americans is meritless.  Lacking probative evidence of causation, the Coalition instead offers up a blizzard of allegations about the minutia of the admissions process, hoping to create the impression that the Plan reflects a nefarious design.  The record evidence refutes every one of those allegations.

1.    The Coalition's principal contention (Br.24) is that the 1.5% allocation per middle school disfavored Asian-American applicants by reducing the number of seats awarded to "six prominent feeder schools" that historically sent large numbers of Asian-American students to TJ.  That argument fails for two reasons.

First, the argument rests on the false assumption that the six feeder schools are proxies for Asian-American applicants overall.  The Board's opening brief demonstrated—and the Coalition notably does not dispute (Br.29-30)—that the top six feeder schools[3] do not differ markedly from the non-feeder schools in their percentages of Asian-American students.  Two feeder schools had Asian-American populations of approximately 45%, but the other four had 20-27% Asian-American

---

[3] The Coalition errs in including Cooper rather than Jackson as a top-six feeder school.  Opening.Br.33.n4.  And the Coalition ignores that *eight* feeder schools lost seats under the Plan, preferring to focus on its chosen six schools.  The Coalition's argument fails no matter which schools are considered.

students—approximately the same range as *eight* other County schools.  The same is true of the applicant pools:  in the last year under the prior policy, Asian Americans accounted for 50% to 64% of applications in four of these six schools, compared with 51% to 67% of applications from five non-feeder schools; and at least 45% of applications from five other non-feeder schools.  Sealed.JA3203-3358.  And in previous years various non-feeder schools had application pools consisting of approximately 70-80% Asian Americans.  There was thus no significant difference in the percentages of Asian-American applicants at feeder and non-feeder schools.

Second, the Coalition conveniently ignores that the Plan *expanded* opportunities for Asian-American students at *non*-feeder schools.  Disparate impact must be assessed based on the "cumulative" effect of the challenged policy, not on cherry-picked elements.  *McCrory*, 831 F.3d at 231; *see N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 310 (4th Cir. 2020).  Here, the expansion of opportunities at non-feeder schools ensured that reducing offers to feeder schools imposed no structural disadvantage on Asian Americans as a class.

Because many non-feeder schools had Asian-American student and applicant percentages comparable to the feeder schools, the 1.5% allocation did not eliminate Asian Americans' primary avenue for admission.  Although the allocation decreased the seats available to feeder schools, it substantially increased the seats available to non-feeder schools, including at the many non-feeder schools with Asian-American

11

applicant pools comparable to those of the feeder schools. Under the previous policy, students at the County's 20 non-feeder schools received an average of 80 offers each year. The Plan doubled that total, enabling students at non-feeder schools to compete for approximately 160 allocated seats, plus all the unallocated seats. Sealed JA2989-3904. Asian Americans at non-feeder schools benefited from that allocation: Asian Americans admitted from non-feeder schools increased from 46 to 79.

The Coalition complains (Br.29-30) that applicants from the top six feeder schools face "stiffer competition" than applicants from non-feeder schools. But because numerous non-feeder schools had applicant pools with comparably high Asian-American percentages, any increased competition at feeder schools would not suggest that *Asian Americans* as a group faced "stiffer competition." The Coalition also fails to account for the unallocated seats, which were overwhelmingly awarded to students at feeder schools, and which must be considered in assessing the Plan's cumulative impact. When *all* seats are considered, the feeder schools' admission rates were very similar to those of non-feeder schools. The average admissions rate of the top six feeder schools for the first year under the Plan was 13.2%, while the average rate of the five non-feeder schools with similar applicant pools (of at least 44% Asian Americans)[4] was 15.6%. And for the ten underrepresented schools

---

[4] Those schools were Cooper, Franklin, Liberty, Lanier, and Thoreau.

