**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1280

COALITION FOR TJ,

            Plaintiff – Appellee,

    v.

FAIRFAX COUNTY SCHOOL BOARD,

            Defendant – Appellant.

------------------------------

NAACP LEGAL DEFENSE AND EDUCATION FUND, INC.; CASA
VIRGINIA; ASIAN AMERICAN YOUTH LEADERSHIP EMPOWERMENT
AND DEVELOPMENT; NATIONAL COALITION ON SCHOOL DIVERSITY;
POVERTY & RACE RESEARCH ACTION COUNSEL; AMERICAN CIVIL
LIBERTIES UNION FOUNDATION; AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF VIRGINIA; LAWYERS COMMITTEE FOR CIVIL
RIGHTS; WASHINGTON LAWYERS COMMITTEE FOR CIVIL RIGHTS; TJ
ALUMNI FOR RACIAL JUSTICE; VIRGINIA STATE CONFERENCE OF THE
NAACP; CASA, INC.; HISPANIC FEDERATION; HAMKAE CENTER;
MASSACHUSETTS; CALIFORNIA; COLORADO; DELAWARE; DISTRICT
OF COLUMBIA; HAWAII; ILLINOIS; MAINE; MARYLAND; MICHIGAN;
MINNESOTA; NEW MEXICO; NEW YORK; OREGON; VERMONT;
WASHINGTON; PROFESSORS OF SOCIAL SCIENCE AND EDUCATION
POLICY; UNITED STATES OF AMERICA,

            Amici Supporting Appellant.

COMMONWEALTH     OF    VIRGINIA;    SOUTHEASTERN     LEGAL
FOUNDATION;    JUDICIAL    WATCH,    INCORPORATED;    ALLIED
EDUCATIONAL FOUNDATION; THE AMERICAN CIVIL RIGHTS PROJECT;
THE   MANHATTAN   INSTITUTE;   AMERICAN   HINDU   COALITION;
CHINESE AMERICAN CITIZENS ALLIANCE, -Greater New York; FRIENDS

OF LOWELL FOUNDATION; NO LEFT TURN IN EDUCATION; PARENT LEADERS FOR ACCELERATED CURRICULUM AND EDUCATION NYC; THE RICHMOND JEWISH COALITION; UNITED AGAINST ANTISEMITISM-NOVA; LIBERTY JUSTICE CENTER; THE ASIAN AMERICAN COALITION FOR EDUCATION; THE ASIAN AMERICAN LEGAL FOUNDATION; COMMONWEALTH OF VIRGINIA AND 15 OTHER STATES; FAIRFAX COUNTY PARENTS ASSOCIATION; FAIRFAX COUNTY ASSOCIATION FOR THE GIFTED,

Amici Supporting Appellee.

--------

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Claude M. Hilton, Senior District Judge.  (1:21-cv-00296-CMH-JFA)

--------

Argued:  September 16, 2022                    Decided:  May 23, 2023

--------

Before KING, RUSHING, and HEYTENS, Circuit Judges.

--------

Reversed and remanded by published opinion.  Judge King wrote the majority opinion, in which Judge Heytens joined.  Judge Heytens wrote a concurring opinion.  Judge Rushing wrote a dissenting opinion.

--------

**ARGUED:**  Donald B. Verrilli, Jr., MUNGER, TOLLES & OLSON LLP, Washington, D.C., for Appellant.  Erin Elizabeth Wilcox, PACIFIC LEGAL FOUNDATION, Sacramento, California, for Appellee. Sydney Foster, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus United States.  Andrew Nathan Ferguson, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia.  **ON BRIEF:**  Sona Rewari, Washington, D.C., Trevor S. Cox, HUNTON ANDREWS KURTH LLP, Richmond, Virginia; Ginger D. Andrews, Xiaonan April Hu, Washington, D.C., Mica L. Moore, MUNGER, TOLLES & OLSON LLP, Los Angeles, California, for Appellant. Glenn E. Roper, Highlands Ranch, Colorado, Alison E. Somin, Arlington, Virginia, Christopher M. Kieser, Joshua P. Thompson, PACIFIC LEGAL FOUNDATION, Sacramento, California, for Appellee.  Jin Hee Lee, Michaele N. Turnage Young, NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., Washington, D.C.; Niyati Shah, Eri Andriola, ASIAN AMERICANS ADVANCING JUSTICE-AAJC, Washington, D.C.; Francisca D. Fajana, LATINOJUSTICE PRLDEF, New York, New York; Arthur Luk, Christine J. Choi,

Elizabeth Denning, Megan Pieper, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Amici TJ Alumni for Racial Justice; Virginia State Conference of the NAACP; CASA Inc.; Hispanic Federation; Asian American Youth Leadership Empowerment and Development; and Hamkae Center.   Jason S. Miyares, Attorney General, Charles H. Slemp, III, Chief Deputy Attorney General, Erika L. Maley, Principal Deputy Solicitor General, Kevin M. Gallagher, Deputy Solicitor General, Annie Chiang, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia for Amicus Commonwealth of Virginia.   Steve Marshall, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama.   Leslie Rutledge, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas, for Amicus State of Arkansas.   Derek Schmidt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas, for Amicus State of Kansas.   Jeff Landry, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF LOUISIANA, Baton Rouge, Louisiana, for Amicus State of Louisiana.   Austin Knudsen, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MONTANA, Helena, Montana, for Amicus State of Montana.   John O'Connor, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma, for Amicus State of Oklahoma.  Ken Paxton, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas, for Amicus State of Texas.   Patrick Morrisey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Amicus State of West Virginia.   Mark Brnovich, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona, for Amicus State of Arizona.  Christopher M. Carr, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF GEORGIA, Atlanta, Georgia, for Amicus State of Georgia.   Daniel Cameron, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY, Frankfort, Kentucky, for Amicus Commonwealth of Kentucky.   Eric Schmitt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MISSOURI, Jefferson City, Missouri, for Amicus State of Missouri.  Douglas J. Peterson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amicus State of Nebraska.  Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus State of South Carolina. Sean D. Reyes, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF UTAH, Salt Lake City, Utah, for Amicus State of Utah. Maura Healey, Attorney General, Elizabeth N. Dewar, State Solicitor, Robert E. Toone, Jr., Chief, Government Bureau, Ann E. Lynch, Assistant Attorney General, David Ureña, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts, for Amicus Commonwealth of Massachusetts.   Robert Bonta, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Sacramento, California, for Amicus State of California. Philip J. Weiser, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF COLORADO, Denver, Colorado, for Amicus State of Colorado.  Kathleen Jennings, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE,

Wilmington, Delaware, for Amicus State of Delaware. Karl A. Racine, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus District of Columbia. Holly T. Shikada, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF HAWAII, Honolulu, Hawaii, for Amicus State of Hawaii. Kwame Raoul, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois. Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine. Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland. Dana Nessel, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota. Hector Balderas, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW MEXICO, Santa Fe, New Mexico, for Amicus State of New Mexico. Letitia James, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York. Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon. Thomas J. Donovan, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington. Susan M. Pelletier, Washington, D.C., Debo P. Adegbile, Clara S. Spera, Lydia J. Turnage, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, for Amici Professors of Social Science and Education Policy. Kristen Clarke, Assistant Attorney General, Nicolas Y. Riley, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Lisa Brown, General Counsel, Daniel Kim, Adina Cole, Jessica Wolland, Office of the General Counsel, UNITED STATES DEPARTMENT OF EDUCATION, Washington, D.C., for Amicus United States. Sarah Hinger, Erika Kelley, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Eden B. Heilman, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia; Jon Greenbaum, David Hinojosa, Genevieve Bonadies Torres, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C.; Kaitlin Banner, Marja K. Plater, WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS, Washington, D.C., for Amici National Coalition on School Diversity, Poverty & Race Research Action Council, American Civil Liberties Union Foundation, American Civil Liberties Union Foundation of Virginia, Lawyers' Committee for Civil Rights, and Washington Lawyers' Committee for Civil Rights. Kimberly S. Hermann, Celia Howard O'Leary, SOUTHEASTERN LEGAL FOUNDATION, Roswell, Georgia, for Amicus Southeastern Legal Foundation. T. Russell Nobile, Gulfport, Mississippi, Robert D. Popper, Eric Lee, JUDICIAL WATCH, INC., Washington, D.C., for Amici Judicial Watch, Inc. and Allied Educational Foundation. Ilya Shapiro, THE MANHATTAN INSTITUTE, Falls Church, Virginia;

Daniel I. Morenoff, THE AMERICAN CIVIL RIGHTS PROEJCT, Dallas, Texas, for Amici The American Civil Rights Project and The Manhattan Institute. Gary M. Lawkowski, DHILLON LAW GROUP, INC., Alexandria, Virginia; Sue Ghosh Stricklett, AMERICAN HINDU COALITION, Sterling, Virginia, for Amici The American Hindu Coalition, Chinese American Citizens Alliance – Greater New York, The Friends of Lowell Foundation, No Left Turn in Education, Parent Leaders for Accelerated Curriculum and Education NYC, The Richmond Jewish Coalition, and United Against Antisemitism – NOVA. Steve Marshall, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama. Leslie Rutledge, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas, for Amicus State of Arkansas. Derek Schmidt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas, for Amicus State of Kansas. Jeff Landry, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF LOUISIANA, Baton Rouge, Louisiana, for Amicus State of Louisiana. Austin Knudsen, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MONTANA, Helena, Montana, for Amicus State of Montana. John O'Connor, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma, for Amicus State of Oklahoma. Ken Paxton, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas, for Amicus State of Texas. Patrick Morrisey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Amicus State of West Virginia. Mark Brnovich, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona, for Amicus State of Arizona. Christopher M. Carr, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF GEORGIA, Atlanta, Georgia, for Amicus State of Georgia. Daniel Cameron, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY, Frankfort, Kentucky, for Amicus Commonwealth of Kentucky. Eric Schmitt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MISSOURI, Jefferson City, Missouri, for Amicus State of Missouri. Douglas J. Peterson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amicus State of Nebraska. Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus State of South Carolina. Sean D. Reyes, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF UTAH, Salt Lake City, Utah, for Amicus State of Utah. Daniel R. Suhr, Jeffrey D. Jennings, LIBERTY JUSTICE CENTER, Chicago, Illinois, for Amicus Liberty Justice Center. Lee C. Cheng, ASIAN AMERICAN LEGAL FOUNDATION, San Francisco, California; Gordon M. Fauth, Jr., LITIGATION LAW GROUP, Berkeley, California, for Amici The Asian American Coalition for Education and The Asian American Legal Foundation. Shawnna M. Yashar, Dunn Loring, Virginia, for Amici Fairfax County Parents Association and Fairfax County Association for the Gifted.

———————

KING, Circuit Judge:

In this appeal, we are called upon to address a single question: whether the admissions policy (hereinafter the "challenged admissions policy," or the "policy") adopted by Virginia's Fairfax County School Board (the "Board") in 2020 for use at Thomas Jefferson High School for Science & Technology ("TJ") purposefully discriminates against Asian American students, in contravention of the Fourteenth Amendment's Equal Protection Clause. In March 2021, the Coalition for TJ (the "Coalition") — an advocacy organization of Fairfax County public school parents — commenced this litigation against the Board in the Eastern District of Virginia, seeking to have the challenged admissions policy invalidated as unconstitutional.

In February 2022, following the submission by the parties of cross-motions for summary judgment, the district court ruled that the challenged admissions policy violates the Fourteenth Amendment's guarantee of equal protection. More specifically, the court concluded that the policy exacts a disparate impact on Asian American applicants to TJ, that it was adopted by the Board with invidious discriminatory intent, and that it fails to satisfy strict scrutiny review. On that basis, the court awarded summary judgment to the Coalition, denied the Board's summary judgment motion, and enjoined the Board from any further use of the policy.

The Board thereafter sought a stay in this Court of the district court's order pending appeal, which we granted in March 2022. After thorough consideration of the record and the appellate contentions, we are satisfied that the challenged admissions policy does not disparately impact Asian American students and that the Coalition cannot establish that the

Board adopted its race-neutral policy with any discriminatory intent. Moreover, we are satisfied that the policy passes constitutional muster under a rational basis standard of review. Accordingly, it is the Board — not the Coalition — that is entitled to summary judgment on the Equal Protection claim. As explained herein, we reverse the judgment of the district court and remand for entry of summary judgment in favor of the Board.

## I.

## A.

### 1.

Consistently ranked among the nation's best public high schools, TJ is a highly selective magnet school located in Alexandria, Virginia. TJ is one of Virginia's 19 so-called "Academic-Year Governor's Schools" — specialized schools that focus on advanced studies and require students to apply for admission — and it is operated by Fairfax County Public Schools ("FCPS"). *See* J.A. 30.[1] The majority of TJ's students reside in Fairfax County, but TJ also accepts applications from students in nearby Arlington, Loudoun, and Prince William counties, and from the City of Falls Church.