(seven of which had applicant pools between 21% and 36% Asian-American), the average admission rate under the Plan was 15.2%.[5] Sealed JA2989-3202. Thus, the Plan did not force Asian Americans to weather disproportionately heavier competition: Asian-American applicants were distributed among feeder and non-feeder schools, and these schools had similar admissions rates.

The Coalition next contends, for the first time on appeal, that the Plan disadvantaged students at Advanced Academic Program (AAP) Level IV Centers. The Coalition alleges (Br.31) that the Plan "targets" those centers because the six feeder schools discussed in its brief are also AAP Level IV Centers. But the Coalition ignores the seven other Centers that are *non-feeder* schools, five of which (Glasgow, Hughes, Sandburg, South County, and Twain) were designated "historically underrepresented" schools. JA3906. Those Centers, like the feeder-school Centers, serve highly qualified, advanced applicants. That those schools nonetheless were underrepresented under the previous policy illustrates the extent to which geographic and socioeconomic factors skewed the admissions process. The Plan addressed that skew. In 2021, 53 applicants from the five underrepresented Center schools received offers, of whom twenty-four were Asian-American (nineteen more than the year before). Sealed.JA2989-3358. The 1.5% allocation

---

[5] Although the Coalition suggests (Br.29-30) that gaining admission from feeder Carson was significantly more competitive than from underrepresented school Whitman, in fact their respective admissions rates were 15.4% and 20%.

therefore did not disproportionately burden schools with Centers—far less the Asian-American students who attend them.

In the end, the Coalition's "feeder schools" argument reveals that the Coalition's true complaint is the Plan's supposed "disparate impact" (Br.29-30) on students at feeder schools. But "feeder school" students are not a protected class under the Equal Protection Clause, which demands evidence of impact on Asian Americans.

2.    The Coalition's assertion (Br.32) that the underrepresented schools factor "likely penalized" Asian Americans is also baseless. That factor affects only offers for unallocated seats—and 81 of the 88 unallocated-seat offers given to County students in 2021 went to feeder-school students. JA2903. Those feeder-school students clearly were not disadvantaged by the factor. And Asian Americans may well have received some or all of the seven remaining unallocated offers. The underrepresented schools factor could not possibly have "penalized" Asian Americans.

* * *

In sum, the Coalition failed to prove its allegations that the 1.5% allocation and the underrepresented schools factor "targeted" or disproportionately disadvantaged Asian-American applicants. To the contrary, the Plan operated exactly as one would expect of a policy whose criteria explicitly focus on geographic

and socioeconomic diversity. It redistributed seats previously concentrated among a handful of schools in more affluent areas to all the middle schools in the County. Asian Americans benefited from those changes; offers to Asian Americans from low-income backgrounds and underrepresented schools increased by 50 and 24, respectively. JA677. Indeed, under the Plan, Asian Americans remained the most highly represented group, and their portion of the admitted class continued to exceed their share of the applicant pool—rising in 2022 to 60%, a number that could rise or fall in future years depending on the applicant pool. Given these undisputed facts, accepting the Coalition's disparate-impact theory would mean that any policy change associated with a demographic shift, including a decrease in representation of the existing majority group, would be constitutionally suspect—even if the resulting policy provides equal opportunity to all racial groups. Such a regime would make it "exceedingly difficult for government actors to change existing policies" from one race-neutral approach to another. Stay.Op.7.

## II.    The Coalition failed to demonstrate that the Board acted with discriminatory intent.

The district court's decision also must be reversed because the undisputed record refutes the court's finding that the Board adopted the Plan for invidious discriminatory reasons. As the Coalition concedes (Br.56), the record is devoid of evidence that the Board acted "'because of,' not merely 'in spite of' its *adverse* effects upon an identifiable group"—that is, with a purpose of decreasing Asian-

American representation. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (emphasis added). The Coalition therefore resorts to mischaracterizing the record to argue that the Board was focused on race. And the Coalition then doubles down on that mischaracterization, asserting that any desire to increase Black and Hispanic representation amounts to impermissible "racial balancing" and invidious discrimination against Asian Americans.