TJ's historically rigorous admissions standards are established by the Board, a 12-member elected body that oversees the public schools of Fairfax County. Prior to the Board's 2020 adoption of the challenged admissions policy, applicants seeking to enroll at

---

[1] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

TJ in the ninth grade were required to reside in one of the five above-mentioned participating school divisions; to possess a minimum grade point average of 3.0; and to have taken a course in algebra.  Following payment of a $100 application fee, the eligible students were administered three standardized tests.  Applicants who achieved certain rankings on the standardized tests would proceed to a "semi-finalist" selection round, wherein they would sit for an additional examination comprised of various writing prompts and a problem-solving essay.  *See* J.A. 41.  The semi-finalists were also to submit two teacher recommendations.  At the conclusion of the process, students were selected from the semi-finalist group based on an "holistic review" of their application materials.  *Id.* at 42.

The pre-2020 admissions process at TJ tended to produce incoming classes that were drawn principally from a limited group of "feeder" middle schools in Fairfax County.  Those TJ classes also included very few low-income students, few English-language learners, few students receiving free or reduced-price meals, few special education students, and just a few Black, Hispanic, or multiracial students.  In an effort to advance TJ's student body diversity by "improv[ing] the potential for underrepresented students to gain admissions," the Board made numerous revisions to TJ's admissions system between 2010 and 2020.  *See* J.A. 445.  Yet the Board's adjustments failed to produce any "significant impact on the diversity of the applicants or admitted students" at TJ.  *Id.*  In 2019, for example, 71.5% of TJ's student body was comprised of Asian American students, and white students accounted for another 19.5%.  *Id.* at 587.

2.

In May 2020, the FCPS staff presented the Board with a series of potential revisions to TJ's admissions process that were designed to "promote diversity in many forms." *See* J.A. 779. FCPS's proposed "admissions pathways" sought to "maintain[] a high level of rigor" in the application process while also "providing fair and equitable access to all students who have the potential to succeed at TJ," specifically by increasing the number of offers extended to students at middle schools that were historically poorly represented at TJ; to low-income and special education students; and to students engaged in community service and in school leadership activities. *Id.* at 780-84.

Shortly after the Board's May 2020 consideration of the proposed "admissions pathways," FCPS published the admissions statistics for TJ's incoming class of 2024.[2] That data indicated that the number of Black students admitted to TJ's incoming freshman class was "too small for reporting" — a designation meaning that "10 or fewer" Black students had been extended offers of admission to TJ's class of 2024. *See* J.A. 561-63. Following the release of those admissions statistics as well as the highly-publicized police killing of George Floyd in Minnesota, TJ's Principal, Ms. Ann Bonitatibus, wrote in a June 2020 message to the school's students and families that "recent events in our nation with black citizens facing death and continued injustices remind us that we each have a responsibility to our community to speak up and take actions that counter racism and

---

[2] We observe that the "class of 2024" refers to those students who are expected to graduate from TJ in 2024. References herein to the "class of 2025" are consistent therewith.

9

discrimination in our society." *Id.* at 516. Principal Bonitatibus went on to observe that the TJ community did "not reflect the racial composition in FCPS," and her message called for adopting a curriculum geared toward "prepar[ing] TJ graduates for a truly diverse and culturally responsive world." *Id.* at 517.

Also in June 2020, the Board received correspondence from then-Virginia Secretary of Education Atif Qarni and state Senator Scott Surovell calling attention to a recently enacted state budget that required each Academic-Year Governor's School to "set diversity goals for its student body," to "develop a plan to meet said goals," and to "submit a report to the Governor by October 1 of each year on its goals." *See* J.A. 789, 795. Qarni and Surovell expressed concern that Virginia's Governor's Schools — and TJ in particular — had historically admitted few underserved and disadvantaged students. Following receipt of those comments, members of the Board likewise voiced their frustrations with the TJ student body's lack of diversity. The Board's Chair, Karen Corbett Sanders, stated that the Board and FCPS "needed to be explicit in how we are going to address the underrepresentation" of Black and Hispanic students at TJ, and Board member Karen Keys-Gamarra insisted at a June meeting that, "in looking at what has happened to George Floyd, we know that our shortcomings are far too great . . . so we must recognize the . . . unacceptable numbers of African Americans that have been accepted to TJ." *Id.* at 259, 426.

Later in the Summer of 2020, Education Secretary Qarni convened a statewide task force intended to address the Commonwealth's concerns with admissions standards and

barriers to access at the Governor's Schools.  Various members of the Board, FCPS staff members, and FCPS Superintendent Dr. Scott Braband attended those task force meetings.

The plaintiff Coalition, meanwhile, was organized during the summer by Asian American parents with children who had either applied to or planned to apply to TJ.  The Coalition's members were primarily concerned with potential modifications to the TJ admissions process, and charged that the Commonwealth's task force possessed an "Anti-Asian" motivation.  *See* J.A. 800.  In an August 2020 email responding to the Coalition's early criticisms, Secretary Qarni — who explained his perspective as "an Asian American who has faced racism and understand[s] the challenges of marginalized groups" — rejected the Coalition's "outrageous claims" and emphasized TJ's "huge problem" with student diversity and inclusion matters, including its share of "children from Asian working-class families." *Id.*

3.

At a public "work session" conducted by the Board on September 15, 2020, Superintendent Braband proposed a set of modifications to TJ's admissions process that he termed the "merit lottery proposal." *See* J.A. 291.  Dr. Braband's merit lottery proposal advocated for a "comprehensive approach" to admissions that would "enhance diversity and inclusion at TJ," urging that TJ "should reflect the diversity of FCPS, the community and Northern Virginia." *Id.* at 293.  Pursuant to the merit lottery proposal, the application fee, standardized test, problem-solving essay, and teacher recommendation components would be removed from TJ's admissions process, while the minimum required grade point average would increase from 3.0 to 3.5.  The lottery proposal also would have assigned

11

applicants to regional "lottery pathways" based on their residence. *Id.* at 303-04. Those "pathways" would receive an equal number of seats in each incoming TJ class, and qualified students would be randomly selected from each regional group. Dr. Braband's presentation included graphs projecting the merit lottery proposal's impact on TJ's racial demographics, its share of economically disadvantaged students, and the proportion of English-language learners expected in the incoming freshman class.

Following discussion of the merit lottery proposal, the Board requested that Dr. Braband engage in "community outreach," evaluate a "school-based . . . approach in place of one based on region," and bring a revised admissions proposal to the Board's October 2020 meeting. *See* J.A. 883-84. The merit lottery proposal proved to be controversial in the TJ community, and the Coalition vocally opposed it, issuing a September 23, 2020, press release contending that "[a]ll racial minorities will lose in the new lottery system." *Id.* at 886.[3]

On October 6, 2020, Dr. Braband presented a "revised merit lottery proposal" to the Board. *See* J.A. 520. His revised proposal retained the merit lottery proposal's use of

---

[3] After the issuance of its September 2020 press release, the Coalition proposed its own "Second-Look Semifinalist" admissions policy. *See* J.A. 892. Like the merit lottery proposal, the Coalition's plan sought to address geographic diversity among the community's middle schools and would have a student's "underrepresented background" be "evaluated favorably and weighted" as part of an "holistic" evaluation. *Id.* at 892, 895. The Coalition maintained that its proposal would "materially increase both the geographic and the socioeconomic diversity at TJ" and "would result in disproportionately more Black and more Hispanic students" receiving offers of admission. *Id.* at 730, 894. That is, the Coalition explicitly suggested what it now labels and opposes as a "facially neutral proxy" for racial discrimination against Asian American students. *See* Br. of Appellee 13; *infra* note 7.

regional, merit-based "pathways" for all but 100 of the seats in each incoming class at TJ. Those 100 seats would be filled first by the overall "highest-evaluated" applicants, who would be identified by "a holistic review of their application." *Id.* at 530. The "holistic review" was to be based on a "portrait sheet" describing the applicant's skills; a problem-solving essay; and four "Experience Factors," including the applicant's special education status, eligibility for free or reduced-price meals, status as an English-language learner, and attendance at a historically underrepresented public middle school. *Id.* at 528. Dr. Braband also proposed a variety of "targeted outreach" methods to engage with the public about the revised proposal, including offering presentations to eighth grade students and parents. *Id.* at 535. The Board, however, took no direct action on the revised merit lottery proposal. It instead voted to remove the $100 application fee and the standardized tests from TJ's admissions process, and asked Dr. Braband to develop a non-lottery admissions plan for the Board's consideration.

Following additional Board meetings throughout October 2020 at which public comments on the proposed TJ admissions policies were received, Dr. Braband prepared and presented a new, standalone "holistic review" proposal to the Board. *See* J.A. 1100. Under that proposal, a certain number of applicant seats would be allocated to each of TJ's five participating school divisions, and all applicants within those divisions would then be assessed based on the aforementioned student "portrait sheet," the problem-solving essay, and the four "Experience Factors." Relevant here, unlike his presentation describing the original merit lottery proposal, Dr. Braband's presentation of the "holistic review" proposal

13

made no projections of the proposed policy's impact on TJ's student demographics, whether racial or otherwise.

The Board met again on December 17, 2020, at which time it heard additional comments from community members regarding TJ's admissions process. During that meeting, the Board rejected Dr. Braband's merit lottery proposal by a vote of 8-4. It ultimately voted 10-1-1, however, to adopt a modified version of the new "holistic review" proposal — that being the challenged admissions policy at issue in this appeal. Under the Board's adopted policy, which was used to select TJ's class of 2025, each public middle school within TJ's participating school divisions is allocated a number of seats in the incoming freshman class equal to 1.5% of that school's eighth grade student population. Within each middle school, prospective students are evaluated on the basis of grade point average, the "portrait sheet," the problem-solving essay, and the "Experience Factors." After each middle school's allocated seats are filled, all remaining applicants — regardless of their attending middle school, and including private- and home-school students — compete under the same criteria for the roughly 100 remaining seats.

Importantly, in adopting the challenged admissions policy, the Board resolved that "[t]he admission process must use only race-neutral methods that do not seek to achieve any specific racial or ethnic mix, balance or targets." *See* J.A. 2224. That race-neutral mandate was subsequently codified in regulations promulgated by Dr. Braband to implement the policy. The policy thus provides in part that "[c]andidate name, race, ethnicity, or sex collected on the application form will not be provided to admissions

14

evaluators.  Each applicant will be identified to the evaluators only by an applicant number." *Id.* at 697.

4.

With the challenged admissions policy in place by the Spring of 2021, the number of applications for TJ's class of 2025 increased by nearly 1,000 students over the prior application cycle.  The mean grade point average among those applicants was higher than it had been in five years and, in terms of demographics, the class of 2025 included markedly more low-income students, English-language learners, and girls than had prior classes at TJ.  Notably, for the first time in more than a decade, all 28 middle schools in Fairfax County sent students to TJ in 2021.  By contrast, in 2020, eight of the County's middle schools had received zero offers of admission to TJ.

As to the challenged admissions policy's impact on Asian American students, while slightly less than half of TJ's applicants in 2021 identified as Asian American (specifically, 48.59%), well over half of the offers extended (54.36%) went to those students.  That share of offers far outpaced the proportion of seats awarded to the other racial and ethnic groups represented in the applicant pool.  Specifically, Black students received 7.9% of offers, and comprised 10% of applicants; Hispanic students were given 11.27% of offers, and made up 10.95% of applicants; white students received 22.36% of offers while representing 23.86% of applicants; and "multiracial/other" students received 4.91% of offers while making up 6.6% of applicants.  *See* J.A. 44.  As the Coalition emphasizes in these proceedings, the 54.36% of offers extended to Asian American students in 2021 was somewhat lower than it had been in the previous five application cycles, when the share of

15

offers awarded to those students ranged from 65% to 75%. Nevertheless, in the 2021 application cycle, Asian American students attending middle schools historically underrepresented at TJ saw a sixfold increase in offers, and the number of low-income Asian American admittees to TJ increased to 51 — from a mere *one* in 2020.

B.

1.

In March 2021, as TJ's class of 2025 was being assembled, the Coalition initiated this civil action against the Board in the Eastern District of Virginia. *See Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, No. 1:21-cv-00296 (E.D. Va. Mar. 25, 2022), ECF No. 1 (the "Complaint").[4] The Complaint pursues a single claim under 42 U.S.C. § 1983, alleging that the challenged admissions policy runs afoul of the Equal Protection Clause. Seeking injunctive and declaratory relief, the Complaint specifically alleges that, although the policy is facially race-neutral, the Board adopted it with a racially discriminatory purpose, insofar as the Board "specifically intended to reduce the percentage of Asian-American students who enroll in TJ," and "intended [for the policy] to act as a proxy in order to racially balance TJ." *Id.* at 1, 23. Accordingly, the Complaint alleges that, under the Equal Protection framework established by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and *Personnel*

---

[4] In its Complaint, the Coalition named Dr. Braband as a defendant, in his official capacity as Superintendent. The district court dismissed Dr. Braband from the proceedings on May 26, 2021, leaving the Board as the only defendant.

*Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), the challenged admissions policy is subject to, and necessarily fails, strict scrutiny review.

On December 3, 2021, following the district court's denial of the Coalition's request for a preliminary injunction and the Board's motion to dismiss the Complaint, the parties filed cross-motions for summary judgment. For its part, the Coalition maintained that the challenged admissions policy imposes a "significant disparate impact" on Asian American applicants to TJ, principally because a "before-and-after admissions data comparison" reveals that the proportion of Asian American students offered admission to TJ "plummeted" following the policy's 2020 adoption. *See Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, No. 1:21-cv-00296, at 14 (E.D. Va. Dec. 3, 2021), ECF No. 98. The Coalition further asserted that the Board's adoption of the policy was "motivated by an impermissible racial purpose," identifying as support alleged procedural irregularities in the Board's process and comments made by individual Board members. *Id.* at 19. Finally, the Coalition reiterated its position that the policy cannot survive strict scrutiny review, rendering summary judgment on its behalf appropriate.

The Board, meanwhile, argued that the Coalition is unable to maintain a claim of intentional discrimination against Asian American students, given that the Coalition's favored before-and-after data comparison does not prove a cognizable "disparate impact." It also emphasized that there is no evidence that the Board adopted the challenged admissions policy in order to intentionally reduce the number of Asian American students enrolled at TJ.

17

2.

By its memorandum opinion and order of February 25, 2022, the district court granted the Coalition's summary judgment motion, denied the Board's motion, and enjoined the Board from any further use of the challenged admissions policy. *See Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, No. 1:21-cv-00296 (E.D. Va. Feb. 25, 2022), ECF Nos. 143 & 144 (the "Summary Judgment Opinion" and the "Summary Judgment Order," respectively). The court first ruled that the policy "has had, and will have, a substantial disparate impact on Asian-American applicants." *See* Summary Judgment Opinion 14. Citing our decision in *North Carolina State Conference of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), the court related that "[t]he proper method for determining the impact of the official action is a simple before-and-after comparison." *Id.* at 14-15 (internal quotation marks omitted). And with that year-over-year metric in mind, the court concluded that the proportional decline in offers extended to Asian American students after the policy's adoption "tells much of the story." *Id.* at 14. Additionally, the court decided that the policy's 1.5% seat set-aside for each middle school's eighth grade class, plus the "Experience Factor" weighing an applicant's attendance at a historically underrepresented public middle school, combined to "deprive[] [Asian American applicants] of a level playing field in competing" for seats at TJ. *Id.* at 16.

Moving on, the district court concluded that the Board sought to achieve a "racial balance" at TJ by increasing the school's representation of Black and Hispanic students at the expense of Asian American students, and that the Board's actions in that regard revealed an invidious discriminatory intent. *See* Summary Judgment Opinion 24. The

court relied on the 2020 Virginia budget's requirement for Governor's Schools to report annually on "diversity goals" as a "triggering event" for the Board's "racially motivated" decision to refine the TJ admissions process, and resolved that the Board's "discussion of TJ admissions changes was infected with talk of racial balancing from its inception." *Id.* at 17, 25. The court focused extensively on what it called the Board's "shoddy" and "unreasonably hurried" process and a "lack of public engagement" during its consideration of the various admissions proposals. *Id.* at 19. And the court concluded that the Board's "requests for and consideration of racial data" — in the form of Dr. Braband's September 2020 presentation of the rejected merit lottery proposal and its projections of that proposal's effects on TJ's racial and economic demographics — demonstrated that "diversity primarily meant racial diversity." *Id.* at 25, 27. Ultimately, the court based its ruling that "the Board acted at least in part because of . . . the policy's adverse effects upon" Asian American students on its separate conclusion that "the Board's policy was designed to increase Black and Hispanic enrollment, which would, by necessity, decrease the representation of Asian-Americans at TJ." *Id.* at 27-28.

After concluding that the challenged admissions policy is subject to — and fails — strict scrutiny review, the district court awarded summary judgment to the Coalition, denying the Board's cross-motion for summary judgment in so ruling. The Board sought a stay of the Summary Judgment Order pending appeal, which the district court denied on March 11, 2022. On March 14, the Board noticed this appeal, and on March 18 the Board requested a stay pending appeal from this Court. We granted a stay of the Summary

Judgment Order on March 31, 2022, and at the same time expedited the proceedings.  We possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

On appeal, the Board contends that the undisputed facts preclude the Coalition from proving its Equal Protection claim, in that the challenged admissions policy levies no racially disparate impact on Asian American students and the Board possessed no intent to strike a "racial balance" — or to otherwise target Asian American students — in its adoption of the policy.  Accordingly, the Board maintains that we should reverse the district court's judgment and remand for judgment to be entered in the Board's favor.

We review an award of summary judgment de novo.  *See King v. Rumsfeld*, 328 F.3d 145, 148 (4th Cir. 2003).  Where, as here, "cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure."  *See Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021) (internal quotation marks omitted).  Pursuant to that standard, summary judgment is appropriate when — viewing the facts in the light most favorable to the nonmoving party — the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)).  Critically, the nonmoving party is obliged to "set out specific facts showing a genuine issue for trial," *id.* at 180, and, in the event of "a complete failure of proof concerning an essential element of the nonmoving party's case," summary judgment will serve to "isolate and dispose of

20

factually unsupported claims or defenses," *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

III.

Public education is among the domains "where states historically have been sovereign," *see United States v. Lopez*, 514 U.S. 549, 564 (1995), and "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools," *see Milliken v. Bradley*, 418 U.S. 717, 741 (1974). Indeed, "[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint." *See Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). Nevertheless, the actions of public school boards and administrators may still be subject to constitutional inquiry.

In that regard, the Fourteenth Amendment's Equal Protection Clause bars "any State" from "deny[ing] to any person within its jurisdiction the equal protection of the laws." *See* U.S. Const. amend. XIV, § 1. The Supreme Court has explained that the "central purpose" of the Equal Protection Clause is to "prevent the States from purposefully discriminating between individuals on the basis of race." *See Shaw v. Reno*, 509 U.S. 630, 642 (1993). Yet "[t]he equal protection guarantee of the Fourteenth Amendment does not take from the States all power of classification" — indeed, so long as "the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern." *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271-72 (1979). Purposeful racial discrimination may occur where state action expressly classifies individuals on the basis of their race, *see Grutter v. Bollinger*, 539 U.S.

21

306, 326-27 (2003); where a facially race-neutral policy "impartial in appearance" is in fact applied unevenly based on race, *see Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886); or where a race-neutral policy which is applied evenhandedly results in a racially disproportionate impact and was motivated by discriminatory intent, *see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977); *see also Washington v. Davis*, 426 U.S. 229, 242 (1976).

Thus, to demonstrate that an evenhanded, facially race-neutral policy like that challenged here is constitutionally suspect, the plaintiff pursuing an Equal Protection challenge must show (1) that the policy exacts a disproportionate impact on a certain racial group, and (2) that such impact is traceable to an "invidious" discriminatory intent. *See Arlington Heights*, 429 U.S. at 264-65; *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 302 (4th Cir. 2020); *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 543-44 (3d Cir. 2011). Only then will such a policy be subject to strict scrutiny review, in which event the state entity defending the challenged policy bears the burden of showing that its policy is "narrowly tailored to serve a compelling interest." *See Hunt v. Cromartie*, 526 U.S. 541, 543, 546 (1999). Otherwise, if the plaintiff is unable to demonstrate purposeful racial discrimination, the rational basis standard of review applies, where the plaintiff must establish that the challenged policy is not "rationally related to legitimate government interests." *See Feeney*, 442 U.S. at 272; *Doe*, 665 F.3d at 544, 556.

Against that backdrop, we are satisfied that the Board's adoption of the challenged admissions policy fully comports with the Fourteenth Amendment's demand of equal protection under the law. On this record, and with application of the proper legal standard,

the policy visits no racially disparate impact on Asian American students.  Indeed, those students have had greater success in securing admission to TJ under the policy than students from any other racial or ethnic group.  Moreover, the Coalition fails to identify any evidence suggesting that the Board adopted the policy "at least in part because of" some calculated adverse effect on Asian American students — that is, the Coalition makes no showing of discriminatory intent by the Board.  *See Feeney*, 442 U.S. at 277, 279.  Finally, the challenged admissions policy faces no obstacle under rational basis review, and so the Coalition has failed to meet its burden with respect to an Equal Protection claim.  In these circumstances, we are constrained to reverse the district court's judgment and remand for entry of summary judgment in favor of the Board.

A.

1.

We begin with the question of whether the challenged admissions policy imposes any "racially disproportionate" or "disparate" impact on Asian American students.  *See Arlington Heights*, 429 U.S. at 265.  To establish such an effect — which serves as an "important starting point" for the ultimate inquiry as to "invidious racial discrimination" — an Equal Protection plaintiff must prove that the challenged state action "bears more heavily on one race than another."  *Id.* at 265-66 (quoting *Davis*, 426 U.S. at 242).  In this situation, the district court based its determination that the policy "has had, and will have, a substantial disparate impact on Asian-American applicants to TJ" on the fact that "a simple before-and-after comparison" reveals that "the number and proportion of Asian-American students offered admission to TJ fell following the challenged changes."  *See*

23

Summary Judgment Opinion 14-15.  In other words, the court focused *solely* on how Asian American applicants fared in attaining offers of admission prior to and following the policy's adoption — it paid no mind to how *other* racial or ethnic groups made out under the policy.  The court's analysis went fatally awry in that regard.

The Coalition defends the district court's flawed calculus on appeal, insisting that the Supreme Court's decision in *Arlington Heights* compels such a narrow comparison between the old and the new in searching for a disparate impact.  *See* Br. of Appellee 25. *Arlington Heights*, however, mandates nothing of the sort.  Nor does our 2016 decision in *North Carolina State Conference of the NAACP v. McCrory*, which the district court erroneously relied on as sanctioning its chosen before-and-after evaluation.

To the contrary, *McCrory* — which weighed an Equal Protection challenge to North Carolina election law provisions — declined to apply an election-to-election voter turnout comparison in assessing alleged disproportionate impacts on Black voters.  *See* 831 F.3d 204, 230-32 (4th Cir. 2016) (concluding that the district court "erred in suggesting that Plaintiffs had to prove that the challenged provisions prevented African Americans from voting at the same levels they had in the past," in part because the relevant elections were "highly sensitive to factors likely to vary from election to election").  And *McCrory*, to be certain, is no outlier among our sister circuits in rejecting a year-over-year approach to a disparate impact analysis.  *See, e.g.*, *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 46 (1st Cir. 2021) (assessing an Equal Protection challenge to a Boston public school admissions policy, and concluding that "comparing the projected admissions under the Plan to prior admissions under the predecessor plan"

was not "apt for purposes of determining adverse disparate impact"); *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 361-62 (5th Cir. 2015) (disapproving a before-and-after approach to disparate impact in an Equal Protection challenge to a school redistricting plan because of "difficulty isolating the operative factor").

Ultimately, the Coalition identifies no precedent standing for the proposition that a particular racial or ethnic group's performance under a prior policy is "the proper baseline for comparison" in a disparate impact inquiry concerning a newly enacted policy. *See Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, No. 22-1280, at 7 (4th Cir. Mar. 31, 2022), ECF No. 27 (Heytens, J., concurring). And that should come as no surprise, because an assessment of the attainments of one group in isolation will not answer the question of whether a challenged policy "bears more heavily *on one race than another*." *See Arlington Heights*, 429 U.S. at 266 (emphasis added). Moreover, as the Board convincingly explains, it would make little sense for us to use a prior government policy as the "proper baseline" for scrutinizing a replacement version of the same. That approach would simply turn "the previous status quo into an immutable quota," thereby opening a new policy that might impact a public institution's racial demographics — even if by wholly neutral means — to a constitutional attack. *See* Br. of Appellant 25.

The district court thus erred in applying a strictly temporal method for assessing racially disparate impact. The proper metric in these circumstances requires, first, an evaluation of a given racial or ethnic group's share of the number of applications to TJ versus that group's share of the offers extended — in other words, the group's "success rate" in gaining admission to TJ under the challenged admissions policy. That rate of

success, in turn, must then be compared to how separate, otherwise similarly situated groups fared in securing offers of admission. *See McCrory*, 831 F.3d at 231, 233 (concluding that proper method for assessing disparate impact under *Arlington Heights* was whether, relative to other racial groups, "African Americans disproportionately used" voting mechanisms removed by challenged election laws and "disproportionately lacked" required voter identification); *see also Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650-51 (1989) (explaining that, in an employment discrimination action, the "proper basis" for inquiring into disparate impact was comparing "the racial composition of the qualified persons in the labor market and the persons holding at-issue jobs"); *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977) (same). The Coalition, in sum, was obliged to show that, under the challenged admissions policy, Asian American students face proportionally more difficulty in securing admission to TJ than do students from other racial or ethnic groups. Only then could it be evident whether the policy "bears more heavily on one race than another." *See Arlington Heights*, 429 U.S. at 266. Put most simply, searching for a racially "disproportionate" impact necessitates a relative inquiry among racial groups, not a simple appraisal of one group's performance over time.