At every step, the Coalition distorts the facts and the law. The undisputed evidence demonstrates that the Board sought to use race-neutral measures to break down barriers—geographic, socioeconomic, language, and special needs—that had hindered students of *all* races from gaining admission to TJ. Individual Board members also hoped that addressing these barriers would increase Black and Hispanic representation. The Coalition's pejorative *ipse dixit* notwithstanding, the desire Board members expressed to remove socioeconomic and geographic barriers to improve prospects for all students simply is not racial balancing, which is the practice of ensuring that "specified percentages" of particular racial groups gain admission. *Fisher I*, 570 U.S. at 311 (citation omitted). Nor does it amount to invidious discrimination in a "zero-sum" system; courts have repeatedly reaffirmed that governments may undertake race-neutral measures, including to increase racial diversity, with awareness of their demographic consequences. *See* Opening.Br.53; *Fisher I*, 570 U.S. at 311; *City of Richmond v. Croson*, 488 U.S. 469, 509-10 (1989).

16

**A.**     **Undisputed record evidence demonstrates that the Board did not adopt the Plan to achieve racial balancing or for any other constitutionally impermissible purpose.**

1.     The Coalition's discriminatory-purpose argument founders at the outset because the most probative evidence of the Board's intent—the substance of the Plan itself and the evidence upon which the Board acted—disproves discriminatory intent. According to the Coalition and the district court, the Board adopted the Plan to "increase and decrease the representation of certain racial groups at TJ *to align with districtwide enrollment data.*" JA2972-73. But the Plan does no such thing. It is completely race-neutral and race-blind, and its design makes any demographic fine-tuning impossible. The Plan's elements—including eliminating the admissions fee and standardized tests, and adding the 1.5% allocation and Experience Factors—work together to break down the socioeconomic and geographic barriers that had held back talented students of all races. *That* was their purpose. The Coalition does not dispute that those elements address legitimate "factors usually considered important" by school districts. *See Spurlock v. Fox*, 716 F.3d 383, 397 (6th Cir. 2013). And the Coalition cannot explain why a Board bent on matching districtwide demographics would design an admissions policy that left it with no ability to control, or even to know, what the racial composition of the admitted class would be, and that would produce a student body that departed so dramatically from "districtwide enrollment data." Opening.Br.21, 41-45.

17

Nor can the Coalition explain how the Board could have used geography "as a proxy" for race (Br.52) without any modeling predicting how the Plan's race-blind provisions would affect racial demographics. It is undisputed that the Board had no such data. Opening.Br.44. And contrary to the Coalition's assertion (Br.51), the Board did not "request[]" "racial data" on earlier, unenacted admissions proposals. The cited documents discuss weighting the Experience Factors without mentioning race. JA181-82. And although FCPS staff modeled how an earlier unenacted proposal would affect socioeconomic, geographic, and racial diversity, JA466-72, they did not model how the enacted Plan would affect racial demographics.

Even less substantial is the Coalition's contention (Br.11, 51) that the Board "would have been able" to use publicly available "data on the racial composition of each middle school" to model the Plan's racial impact. The Coalition's clever use of the conditional tense elides the lack of evidence that the Board actually *did* any modeling. In reality, the undisputed evidence established that no such modeling was done. Nor would it have been practicable: most feeder and non-feeder schools had similar Asian-American populations and applicant pools, *see* pp. 10-11, *supra*; and the Experience Factors, which played a significant role in determining admission, indisputably were not modeled by FCPS staff. JA2919, JA145. Indeed, if the publicly-available data were sufficient to predict the Plan's racial impact, the

18

Coalition's own predictions should not have been so wildly off base.  JA22 (predicting Asian Americans would receive 31% of offers).

It is therefore absurd to contend that the Board engaged in racial balancing, and the district court plainly erred when it so ruled.