2.

When the proper disparate impact analysis is applied in this situation, it is clear that Asian American applicants to TJ suffer from no such detriment. The admissions data for TJ's class of 2025, the first class selected using the challenged admissions policy, tells much of — if not all of — the story. In 2021, Asian American students accounted for 48.59% of the applications to TJ's class of 2025, but actually secured 54.36% of the

26

admission offers made for that class. By contrast, 10% of the TJ applicants in 2021 identified as Black, while only 7.9% of offers went to Black students; Hispanic students comprised 10.95% of the applicant pool and received 11.27% of offers; white students represented 23.86% of applicants and received 22.36% of offers; and 6.6% of applicants were "multiracial/other" students, whereas only 4.91% of the offers extended went to those students. *See* J.A. 44. Asian American applicants were thus the only racial or ethnic group to receive offers notably in excess of its share of the applicant pool in 2021, producing the highest admissions "success rate" of any such group. And we observe that the Coalition's preferred use of year-over-year admissions statistics for assessing disparate impact does not paint a grim picture for Asian American students. After the challenged admission policy's adoption, low-income Asian American students, as well as Asian American students attending middle schools theretofore poorly represented at TJ, saw far more offers of admission to TJ than they had in earlier years.

The district court also resolved that the challenged admissions policy's reservation of seats for each middle school equivalent to 1.5% of the specific middle school's eighth grade class — and its "Experience Factor" that takes stock of an applicant's attendance at a historically underrepresented middle school — somehow contribute to the policy's perceived adverse blow to Asian American applicants. But neither the Summary Judgment Opinion nor the Coalition on appeal have meaningfully explained how Asian American students are differently situated from others when it comes to the operation of those two

27

features of the policy.[5]  In any event — and critically for purposes of summary judgment — an application of elementary arithmetic shows that Asian American students, as a class, experience no material disadvantage under the policy's functioning.  In fact, they do better in securing admission to TJ than students from any other racial or ethnic group.

That being so, the Coalition's core assertion that the challenged admissions policy disproportionately impairs Asian American students' ability to enroll and study at TJ is without merit.  Because the Coalition cannot establish that essential element of its Equal Protection claim, the claim fails as a matter of law and the Board is entitled to summary judgment for that reason.  *See Arlington Heights*, 429 U.S. at 264-65; *Palmer v. Thompson*, 403 U.S. 217, 224 (1971) ("[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it. . . . If the law is struck down for this reason, rather than because of its facial content or effect, it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons."); *Raymond*, 981 F.3d at 302 (explaining that, in order to prevail on an Equal Protection challenge to a voter identification law, plaintiffs had to prove that

---

[5] The Coalition, by way of example, urges that the 1.5% seat allocation is "designed to limit access to TJ" for students attending six Fairfax County "feeder" middle schools, and that a 2021 drop in the number of Asian American students attending those schools who were offered admission to TJ "was by design."  *See* Br. of Appellee 29.  Yet, as the Board points out, the Asian American percentage of the student bodies at those "feeder" schools is roughly proportional to that of other County middle schools.  It is thus far from clear how the 1.5% seat allocation could disproportionately impact the fortunes of Asian American students, whether "by design" or otherwise.

the measure "was passed with discriminatory intent and has an actual discriminatory impact").

B.

Though we recognize that we could end our analysis of the Coalition's Equal Protection Claim at this juncture, we are also satisfied that, if the challenged admissions policy actually imposed a disparate impact on Asian American applicants to TJ, the undisputed facts would preclude the Coalition from proving that the impact was driven by an invidious discriminatory intent. The evidence relied on by the Coalition in furtherance of its discriminatory intent contention is far too sparse to permit an inference of nefarious design and, crucially, the reasoning applied by the district court — and advanced by the Coalition on appeal — to deduce such an intent is proscribed by well-established Equal Protection doctrine. Consequently, the discriminatory intent aspect of the Coalition's Equal Protection claim must also fail.

1.

As explained heretofore, a racially disproportionate impact, while necessary to an Equal Protection claim, is not alone sufficient to render a race-neutral state law or policy unconstitutional — impact, that is, "is not the sole touchstone of an invidious racial discrimination." *See Washington v. Davis*, 426 U.S. 229, 242 (1976). Rather, proof of a racially discriminatory intent is also required. *See Arlington Heights*, 429 U.S. at 265-66. In that regard, an Equal Protection plaintiff need not establish that the challenged policy "rested solely on discriminatory purposes," or even that "a particular purpose was the 'dominant' or 'primary' one." *Id.* at 265. But if a discriminatory purpose "has been a

29

motivating factor in the decision . . . judicial deference is no longer justified." *Id.* at 265-66.

Determining whether such a "motivating factor" was at play calls for "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *See Arlington Heights*, 429 U.S. at 266. Absent a policy that is "unexplainable on grounds other than race," the reviewing courts are entitled to look to, inter alia, the "historical background" of the challenged policy; the "specific sequence of events leading up to" the policy's enactment; any "departures from the normal procedural sequence"; and the "legislative or administrative history" pertaining to the policy. *Id.* at 266-68. Ultimately, proving discriminatory intent requires more than sheer "awareness of consequences." *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). The "decisionmaker" — here, the Board — must instead be shown to have "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* Stated differently, that a given law or policy may foreseeably have some adverse impact on a particular racial or ethnic group is not sufficient to demonstrate invidious discriminatory intent — the "decisionmaker" must set out with that very purpose in mind. *Id.*

## 2.

The Complaint alleges that "[o]verhwelming public evidence" demonstrates that the challenged admissions policy was "adopted with the purpose of disadvantaging Asian-American students" and that the policy specifically seeks "to reduce the percentage of Asian-American students who enroll in TJ." *See* Complaint 1-2. But the Coalition has

never identified any direct evidence of discriminatory intent.  To the contrary, the record is devoid of any statements by Board members, meeting minutes, or other documentation showing that the policy was adopted "because of" a specific intent to reduce the number of Asian American students at TJ or to otherwise bring hardship to bear on those students. *See Feeney*, 442 U.S. at 279.  The policy itself stands directly and forcibly in the way of such a finding.  Not only is the policy facially race-neutral, it is fully race-*blind*, providing that "[t]he admission process must use only race-neutral methods" and that "[c]andidate name, race, ethnicity, or sex . . . will not be provided to admissions evaluators."  *See* J.A. 697, 2224.  The Board's adoption of the policy is therefore amply "explainable on grounds other than race."  *See Arlington Heights*, 429 U.S. at 266.  In that circumstance, the district court could only claim to infer discriminatory intent from the Board's supposed "goal of achieving racial balance" at TJ, and its alleged use of "proxies that disproportionately burden Asian-American students."  *See* Summary Judgment Opinion 12.

a.

The facts assembled by the district court fall well short of supporting its conclusion that the Board was motivated by impermissible "racial balancing" when it adopted the challenged admissions policy, and the Coalition's appellate argument to that effect faces the same dilemma.  The Supreme Court has defined "racial balancing" as seeking to obtain in some cohort a "specified percentage of a particular group merely because of its race or ethnic origin," and the Court has dismissed that practice as "patently unconstitutional."  *See Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013).  The challenged admissions

31

policy, however, contains no racial quotas, goals, or other standards that would make for a straightforward case of "racial balancing."[6]

Instead, as evidence of the Board's purported efforts to admit "specified percentage[s]" of students from certain racial groups in order to "balance" TJ's racial demographics, the district court turned to what it called the Board's "remarkably rushed and shoddy process" in adopting the challenged admissions policy; its "lack of public engagement and transparency"; statements and text messages from individual Board members regarding TJ's admissions standards; and Dr. Braband's "consideration of racial data" in his presentation of the rejected merit lottery proposal. *See* Summary Judgment Opinion 19-20, 27. But neither individually nor collectively do those matters reveal any intent to adjust TJ's student population along racial lines — let alone to scale down its share of Asian American students.

The district court's characterization of the Board's "process" as "rushed" and "unreasonably hurried" makes little sense. *See* Summary Judgment Opinion 19. The Board studied TJ's admissions process for more than four months, not to mention its work with the FCPS staff and Virginia's education department in the Summer of 2020. And, in any event, nothing about the Board's "procedural sequence" reveals "that improper

---

[6] Notably, if the Board actually sought to "balance" the student population at TJ, it did a terrible job. For example, in the Fall of 2019, Asian American students comprised some 19.5% of Fairfax County's student population, and Hispanic students made up another 26.8%; but the Asian American students received 54.36% of TJ's offers of admission in 2021, and the Hispanic students received only 11.27% of the offers.

purposes [were] playing a role." *See Arlington Heights*, 429 U.S. at 267. The court's assertion that the Board "scrambled to meet a perceived deadline . . . with race in mind" regarding the Virginia state budget's request for annual October reports on "diversity goals" is not persuasive at all. *See* Summary Judgment Opinion 17, 19. The FCPS staff actually did submit such a report on October 9, 2020, and the Board then continued to study TJ's admissions standards for another two months.

As to the matter of "public engagement and transparency," the Board clearly engaged with the public on a grand scale — the various proposed admissions policies were considered at public meetings, at which public comments were received, and the Board's proposals were presented to community members through "targeted outreach" methods. *See* J.A. 535. The comments of individual Board members that are used by the district court and the Coalition as evidence of an intent to strike a "racial balance" at TJ, meanwhile, reveal — at most — individual aspirations to improve student diversity. Moreover, many of the statements identified by the court were made in October 2020, during the period when Dr. Braband's rejected merit lottery proposal was under consideration. Finally, the court's focus on Dr. Braband's "racial data" moves its "balancing" accusation no further: it ignores that (1) Dr. Braband's September 2020 presentation of the rejected merit lottery proposal assessed that proposal's impact on TJ's representation of low-income students and English-language learners, not just its racial demographics, and (2) the merit lottery proposal was specifically voted down by the Board in December 2020. In sum, nothing about the Board's adoption of the challenged

33

admissions policy exposes some covert effort to "balance" the racial makeup of TJ's student body.

b.

Thus lacking genuine evidentiary support for its claim that the Board adopted the challenged admissions policy "because of" a desire to "racially balance" TJ and to shrink the school's Asian American student population, the Coalition embraces the district court's ultimate, "Hail-Mary" line of reasoning:  that the Board must have discriminated against Asian American students "by proxy." *See* Br. of Appellee 15; Summary Judgment Opinion 12.  Specifically, that proposition maintains that the Board sought to increase the number of Black and Hispanic students enrolled at TJ and, in the "zero-sum environment" of school admissions where the number of available seats is finite, that effort naturally led to fewer overall Asian American students enrolling at TJ — thus exposing a discriminatory intent toward those students.  *See* Br. of Appellee 56.  As the court put it, the challenged admissions policy "was designed to increase Black and Hispanic enrollment, which would, *by necessity*, decrease the representation of Asian-Americans at TJ." *See* Summary Judgment Opinion 27-28 (emphasis added).  Accordingly, the court related, "the Board acted at least in part because of, not merely in spite of, the policy's adverse effects" on Asian American students. *Id.* at 27 (citing *Feeney*, 442 U.S. at 279).

But that inferential leap rests on unsteady ground, because its basic rationale has been pointedly rejected by the Supreme Court.  In its 1979 decision in *Personnel Administrator of Massachusetts v. Feeney*, the Court rebuffed a gender discrimination challenge to Massachusetts' civil service hiring preference for qualified veterans — a

policy that operated disproportionately to the benefit of men — resolving that, despite the State's general knowledge that veterans were overwhelmingly male at the time of the policy's approval, mere "awareness of consequences" is not sufficient for proving a discriminatory purpose. *See* 442 U.S. 256, 279 (1979). In other words, the assertion that "a person intends the natural and foreseeable consequences of his voluntary actions" does little to prove intentional discrimination in the Equal Protection context. *Id.* at 278. As the *Feeney* Court explained, the Massachusetts statute's adverse impact on women seeking civil service positions was, at most, a secondary impact of the State's legitimate and gender-neutral aim to assist veterans in securing employment. The *Feeney* plaintiffs therefore failed to prove that state action was taken "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon" women in the Massachusetts workforce. *Id.* at 279.