2.    Tacitly conceding that the direct evidence refutes its racial balancing claim, the Coalition asserts that *Arlington Heights*' circumstantial factors—the history of the policy's enactment, contemporaneous statements, and purported procedural deviations—support an inference of invidious intent.  Even putting aside the fact that an intent to use race-neutral means to increase opportunities for underrepresented minorities *is not* "racial balancing," *Fisher I*, 570 U.S. at 311 (citation omitted), the Coalition's account lacks record support.   Indeed, the Coalition's brief is one long exercise in manufacturing a basis for its claim: the Coalition systematically mischaracterizes statements to give them a racial connotation that they do not have (Br.7, 48, 50, 56-57); improperly relies on statements of *non*-decisionmakers whose statements are not attributable to the Board (Br.47), *Thai Meditation Ass'n of Alabama, Inc. v. City of Mobile, Alabama*, 980 F.3d 821, 836 (11th Cir. 2020); and repeats false accusations that the Board sought to manipulate TJ's racial demographics (Br.49, 54, 56-57).

a.    The Coalition asserts (Br.38) that the Plan's adoption was "trigger[ed]" by Virginia's passage of a budget law requiring Governors' Schools to report on

diversity goals for "historically underserved students." 2020 Va. Acts ch. 1289. That is false. The uncontroverted evidence showed that the school system had been working *for years* to improve socioeconomic, geographic, and racial diversity at TJ. JA779-82; JA772-73.

Nor is there support for the Coalition's bald assertion (Br.38) that the budget law drove the Board to "move towards racial balance." The Coalition cites no evidence that the Board construed the budget law as a mandate for racial balancing or that the Board sought specified racial percentages in response. The statements highlighted by the Coalition as supposedly indicating a racial focus (Br.39) were primarily made by Superintendent Brabrand, and none mentions race. JA381, JA488, JA495. The Coalition emphasizes Superintendent Brabrand's statement that a state task force discussed creating a timeline to bring Governor's Schools within "5% of diversity in the systems they represent." JA364. But Brabrand's full update described the task force as focused on socioeconomic status without mentioning race, *id*., and the Coalition proffers no evidence that the *Board* was influenced by that one-off statement. In all events, FCPS's diversity report merely expressed a general objective of improving "diversity" of *all* "historically underrepresented

groups," including students from "underrepresented schools," "economically disadvantaged students," and ELLs.  JA1073-74.[6]

More generally, the Coalition imputes (Br.40-41) to the Board an intent to engage in "racial balancing" based on statements from three Board members in June 2020 expressing dissatisfaction with the levels of Black and Hispanic admissions to TJ.  JA259, 426, 435.  But the Coalition omits that the same Board members made clear that increasing racial diversity was not their predominant aim: each emphasized that the policy should address socioeconomic, geographic, and ELL diversity as well.  JA435, 404, JA2369.  In all events, individual Board members' desire to use race-neutral measures to address the fact that the number of admitted Black students was "too small to report," JA2959 (a desire that the Coalition professed to share, JA889) would not be an impermissible purpose.  *Croson*, 488 U.S. at 507.  Finally, that three Board members expressed dissatisfaction with Black and Hispanic admission rates raises no inference that the 12-member *Board*—which operates by majority vote—adopted the Plan for that reason, much less to achieve racial balance. *See, e.g.*, *Thai Meditation Ass'n*, 980 F.3d at 836 ("intent of one or a few decisionmakers" cannot be imputed "to the entire group"); *Rosenstiel v. Rodriguez*,

_____

[6] The Coalition's assertion (Br.40) that the murder of George Floyd spurred the Board to engage in racial balancing is preposterous.  The Coalition cites only the fact that 2020 admissions data showing the low number of Black offerees was released shortly after George Floyd's death, which hardly shows causation.