To the extent the Board may have adopted the challenged admissions policy out of a desire to increase the rates of Black and Hispanic student enrollment at TJ — that is, to improve racial diversity and inclusion by way of race-neutral measures — it was utilizing a practice that the Supreme Court has consistently declined to find constitutionally suspect. *See, e.g.*, *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015) (citing *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 789 (2007) (Kennedy, J., concurring in part and concurring in the judgment)). But more importantly on the Coalition's "proxy" argument, the simple fact that the Board may have been able to discern that expanding TJ's Black and Hispanic student population might — as a "natural and foreseeable consequence" — impact the enrollment figures for Asian American students (or students of another racial group) is, under *Feeney*, wholly

35

insufficient from which to infer constitutionally impermissible intent.  *See* 442 U.S. at 278-79; *see also Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 48 (1st Cir. 2021) ("The fact that public school officials are well aware that race-neutral selection criteria . . . are correlated with race and that their application would likely promote diversity does not automatically require strict scrutiny of a school system's decision to apply those neutral criteria.").[7]  An Equal Protection plaintiff alleging purposeful racial discrimination must show at least some specific intent to target a certain racial group and to inflict adverse effects upon that group.  In this situation, the undisputed facts show only that the Board intended to improve the overall socioeconomic and geographic diversity of TJ's student body.  As in *Feeney*, "nothing in the record demonstrates" that the challenged action by the Board "was originally devised . . . because it would accomplish the collateral goal" of excluding Asian American students from TJ.  *See* 442 U.S. at 279.[8]

---

[7] We again emphasize that, if the challenged admissions policy had indeed been adopted to promote TJ's representation of Black and Hispanic students as the Coalition insists, the Coalition actually received what it asked for.  Its own proposed "Second-Look" admissions policy, after all, was intended — as the Coalition said — to "result in disproportionately more Black and more Hispanic students" receiving offers of admission to TJ.  *See supra* note 3.

[8] The *Feeney* ruling thus bars the district court's discriminatory intent analysis in this case.  And that makes good sense, insofar as — much like the court's before-and-after approach to the disparate impact inquiry — the court's method of reasoning would open a whole host of government policies to invalidation on Equal Protection grounds.  *See Washington v. Davis*, 426 U.S. 229, 242 (1976) (recognizing that "[a] rule that a statute designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more than another would be far-reaching and would (Continued)

* * *

In sum, the Coalition cannot satisfy its burden of proving that the Board's adoption of the race-neutral challenged admissions policy was motivated by an invidious discriminatory intent, whether by way of "racial balancing," "proxies," or otherwise. The Coalition has failed to marshal any evidence that the Board adopted the policy in order to disadvantage Asian American students — let alone the quantity of evidence that would entitle it to judgment as a matter of law on that question. Instead, we have "a complete failure of proof concerning" the second "essential element" of the Coalition's claim, and the Board is entitled to summary judgment twice over. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

C.

It is settled, as the Supreme Court said, that "the Fourteenth Amendment guarantees equal laws, not equal results." *See Feeney*, 442 U.S. at 273. Doubtlessly, there are some unequal results at play here. Under the challenged admissions policy, Asian American applicants to TJ enjoy far greater success in securing offers of admission than do prospective students from any other racial or ethnic group. Thus, the Coalition's remarkable efforts to twist TJ's admissions statistics and to prove a disproportionate, adverse impact on Asian Americans students fall flat. By the same token, the Coalition's contention that the Board's aim to expand access to TJ and to enhance the overall diversity

_____

raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes").

of TJ's student population constitutes per se intentional racial discrimination against Asian American students simply runs counter to common sense.

Because the Coalition cannot prove invidious racial discrimination by the Board, the challenged admissions policy is assessed by us under the rational basis standard of review. *See Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 361-62 (5th Cir. 2015) ("[W]here there is no proof of *either* discriminatory purpose *or* discriminatory effect, the government action is subject to rational basis review."). The policy therefore comes to us "bearing a strong presumption of validity," and we have no difficulty in concluding that it is rationally related to a legitimate state interest — indeed, the parties do not dispute that fact. *See Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008). Moreover, we have recognized that the "federal courts should not lightly interfere with the day-to-day operation of schools," given that "school officials are far more intimately involved with running schools" than are judges. *See Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 440 (4th Cir. 2013). In that regard, the Supreme Court has instructed the judiciary not to "intervene in the resolution of conflicts which arise in the daily operation of school systems," unless those conflicts "directly and sharply implicate basic constitutional values" — which, as we have explained, is by no means the situation presented here. *See Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).

On this record, the challenged admissions policy's central aim is to equalize opportunity for those students hoping to attend one of the nation's best public schools, and to foster diversity of all stripes among TJ's student body. The Supreme Court has recognized that — in the context of higher education — promoting a broad spectrum of

38

student diversity qualifies as a *compelling* state interest, in view of the "substantial," "important," and "laudable . . . educational benefits that flow from a diverse student body." *See Grutter v. Bollinger*, 539 U.S. 306, 330, 343 (2003); *see also Parents Involved*, 551 U.S. at 783 (Kennedy, J., concurring in part and concurring in the judgment) ("Diversity, depending on its meaning and definition, is a compelling educational goal a school district may pursue."). Expanding the array of student backgrounds in the classroom serves, at minimum, as a legitimate interest in the context of public primary and secondary schools. And that is the primary and essential effect of the challenged admissions policy. Accordingly, the policy is rationally based, and the challenge interposed against it by the Coalition must be rejected.

## IV.

Pursuant to the foregoing, we reverse the judgment of the district court and remand for entry of summary judgment in favor of the Board.

*REVERSED AND REMANDED*

TOBY HEYTENS, Circuit Judge, concurring:

I write to underscore the unusual nature of the Coalition's claim, and the troubling consequences of accepting it.

\*   \*   \*

It is a "fundamental principle that racial discrimination in public education" violates the Constitution. *Brown v. Board of Educ.*, 349 U.S. 294, 298 (1955). In the decisions culminating in *Brown*, the Supreme Court invalidated policies excluding Black students from educational spaces.[1] Since *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), its decisions have most often involved policies seeking to increase or maintain racial diversity.[2] But what those cases have in common—and share with two others now before the Court[3]—is that the challenged policies, on their face, classified or considered students based on race. Those cases thus directly invoked "[t]he moral imperative of racial neutrality [that] is the driving force of the Equal Protection Clause." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 518 (1989) (Kennedy, J., concurring in part and concurring in the judgment).

---

[1] See *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337 (1938); *Sipuel v. Board of Regents of Univ. of Okla.*, 332 U.S. 631 (1948); *Sweatt v. Painter*, 339 U.S. 629 (1950); *McLaurin v. Oklahoma State Regents for Higher Educ.*, 339 U.S. 637 (1950).

[2] See *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Grutter v. Bollinger*, 539 U.S. 306 (2003); *Parents Involved in Cmty. Schools v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007); *Fisher v. University of Tex. at Austin*, 570 U.S. 297 (2013); *Fisher v. University of Tex. at Austin*, 579 U.S. 365 (2016).

[3] See *Students for Fair Admissions, Inc. v. University of N.C.*, No. 21–707 (argued Oct. 31, 2022); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, No. 20–1199 (argued Oct. 31, 2022).

This case is different. Under the policy challenged here, no students are told "where they [can] and [can] not go to school based on the color of their skin." *Parents Involved in Cmty. Schools v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 747 (2007) (plurality op.). No seats are reserved based on race. See *Bakke*, 438 U.S. at 269–70. No points are awarded based on race, see *Gratz v. Bollinger*, 539 U.S. 244, 271 (2003), nor do evaluators consider race as part of a "holistic-review calculus," *Fisher v. University of Tex. at Austin*, 579 U.S. 365, 375 (2016); see *Grutter v. Bollinger*, 539 U.S. 306, 312–16 (2003). Instead, this case involves a school whose governing Board decided to replace one facially race-neutral policy with another. Cf. *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960) (challenged policy replaced previously square-shaped city with "an uncouth twenty-eight-sided figure"). When it did so, the Board also adopted—by supermajority vote—a rule saying "[t]he admission process must use only race-neutral methods that do not seek to achieve any specific racial or ethnic mix, balance, or targets." JA 2224.[4]

The policy challenged here is not just race neutral: It is race blind. To ensure race does not impact an individual student's chance for admission, evaluators are not told the race or ethnicity of applicants they are considering. Evaluators are not even given applicant

---

[4] This directive makes it difficult to swallow the Coalition's repeated accusations of racial balancing, see Coalition Br. 2–3, 5, 12, 34, 37–38, 47, which is when a decisionmaker "define[s] diversity as some specified percentage of a particular group merely because of its race or ethnic origin," *Fisher*, 570 U.S. at 311 (quotation marks omitted). Nor are the Coalition's allegations substantiated by reference to broad statements—only one of which was uttered by the Board or its members—suggesting TJ should "reflect the diversity of" the community. See JA 293 (non-Board member), JA 458 (same), JA 517 (same), JA 808 (same); see also JA 909 (Board resolution stating "TJ's demographics [should] represent the NOVA region" with no mention of race or ethnicity.).

*names*, lest they betray some hint about a student's race or ethnicity. This case is thus, at best, a distant cousin to those involving challenges to race-conscious admissions policies.

*       *       *

Of course, a facially neutral policy is still constitutionally suspect if it was "motivated by a racial purpose or object." *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (quotation marks omitted). But here too, the Coalition's claim is a poor fit with traditional equal protection doctrine.

I am aware of no decision from the Supreme Court or this one applying strict scrutiny to a facially neutral admissions policy. To be sure, such scrutiny would be warranted if a plaintiff rebutted the "presumption of legislative good faith" by providing evidence that a challenged policy was motivated "at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Abbott v. Perez*, 138 S. Ct. 2305, 2324–25 (2018) (first quote); *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (second quote) (quotation marks omitted). The Coalition's efforts, however, fall far short of meeting that standard.

Most tellingly, the Coalition offers no statements from any decisionmaker suggesting a purpose of disadvantaging any applicant based on race. See *Hunter v. Underwood*, 471 U.S. 222, 229 (1985) (quoting president of state constitutional convention: "And what is it that we want to do? Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State."). In its attempt to show discriminatory purpose, the Coalition points to text messages between various Board members. Some of the texts reflect concern that the superintendent's plan—a plan the

42

Board *rejected*—would unfairly disadvantage Asian American applicants. See JA 119 (complaining lottery proposal "will whiten our schools and kick ou[t] Asians. How is that achieving the goals of diversity?"). Some reveal Board members' frustration with, or condemnation of, certain remarks by the superintendent—a non-Board member who had no vote. See JA 128 ("[The superintendent] [c]ame right out of the gate blaming [Asian Americans]"); JA 119, 125 (criticizing the superintendent's remarks as "demeaning" and "[s]o racist"). Still others show Board members' desire "to honor" the "huge sacrifices" Asian American families make to "prioritize education." JA 119. None of these conversations contain any hint that any Board member intended or desired to create a policy that would adversely affect Asian American students.

The Coalition also points to demographic models prepared by the superintendent analyzing several potential admissions plans. As the Court notes, the Board rejected every proposal for which such estimates were provided. See JA 294–95 (rejected lottery proposal); JA 1951 (same). Just as important, the Board ultimately adopted a policy the superintendent advised was not susceptible to demographic modeling. See JA 1246 ("For holistic, we really had no way to know what the modeling would be, so we didn't present any modeling for that."). This lack of statistical information deflates the Coalition's assertion that the Board disadvantaged "feeder" schools and elevated "underrepresented schools" in a surreptitious pretextual bid to discriminate against Asian Americans. Coalition Br. 11, 15, 28–29. Indeed, the numbers show that, in the first year using the challenged policy, Asian American applicants accounted for the largest share of admitted students who benefitted from the underrepresented school factor.

43

Nor has the Coalition shown any disparate impact, at least as that term is normally understood. Under the challenged policy, more than half of admitted students identify as Asian American. In addition, such applicants were one of only two populations (the other being Hispanic students) whose admission rates were higher than their application rates. Cf. *Feeney*, 442 U.S. at 270 (rejecting constitutional challenge to facially neutral policy whose potential beneficiaries were "over 98%" male); *Washington v. Davis*, 426 U.S. 229, 237 (1976) (rejecting constitutional challenge to facially neutral test that weeded out Black applicants at "four times" the rate it disqualified white applicants). This too emphasizes the unsure grounding for the Coalition's plea for strict scrutiny.

\*      \*      \*

Throughout this litigation, the Coalition has been coy about the full implications of its claims. But it seems to me the Coalition cannot win its case unless at least one of two premises is true. Accepting either would require major alterations to current law and have troubling consequences.

The first possibility is that the challenged policy is constitutionally suspect because Asian American applicants, as a group, appear somewhat less likely to be admitted under the current race-neutral policy than under the race-neutral policy it replaced. That cannot be right. The Coalition cites no authority suggesting past policy creates a floor against which all future ones will be judged—an approach that could make it difficult to alter *any* existing policy, even those that have a real (perhaps unintentional) disparate impact on some groups.

Fortunately, the Supreme Court has disclaimed the notion that the Constitution

commits public officials "irrevocably to legislation that has proved unsuccessful or even harmful in practice." *Crawford v. Board of Educ. of Los Angeles*, 458 U.S. 527, 539 (1982). Of particular note, the Court has held state and local governments may eliminate otherwise lawful race conscious measures in the education context, even when a foreseeable (if not inevitable) result will be to alter a class's racial composition. See *Schuette v. Coalition to Def. Affirmative Action*, 572 U.S. 291 (2014); see also *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406 (1977).