101 F.3d 1544, 1552 (8th Cir. 1996); Opening.Br.38.  Indeed, Board members'

statements upon voting for the Plan—which the Coalition ignores—are far more

probative of their ultimate reasons for adopting the Plan, and those statements

emphasized geographic and socioeconomic, not racial, diversity.  *E.g.*, JA2340,

JA2342, JA2346, JA2352, JA2375.

b.    The Coalition next contends (Br.41-46) that the Board "rushed" the

Plan's adoption in a manner that reflects discriminatory intent.  Once again, the

Coalition distorts the record.  The process was not rushed and none of the evidence

the Coalition cites even remotely suggests that the Board was trying to hide

discriminatory intent.  The Coalition highlights (Br.42) some Board members'

concern in September 2020 that the initial lottery proposal was rushed, JA104-110—

but the Board addressed those concerns by deferring discussion to allow further

community outreach and additional staff analysis.  JA618, JA883.  In fact, the Board

waited until December 2020 to adopt a plan, by which time Board members said

they were ready to make a decision.

The Coalition's allegations about a lack of transparency (Br.45-46) are also

pure fiction.  The Coalition highlights (Br.45) a statement by one Board member

criticizing the lack of community engagement early in the process, JA394—but

ignores that the Board and County staff engaged in "extensive discussion, work

sessions, community discussion, [and] community feedback" over the following 10

weeks, JA1250, and that Board members commended this community engagement before adopting the Plan, JA2818.  And although the Coalition asserts that the public was not given advance notice of the 1.5% allocation element, the allocation was a variation of existing regional geographic-diversity proposals, and the Board had publicly requested "school-based" proposals.  JA883.  Finally, Board members' uncertainty about the details of FCPS officials' implementation of the Plan does not remotely justify an inference of discriminatory intent.

Most fundamentally, the only procedural irregularities relevant under *Arlington Heights* are those that suggest discriminatory intent, 429 U.S. at 267— and the Coalition has not identified a single procedural misstep that could be construed as an effort to mask an intent to discriminate against Asian Americans.

c.     The Coalition next contends (Br.47) that certain of the "Board's actions" demonstrate that the Board's goal was racial balancing.  But the cited actions were not those of the Board and they do not reflect any focus on race, much less an effort to pursue racial balancing.

The Coalition asserts (Br.47-48) that the first, rejected merit lottery proposal was an attempt at "racial balancing" based on Superintendent Brabrand's presentation of the proposal, which stated that TJ "should reflect the diversity of FCPS."  But the presentation defined "diversity" to include socioeconomic, ELL, and racial diversity, and modeled the proposal's impact accordingly.  JA293-296.

23

Moreover, Brabrand was not a decisionmaker so his presentation is not probative of the Board's intent. The Board's preliminary consideration of an unenacted proposal that never sought racial balancing does not suggest that the later-adopted Plan was an exercise in racial balancing.

The Coalition next contends (Br.48) that the Board rejected the merit lottery proposal because it did not *do enough* to racially balance TJ's population. That is false. The Coalition cites statements of two Board members who asked whether the lottery, given its random nature, would increase "diversity"—but, again, the question was about diversity *of all types*, including geographic and socioeconomic, which says nothing about racial balancing. JA101, JA406. The Coalition also cites two irrelevant Board member emails, neither of which mentioned race. JA428, JA430. And the Coalition omits that two other Board members expressed concern that the lottery would *disadvantage* Asian Americans—precisely the opposite of the impermissible intent the Coalition ascribes to the Board. JA2918.