Or go back to the Supreme Court's foundational cases about the difference between discriminatory purpose and disparate impact. The Court determined the Constitution did not require retiring the veterans' preference that overwhelmingly benefitted male applicants in *Feeney* or the test that disproportionately weeded out Black applicants in *Davis*. But that does not mean the Constitution would have barred policymakers from deciding to do so if they later came to question the policies' wisdom or effectiveness. See *Feeney*, 442 U.S. at 280–81 (noting the challenged law's "troubled history" and that it "may reflect unwise policy"). The same is true about the Board's decision to reconsider its previous admission policy—a policy that, in its last year, generated a class with so few Black students the number could not be reported without implicating student privacy laws.

A second possibility is that the challenged policy is unconstitutional because the Board hoped it would increase the number of Black and Hispanic students at TJ. The

Coalition has waived that argument here,[5] and rightly so. Any such argument would be no more tenable than the previous one.

The Supreme Court has repeatedly blessed seeking to increase racial diversity in government programs through race-neutral means. In fact, the Court and individual Justices have spent more than three decades encouraging—and sometimes insisting—government officials do precisely that before considering race-conscious ones. See *Croson*, 488 U.S. at 509 (plurality op.) ("[T]he city has at its disposal a whole array of race-neutral devices to increase the accessibility of city contracting opportunities to small entrepreneurs of all races."); *id.* at 526 (Scalia, J., concurring in the judgment) (noting that government may "act to undo the effects of past discrimination in many permissible ways that do not involve classification by race" even if such methods "may well have racially disproportionate impact" (quotation marks omitted)); see also *Grutter*, 539 U.S. at 362 (Thomas, J., concurring in part and dissenting in part) ("the Law School could achieve its vision of a racially aesthetic student body without the use of racial discrimination"); *Parents Involved*, 551 U.S. at 735 (school districts seeking to increase diversity *must* engage in "serious, good faith consideration of workable race-neutral alternatives" before turning to "explicit racial classifications" (quotation marks omitted)); *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive*

---

[5] Throughout this litigation, the Coalition has refrained from saying it thinks such ambitions render a facially neutral plan unconstitutional. Indeed, the Coalition's representative testified during a deposition that "there has been a failure, by Fairfax County Public Schools, to . . . pair [*sic*] students from Black and Hispanic communities to gain admission to TJ," and endorsed "increasing the diversity of Black and Hispanic students at TJ through merit-based admissions." JA 2638.

*Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015) (local housing authorities may "choose to foster diversity . . . with race-neutral tools").

In truth, the policy challenged here bears more than a passing resemblance to one proposed by a dissenting Justice who objected to the race-conscious policy upheld in *Fisher*. See 579 U.S. at 426–27 (Alito, J., dissenting) (asserting Texas could achieve its diversity goals "without injecting race into the process" by combining a system guaranteeing admission of each public high school's students along "with race-blind, holistic review"). Having spent decades telling school officials they must consider race-neutral methods for ensuring a diverse student body before turning to race-conscious ones, it would be quite the judicial bait-and-switch to say such race-neutral efforts are also presumptively unconstitutional.

RUSHING, Circuit Judge, dissenting:

Our Constitution guarantees every person equal treatment under the law regardless of race. That guarantee would be hollow if governments could intentionally achieve discriminatory ends under cover of neutral means. Therefore, even facially neutral laws are subject to the highest level of judicial scrutiny if they are passed with discriminatory intent and disproportionately impact a particular racial group. The Fairfax County School Board did just that when it passed the new admissions policy (Policy) for Thomas Jefferson High School (TJ). The Policy reduced offers of enrollment to Asian students at TJ by 26% while increasing enrollment of every other racial group.* This was no accident. The Board intended to alter the racial composition of the school in exactly this way—as demonstrated by a resolution it adopted saying as much, the racial data it requested and considered in the process, the means it selected, and the candor of individual Board members' internal discussions. In the face of this evidence, the Board does not attempt to justify its Policy under strict scrutiny.

The majority, however, refuses to look past the Policy's neutral varnish. Because the evidence shows an undisputed racial motivation and an undeniable racial result, I respectfully dissent.

## I.

The Equal Protection Clause prohibits a State from denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Its central

---

* This opinion uses the racial terms the Board used when designing the Policy.

mandate is racial neutrality in governmental decisionmaking." *Miller v. Johnson*, 515 U.S. 900, 904 (1995). "At the heart" of the Clause's guarantee of equal treatment "lies the principle that the government must treat citizens as individuals, and not as members of racial, ethnic, or religious groups." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 316 (2013) (*Fisher I*) (Thomas, J., concurring) (internal quotation marks omitted); *see also Miller*, 515 U.S. at 911.

Racial balancing offends the Equal Protection Clause. It is "patently unconstitutional" for a public school to undertake to achieve within its student body "some specified percentage of a particular group merely because of its race or ethnic origin." *Grutter v. Bollinger*, 539 U.S. 306, 329–330 (2003) (internal quotation marks omitted); *Fisher I*, 570 U.S. at 311. Indeed, the Supreme Court has "repeatedly condemned" the objective of "racial balance" as "illegitimate." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 726 (2007) (plurality opinion); *see id.* at 729–730 ("We have many times over reaffirmed that '[r]acial balance is not to be achieved for its own sake.'" (brackets in original) (quoting *Freeman v. Pitts*, 503 U.S. 467, 494 (1992))).

This principle "is one of substance, not semantics." *Id.* at 732. Racial balance "cannot be the goal, whether labeled 'racial diversity' or anything else." *Id.* at 733; *see Fisher I*, 570 U.S. at 311 ("Racial balancing is not transformed from patently unconstitutional to a compelling state interest simply by relabeling it racial diversity." (internal quotation marks omitted)). For example, the Supreme Court has condemned as impermissible racial balancing a school district's goal of "attaining a level of diversity within the schools that approximates the district's overall demographics." *Parents*

*Involved*, 551 U.S. at 727 (plurality opinion) (internal quotation marks omitted); *see also id.* at 766–767 (Thomas, J., concurring) ("Environmental reflection . . . is just another way to say racial balancing."); *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2225 (2016) (*Fisher II*) (Alito, J., dissenting) ("[P]ursuing parity with [local] demographics . . . is nothing more than 'outright racial balancing[.]'" (quoting *Fisher I*, 570 U.S. at 311)).  Our Court has similarly identified as racial balancing a policy that sought "to achieve racial and ethnic diversity in . . . classes in proportions that approximate the distribution of students from racial groups in the district's overall student population."  *Tuttle v. Arlington Cnty. Sch. Bd.*, 195 F.3d 698, 707 (4th Cir. 1999) (internal quotation marks and brackets omitted).  We found that policy unconstitutional even though it did not "explicitly set aside spots solely for certain minorities," because it worked toward "the same result by skewing the odds of selection" in favor of certain racial groups.  *Id.*  As these cases illustrate, even supposedly well-intentioned racial balancing is a discriminatory purpose.  *See Parents Involved*, 551 U.S. at 741–742; *cf. N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016) (acknowledging that a finding of discriminatory purpose does not require proof that any government actor "harbored racial hatred or animosity toward any minority group").

A school board's motivation to racially balance its schools, even using the means of a facially neutral policy, must be tested under exacting judicial scrutiny.  *See*, *e.g.*, *Lewis v. Ascension Parish Sch. Bd.*, 662 F.3d 343, 354 (5th Cir. 2011) (Jones, J., concurring). After all, "[i]f discriminatorily motivated, such [facially neutral] laws are just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race."

50

*McCrory*, 831 F.3d at 220. A challenger need not prove that discriminatory purpose was the school board's "'sole[]' or even . . . 'primary' motive," "just that it was a motivating factor" in the decision. *Id.* (brackets in original) (emphasis removed) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–266 (1977)). It is not enough, however, to show that the school board was "aware of racial considerations"—it must have been "motivated by them." *Miller*, 515 U.S. at 916. In other words, we ask if the school board acted "at least in part 'because of,' not merely 'in spite of,'" the expected discriminatory effect of its action upon a particular racial group. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

The Supreme Court has set forth a nonexhaustive list of factors to consider in making the "sensitive inquiry" into whether discriminatory intent motivated a facially neutral law. *Arlington Heights*, 429 U.S. at 266; *see Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts . . . ."). These include "(1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law 'bears more heavily on one race than another.'" *N.C. State Conference of NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020) (quoting *Arlington Heights*, 429 U.S. at 266).

Once it is shown that racial discrimination was a motivating factor behind enactment of the law, then the law's defenders may attempt to prove that "the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985); *see Arlington Heights*, 429 U.S. at 270 n.21. At this step, the court "must scrutinize the

51

legislature's *actual* non-racial motivations to determine whether they *alone* can justify the legislature's choices" or whether, instead, "race constituted a but-for cause" of the law. *McCrory*, 831 F.3d at 221, 238.

A law "'motivated by a racial purpose or object,'" even if facially neutral, warrants strict judicial scrutiny. *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (quoting *Miller*, 515 U.S. at 913). Only laws that are "narrowly tailored to achieve a compelling interest" survive this "most rigorous and exacting standard of constitutional review." *Miller*, 515 U.S. at 920.

## II.

Applying this well-established framework to the undisputed facts of this case on summary judgment compels the conclusion that the Board adopted the Policy with an impermissible purpose of racially balancing TJ to reduce Asian student enrollment. With the Policy in place, Asian student enrollment decreased while enrollment of every other racial group increased. "[T]he surest explanation" for this disproportionate impact is found in the Board's discriminatory purpose for revising TJ's admissions policy. *Feeney*, 442 U.S. at 275.

## A.

"Proving the motivation behind official action is often a problematic undertaking," as outright admissions of impermissible racial motivation are rare and circumstantial evidence about the purposes of a multimember deliberative body often cuts both ways. *Hunter*, 471 U.S. at 228. But here, the twelve-member Board plainly stated its intention to craft an admissions policy for TJ that would reform the racial composition of the student

body to reflect the racial demographics of the district. The Board unanimously approved a resolution saying as much. In addition, throughout the process of designing the new Policy, the Board repeatedly requested and received detailed racial data and modeling that it used to make its decisions. Then, in the final Policy, the Board allocated seats at TJ by middle school—specifically, the school applicants attend, not the school to which they are zoned—knowing that choice would significantly reduce the number of students admitted from "feeder" schools, which historically sent large percentages of Asian students to TJ. And finally, Board members' private messages reveal their understanding that the process discriminates against Asian students. This "highly relevant" evidence, taken together, leaves no doubt about the Board's discriminatory purpose. *Arlington Heights*, 429 U.S. at 268 (noting that legislative history "may be highly relevant, especially where," as here, "there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports").

1.

Consider first the Board's stated purpose in changing TJ's admissions policy.

By way of background, the Board classifies all children in the school district as either "Asian," "Black," "Hispanic," "White," or "2 or More Races," sometimes also using a catch-all labeled "Multiracial/Other" to account for other ethnicities. When admissions statistics for TJ's class of 2024 were released in June 2020, the numbers revealed that Asian students made up 73% of the class, while White students were 17.7%, Hispanic students were 3.3%, Multiracial/Other students were 6%, and the percentage of Black students was "too small for reporting"—meaning 10 or fewer students. J.A. 563. These figures quickly

53

sparked disapproval.  In a message to TJ students and families, school principal Ann Bonitatibus stressed that the student body did "not reflect the racial composition in FCPS [Fairfax County Public Schools]," and if it did, the school "would enroll 180 black and 460 Hispanic students."  J.A. 517.  School Board members echoed this reaction.  For example, Board Chair Karen Corbett Sanders called the admissions data "unacceptable" and vowed the Board would take "intentful [sic] action."  J.A. 192, 414, 426.  She told Superintendent Scott Brabrand that the Board "needed to be explicit in how [it was] going to address the under-representation."  J.A. 426.  Board member Karen Keys-Gamarra similarly urged her colleagues to "recognize the unacceptable numbers . . . of African Americans that have been accepted to T.J." and take action.  J.A. 259.

The Board met on September 15, 2020, to consider TJ's admissions policy. Brabrand began with a slide presentation stating that the purpose of changing TJ's admissions policy was to make TJ "reflect the diversity of FCPS, the community and Northern Virginia."  J.A. 293.  The next slide illustrated this goal and "frame[d] [the Board's] discussion for the remainder of the day."  J.A. 808.  It showed the racial composition of the school district student population as of the fall of 2019:



J.A. 294.  Looking at this chart, FCPS staff explained, "as Dr. Brabrand said earlier, the diversity at TJ doesn't currently reflect the diversity of Northern Virginia."  J.A. 808. Based on this chart, only Asian students were "over-represented" at TJ.  The percentage of Multiracial students at TJ approximated that of the school district generally.  But, according to this chart, students of all other races were "under-represented" at TJ.

The Board subsequently adopted this statement of purpose for itself.  Recall that in the summer of 2020, the Virginia General Assembly passed a new law requiring each Governor's School, like TJ, to "set diversity goals for its student body and faculty, and develop a plan to meet said goals."  2020 Va. Acts 183.  Each school's annual diversity report had to include the school's admission processes that "promote access for historically underserved students" and "the racial/ethnic make-up and socioeconomic diversity of its students, faculty, and applicants."  *Id.*  At its October 6 meeting, the Board unanimously

(with one abstention) approved a resolution directing Brabrand to submit an annual report to the Commonwealth which "shall state that the goal is to have TJ's demographics represent the NOVA region."  J.A. 909.