The Coalition's assertion (Br.49) that FCPS staff acted "at the Board's direction" to design the Experience Factors "in the service of racial balance" is doubly baseless. The cited emails discuss how to weight the Experience Factors to "level the playing field" for *all* "historically underrepresented candidates"— including "those facing challenges like living in poverty and special ed." JA176-177. Nor is there any evidence that staff sought to manipulate the Experience Factors

24

to achieve racial balance; to the contrary, they expressed uncertainty about, and did not analyze, the Experience Factors' impact. *Id.* Finally, the Coalition cites no evidence whatsoever that the cited discussion took place "at the Board's direction."

d.    Finally, grasping at yet another straw, the Coalition egregiously misrepresents (Br.7, 55-56) Board member statements expressing solicitude for Asian Americans. The Coalition asserts (Br.7) that Board members Omeish and Pekarsky "recognized that Asian Americans are 'discriminated against in this process [of revising TJ admissions].'" The bracketed language is the Coalition's invention, and its effect is to give the quoted phrase a meaning that is the opposite of what its speaker intended. In a sworn declaration, Pekarsky explained that this discussion referred to the discriminatory effect of the "TJ admission process that was in place *until fall 2020*" on underprivileged students, including Asian Americans. JA2917-2918 (emphasis added). The remaining statements (Br.55-56) criticized Superintendent Brabrand for making comments that could offend some Asian Americans, and expressed concern that Brabrand's lottery proposal—which, again, the Board rejected—could disadvantage Asian Americans. JA119, 125, 128.

**B.    An objective of improving racial diversity, along with other types of diversity, is not invidious discriminatory intent.**

1.    The Coalition has failed to present any evidence that the Board sought to disadvantage Asian Americans or engaged in racial balancing. At every turn, the Board focused on removing socioeconomic, geographic, and other barriers to entry

25

for all races.  The Plan's race-blind design reflects that focus.  The evidence at most demonstrates that some Board members—whose individual views are distinct from those of the Board as a corporate body, *see* p.21-22, *supra*—hoped that alleviating these barriers would also increase Black and Hispanic representation.  There is nothing unconstitutional about expressing such laudable sentiments.

The Coalition's position therefore boils down to the extraordinary contention (Br.56-57) that, as the district court put it, policies "designed to increase Black and Hispanic enrollment" "*by necessity*" discriminate against whatever racial group happens to be in the majority.  JA2981.  But a desire to break down socioeconomic and geographic barriers for all groups is simply not equivalent to an intent to disadvantage the existing majority group.  The former reflects a legitimate desire to ensure that "individuals of *all* races may equally take advantage of valuable opportunities," U.S.Amicus.Br.4, while the latter would almost certainly rest on racial stereotypes.  Pointing to precedents addressing race-*based* classifications (Br.57-58), the Coalition responds that "racial discrimination" does not deserve "less scrutiny" if it is meant to "help" a particular group.  But policies that classify individuals *based on race* are constitutionally suspect, and therefore subject to strict scrutiny regardless of their intent, *Grutter v. Bollinger*, 539 U.S. 306, 329-30 (2003), while race-blind policies like the Plan constitute "discrimination" only if they are

intended to disadvantage a particular racial group. *Feeney*, 442 U.S. at 279; *Arlington Heights*, 429 U.S. at 266-267.

The Coalition's argument flies in the face of *Feeney*'s clear holding that decisionmakers' awareness that a policy might have an impact on a particular group does not amount to invidious discrimination. 442 U.S. at 279. The Coalition considers *Feeney* inapposite because the statute there benefited veterans rather than underrepresented racial groups. But the Supreme Court has repeatedly approved race-neutral measures designed to increase representation of underrepresented racial groups in zero-sum situations, demonstrating that the Court does not consider such measures discriminatory. *See Grutter*, 539 U.S. at 342; *Croson*, 488 U.S. at 507; *id.* at 526 (Scalia, J., concurring); *Fisher I*, 570 U.S. at 333 (Thomas J. concurring). The Coalition has no answer for those decisions.

2.    Adopting the Coalition's position would upend decades of settled precedent and inflict staggering consequences on policymakers at all levels of government. Treating as invidiously discriminatory any policy adopted partly out of a desire to promote racial diversity would invalidate scores of race-neutral initiatives long understood to be constitutional, including admissions programs like the University of Texas' Top Ten Percent Plan. *But see Fisher I*, 570 U.S. at 312, 315; *id.* at 333 (Scalia, J., concurring) (Top Ten Percent plan, which was enacted to increase representation of Blacks and Hispanics, operated "without discrimination").