Thus, the Board unanimously articulated its "goal" for TJ's new admissions policy: to bring the school's demographics in line with the demographics of the region the school serves.  In other words, to racially balance the school.  *See Parents Involved*, 551 U.S. at 727, 732 (plurality opinion) (characterizing the school board's goal of "attaining a level of diversity within the schools that approximates the district's overall demographics" as "racial balance" (internal quotation marks omitted)); *see also id.* at 766–767 (Thomas, J., concurring) ("Environmental reflection . . . is just another way to say racial balancing."). We need not guess at the Board's purpose when it stated it explicitly.

The Board hewed to this goal throughout the admissions overhaul process.  At its November 17 meeting, the Board's presentation again highlighted its "goal" of "improving ethnic, racial, and socioeconomic diversity" at TJ.  J.A. 270.  A November white paper prepared by FCPS staff at the Board's request explained that changes to TJ's admissions policy over the prior decade "did not have the desired impacts with respect to diversity," "as described in the data below."  J.A. 445.  The data beneath this statement showed that, over the prior 15 years, offers of admission to Asian students skyrocketed while offers to White students fell and offers to students of all other races remained consistently low.  The white paper summarized this trajectory as "a steady failure to improve ethnic, racial, and socio-economic diversity."  J.A. 447.  And it projected that the proposed changes to the admissions process would fix this failure by causing TJ's student population to "reflect,

56

more closely," the population of the school districts eligible to send students to TJ.  J.A. 458.

For the Board, therefore, increased Asian student enrollment was not "improving ethnic[ or] racial . . . diversity."  J.A. 270.  To the contrary, for TJ's student body to more closely reflect the surrounding region in line with the Board's explicit purpose, the number of Asian students would need to be significantly reduced.

This undisputed evidence demonstrates that the Board as a whole, and FCPS officials more broadly, intended to racially balance TJ.  The majority's assertion that the evidence does not "reveal any intent to adjust TJ's student population along racial lines," *supra*, at 32, cannot be squared with the Board's own expression of its purpose to alter TJ's racial demographics to "represent the NOVA region," J.A. 909.  The Board repeatedly, consistently, and forthrightly declared its racial motivation; no objective appraisal of the evidence could deny it.  Still, the Coalition provided more evidence of the Board's discriminatory intent.

## 2.

The Board's extensive use of racial data and modeling further demonstrates its racial purpose.  *See McCrory*, 831 F.3d at 230 (finding "requests for and use of race data" relevant to discriminatory intent).  Throughout the decisionmaking process, new admissions policy proposals were assessed for whether they would achieve the desired racial demographics.

As discussed, the process of changing TJ's admissions policy began with identifying the problem the Board was trying to fix.  At their September 15 meeting, Board members reviewed these graphs of historical admissions data divided by race:



J.A. 295.  Like the data mentioned above, these graphs reflect a dramatic increase in offers to Asian students over the past 15 years while offers to White students declined and offers to students of other races remained consistently low.  The presentation explained that changes to the admissions process over the past decade had "not made a significant impact on the application pool or admitted student demographics."  J.A. 296.  Board members next reviewed pie charts labeled "Impact of Testing" that compared the racial composition of the applicants and semifinalists for the classes of 2015, 2019, and 2024.  Those charts showed that Asian students consistently performed better than students of other races on the TJ standardized admissions tests, which the slides called "a barrier for historically underrepresented students."    J.A. 298–300.    A few weeks later, the Board voted unanimously to eliminate standardized testing from the admissions process.

Also at the Board's September 15 meeting, Brabrand presented data on how his merit lottery proposal would change the racial composition of TJ's student body.  This modeling showed that, had the merit lottery been in effect for the class of 2024, the racial makeup of the class would have been drastically different:





J.A. 310. Offers to White students would have *increased* 7 percentage points, offers to Black students would have *increased* 6 percentage points, offers to Hispanic students would have *increased* 5 percentage points, and offers to students of "2 or More Races" would have *increased* 1 percentage point, while offers to Asian students would have *decreased* 19 percentage points. These were not the only racial projections Brabrand presented. He also provided similar models showing the racial impact of his proposal for the classes of 2015 and 2019. The one thing every model had in common? A significant decrease in offers to Asian students.

The Board ultimately rejected the merit lottery proposal, with some members saying it left "too much to chance" and could not "guarantee an increase in racial/SES [socioeconomic status] diversity." J.A. 101, 406. But—contrary to the majority's insinuation, *see supra*, at 33–34—the Board certainly did not stop considering racial data.

In fact, after the September 15 presentation and over the following weeks, the Board requested more demographic data about the applicant pool and admitted students as well as updated statistical modeling for each new proposal and numerous variations on those proposals.  FCPS staff worked to compile this data.  Staff also developed the "experience factors" ultimately incorporated into the Policy and studied how much weight to give those factors in order to "change who got in," J.A. 182, given research showing that several portions of the TJ application "historically favored White and Asian candidates," J.A. 176.

FCPS staff delivered more of the requested data to the Board in the November white paper, one month before the Board adopted the new Policy.  The 43-page white paper contained 21 graphs and tables of racial data and racial modeling of the student body and applicants, plus one more table analyzing TJ's faculty and staff by race.  Some of the data and surrounding discussion of race was quite granular.  For example, the white paper analyzed "eighth grade students' mathematics courses by race/ethnicity."  J.A. 452.  In addition to specifying the racial breakdown of each eighth-grade math course, the white paper went on to analyze the percentage of students of each race enrolled in those classes who chose to apply to TJ.  For instance, after crunching the numbers, the white paper concluded that "while a majority of Asian students in Geometry opted to apply for admission to [TJ], a majority of Black and Hispanic (and White) students enrolled in the same course during eighth grade chose *not* to apply for admissions."  J.A. 452.

The white paper also included extensive racial modeling of new admissions policy proposals.  For example, it modeled how the new hybrid lottery proposal would impact the "[d]emographic [m]ake-up" of TJ students:

60

Table 9: Demographic Make-up of FCPS Students in the TJHSST Class of 2025,
based on Modeling the Hybrid Lottery[10]

| Student Group | Number of Students Meeting Applicant Requirements | Average. Percent of Admitted Class[11] | Minimum Percent of Admitted Class | Maximum Percent of Admitted Class | Average Number of Admitted Students |
|---|---|---|---|---|---|
| Asian | 1,425 | 31% | 23% | 38% | 121 |
| Black | 270 | 7% | 3% | 11% | 27 |
| Hispanic | 439 | 11% | 6% | 15% | 42 |
| White | 1,895 | 44% | 35% | 51% | 168 |
| English Learners | 3 | 0% | 0% | 1% | 0 |
| Economically Disadvantaged | 510 | 12% | 8% | 18% | 48 |
| Students with Disabilities | 91 | 2% | 0% | 4% | 8 |

J.A. 461. Other models measured the effect that changes to certain eligibility requirements would have on student demographics and presented the evidence in tables similar to the one above. In commentary, FCPS staff analyzed which races performed better in which simulations. And yet other models compared the "[d]emographic [m]ake-up" of admitted students from each regional pathway under a hybrid lottery approach.

As this evidence demonstrates, the Board was keenly interested in data about the racial effect of the policy proposals and admissions variables it considered. Board members requested, received, and considered extensive racial data during their deliberations. Given the Board's goal of altering TJ's racial composition to more closely reflect the demographics of the surrounding area, it is unsurprising that the Board was committed to measuring whether the policy changes it considered would achieve the desired racial balance. The Board notes that FCPS staff did not model the racial impact of

the Policy it ultimately adopted, which was a last-minute revision of the white paper proposals.  But the absence of yet another racial model does not sanitize the record.  Even without a model of the exact policy adopted, the Board's intense interest in racial data and results during its decisionmaking is another indicator it was acting with the discriminatory intent of racially balancing TJ, just as it said it was doing.

It bears mention that the majority's account of the factual record cannot be reconciled with the evidence described and excerpted above.  According to the majority, "the undisputed facts show *only* that the Board intended to improve the overall *socioeconomic* and *geographic* diversity of TJ's student body."  *Supra*, at 36 (emphases added).  But much to the contrary, the record is replete with evidence of the Board's concern to reform the *racial* diversity of TJ's student body.  The fact that the Board also considered the impact on low-income and English-learner students, *see supra*, at 33, in no way disproves that racial balancing was at least "a motivating factor" in the Board's decision, *Arlington Heights*, 429 U.S. at 266.

3.

"[T]he choices the [Board] made with this [racial] data in hand" are additional evidence of discriminatory intent.  *McCrory*, 831 F.3d at 230.  One choice is particularly noteworthy.  After receiving voluminous racial data, the Board allocated seats at TJ based on the middle school an applicant attends.  The data showed that this change would indisputably disadvantage so-called "feeder" schools that had historically sent many students to TJ, the vast majority of whom were Asian.

Under the old admissions plan, students from all participating school divisions competed against each other for seats in the incoming ninth-grade class at TJ. A handful of Fairfax County middle schools became "feeder" schools, sending a large number of students to TJ each year. For example, half of the offers extended to the class of 2024 came from six feeder schools. Each feeder school was an Advanced Academic Program Level IV center, which is a selective school that admits students who are zoned to attend other middle schools based on their residential address. A significant majority of applicants from these feeder schools were Asian, and the overwhelming majority of offers of admission to TJ from the top six feeder schools were extended to Asian students. For example, for the class of 2024, 84% of the offers to TJ from these feeder schools went to Asian students.

The new admissions proposals that Brabrand and FCPS staff presented to the Board divided Fairfax County geographically into "regional pathways" and allocated or capped seats at TJ per each region. A student's regional pathway was determined by his or her "base school," the middle school the student was zoned to attend based on residence. J.A. 306. Brabrand touted the regional approach's potential to "create[] geographic diversity across Fairfax and participating jurisdictions." J.A. 811. Demographic modeling showed that "Asian and White students make up the largest percentage" of students meeting the application requirements in every region but one. J.A. 468–469. Brabrand warned the Board that a "concern[]" with proportional regional pathways was that they "[m]ay continue to admit more students from a few top-performing FCPS middle schools," a reference to feeder schools. J.A. 533.

63

Board members expressed interest in allocating seats at TJ by middle school rather than by region. In response, FCPS staff provided the requested data but warned the Board that a school-pathway approach "would disadvantage schools that traditionally admit large numbers of students," i.e., feeder schools. J.A. 458.

The Board then voted to adopt the Policy, which allocates seats at TJ to 1.5% of each middle school's eighth-grade class. Each middle school's allocated seats are offered to the highest evaluated students at that school based on the Policy's metrics. Remaining applicants then compete for about 100 unallocated seats based on the same metrics, with bonus points going to students in "underrepresented schools" that have not historically sent many students to TJ. Students from feeder schools cannot receive these bonus points.

Community members immediately recognized the effect per-school allocation would have on students at feeder schools. Some constituents expressed concern that basing the allocation on school attended, rather than base (i.e., zoned) school, would hurt gifted students in less affluent communities, who attend feeder schools outside their own community and now must compete with those students for admission to TJ rather than competing with their neighbors. Others expressed concern that the allocation imposed a "special penalty" on students from traditionally low-performing regions who pursued placement at a feeder school. J.A. 332.

In response, Brabrand clarified that the Board was indeed aware of this consequence and intended to allocate seats by school attended, not by zoned school. A zoned-school approach, he said, did not "represent[] the geographic distribution the [B]oard wanted." J.A. 323.

64

The Board's insistence on allocating seats by attended school to promote "geographic distribution" is suspect. Allocating seats by zoned school, of course, would have produced actual geographic distribution throughout Fairfax County. Students in the same neighborhood—a measure of socioeconomic and geographic diversity—would have competed with each other for admission. But in some regions, students attending feeder schools would likely win many of their region's allocated seats. Allocating seats by attended school, by contrast, would result in some geographic distribution but would also "disadvantage" applicants from feeder schools, J.A. 458, the great majority of whom were Asian. Armed with that knowledge, the Board chose the approach that better targeted a reduction of Asian student enrollment.

4.

Finally, in private discussions, some of the twelve Board members candidly admitted their belief that the process targeted Asian students.

For example, in text messages, Board members Stella Pekarsky and Abrar Omeish agreed that "there has been an anti [A]sian feel underlying some of this, hate to say it lol" and that Asian students were "discriminated against in this process." J.A. 119. They observed that Brabrand "ha[d] made it obvious" with "racist" and "demeaning" remarks and that he "[c]ame right out of the gate blaming" Asian students and parents. J.A. 119, 125, 128. They reasoned that Brabrand's proposals would "whiten our schools and kick ou[t] Asians," J.A. 119, while another Board member thought Brabrand was "trying to be responsive to the times—BLM [Black Lives Matter] and a super progressive [B]oard," J.A. 116. In the end, they believed, "Asians hate us." J.A. 128.