27

The sweeping consequences do not end there: if a foreseeable adverse impact on a racial group is evidence of invidious intent, then "a whole range of tax, welfare, public service, regulatory, and licensing statutes" that are foreseeably "more burdensome" for particular racial groups would be unconstitutional. *Washington*, 426 U.S. at 229. So too would a wide range of race-neutral measures designed to allocate limited government resources—for instance, as the States' Amicus Brief illustrates (Br.27-28), policies intended to address both socioeconomic and racial health disparities. That has never been the law, and for good reason. *Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rts. & Fight for Equal. By Any Means Necessary (BAMN)*, 572 U.S. 291, 313 (2014) (plurality op.); *id*. at 330-31 (Scalia, J., joined by Thomas, J., concurring in the judgment); *Jefferson v. Hackney*, 406 U.S. 535, 548-49 (1972). The Equal Protection Clause does not require governments to "blind themselves" to demographic realities, *Spurlock*, 716 F.3d at 394, nor does it deprive them of the flexibility to enact race-neutral measures with awareness that such measures may increase (or decrease) diversity.

## III.    The Coalition's strict scrutiny analysis underscores the error of its equal protection analysis.

The Coalition's strict scrutiny analysis is irrelevant, as the Coalition has not demonstrated that the Plan had a disparate impact on Asian Americans or reflects discriminatory intent. It is also incoherent and self-refuting. Invoking the analysis that applies to race-*based* college admissions policies, the Coalition urges the Court

to examine whether race-neutral alternatives would have achieved the Board's goals. But the Plan is *already* race-neutral, and the Coalition's position is that any race-neutral policy adopted in part to increase racial diversity (or with that foreseeable effect) is invalid. Therefore, any race-neutral alternative to the Plan that could similarly alter racial demographics would presumably also be invalid. The Coalition's strict scrutiny analysis thus confirms the radical nature of its position.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's grant of summary judgment to the Coalition and remand with instructions to grant summary judgment to the Board.

DATED: July 7, 2022                    MUNGER, TOLLES & OLSON LLP


                                       By:      /s/ Donald B. Verrilli, Jr.
Sona Rewari (VSB No. 47327)            Donald B. Verrilli, Jr.
HUNTON ANDREWS KURTH LLP               Ginger D. Anders
2200 Pennsylvania Avenue, NW           Xiaonan April Hu
Washington, DC 20037                   MUNGER, TOLLES & OLSON LLP
Telephone: (202) 955-1500              601 Massachusetts Avenue NW, Suite 500 E
                                       Washington, DC 20001
Trevor S. Cox (VSB No. 78396)          Telephone:  (202) 220-1100
HUNTON ANDREWS KURTH LLP
951 E. Byrd Street                     Mica L. Moore
Richmond, VA 23219                     MUNGER, TOLLES & OLSON LLP
Telephone: (804) 788-7221              350 South Grand Avenue, 50th Floor
                                       Los Angeles, CA 90071
                                       Telephone:  (213) 683-9100

        *Counsel for Fairfax County School Board*

30

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32-1, I certify that

the attached motion is proportionally spaced, has a typeface of 14 points and contains

6491 words.


DATED:  July 7, 2022                    MUNGER, TOLLES & OLSON LLP



                              By: _____*/s/ Donald B. Verrilli, Jr.*_____
                                   Donald B. Verrilli, Jr.
                                   *Counsel for Fairfax County School Board*

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2022, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which sent notification of such filing to all registered CM/ECF users.

DATED:  July 7, 2022                    MUNGER, TOLLES & OLSON LLP


By:  _____*/s/ Donald B. Verrilli, Jr.*_____
         Donald B. Verrilli, Jr.