65

These sentiments demonstrate that some Board members saw the process as deeply discriminatory toward Asian students and families. The majority does not engage with these text messages beyond its conclusory remark that they do not support a finding of "intent to adjust TJ's student population along racial lines" or "scale down its share of Asian American students." *Supra*, at 32. But the messages, and the evidence as a whole, tell a different story.

\* \* \* \*

In sum, the undisputed contemporaneous evidence makes plain the Board's intent to racially balance TJ to reduce Asian student enrollment. Not only did the Board explicitly state its purpose to alter TJ's racial composition to reflect the demographics of the region, but race was central to its decisionmaking. Its insistence that seats for TJ's incoming class be allocated based on which school the applicant attended targeted Asian admissions from feeder schools. And Board members acknowledged, among themselves, that the process discriminated against Asian students. As will be seen, the Policy's impact confirms this discriminatory intent.

### B.

The undisputed evidence shows that the Board successfully engineered the Policy to reduce Asian student enrollment at TJ—while increasing enrollment of every other racial group—consistent with the Board's discriminatory purpose. This is further evidence of the Board's discriminatory intent.

66

1.

When assessing "[t]he impact of the official action," we consider "whether it bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (internal quotation marks omitted). For example, in *Arlington Heights*, the Supreme Court found that the Village's refusal to rezone a parcel for multiple-family low-income housing "d[id] arguably bear more heavily on racial minorities," who constituted 18% of the area population and 40% of the income groups said to be eligible for the proposed housing project. *Id.* at 269.

Similarly, in *McCrory*, we found sufficient disproportionate impact on African Americans by observing that, before the new law, "African Americans disproportionately used" the voting mechanisms the new law removed and "disproportionately lacked the photo ID" the new law required. 831 F.3d at 231. We faulted the district court for focusing on "the options remaining" for African Americans "after enactment of the legislation." *Id.* at 230 (internal quotation marks omitted). We also criticized the district court for suggesting that the plaintiffs had to show the new law prevented African Americans from voting at the same levels after the law as they had before. As we explained, plaintiffs are not required to make "such an onerous showing" to prove disparate impact. *Id.* at 232. For example, the district court gave significant weight to the 1.8% increase in African American voter turnout under the new law. *Id.* We clarified that the plaintiffs were not required to show a year-over-year drop in voter turnout and, moreover, the 1.8% figure "actually represent[ed] a significant *decrease* in the *rate* of change" because, before the

new law, African American voter turnout had increased by 12.2% over a four-year period. *Id.*

2.

By any metric, the new admissions Policy adversely—and disproportionately—affected the enrollment of Asian students at TJ. In the five years before the Policy, Asian students averaged 71% of the annual offers to TJ, with offers to Asian students never falling below 65% of the class. In the year immediately before the new Policy was implemented, Asian students received 73% of offers for the incoming class. Under the new Policy, however, offers to Asian students fell to 54%. That's a 26% decrease in Asian student enrollment and a drop of 19 percentage points.

Perhaps most telling, Asian students were the *only* race to experience any decrease in admissions numbers while offers to all other races measured by the Board increased. Whether reported in whole numbers or percentage of the incoming class, White, Black, and Hispanic students all saw a notable increase in offers under the new Policy. (The Multiracial/Other category, which combines multiple different racial groups, saw a slight decrease.) Offers to White students increased from 17% to 22%; offers to Black students increased from nonreportable to 7%; and offers to Hispanic students increased from 3% to 11%. In other words, the new Policy "bore not just *more* heavily on one race than another," it "bore *exclusively* on one race." *Williams v. Hansen*, 326 F.3d 569, 585 (4th Cir. 2003) (King, J., dissenting).

This result correlated with the Board's decisions to allocate seats at TJ by middle school attended and to award bonus points to underrepresented schools—both choices that

68

disproportionately affected feeder schools, whose offers had gone overwhelmingly to Asian students. In 2021, Asian students from the top six feeder schools received 96 fewer offers to TJ than they did in 2020, despite an increase in the size of the ninth-grade class. Even with the increased class size and accounting for offers to Asian students at non-feeder schools, that difference mirrors the drop in Asian student enrollment under the Policy.

The foreseeability of the Policy's consequences for Asian students raises a reasonable inference that "the adverse effects were desired." *Feeney*, 442 U.S. at 279 n.25. When that anticipated result is considered alongside the other evidence of the Board's racial purpose in changing the TJ admissions policy, that inference "ripen[s] into proof." *Id.*

3.

The majority rejects this before-and-after assessment in favor of an exclusively "after" assessment. *See supra*, at 23–28. Under the majority's approach, a court may consider Asian students' chance of success only after the Policy's implementation and must ignore the larger context that would demonstrate whether the Policy decreased that chance of success. That echoes the approach we rejected in *McCrory*, which focused "on the options remaining after enactment of the legislation," and neglected the importance of considering the options available to African American voters before the legislation and which the legislation removed. 831 F.3d at 230 (internal quotation marks omitted). Such analysis is untenable, we explained, because an "individual piece of evidence can seem innocuous when viewed alone, but gains an entirely different meaning when considered in context." *Id.* at 233.

69

For example, even using the majority's preferred "success rate" metric, Asian students fared worse after the Policy than before. The success rate for Asian students under the Policy dropped from 24.94% in 2020 (and a five-year historical average of 22.71%) to 17.73% in 2021. By comparison, the success rate for every other race measured by the Board improved. The success rate for White students increased from 14.45% to 14.85%; the success rate for Black students increased from 5% to 11.23%; and the success rate for Hispanic students increased from 7.69% to 16.31%. (The success rate for the catch-all "Multi/Other" group decreased.) This analysis demonstrates the *Policy's* impact on each racial group's success rate, something that the majority's "after-only" approach cannot do.

Indeed, the majority rejects the very possibility that a State could ever discriminate against a racial group by intentionally reducing its success in a competitive process to a level equal with that of other races. According to the majority, the Board could not have discriminated against Asian students by reducing their success rate—even intentionally and with a discriminatory purpose—so long as Asian students remain no *less* successful than students of other races. I don't see why not. "Invidious discrimination does not become less so because the discrimination accomplished is of a lesser magnitude." *Feeney*, 442 U.S. at 277. If a State enacts a policy with the purpose and effect of trimming down the success of one particular racial group to a level the State finds more appropriate, it has discriminated against that racial group.

To hold otherwise misses the point of discriminatory-intent claims under the Equal Protection Clause. These claims are meant to root out government action that, while facially neutral, is motivated by a racially discriminatory purpose. *See Arlington Heights*,

429 U.S. at 265; *Davis*, 426 U.S. at 238–242.  But in the majority's view, governments are free to pass facially neutral laws explicitly motivated by racial discrimination, as long as the law's negative effect on the targeted racial group pushes it no lower than other racial groups.  Under the majority's approach, we would not even consider the other evidence of discriminatory intent—no matter how strong—because the group challenging the law would fail to show discriminatory impact.  *See supra*, at 28.  It would not matter, for example, if a new law cut a racial group's success rate from 90% to 30% and the legislature was open about its discriminatory purpose, as long as no other racial group succeeded at a higher rate.  The Equal Protection Clause, however, does not permit such blatant government discrimination.  *See Davis*, 426 U.S. at 239 ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race.").

Nor does case law reject a before-and-after comparison, as the majority suggests.  *See supra*, at 24–25.  As explained above, our Court in *McCrory* found "sufficient disproportionate impact" based on evidence that *before* the new law's enactment, African Americans disproportionately used the voting mechanisms the new law *removed* and disproportionately lacked the photo ID the new law *required*.  831 F.3d at 231.  The Court cautioned against reading too much into the increase in African American voter turnout after the new law because contextual evidence suggested that statistic was misleading and because of problems with comparing voter turnout across two midterm elections.  *See id.* at 232.  In doing so, the Court explained that the Fourteenth Amendment did not require plaintiffs to prove the new law "prevented African Americans from voting at the same

levels as they had in the past," which would set *too high a standard*. *Id.* at 232. Today, the majority turns *McCrory*'s analysis on its head. *See supra*, at 24. Although evidence proving a year-over-year reduction (or, as here, a comparison with five prior years) may not be necessary, it is certainly relevant.

The two out-of-circuit cases on which the majority relies similarly do not rule out the relevance of before-and-after analysis to show disproportionate impact. *See supra*, at 24–25 (citing *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of the City of Bos.*, 996 F.3d 37 (1st Cir. 2021), and *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344 (5th Cir. 2015)). In *Boston Parent Coalition*, the First Circuit found the plaintiff's impact evidence "weak[]" because the plaintiff "offer[ed] no analysis or argument" in support of its comparators. 996 F.3d at 46. And in *Lewis*, the Fifth Circuit found the plaintiff failed to prove his theory that the school redistricting plan had a discriminatory effect on nonwhite students by funneling "at risk" students into certain schools with a resulting negative effect on academic performance. 806 F.3d at 361–362. Among other things, the plaintiff's statistical evidence about academic performance was limited and showed mixed results that did not clearly support his theory. *Id.* at 362. Neither court categorically rejected before-and-after comparison.

Finally, none of this "turn[s] 'the previous status quo into an immutable quota.'" *Supra*, at 25 (quoting Opening Br. at 25). The reason is obvious. Disproportionate impact is not "'the sole touchstone'" of an intentional discrimination claim—"[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 265 (quoting *Davis*, 426 U.S. at 242). And

discriminatory purpose requires the decisionmaker to have acted "in part 'because of,' not merely 'in spite of,'" a foreseeable adverse effect upon an identifiable group. *Feeney*, 442 U.S. at 279.   States remain free to change the status quo, and even in ways that disproportionately affect protected groups, but States may not intentionally discriminate on the basis of race.

C.

Because the Coalition has established race was a factor that motivated the Board to adopt the Policy, the burden now shifts to the Board "to demonstrate that the [Policy] would have been enacted" absent the Board's purpose of racially balancing TJ to reduce Asian student enrollment. *Hunter*, 471 U.S. at 228; *Arlington Heights*, 429 U.S. at 271 n.21.   In other words, the Board now has an opportunity to prove that, despite its discriminatory purpose, it also acted with "actual nonracial motivations" that can, by themselves, justify the Policy. *Raymond*, 981 F.3d at 303 (internal quotation marks and emphasis omitted).

The Board has not attempted to carry its burden.   In its briefing, the Board occasionally refers to a dual purpose of "improving racial diversity, along with other types of diversity." *See*, *e.g.*, Opening Br. at 51.   But neither in our Court nor in the district court has the Board argued that, if the Coalition proved the existence of a racial motivation, the Board's actual nonracial motivations were sufficiently strong to independently support enactment of the Policy. *See McCrory*, 831 F.3d at 234 (describing this analysis).   We therefore have no basis to conclude that the Board would have adopted the Policy "without considerations of race." *Id.*

73

III.

Having determined that the Policy was "motivated by a racial purpose or object," the remaining analysis is straightforward. *Hunt*, 526 U.S. at 546 (internal quotation marks omitted). All such laws "warrant[] strict scrutiny." *Id.*; *see Miller*, 515 U.S. at 913. To satisfy strict scrutiny, the Board must demonstrate that the Policy is "narrowly tailored" to achieve a "compelling governmental interest[]." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

The Board has not attempted to defend the Policy under strict scrutiny. And for good reason: The Policy cannot withstand such rigorous examination. The Supreme Court has endorsed two interests as sufficiently compelling to justify race-based decisionmaking in public education. *Parents Involved*, 551 U.S. at 720. The first is "remedying the effects of past intentional discrimination." *Id.* No one claims the racial imbalance at TJ was the result of past intentional discrimination.

The second is "the interest in diversity in higher education." *Id.* at 722; *see Grutter*, 539 U.S. at 328–329. According to the Supreme Court, this interest is "unique to institutions of higher education" and does not apply to "elementary and secondary schools." *Parents Involved*, 551 U.S. at 724–725; *see also id.* at 725 (calling "the unique context of higher education" and "a specific type of broad-based diversity" "key limitations on [the] holding" of *Grutter*); *id.* at 770–771 (Thomas J., concurring) (*Grutter*'s holding "was critically dependent upon features unique to higher education."). Obviously, that interest cannot apply to TJ. The Policy therefore cannot survive strict scrutiny.

IV.

Because the new admissions Policy for TJ violates the rights of Asian students under the Equal Protection Clause, I would affirm the district court's order granting summary judgment to the Coalition.

None of this freezes the TJ admissions policy in its prior form or forecloses future changes to the school's admissions plan. The Policy's discriminatory purpose and effect are what render it unconstitutional. *Cf. Hunter*, 471 U.S. at 233 (distinguishing the separate question "whether [the law] would be valid if enacted today without any impermissible motivation"). But past discrimination does not, "in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980)). If in the future the Board finds legitimate justifications counsel modification of TJ's admissions policy, the Board is free to act in its best judgment. The Constitution constrains it, however, from making decisions based on race.